# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| DEMOCRACY NORTH CAROLINA, THE LEAGUE OF WOMEN VOTERS OF NORTH CAROLINA, DONNA PERMAR, JOHN P. CLARK, MARGARET B. CATES, LELIA BENTLEY, REGINA WHITNEY EDWARDS, AND ROBERT K. PRIDDY II, | |
| *Plaintiffs,* | |
| *vs.* | Civil Action No. 20-cv-457 |
| THE NORTH CAROLINA STATE BOARD OF ELECTIONS; DAMON CIRCOSTA, in his official capacity as CHAIR OF THE STATE BOARD OF ELECTIONS; STELLA ANDERSON, in her official capacity as SECRETARY OF THE STATE BOARD OF ELECTIONS; KEN RAYMOND, in his official capacity as MEMBER OF THE STATE BOARD OF ELECTIONS; JEFF CARMON III, in his official capacity as MEMBER OF THE STATE BOARD OF ELECTIONS; DAVID C. BLACK, in his official capacity as MEMBER OF THE STATE BOARD OF ELECTIONS; KAREN BRINSON BELL, in her official capacity as EXECUTIVE DIRECTOR OF THE STATE BOARD OF ELECTIONS; THE NORTH CAROLINA DEPARTMENT OF TRANSPORTATION; J. ERIC BOYETTE, in his official capacity as TRANSPORTATION SECRETARY; THE NORTH CAROLINA DEPARTMENT OF HEALTH AND HUMAN SERVICES; MANDY COHEN, in her official capacity as SECRETARY OF HEALTH AND HUMAN SERVICES, | |
| *Defendants.* | |

## COMPLAINT

1

Plaintiffs Democracy North Carolina, the League of Women Voters of North Carolina (together with Democracy North Carolina, the "Organizational Plaintiffs"), and Donna Permar, John P. Clark, Margaret B. Cates, Lelia Bentley, Regina Whitney Edwards, and Robert K. Priddy II, individuals ("Individual Plaintiffs," together with the Organizational Plaintiffs, the "Plaintiffs"), bring this civil rights action under 42 U.S.C. § 1983, the First and Fourteenth Amendments, Title II of the Americans with Disabilities Act (the "ADA"), 42 U.S.C. §§ 12131, *et seq.*, and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, for preliminary and permanent declaratory and injunctive relief against the Defendants the North Carolina State Board of Elections; Damon Circosta, in his official capacity as Chair of the State Board of Elections; Stella Anderson, in her official capacity as Secretary of the State Board of Elections; Ken Raymond, Jeff Carmon III, and David C. Black, all in their official capacities as Members of the State Board of Elections; Karen Brinson Bell, in her official capacity as Executive Director of the State Board of Elections (together the "SBE Defendants"); Defendants the North Carolina Department of Transportation and J. Eric Boyette, in his official capacity as Secretary of the Department of Transportation (the "DOT Defendants"); and Defendants the North Carolina Department of Health and Human Services and Dr. Mandy Cohen, in her official capacity as Secretary of Health and Human Services (the "DHHS Defendants"). Plaintiffs allege as follows:

## NATURE OF ACTION

1.     The COVID-19 pandemic presents an unprecedented challenge to our nation. Caused by a novel coronavirus and transmitted by asymptomatic, otherwise-healthy individuals as well as the symptomatic, this disease threatens the health of millions of

2

Americans, especially elderly people and those with pre-existing medical conditions. As infection and death rates continue to climb, the fallout from COVID-19 has severely strained health care systems, the economy, and all levels and branches of government.

2.      This public health crisis has also endangered the machinery of our democracy by threatening massive disruptions in election administration, especially in a presidential election year that was on track for exceptionally high registration rates and turnout. Many states have already taken drastic measures to counteract the spread of COVID-19 and ensure that eligible voters can cast their ballots safely. North Carolina, however, has failed to act: it has not altered its statutory electoral scheme in order to allow for safe and accessible voting. As a result, millions of North Carolinians will likely either lose their right to vote or be forced to compromise their health in order to access the franchise.

3.      At present, North Carolina's election code imposes numerous restrictions— on voter registration, mail-in absentee ballots, in-person early voting, and Election Day administration—that, in light of the COVID-19 pandemic, unduly burden Plaintiffs' right to vote in violation of the First and Fourteenth Amendments. With respect to voter registration, the pandemic has already caused registration rates to plummet in comparison with previous election years. North Carolina election code and registration practices can be altered to address the voter registration crisis with reasonable accommodations that make registering to vote easier and safer during this public health crisis. For example, North Carolina law requires voters to submit their registration applications at least 25 days prior to the election, or else, register in-person at an early voting site, therefore potentially exposing themselves or their families to infection via COVID-19. By preventing voters

3

from registering in the three weeks leading up to the election, the 25-day registration requirement unconstitutionally burdens the right to vote. Voters cannot be required by their government to choose between registering to vote and preserving their health. Likewise, online voter registration opportunities could be easily expanded to allow voters to register to vote from the safety of their home.

4. Several aspects of North Carolina's cumbersome absentee vote-by-mail regime are unconstitutional because they will require Plaintiffs to risk exposure to COVID-19 and to violate public health social distancing requirements in order to successfully vote by mail. For example, North Carolina requires mail-in absentee voters to complete the ballot in the presence of two witnesses or a notary. To comply, the Individual Plaintiffs will need to expose themselves to individuals outside of their household, thereby risking their health. The two-witness requirement thus creates a severe and unjustified burden on Plaintiffs' right to vote.

5. Finally, certain restrictions on the administration of in-person voting, both during the one-stop absentee voting period (known more commonly as "early voting" and so identified hereinafter) and on Election Day, will produce unsafe conditions for voters. For example, North Carolina requires each county to maintain uniform hours across all early voting sites, regardless of the capacity and demand at each site. This statutory requirement, recently added in June 2018, resulted in a significant reduction in early voting sites in the 2018 general election by inflating costs through the addition of unnecessary hours. This will likewise result in reduced sites and days for early voting in the upcoming 2020 general election because counties will have to close numerous early voting sites to

4

comply with the law and still stay within their budgets. On Election Day, moreover, a majority of poll workers must reside in the precinct where they serve. This "home precinct" requirement will exacerbate shortages of poll workers and lead to precinct consolidation. Both the uniform-hours requirement for early voting sites and the home-precinct requirement for Election Day poll workers will produce unsafe conditions by reducing the number of sites in which voters can cast an in-person vote, which will, in turn, result in long lines and large crowds, as seen in the recent Wisconsin primary election. Further, it is not possible for a state like North Carolina— where historically, the vast majority of voters choose to cast their ballot in person—to shift entirely to vote-by-mail methods in mere months. North Carolina simply lacks the infrastructure necessary to conduct an election predominantly by mail without overwhelming both county election administration systems and the local U.S. Postal Service infrastructure. Immediate steps must be taken to ensure that in-person voting opportunities are preserved and conducted in accordance with public health guidance.

6.     In short, with its high transmission and mortality rates, COVID-19 poses a risk to all voters, especially those who could develop severe complications like some of the Individual Plaintiffs. The pandemic has already decimated voter registration rates and third-party voter registration initiatives, and makes it impossible for voters to comply safely with certain requirements for mail-in absentee voting, including the two-witness or notary requirement. In addition, election officials anticipate severe shortages of poll workers, who justifiably fear contracting the disease, resulting in fewer polling sites. A number of states' election officials, including in North Carolina, have already felt compelled to postpone

primary and other elections by weeks or months in the face of this unprecedented public health emergency.

7.      As of the filing of this complaint, Defendants have failed to implement any election-related measures to mitigate the impact of the COVID-19 crisis on North Carolina's upcoming general election and safeguard the voting rights of countless eligible North Carolina voters.[1] This failure to act, leaving the current electoral structure in place, imposes an undue burden and an unconstitutional condition on the right to vote in violation of the First and Fourteenth Amendments to the U.S. Constitution and a violation of procedural due process. In addition, the State's failure to accommodate the needs of high-risk voters and others violates the ADA and the Rehabilitation Act.

8.      Judicial intervention is warranted now, in advance of the 2020 general election, to ensure that the State has adequate time to implement the measures necessary to ensure that the right to vote may be exercised safely during this global pandemic. North Carolina law sets forth an inflexible calendar of pre-election administrative steps and milestones. For example, mail-in absentee ballots, their container-return envelopes with witness certifications and signature blocks, and instruction sheets must be *available for use* 60 days in advance of a statewide general election and 50 days in advance of all other elections, which in this case would be September 4, 2020. *See* N.C. Gen. Stat. §§ 163-

---

[1] Plaintiffs are aware of at least two bills that have been filed purporting to address a small number of the issues identified in this litigation.  Plaintiffs have no basis to believe that either bill will be enacted into law, certainly not in a timely-enough fashion, and even if they were, those bills are entirely inadequate to address the constitutional violations implicated in this lawsuit.

6

227.10(a), 163-229(b), 163-229(c). This means that all the text and design for mail-in absentee ballots must be finalized well in advance of the 60th or 50th day before an election such that these materials can be timely printed, delivered, and distributed to voters. Moreover, in "emphasiz[ing] that lower federal courts should ordinarily not alter the election rules on the eve of an election," the Supreme Court has suggested that challenges to a state's election administration should be brought as soon as possible. *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205, 1207 (2020) (per curiam).

9. Election administration plans for the June 23, 2020 Republican second primary in Congressional District[2] have unfortunately been irreversibly set in motion. But it is not too late to safeguard the right to vote in November's general election, when the pandemic is expected to resurge and once again threaten the functioning of our democracy.

## JURISDICTION AND VENUE

10. This Court has jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. §§ 1331 and 1343 because this case arises under the U.S. Constitution and the laws of the United States and seeks equitable and other relief for the deprivation of constitutional and federal statutory rights under color of state law.

11. This Court has jurisdiction to award attorneys' fees and costs pursuant to 42 U.S.C. § 1988 and 28 U.S.C. § 1920.

---

[2] N.C. State Bd. of Elections, Emergency Exec. Order (Mar. 20, 2020), https://s3.amazonaws.com/dl.ncsbe.gov/State_Board_Meeting_Docs/Orders/Executive%20Director%20Orders/Order_2020-03-20%20.pdf (rescheduling the Republican second primary in Congressional District 11 from May 12, 2020, to June 23, 2020).

7

12.     This Court has jurisdiction to grant declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202.

13.     Venue is appropriate in the Middle District of North Carolina, under 28 U.S.C. § 1391(b)(1).

## PARTIES

*Plaintiffs*

14.     Plaintiff Democracy North Carolina ("Democracy NC") is a nonpartisan, nonprofit organization dedicated to increasing voter access and participation and reducing the corrupting role of money in politics through research, organizing, and advocacy. Democracy NC's volunteers, who are registered North Carolina voters across every region of the state, form grassroots coalitions and are advocates in communities throughout the state, including Wake County, Edgecombe and Nash Counties (the "Twin Counties"), Alamance County, Mecklenburg County, Fayetteville, Wilmington, Winston-Salem, Asheville, New Bern, Salisbury and Greenville. Democracy NC works for pro-democracy reforms that strengthen the enforcement of election laws, protect voting rights, and improve government accountability and ethics. Democracy NC engages in substantial election protection efforts to ensure that voters are able to access the ballot, and spends substantial time and effort producing voter guides to educate voters about the candidates that will be on their ballots. Democracy NC advocates spend thousands of hours fighting for more early voting sites and times to ensure that all voters have easy access to the franchise. In previous elections, Democracy NC has also run rides-to-the-polls programs to ensure that voters who lacked transportation and could not or did not want to use mail-in absentee voting

8

could nonetheless cast a ballot. Through original research, policy advocacy, grassroots organizing, civic engagement, and leadership training, Democracy NC seeks to achieve a fair and representative political system and advance a just and equitable North Carolina.

15. Plaintiff the League of Women Voters of North Carolina ("LWVNC") is a nonpartisan community-based organization, formed in 1920, immediately after the enactment of the Nineteenth Amendment to the U.S. Constitution granting women's suffrage. The LWVNC is dedicated to encouraging its members and the people of North Carolina to exercise their right to vote as protected by the U.S. Constitution and the Voting Rights Act of 1965. The LWVNC's mission is to promote political responsibility through informed and active participation in government and to act on selected governmental issues. The LWVNC impacts public policies, promotes citizen education, and makes democracy work by, among other things, removing unnecessary barriers to full participation in the electoral process. Currently the LWVNC has 17 local leagues and over 1,912 members, each of whom, on information and belief, is a registered voter in North Carolina. The LWVNC is affiliated with the League of Women Voters of the United States, which was also founded in 1920. The LWVNC began as an organization focused on training women voters, and has evolved into an organization concerned with educating, advocating for, and empowering all North Carolinians. With members in almost every county in the state, the LWVNC's local leagues are engaged in numerous activities, including hosting public forums and open discussions on important issues to the community. Individual League members invest substantial time and effort in voter training and civic engagement activities, such as voter registration assistance and get-out-the-vote

9

(GOTV) efforts leading up to elections, including during the early voting period. The LWVNC has developed a First Time Voter Engagement Program, which partners with local election boards and schools to encourage young voters to register to vote. The LWVNC also devotes substantial time and effort to ensuring that government at every level works as effectively and as fairly as possible in implementing voting regulations and procedures. To do so, the LWVNC advocates to make elections more transparent, to support a strong and diverse judiciary, and to urge for appropriate government oversight.

16.     Plaintiff Donna Permar is a U.S. Citizen and a Durham County resident who is completely blind and lives with her spouse who is also completely blind. Ms. Permar is a registered voter who is eligible to vote in the November 2020 general election. Ms. Permar only feels confident voting in-person and thus relies on polling places being open and accessible by public transportation. Ms. Permar must utilize an ADA-compliant machine in order to vote, because she cannot fill out an absentee ballot with confidence or privacy.

17.     Plaintiff John P. Clark is a U.S. citizen and a resident of the town of Apex in Wake County, North Carolina. He is 79 years old and a registered North Carolina voter who is eligible to vote in the November 2020 general election. He has severe chronic obstructive pulmonary disease ("COPD") and has lived with this disease, which severely limits his activities, for the last 12 years. Whenever he is active at all, walking around or working in the yard, he carries an oxygen tank. He can walk only two blocks, even with oxygen. He has also become more susceptible to exacerbated bouts of pneumonia, contracting it about four times in the last six years. The most recent episode was in January

10

2020, which has caused a further deterioration of his respiratory condition. COPD makes him more vulnerable to severe complications or even death from COVID-19 and, therefore, it is too high a risk for him to vote in person. It is a necessity that he vote by absentee ballot in the November general election. To avoid any risk of contracting COVID-19, Mr. Clark has been quarantined along with his wife for approximately the last eight weeks. He lives with his wife, and the only people who have entered their house during the lockdown have been three service people whom he completely avoids. He and his wife never leave their property except for necessary medical appointments, short walks, and occasional drives including a weekly trip to the grocery store, during which Mr. Clark stays in the vehicle. He has voted in every presidential election since 1968, and votes regularly in state and local elections. He wants to vote in the November 2020 general election and has already applied for his mail-in absentee ballot. His wife could serve as one witness for his mail-in absentee ballot, but Mr. Clark could not safely obtain a second witness, given his COPD and the risk COVID-19 poses to Mr. Clark's life. Each person he interacts with poses an additional, serious risk to his life. Given the two-witness-signature requirement, he does not know how he can safely cast a ballot by mail, and he cannot safely vote in person.

18.     Margaret B. Cates is a U.S. citizen and a resident of the Town of Faison in Duplin County, North Carolina. She is 85 years old and a registered North Carolina voter who is eligible to vote in the November 2020 general election. She lives alone and has had chronic fatigue syndrome for the last 27 years since 1993. This is a severely debilitating disease and has severely curtailed Ms. Cates' ability to move about and be active. Today, she is in poor health, having suffered several falls recently and a urinary tract infection that

she has been fighting for a year. As a result, she has been weak, using a walker in the house, and bedridden for twelve hours at night and for two in the afternoon. Ms. Cates has not left her house in three months, except to go to a doctor's appointment right before March and before the social distancing guidelines were put in place. She has voted in every presidential election since 1956, and also votes in many state and local elections. She wants to vote in the November 2020 general election, and she has never voted by mail. Under the current North Carolina election procedures, there is no way for Ms. Cates to request an absentee ballot online. If this option were available, with some assistance, she could and would request a ballot that way. She would also be able to request a ballot by phone call. Her nearest family member is her son, who lives a two-hour drive away in Southern Pines, North Carolina. Without an online or phone option to request an absentee ballot, Ms. Cates cannot request an absentee ballot on her own and would depend on others to mail or otherwise provide it to her. As to the two-witness requirement, Ms. Cates' assistant—who comes to the house to help with daily tasks and is the only person to enter Ms. Cates' home—could serve as one witness for her absentee ballot, but Ms. Cates cannot take the additional risk of securing a second witness given her poor health and debilitated state. Each additional person she interacts with poses a risk to her life. Voting in person is not an option for her, as it would pose too much of a risk to her health. Given the current rules for voting by mail, she does not know how she will safely cast a ballot by mail in the upcoming election.

19.     Lelia Bentley is a U.S. Citizen and a 62-year-old registered voter in Wilkesboro who lives on her own. She has been diagnosed with hypertension, which she

controls through diet, exercise, and meditation. About once a year, Ms. Bentley develops a cold, which often progresses to include symptoms like sinus and chest congestion, a hacking cough, and shortness of breath. As a result of her medical history, she has been self-isolating at her home since March 10. Consistent with the Governor's stay-at-home order, she does not leave her home unless absolutely necessary. Since March 15, if she has needed groceries, she has ordered them online and had them delivered. Ms. Bentley does not know if she can satisfy the two-witness requirement in order to request and cast an absentee mail-in ballot. She has observed some of her neighbors breaking social distancing guidelines, including hosting social gatherings in their homes. Other neighbors are themselves self-isolating in order to protect elderly family members and she worries that, even if they would agree to be her witnesses, she could accidentally expose them to the virus, in spite of the precautions she has been taking. She does not know if her remaining neighbors have been taking appropriate precautions to prevent contracting the novel coronavirus, and therefore does not feel safe asking them to be witnesses. Even if she can obtain two witnesses, she does not know if she will risk contact with them in order to vote because she fears that it will lead her to contract COVID-19. Ms. Bentley will not vote in person because that would be too much of a risk to her health. She does not know what she will do if she cannot vote by mail.

20.     Regina Whitney Edwards is a U.S. citizen and resident of Durham County. She is 30 years old and a registered North Carolina voter who is eligible to vote in the November 2020 general election. She is at high risk of developing severe illness from COVID-19 because she has a serious pre-existing medical condition, type 1 diabetes. She

13

has had type 1 diabetes for 21 years. To protect her health from the impact of COVID-19, she has remained at home since mid-March and has not seen another person except her partner, whom she lives with. She is uncomfortable leaving her home or being in proximity to people other than her partner. She has voted in multiple elections in North Carolina. But for the threat of COVID-19, she would vote in the November 2020 general election in person. Because of the pandemic and the health risks posed by in-person voting, she is not willing to vote in person during the November 2020 general election, and instead would like to vote by mail-in absentee ballot to protect her health. Ms. Edwards cannot safely comply with North Carolina's two-witness requirement. Her partner is available to serve as the first witness, but she is not willing to jeopardize her physical well-being by asking another person to serve as the second witness. Although she strongly wishes to vote in the November 2020 general election, she will not do so if the two-witness requirement remains in effect.

21.    Robert K. Priddy II is a U.S. citizen and a resident of Brunswick County. He is a 70-year-old registered North Carolina voter who is eligible to vote in the November 2020 general election. He is at high risk of developing severe illness from the novel coronavirus because he has several serious pre-existing health conditions, and because of his age. In 2010, he received a kidney transplant. To ensure that his body does not reject the transplant, he takes medication that suppresses his immune system. The medication also causes borderline diabetic issues, so he receives treatment for diabetes. To protect his health, Mr. Priddy's doctor has advised him to stay home and avoid contact with people outside his household. He has remained at home since mid-March. He relies on his wife to

14

shop for groceries and run other errands. The only time he has gone outside since mid-March was to pick up prescriptions from a drive-thru pharmacy, during which he remained in his vehicle without interacting directly with the pharmacist. He is uncomfortable leaving his home or being in close proximity to people other than his wife. He has voted in numerous elections in North Carolina. But for the threat of COVID-19, he would vote in the November 2020 general election in person. Because of the pandemic and the health risks posed by in-person voting, he is not willing to vote in person in the November 2020 general election. He would like to vote by mail-in absentee ballot, but he cannot safely comply with North Carolina's two-witness requirement. His wife is available to serve as the first witness, but he would have to jeopardize his physical well-being to ask another person to serve as the second witness. Although he strongly wishes to vote in the November 2020 general election, his health will be at risk if the two-witness requirement remains in effect, and he is not sure he will be able to vote.

*Defendants*

22.     Defendant North Carolina State Board of Elections is the agency responsible for the administration of the election laws of the State of North Carolina.

23.     Defendant Damon Circosta is the Chair of the North Carolina State Board of Elections. Mr. Circosta is sued in his official capacity.

24.     Stella Anderson is the Secretary of the North Carolina State Board of Elections. Ms. Anderson is sued in her official capacity.

25.     Ken Raymond is a Member of the North Carolina State Board of Elections. Mr. Raymond is sued in his official capacity.

15

26. Jeff Carmon III is a Member of the North Carolina State Board of Elections. Mr. Carmon is sued in his official capacity.

27. David C. Black is a Member of the North Carolina State Board of Elections. Mr. Black is sued in his official capacity.

28. Defendant Karen Brinson Bell is the Executive Director of the North Carolina State Board of Elections. Ms. Brinson is sued in her official capacity.

29. The North Carolina Department of Transportation is the agency that implements the online voter registration system in the State of North Carolina.

30. J. Eric Boyette is the Secretary of the North Carolina Department of Transportation. Mr. Boyette is sued in his official capacity.

31. The North Carolina Department of Health and Human Services is the agency that administers online public benefits renewal in the State of North Carolina.

32. Dr. Mandy Cohen is the Secretary of the North Carolina Department of Health and Human Services. Dr. Cohen is sued in her official capacity.

## STATEMENT OF FACTS

I. **The COVID-19 Pandemic**

A. **COVID-19**

33. In December 2019, health officials in mainland China detected a novel coronavirus, SARS-CoV-2, which causes a disease known as COVID-19. On January 30, 2020, the World Health Organization ("WHO") declared COVID-19 to be a Public Health Emergency of International Concern. On March 11, 2020, the WHO declared that it had

16

become a pandemic. COVID-19 has now spread throughout the world, including to every state in the United States and to every county in North Carolina.

34. The novel coronavirus that causes COVID-19 continues to spread at an unprecedented pace around the world and within the United States. As of May 21, 2020, there were 1,551,095 confirmed cases in the United States, and there have been 93,061 deaths nationwide.[3] As of May 22, 2020, the North Carolina Department of Health and Human Services had confirmed 21,618 positive cases of coronavirus and 728 deaths in North Carolina.[4]

35. COVID-19 appears to be much more contagious than other respiratory illnesses, such as influenza, SARS, or MERS, in significant part because of its capacity for asymptomatic transmission, and substantially more lethal than influenza.

36. According to the U.S. Centers for Disease Control and Prevention, ("CDC"), individuals are at higher risk of severe complications and death from COVID-19 if they are 65 years old or older or have underlying health conditions and diseases, including chronic lung disease, moderate to severe asthma, serious heart conditions, severe obesity (body mass index ("BMI") of 40 or higher), diabetes, chronic kidney disease undergoing dialysis, liver disease, and other health conditions that suppress immune systems like

---

[3] Coronavirus Disease 2019 (COVID-19), *Cases in the U.S.*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html (last updated May 21, 2020).

[4] COVID-19 Response, *COVID-19 North Carolina Dashboard*, NCDHHS, https://www.ncdhhs.gov/divisions/public-health/covid19/covid-19-nc-case-count (last updated May 22, 2020, at 10:51am).

17

HIV/AIDS.[5] The CDC's website, relying upon research from the National Center for Immunization and Respiratory Diseases ("NCIRD"), Division of Viral Diseases, notes that immunocompromised individuals are at severe risk from COVID-19: "Many conditions can cause a person to be immunocompromised, including cancer treatment, smoking, bone marrow or organ transplantation, immune deficiencies, poorly controlled HIV or AIDS, and prolonged use of corticosteroids and other immune weakening medications."[6]

37. Severe COVID-19 cases can cause a wide variety of secondary infections and pathologies, including but not limited to: pneumonia, acute respiratory distress syndrome, kidney failure, liver failure, strokes, heart attacks, cardiac inflammation, and gastrointestinal infections, among others.[7] Furthermore, everyone is at some risk of severe complications and death from COVID-19, as health officials have recently associated COVID-19 with pulmonary embolism and stroke in younger patients without known risk

---

[5] Coronavirus Disease 2019 (COVID-19), *People Who Are at Higher Risk for Severe Illness*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/specific-groups/people-at-higher-risk.html (last updated May 14, 2020).

[6] *Id.*

[7] Meredith Wadman et al., *How does coronavirus kill? Clinicians trace a ferocious rampage through the body, from brain to toes,* SCIENCE (Apr. 17, 2020), https://www.sciencemag.org/news/2020/04/how-does-coronavirus-kill-clinicians-trace-ferocious-rampage-through-body-brain-toes.

factors[8] and subsequent inflammatory disease in young children.[9] In critical cases, some patients need to be intubated and put on a ventilator. Many critical care patients ultimately die. There is also evidence that individuals of color are dying of COVID-19 at a higher rate than other demographic groups.[10]

38.     The CDC has warned that asymptomatic COVID-19-positive individuals can transmit the disease to others.[11] Studies have confirmed this.[12] As a result, individuals can spread the disease for a week or more before realizing they are infected, facilitating rapid contagion. Currently, there are no therapeutic treatments or vaccinations that have been shown to significantly alter the trajectory of the COVID-19 outbreak. Leading epidemiology experts anticipate that the pandemic will continue into fall and winter of 2020, and potentially well into 2021.

---

[8] Robert Glatter, M.D., *Why is COVID-19 Coronavirus Causing Strokes in Young And Middle-Aged People?*, FORBES (Apr. 27, 2020), https://www.forbes.com/sites/robertglatter/2020/04/27/why-is-covid-19-coronavirus-causing-strokes-in-young-and-middle-aged-people/#598e78fe34df.

[9] Pam Belluck, *New Inflammatory Condition in Children Probably Linked to Coronavirus, Study Finds*, N. Y. TIMES (May 13, 2020), https://www.nytimes.com/2020/05/13/health/coronavirus-children-kawasaki-pmis.html.

[10] Shelby Lin Erdman, *Black Communities Account for Disproportionate Number of Covid-19 Deaths in the US, study finds*, CNN (May 6, 2020), https://www.cnn.com/2020/05/05/health/coronavirus-african-americans-study/index.html.

[11] Coronavirus 2019 (COVID-19), *Prevent Getting Sick: How COVID-19 Spreads*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/prepare/transmission.html (last updated Apr. 13, 2020).

[12] Mary Van Beusekom, *Studies profile lung changes in asymptomatic COVID-19, viral loads in patient samples*, CTR. FOR INFECTIONS DISEASE RESEARCH & POL'Y, UNIV. OF MINN. (Feb. 25, 2020), http://www.cidrap.umn.edu/news-perspective/2020/02/studies-profile-lung-changes-asymptomatic-covid-19-viral-loads-patient.

19

### B.    North Carolina's Response to COVID-19

39.    In North Carolina, Governor Cooper declared a State of Emergency on March 10, 2020, which remains in effect as of the date of this filing. Within a week thereafter, the Governor imposed social distancing guidelines for individuals and businesses, closed public schools, and prohibited mass gatherings.

40.    Governor Cooper has announced a three-phase plan to slowly ease restrictions in North Carolina that will depend on whether North Carolina has successfully met key metrics regarding infection in the state.[13] On May 5, 2020, Governor Cooper issued an executive order modifying North Carolina's stay at home order and transitioning the state to "Phase 1" of slowly easing certain COVID-19 restrictions.[14] This order advised North Carolinians to maintain six-feet social distancing from non-family or household members and encouraged high risk individuals to stay home and travel only for "absolutely essential purposes."[15] On May 20, 2020, the Governor issued an order moving North Carolina into "Phase 2" and superseding the Phase 1 order.[16] The Phase 2 Order notes that "the risk of contracting and transmitting COVID-19 is higher in settings that are indoors,

---

[13] Press Release, North Carolina Office of the Governor, *Governor Extends Stay At Home Order Through May 8, Plans Three Phase Lifting of Restrictions Based on Virus Trends* (Apr. 23, 2020), https://governor.nc.gov/news/governor-extends-stay-home-order-through-may-8-plans-three-phase-lifting-restrictions-based.

[14] Governor Roy Cooper, Exec. Order No. 138 (May 5, 2020), https://files.nc.gov/governor/documents/files/EO138-Phase-1.pdf.

[15] *Id.*

[16] Governor Roy Cooper, Exec. Order No. 141 (May 20, 2020), https://htv-prod-media.s3.amazonaws.com/files/eo141-phase-2-1590009188.pdf.

Case 1:20-cv-00457   Document 1   Filed 05/22/20   Page 20 of 72

where air does not circulate freely and where people are less likely to maintain social distancing by staying six (6) feet apart," and "very strongly encourage[s]" individuals at high risk of severe illness, including those 65 years or older and with underlying medical conditions, to stay home and travel only for "absolutely essential purposes."[17] It maintains the prior guidance that individuals maintain at least six feet of social distancing from other individuals, and requires businesses to limit occupancy and take other measures promoting social distancing. It also encourages individuals, including restaurant workers and personal care patrons, to wear face coverings. Mass gatherings of more than 10 people indoors and 25 people outdoors remain prohibited.[18]

41. The Governor has also issued an executive order allowing non-profit corporations incorporated under the laws of the State of North Carolina to vote on matters by electronic balloting to "prevent members and directors from having to gather in a place, and thereby to promote social distancing and the mitigation of the spread of COVID-19."[19]

42. The DHHS Defendants similarly recommend that individuals "put distance between yourself and other people" and advise, "[t]he very best evidence on reducing the spread is to maintain social distance and stay at home."[20]

---

[17] *Id.*

[18] *Id.*

[19] Governor Roy Cooper, Exec. Order. No. 136 (Apr. 24, 2020), https://files.nc.gov/governor/documents/files/EO136-Nonprofit-Corp.pdf.

[20] COVID-19 Response, *Individuals and Families*, NCDHHS, https://www.ncdhhs.gov/divisions/public-health/covid19/individuals-and-families (last accessed May 19, 2020).

21

43.     These measures are far from temporary and similar measures will likely be required for the remainder of 2020. Governor Cooper's current Phase 2 executive order notes that "it may be necessary to reinstate certain restrictions eased by this Executive Order,"[21] and, in any event, even the final "Phase 3" guidelines encourage social distancing and minimizing exposure, and any spike in infections may require tightening restrictions again.[22]

44.     Epidemiologists and infectious disease specialists have already concluded that there will very likely be a COVID-19 resurgence in the United States this fall. Dr. Anthony Fauci, Director of the National Institute of Allergy and Infectious Diseases, has said a second wave of infections in the United States is "inevitable."[23] South Korea, Germany, and China are already seeing a resurgence of COVID-19 after loosening restrictions in response to declining new COVID-19 cases. Pointing to the spread of COVID-19 cases in southern hemisphere countries as those regions enter their winter seasons, Dr. Fauci remarked, "And if, in fact, they have a substantial outbreak, it will be

---

[21] Governor Roy Cooper, Exec. Order No. 141 (May 20, 2020), https://htv-prod-media.s3.amazonaws.com/files/eo141-phase-2-1590009188.pdf.

[22] *Id.*

[23] Miriam Berger et al., *Drug trial shows modest benefits in treating coronavirus, Fauci says*, WASH. POST (Apr. 20, 2020), https://www.washingtonpost.com/world/2020/04/29/coronavirus-latest-news/; *see also Remarks by President Trump, Vice President Pence, and Members of the Coronavirus Task Force in Press Briefing*, WHITE HOUSE (Mar. 25, 2020), https://www.whitehouse.gov/briefings-statements/remarks-president-trump-vice-president-pence-members-coronavirus-task-force-press-briefing-11/.

inevitable that we need to be prepared that we'll get a cycle around the second time."[24] He concluded, "[W]e really need to be prepared for another cycle."[25] Furthermore, experts from the Harvard T.H. Chan School of Public Health's Center for Communicable Disease Dynamics warned that, to avoid exceeding hospital critical care capacities, prolonged or intermittent social distancing may be necessary into 2022.[26]

## C. Inadequacies in North Carolina's Administration of the Upcoming 2020 General Election in Light of the COVID-19 Pandemic

45.     The general election for all federal offices, including the presidential election, will be held on November 3, 2020. COVID-19 will have an unprecedented impact on this upcoming election. Even before the COVID-19 pandemic, the Brookings Institution predicted that "turnout in 2020 could break all records and test our election machinery as it has never been tested before."[27] Other experts also anticipate record-breaking turnout in the 2020 presidential election.[28]

---

[24] *Id.*

[25] *Id.*

[26] Stephen M. Kissler et al., *Projecting the transmission dynamics of SARS-CoV-2 through the postpandemic period*, SCIENCE (Apr. 14, 2020), https://science.sciencemag.org/content/early/2020/04/24/science.abb5793.

[27] William A. Galston, *What does high voter turnout tell us about the 2020 elections?*, BROOKINGS INST. (Nov. 20, 2019), https://www.brookings.edu/blog/fixgov/2019/11/20/what-does-high-voter-turnout-tell-us-about-the-2020-elections/.

[28] *See, e.g.*, Susan Milligan, *Preparing for a Voter Surge*, U.S. NEWS & WORLD REPORT (Sept. 20, 2019), https://www.usnews.com/news/elections/articles/2019-09-20/experts-predict-huge-turnout-in-2020; Nate Cohn, *Huge Turnout Is Expected in 2020. So Which Party Would Benefit?*, N.Y. TIMES (July 15, 2019), https://www.nytimes.com/2019/07/15/upshot/2020-election-turnout-analysis.html; Ronald Brownstein, *Brace for a Voter-Turnout Tsunami*, THE ATLANTIC (June 13, 2019),

23

46.     North Carolina's election laws and procedures are not designed to facilitate safe, fair, and free elections during such a public health crisis, and the legislature has failed to take action to remedy this situation. Given the rapidly spreading infection, North Carolina's current election laws will force voters to choose between exposing themselves to severe risks to their health and exercising their constitutionally-protected right to vote.

47.     The inadequacies of North Carolina's election laws and procedures to facilitate safe, free, and fair voting during a pandemic have not gone unnoticed by state and county election officials. On March 26, 2020, Defendant Karen Brinson Bell, Executive Director of the North Carolina State Board of Elections, wrote to Governor Cooper and the leadership in North Carolina's General Assembly requesting statutory changes to address the impact of the COVID-19 pandemic on North Carolina's upcoming elections.[29] Among other recommendations, Defendant Bell requested (*i*) expanding options for voters to submit mail-in absentee ballot requests beyond the current mail-only option to enable requests by fax, email, and an online portal; (*ii*) establishing a fund to pay for postage for returned absentee ballots; (*iii*) reducing or eliminating the requirement that two witnesses sign an absentee mail container envelope in order for the ballot to be counted; (*iv*) lifting the requirement that a majority of Election Day poll workers reside in the precinct in which they work; and (*v*) lifting the uniformity requirement for early voting sites, days and hours.

---

https://www.theatlantic.com/politics/archive/2019/06/2020-election-voter-turnout-could-be-record-breaking/591607/.

[29] Letter from Karen Brinson Bell, Exec. Dir., N.C. State Bd. of Elections, to Governor Roy Cooper et al. (Mar. 26, 2020) (Exhibit 1).

In a follow-up letter sent April 22, 2020, Defendant Bell emphasized that changes were required immediately during the April 28 legislative session of the General Assembly in order to be effective for North Carolina's 2020 elections, including the 2020 general election.[30]

48.　　On April 27, 2020, dozens of county board of elections officials from eleven counties in North Carolina's 11th Congressional District similarly issued an "urgent request" of North Carolina's legislators to protect upcoming elections.[31] They warned that regular poll workers were "reluctant to serve" during the pandemic given that a large percentage of them are elderly and at higher risk of severe complications and death from COVID-19. These county officials requested that the legislators eliminate the requirement that a majority of poll workers reside in the precinct in which they serve and instead permit officials to recruit poll workers from anywhere in the entire county.

### D.　　Voter Registration

49.　　Those eligible to vote in North Carolina can register in person, by mail, or, under some circumstances, online with the Department of Motor Vehicles ("DMV"), a division of Defendant the North Carolina Department of Transportation.[32] To register by mail, eligible voters can download a voter registration form from the State Board of

---

[30] *See* Letter from Karen Brinson Bell, Exec. Dir., N.C. State Bd. of Elections, to Governor Roy Cooper et al. (Apr. 22, 2020) (Exhibit 2).

[31] Letter from Board of Elections Members in Congressional District 11 to General Assembly Leaders et al. (Apr. 29, 2020) (Exhibit 3).

[32] *See Registering to Vote in North Carolina,* N.C. State Bd. of Elections, https://www.ncsbe.gov/Voters/Registering-to-Vote (last accessed May 20, 2020).

Elections website and then print, complete, and sign the form. Voters cannot submit this form electronically and they must mail in the original form with a wet-ink signature to the local county board of elections. *See* N.C. Gen. Stat. § 163-82.6(c). Voters must also include their drivers license number, non-driver identification card, or last four digits of their Social Security number. *See* N.C. Gen. Stat. § 163-230.2.

50. Alternatively, eligible voters who are existing DMV customers with a North Carolina drivers license or DMV-issued ID may register to vote online. *See* N.C. Gen. Stat. § 163-82.19. Until recently, this option required users to complete a DMV transaction, such as a license renewal or duplicate, at the same time.[33] For this registration method, voter registration applications must be submitted at least 25 days before the election in which the voter wishes to cast a ballot.[34]

51. Eligible voters may also register to vote through certain state agencies such as the Division of Social Services, Division of Public Health/WIC, and Division of Services for the Blind—all divisions of Defendant N.C. Department of Health and Human Services—among others. *See* N.C. Gen. Stat. §§ 163-82.20 – 82.23.[35] Voters may submit forms to state agencies in lieu of mailing the application but must do so at least 25 days

---

[33] *See* Press Release, N.C. State Bd. of Elections, *State Board, DMV Partner to Expand Online Voter Registration Service* (Mar. 30, 2020), https://www.ncsbe.gov/Press-Releases?udt_2226_param_detail=2195.

[34] *See also Registering to Vote in North Carolina,* N.C. State Bd. of Elections, https://www.ncsbe.gov/Voters/Registering-to-Vote (last visited May 19, 2020) ("Voter registration applications submitted [through the DMV] fewer than 25 days before an election will not be processed until after the election.")

[35] *See NVRA Agency Forms,* N.C. State Bd. of Elections, https://www.ncsbe.gov/Voter-Registration/NVRA (last accessed May 19, 2020).

before the election in which they wish to vote, *see* N.C. Gen. Stat. § 163-82.20(g), (h), and may not do so online, even though those agencies, upon information and belief, possess "wet-ink" signatures for those customers.

52.     Finally, voters may register in person at an early voting site using same-day registration with valid identification.[36] This option is available up until the last Saturday before the election. *See* N.C. Gen. Stat. § 163-227.2(b)

53.     The COVID-19 pandemic and resulting stay-at-home orders in North Carolina have significantly hindered third-party voter registration efforts for the 2020 general election. For example, Plaintiff LWVNC has had to cancel and otherwise reduce its in-person voter registration initiatives, which typically comprise a significant portion of its voter registration efforts. Plaintiff Democracy NC has had to cancel its in-person voter education forums where voter registration forms are usually provided. Furthermore, voters' ability to access the resources needed to register to vote—whether they be printers, postage, and access to a post-office box, state agency, county board of election or the DMV—have also been significantly hindered by the COVID-19 pandemic. As a result, voter registration is significantly lagging this year as compared to previous general election years. While January 2020 showed an approximately 162 percent *increase* in registrations compared to

---

[36] *One-Stop Early Voting; Same-Day Registration*, N.C. State Bd. of Elections, https://www.ncsbe.gov/Voting-Options/One-Stop-Early-Voting (last accessed May 20, 2020).

27

January 2016 (indicating increased intent to vote in this election cycle), April 2020 showed an approximately 50 percent *decrease* in voter registrations compared to April 2016.[37]

### E. Absentee Vote-By-Mail

54.     There will be a dramatic increase in the number and proportion of mail-in absentee ballots cast in the upcoming 2020 elections. While North Carolina permits all registered voters to cast an absentee ballot if they choose, *see* N.C. Gen. Stat. § 163-226(a), recently-enacted restrictions on absentee voting as well as other pre-existing provisions in the North Carolina election code impose undue burdens on voters wishing to cast mail-in absentee ballots in light of the current pandemic, and will force voters to choose whether to exercise their right to vote or protect their health.

55.     Wisconsin's recent election, which was held after its governor declared state of emergency in response to COVID-19, shows that there will likely be an increased use of mail-in ballots in North Carolina.  Like North Carolina, Wisconsin does not require an excuse to vote by mail. In its April 7, 2020 spring election, nearly 1.3 million registered Wisconsin voters requested a mail-in ballot,[38] the most in the state's history. Of the 1.6 million voters who cast ballots in the spring election,[39] more than 70 percent, that is 1.1

---

[37]*See* N.C. State Bd. of Elections, *NVRA Data (2008 to present)*, https://s3.amazonaws.com/dl.ncsbe.gov/NVRA/nvra_stats_all.txt. This data file is accessible by going to https://www.ncsbe.gov/Public-Records-Data-Info/Election-Results-Data and navigating to "FTP Site" → "NVRA" → "NVRA_stats_all.txt".

[38] *Absentee Ballot Report - April 7, 2020 Spring Election and Presidential Preference Primary*, WIS. ELECTIONS COMM'N (Apr. 16, 2020), https://elections.wi.gov/node/6856.

[39] *Unofficial Spring Election Turnout - 34.3 % - 4/14/2020*, WIS. ELECTIONS COMM'N, https://elections.wi.gov/blog (last accessed May 21, 2020).

28

million, voted by mail-in absentee ballot.[40] This was a dramatic increase from the percentage of mail-in absentee ballots cast in the 2016 presidential primary election, in which mail-in absentee ballots made up just 11.8 percent of total ballots cast.[41]

56.     Defendant North Carolina State Board of Elections anticipates a similar dramatic increase in mail-in absentee voting in 2020 to 30 to 40 percent,[42] and thus needs to prepare for such an increase. As it currently stands, North Carolina's election code imposes severe burdens to voters who need to cast absentee mail-in ballots, in light of the current pandemic, and to the expected influx of voters wishing to vote by mail for the first time.

### 1.     Senate Bill 683

57.     North Carolina law has permitted all eligible citizens to vote by mail in all federal and state elections since 2001. *See* N.C. Gen. Stat. § 163-226(a). Voters must submit a completed State Absentee Ballot Request Form to their county board of elections in order to receive an absentee ballot.  N.C. Gen. Stat. § 163-230.2(a).

58.     In November 2019 North Carolina made it significantly more cumbersome for its voters to cast absentee ballots by mail by enacting Senate Bill 683. *See* An Act to Amend the Laws Governing Mail-In Absentee Ballots ("SB 683"), S.L. 2019-239, § 1

---

[40] *Updated municipal absentee ballot data*, WIS. ELECTIONS COMM'N, https://elections.wi.gov/blog (last updated 4/13/20 9:35am).

[41] *Absentee Ballot Requests for April 7 Exceed 1 million - COVID-19*, WIS. ELECTIONS COMM'N (Apr. 1, 2020), https://elections.wi.gov/node/6802.

[42] *See* Letter from Karen Brinson Bell, Exec. Dir., N.C. State Bd. of Elections, to Governor Roy Cooper et al. (Apr. 22, 2020) (Exhibit 2).

(Nov. 6, 2019).[43] Among other provisions, SB 683 imposes restrictions on who can assist voters with completing mail-in absentee ballot request forms. *See* S.B. 683 § 1.3(a) (amending N.C. Gen. Stat. § 163-230.2(e), (e1)). Requests are invalid if "completed partially or in whole, or signed by anyone other than the voter, or the voter's near relative or verifiable legal guardian." N.C. Gen. Stat. § 163-230.2 (e)(2). Members of multi-partisan teams ("MATs") trained and authorized by county boards of elections may assist in completion of the request, *id.*, but in certain North Carolina counties, the availability of MATs has been inadequate. Voters requiring assistance to complete the written request form due to blindness, disability, or inability to read or write may request another person if "there is not a near relative or legal guardian available to assist that voter." N.C. Gen. Stat. § 163-230.2(e1).

59.     There are also restrictions on who may help return a completed absentee ballot request. Under N.C. Gen. Stat. § 163-230.2(c), the completed request form may only be delivered to the county board of elections by the voter, the voter's near relative or verifiable legal guardian, or a MAT team member. Unlike for completing an absentee ballot request form, there is no exception in the statute for a voter who needs assistance with returning the request form by reason of their blindness, disability, or inability to read or write. *See* N.C. Gen. Stat. § 163-230.2 (e)(4).

60.     Strangely, North Carolina law imposes greater restrictions on completing and submitting absentee ballot *applications* than exist under North Carolina law for returned,

---

[43] *See* https://www.ncleg.gov/EnactedLegislation/SessionLaws/PDF/2019-2020/SL2019-239.pdf.

completed absentee ballots, for which a voter may obtain assistance from a third party who is not a near relative or legal guardian. *See* N.C. Gen. Stat. §§ 163-226.3(a), 163-229(b)(4), 163-231(a). By doing so, SB 683 has effectively banned organizations like LWVNC from assisting voters with requesting absentee ballots. This is especially damaging where, as here, the State Board expects a dramatic increase in voting-by-mail, indicating that many individuals will be seeking to vote by mail for the first time. Without assistance by organizations like LWVNC, which was available up until SB 683's passage in late 2019, many of these voters will lack needed assistance to navigating the ballot request process during a time when that assistance is crucial to ensuring individuals can vote safely.

### 2. Two-Witness Requirement

61.     North Carolina's two-witness or notary requirement for mail-in absentee voting will also force voters to decide whether to break quarantine or violate social-distancing directives, and thereby risk their own health, in order to successfully cast a ballot this year. Among other requirements, North Carolina election law requires that an individual voting an absentee ballot do so "[i]n the presence of two persons who are at least 18 years of age." N.C. Gen. Stat. § 163-231(a).[44] The only alternative is to obtain the signature of a notary public. *Id*. However, during the current pandemic a notary public is not a viable option for many voters because many businesses are closed and the recent

---

[44] Other restrictions include prohibiting any candidate for nomination or election from serving as a witness unless the voter is the candidate's near relative, prohibiting owners, managers, directors, employees of any hospital, clinic, nursing home, or rest home from witnessing for a voter who is a patient or resident, and certain office-holders. *See* N.C. Gen. Stat. §§ 163-226.3(a)(4) and 163-237(b)(1).

31

exclusion of absentee ballots from the recent COVID response bill allowing for electronic notaries. *See* An Act to Provide Aid to North Carolinians in Response to the Coronavirus Disease (COVID-19) Crisis, S.L. 2020-3 § 4.1(c) (May 4, 2020).[45] Accordingly, even when they do have access to a notary public, individuals again would have to breach social-distancing measures and leave their home to have their ballot notarized.

62.  North Carolina is one of just twelve states that requires a witness or notary to observe the voter casting the absentee ballot and then sign the ballot's certificate envelope and one of just three states that requires two witnesses.[46] In a time when social distancing is a crucial measure to protect public health, the two-witness requirement unconstitutionally forces individuals to choose between voting through an absentee mail-in ballot that will count or protecting their health, and constitutes an insurmountable hurdle for many eligible North Carolina voters seeking to protect their health and the health of

---

[45] *See* https://www.ncleg.gov/EnactedLegislation/SessionLaws/PDF/2019-2020/SL2020-3.pdf (at PDF p. 31) ("Nothing in this section shall apply to any notarization under Article 20 of Chapter 163 of the General Statutes [regarding absentee ballots].").

[46] *See* Ala. Code §§ 17-9-30(b), 17-11-7, 17-11-10; Alaska Stat. § 15.20.030; La. Stat. Ann. § 18:1306(2)(a); Minn. Stat. §§ 203B.07, 203B.121; Minn. R. 8210.2450; Miss. Code Ann. §§ 23-15-627, 23-15-635, 23-15-633; Mo. Rev. Stat. §§ 115.279, 115.283, 115.295; N.C. Gen. Stat. § 163-231; Okla. Stat. tit. 26, § 14-108; 17 R.I. Gen. Laws § 17-20-23; S.C. Code Ann. §§ 7-15-220, 7-15-230; Va. Code Ann. §§ 24.2-706, 24.2-707; Wis. Stat. § 6.87(4)(b)1; *see also* Jay Chaudhury, *NC absentee ballots require 2 witnesses. Is that unique?*, POLITIFACT (Apr. 23, 2020), https://www.politifact.com/factchecks/2020/apr/23/jay-chaudhuri/nc-absentee-ballots-require-2-witnesses-unique/; *Voting Outside the Polling Place: Absentee, All-Mail and other Voting at Home Options*, NAT'L CONF. OF STATE LEGIS. (Apr. 14, 2020), https://www.ncsl.org/research/elections-and-campaigns/absentee-and-early-voting.aspx (select tab titled "Processing, Verifying, and Counting Absentee Ballots" and scroll down to the chart "Verifying Authenticity of Absentee/Mailed Ballots.").

32

their family or co-habitants. Those eligible North Carolina voters under self-quarantine, particularly those at risk of severe complications and death from COVID-19, who live alone or who do not have two other adults in their household, will be unable to safely satisfy the state's double-witness signature requirement and cast a mail-in absentee ballot. This is no small number: According to the U.S. Census, there are 1,113,548 single-member households in North Carolina.[47] Of those single-member households, 416,121, or 37 percent, are occupied by someone 65 or older.[48]

63.     Plaintiffs Clark, Cates, Edwards, Priddy, and Bentley are all eligible North Carolina voters who need to vote by mail-in absentee ballot to safeguard their lives and the health and well-being of their family members or co-habitants. Mr. Clark, who is 79 years old, has severe COPD that puts him at serious risk of severe complications and even death from COVID-19. After several bouts of pneumonia in recent years, Mr. Clark has been quarantining himself at home. Ms. Cates, who is 85 years old, lives with chronic fatigue syndrome, a debilitating disease that makes it hard for her to engage in normal daily activities and has suffered a urinary tract infection and fallen several times over the last year. Since the social distancing guidelines were put in place, Ms. Cates has not left her home, and only allows an assistant to visit and help with household chores while carefully maintaining distance from Ms. Cates. Ms. Edwards has a pre-existing medical condition,

---

[47] Table S2501, *Occupancy Characteristics, American Community Survey*, U.S. CENSUS BUREAU, https://data.census.gov/cedsci/table?q=S2501&g=0400000US37&tid=ACSST5Y2018.S2501.

[48] *Id.*

type 1 diabetes, which puts her at high risk for developing severe illness from COVID-19. In light of the risks to her health, she is uncomfortable leaving her home or being in close proximity to people other than her partner. Mr. Priddy's doctor has informed him that he is at high risk of developing severe illness from the novel coronavirus due to his age and serious pre-existing health conditions, including his use of medication that suppresses his immune system related to a kidney transplant in 2010, and treatment for diabetes. To protect his health, Mr. Priddy's doctor has advised him to stay at home and avoid contact with people other than his wife. Ms. Bentley has been diagnosed with hypertension and has a history of developing cold symptoms attacking her lungs, also putting her at risk of severe illness from COVID-19. As a result, she has been self-isolating in her home since March 10 to avoid contracting novel coronavirus. Ms. Bentley lives alone and does not have any family nearby and does not feel safe asking her neighbors to serve as witnesses because she has observed some breaking the Governor's stay-at-home order. Other neighbors are themselves self-isolating to protect vulnerable family members, and Ms. Bentley does not know what precautions her remaining neighbors are taking. *Id*. Accordingly, Plaintiffs Clark, Cates, Edwards, Priddy, and Bentley have no way to safely comply with the two-witness requirement and are therefore effectively disenfranchised by N.C. Gen. Stat. § 163-231(a). Plaintiffs Clark, Cates, Edwards, Priddy, and Bentley will be forced to choose between exercising their fundamental right to vote or running the risk of contracting and spreading COVID-19 and further worsening the pandemic in North Carolina.

34

### 3. Other North Carolina Election Laws and Procedures that Must Be Adjusted to Protect the Right to Vote By Mail During This Public Health Crisis

64.     In addition to the restrictions imposed by SB 683 and the two-witness requirement, North Carolina's election laws lack crucial mechanisms for guaranteeing that eligible individuals in North Carolina will be able to cast a mail-in absentee ballot that is counted. As pointed out by Defendant Director Bell, North Carolina has no mechanism for requesting absentee ballots by phone, email, or online. Accordingly, voters wishing to request an absentee mail-in ballot must either have the necessary equipment at home (printer, envelope, postage, and access to mail pick-up), violate social-distancing directives and guidelines and put themselves at severe risk by seeking these items outside the home, or rely on others to provide them with a form. By contrast, at least twelve states allowed voters to request an absentee ballot online, and an additional three allowed voters to submit a scanned application via email.[49]

65.     Furthermore, North Carolina voters need a fail-safe for absentee voting to prevent the unlawful denial of the right to vote given North Carolina's lack of experience with the anticipated volume of mail-in absentee ballot requests for the November general election. This is especially critical given the recent evidence out of Wisconsin and Ohio that state and local election officials, as well as the U.S. Postal Service, are failing to deliver

---

[49] *VOPP: Table 6: States With Web-Based and Online Absentee Ballot Applications*, NAT'L CONF. OF STATE LEGIS. (May 4, 2020), https://www.ncsl.org/research/elections-and-campaigns/vopp-table-6-states-with-web-based-and-online-absentee-ballot-applications.aspx.

thousands of absentee ballots to voters in the mail.[50] Those voters who timely request an absentee ballot but who do not receive their requested absentee ballot in time to vote and drop them off or mail them by Election Day—i.e., within a certain number of days of the election of their request and/or within a certain number of days of the request—will be disenfranchised unless they are permitted to use the Federal Write-In Absentee Ballot ("FWAB") as an alternative of last resort to cast their votes.[51] FWABs are already offered to overseas civilians, who can download them and print them for use, but domestic civilian absentee voters are denied the same option, even when their regular mail-in absentee ballot does not arrive in time or at all.

66.     Additionally, voters without access to postage and mail pick-up must also violate social-distancing directives and guidelines to submit mail-in absentee ballots. To successfully vote by mail, voters must mail their ballots such that they are postmarked on or before Election Day and delivered no later than 5:00 pm on Election Day, or return their voted ballots to the county board of elections (not a polling location) no later than 5:00 pm on Election Day. However, there is currently no provision in North Carolina law for contactless drop boxes for absentee ballots, which would allow voters to avoid severe delays with the U.S. Postal Service, reduce the overall burden on the U.S. Postal Service, and allow those voters with their own vehicles to submit absentee ballots without requiring

---

[50] *See, e.g.*, Carrie Levine, *Ohio's Mail-in Ballot Brouhaha: A Sign of Coming Trouble?* THE CTR. FOR PUBLIC INTEGRITY (Apr. 28, 2020), https://publicintegrity.org/politics/elections/ohios-mail-in-ballot-brouhaha-a-sign-of-coming-trouble/.

[51] *See* https://www.fvap.gov/uploads/FVAP/Forms/fwab2013.pdf.

contact with anyone to obtain required postage or deliver in-person to the county board of elections.

67.     Finally, there is no adequate statewide-mandated procedure in North Carolina for voters to cure deficient absentee ballot requests or the ballots themselves. In the March 2020 North Carolina primary, almost 15 percent of submitted absentee mail-in ballots were rejected.[52] This number was even higher for voters of color, with 19 percent of mail-in ballots submitted by black voters rejected and almost 16 percent of mail-in ballots submitted by Latinx voters rejected.[53]  In light of the anticipated dramatic increase in the use of absentee ballots and the new restrictions under SB 683 on who may assist a voter to request an absentee ballot, there is a heightened risk that voters new to mail-in absentee voting will fail to follow the proper procedures without being afforded any opportunity to cure any deficiencies. As it stands, North Carolina's election code risks disenfranchising vast numbers of voters attempting to submit mail-in absentee ballots.

### F.     In-Person Voting

68.     North Carolina's electorate has expressed a clear preference for in-person voting, with just 4 percent of voters casting mail-in absentee ballots in the 2016 general

---

[52] *See* N.C. State Bd. of Elections, *March 3, 2020 Absentee File*, https://s3.amazonaws.com/dl.ncsbe.gov/ENRS/2016_03_03/absentee_20200303.zip. This data file is accessible by going to https://www.ncsbe.gov/Public-Records-Data-Info/Election-Results-Data and navigating to "FTP Site" → "ENRS" → "2020_03_03" → "absentee_20200303.zip". The statistics generated from the absentee file do not include absentee by mail ballots that were either requested and not sent to the voter, or sent to the voter but not returned to the State Board of Elections.

[53] *Id.*

election.[54] In general, preference for in-person voting holds disproportionately true for voters of color.[55] There are a multitude of causes for this voter behavior pattern, but one reason stems from the machinations used to steal votes from and defraud voters of color, among others.[56] This means that North Carolina has not needed to, and indeed has not, built the infrastructure to accommodate such a dramatic increase in voter demand for absentee ballots without overwhelming current systems and causing mass disenfranchisement.[57] Thus, it is critically important that voters be provided with ample and as-safe-as-possible in-person voting options.

69.     The CDC has issued guidance directing election officials to "reduce crowd size at polling stations" such as encouraging "early voting, where voter crowds may be smaller throughout the day," which "minimizes the number of individuals a voter may

---

[54] *See* N.C. State Bd. of Elections, *November 8, 2016 History Statistics*, https://s3.amazonaws.com/dl.ncsbe.gov/ENRS/2016_11_08/history_stats_20161108.zip This data file is accessible by going to https://www.ncsbe.gov/Public-Records-Data-Info/Election-Results-Data and navigating to "FTP Site" → "ENRS" → "2016_11_08" → "history_stats_20161108.zip".

[55] *See* David Becker, *Mail-in ballots to avoid coronavirus? Yes, but here's how to minimize chaos and unfairness*, WASH. POST (Mar. 18, 2020), https://www.washingtonpost.com/opinions/2020/03/18/mail-in-ballots-avoid-coronavirus-yes-heres-how-minimize-chaos-unfairness/.

[56] *See generally*, CAROL ANDERSON, ONE PERSON, NO VOTE: HOW VOTER SUPPRESSION IS DESTROYING OUR DEMOCRACY 19-22 (2018); STEVEN LAWSON, BLACK BALLOTS: VOTING RIGHTS IN THE SOUTH, 1944-1969, Ch. 2 (1999).

[57] *See* Ryan McCarthy, *Whether the Ballot You Mail Is Counted May Depend On Where You Vote*, PROPUBLICA (Apr. 30, 2020), https://www.propublica.org/article/whether-the-ballot-you-mail-is-may-depend-on-where-you-vote.

come in contact with."[58] There are two provisions of North Carolina law that have already and will continue to hinder county boards in providing safe and adequate in-person voting options, and there are a number of other adjustments needed to ensure voter and poll worker safety.

### 1. Ensuring Adequate Number of Poll Workers

70. The first problematic provision is North Carolina's requirement that a majority of poll workers reside in the precinct where they serve on Election Day. *See* N.C. Gen. Stat. § 163-42(b). Upon information and belief, as of May 14, 2020, eight county boards have requested to eliminate 64 precincts for the upcoming Congressional District 11 Second Republican Primary, impacting over 50,000 voters.[59] Several of these county boards specifically cited a lack of poll workers as a reason for consolidated precincts.

71. As the pandemic persists into the fall, older poll workers will continue to withdraw in numbers sufficient to preclude the operation of countless polling places. In the 2014 general election, over 60 percent of North Carolina poll workers were 61 years of age or older and, as a result, a significant portion of poll workers are in the 65-years-old-plus CDC risk category.[60]

---

[58] Coronavirus Disease 2019 (COVID-19), *Recommendations for Election Polling Locations*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/community/election-polling-locations.html (last updated: Mar. 27, 2020).

[59] *See* https://dl.ncsbe.gov/index.html?prefix=Public_Records_Requests/June%2023%20Second%20Primary_temporary_precinct_transfers/.

[60] U.S. Election Assistance Comm'n, The 2014 EAC Election Administration and Voting Survey Comprehensive Report (Table 39), at 248,

72.     Defendant Director Bell requested a change in state law to allow county boards to recruit and train poll workers from across the county,[61] and county board members from Congressional District 11 similarly conveyed to North Carolina's leadership that this change "would significantly help us staff polling places in these challenging times."[62]

73.     As North Carolina faces the withdrawal of countless poll workers statewide, this requirement will make it extremely difficult, if not impossible, to cure those critical shortages, prevent the closure of any polling places, and minimize the lines, crowds, and wait times at operational polling places. Long wait times and crowds unduly place vulnerable voters at a greater risk of contracting COVID-19.

### 2.     Early Voting Flexibility

74.     North Carolina must also change its hours-uniformity requirement for one-stop, better known as "early voting," sites. Currently, if any early voting site is open in a county, all early voting sites must be open and all sites other than the county board office must be open 8:00 a.m. to 7:30 p.m. *See* N.C. Gen. Stat. § 163-227.6(c). As a result, precincts are unable to provide flexible hours that accommodate the specific behaviors and needs of the local voting population using that site. Precincts that might otherwise close

---

https://www.eac.gov/sites/default/files/eac_assets/1/1/2014_EAC_EAVS_Comprehensive_Report_508_Compliant.pdf.

[61] *See* Letter from Karen Brinson Bell, Exec. Dir., N.C. State Bd. of Elections, to Governor Roy Cooper et al. (Mar. 26, 2020) (Exhibit 1).

[62] Letter from Board of Elections Members in Congressional District 11 to General Assembly Leaders et al. (Apr. 27, 2020) (Exhibit 3).

due to low anticipated activity must stay open, increasing costs for the entire county and causing precinct consolidation.[63]

75.     After North Carolina imposed this requirement in June 2018 mandating uniform hours across all early voting sites within each county,[64] the costs of implementing this measure caused 43 counties to reduce the number of early voting sites in the 2018 general election compared to 2014 and over two thirds of counties to reduce weekend hours. This disproportionately impacted black voters, who in 2018 made up approximately 22% of registered voters but 27% of those who cast ballots on the last Saturday of early voting.[65]

76.     As discussed above, the anticipated shortage of poll workers will already cause precinct consolidation in light of the global pandemic; the uniform hours requirement will compound this, causing long lines and limited early voting sites during the early voting period when social distancing and reducing crowds is required for safe election administration. Individuals accustomed to early voting may very well be deterred by large

---

[63] *See* Blake Paterson, *Bipartisan Furor as North Carolina Election Law Shrinks Early Voting Locations by Almost 20 Percent*, PROPUBLICA (Sept. 24, 2018), https://www.propublica.org/article/bipartisan-furor-as-north-carolina-election-law-shrinks-early-voting-locations-by-almost-20-percent.

[64] *See* An Act to Set Hours for One-Stop Early Voting Sites, S.L. 2018-112 (June 15, 2018). As originally written, the statute removed the final Saturday of early voting beginning in 2018; this was subsequently postponed.

[65] *See Voting Rights and Election Administration in North Carolina: Field Hearing Before the Subcomm. on Elections of the H. Comm. on House Administration* (Apr. 18, 2019) (testimony of Tomas Lopez, Exec. Dir., Democracy North Carolina), https://docs.house.gov/meetings/HA/HA08/20190418/109315/HHRG-116-HA08-Wstate-LopezT-20190418.pdf.

41

crowding and the inherent heightened risk of infection; they will thus be forced to choose between risking their health to cast a ballot or foregoing their right to vote.

### 3.    Information Regarding Precinct Consolidation

77.    The State Board of Elections must also create a more accessible, centralized way in which voters and advocates can monitor precinct consolidation, and thereby advocate against harmful precinct consolidations. Currently, each county board of elections must give notice at least 45 days before the election when altering or consolidating precincts. *See* N.C. Gen. Stat. § 163-128(a). This notice must be posted in a generally circulated newspaper, posted on the door of the county courthouse and county board of elections, and mailed to the chairmen of every political party in the county. *Id*. Voters only need to be notified of changes in their particular precinct 30 days before an election. *Id*. In order to ensure that all voters have access to information about precinct consolidations necessitated by poll worker and/or site shortages, the State Board must provide that information in a centralized and accessible manner.

### 4.    Personal Protective Equipment

78.    Finally, there is currently no provision for counties to provide poll workers and voters with Personal Protective Equipment ("PPE") for use during in-person voting, such as protective masks and gloves for poll workers and/or voters, separation shields, antiseptic wipes for equipment, and single-use pens. Effective use of PPE can dramatically

42

reduce the likelihood of coronavirus transmission,[66] and these measures are needed to adequately protect voters exercising their constitutional rights. In a May 15, 2020, meeting of the State Board of Elections, Defendant Director Bell stated that she had ordered PPE for those counties holding the second Republican primary election on June 23, 2020. The same provisions are required for the 2020 general election and, because of the state-wide nature and expected high turnout of this election, the SBE Defendants must take action immediately to ensure counties obtain adequate supplies. Without these measures, plaintiffs will be forced to choose between their right to vote and their right to bodily integrity.

## CLAIMS

### COUNT ONE

### (All Defendants)
### (Undue Burden on the Right to Vote in Violation of the First and Fourteenth Amendments to the U.S. Constitution and 42 U.S.C. § 1983)

79.    Plaintiffs reallege and reincorporate by reference all prior paragraphs of this Complaint and the paragraphs in the counts below as though fully set forth herein.

80.    Under the First and Fourteenth Amendments to the U.S. Constitution, any burden on the right to vote must be balanced against a state's interest in that requirement. The Supreme Court has set forth the following test:

> [T]he rigorousness of our inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights. Thus, as we have recognized when those

---

[66] *See, e.g.,* Zeynep Tufekci et al., *The Real Reason To Wear A Mask*, THE ATLANTIC (Apr. 22, 2020), https://www.theatlantic.com/health/archive/2020/04/dont-wear-mask-yourself/610336/.

43

rights are subjected to "severe" restrictions, the regulation must be "narrowly drawn to advance a state interest of compelling importance." *Norman v. Reed*, 502 U.S. 279, 289 (1992). But when a state election law provision imposes only "reasonable, nondiscriminatory restrictions" upon the First and Fourteenth Amendment rights of voters, "the State's important regulatory interests are generally sufficient to justify" the restrictions. *Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983); *see also id*., at 788–789, n. 9.

*Burdick v. Takushi*, 504 U.S. 428, 434 (1992).

81.    "A panoply of regulations, each apparently defensible when considered alone, may nevertheless have the combined effect of severely restricting participation and competition." *Clingman v. Beaver*, 544 U.S. 581, 607-08 (2005) (O'Connor, J., concurring); *see also N.C. State Conf. of NAACP v. McCrory*, 831 F.3d 204, 231 (4th Cir. 2016) (because there were fewer early voting days, more voters would have to vote on Election Day, and "[t]ogether, these produce longer lines at the polls on Election Day, and absent out-of-precinct voting, prospective Election Day voters may wait in these longer lines only to discover that they have gone to the wrong precinct and are unable to travel to their correct precincts. Thus, cumulatively, the panoply of restrictions results in greater disenfranchisement than any of the law's provisions individually.").

82.    Unless Plaintiffs are granted the relief requested, the right to vote of thousands of North Carolinians, including Individual Plaintiffs and Organizational Plaintiffs and their members, will be severely burdened (if not denied entirely) in the general election on November 3, 2020.

*Voter Registration*

83.    North Carolina's requirement that voter registration applications be submitted at least 25 days before the election in which the voter wishes to cast a ballot

44

under N.C. Gen. Stat. § 163-82.6(d), and the DMV's requirement that those registering online do so at least 25 days before the election, is a severe burden on the right to vote in light of the COVID-19 pandemic, which has caused a dramatic decrease in voter registration rates. If a voter is not able to register at least 25 days before the election, then their only recourse is to do same-day registration at an early voting site, therefore potentially exposing themselves or their families to infection via COVID-19. *See* N.C. Gen. Stat. § 163-82.6(f). Furthermore, North Carolina's failure to provide online voter registration through other state agencies, and specifically Defendant DHHS, places a severe burden on those individuals who need to register online but are not registered with the DMV.

84. Any administrative burden created by extending the voter registration deadline and/or expanding online voter registration through Defendant DHHS is "de minimis" and Defendants cannot put forth a compelling or legitimate state interest in keeping the deadline as such in face of the emergency situation that COVID-19 has created and will create. *See Democratic Nat'l Comm. v. Bostelmann*, No. 20-cv-249-wmc, 2020 U.S. Dist. LEXIS 48394, at *14 (W.D. Wis. Mar. 20, 2020); *Fla. Democratic Party v. Scott*, 215 F. Supp. 3d 1250, 1257 (N.D. Fla. 2016); *Ga. Coal. for the Peoples' Agenda, Inc. v. Deal*, 214 F. Supp. 3d 1344, 1345–46 (S.D. Ga. 2016).

85. Since DMV has only allowed voters to register online without requiring a DMV transaction at the same time since March 2020, voters are generally unaware of this option. The 25-day deadline will hinder LWVNC's efforts to promote voter registration and require LWVNC and its members to divert significant resources. The lack of other

45

online registration options offered by the DHHS Defendants further impedes LWVNC's ability to educate and engage in its voter registration efforts, and frustrates its mission to ensure that all eligible voters can register safely during the COVID-19 pandemic.

86. In the midst of this ongoing public health crisis, there is no state interest in favor of enforcing this 25-day deadline or failing to provide online voter registration through Defendant DHHS that justifies the burden placed on Plaintiffs' constitutional right to vote, especially given that North Carolina allows for same-day registration at one-stop early voting sites up until the Saturday before the election and has already implemented an online voter registration method through DMV for certain voters. Upon information and belief, Defendant DHHS possesses "wet-ink" signatures of its benefits recipients. Accordingly, any purported state interests in enforcing this 25-day deadline or failing to provide Defendant DHHS online voter registration are neither narrowly drawn to advance nor justified by this interest, in light of the ongoing public health crisis.

*Vote-by-mail assistance restrictions*

87. North Carolina's restrictions on who can assist voters with completing and returning mail-in absentee ballot request forms pursuant to N.C. Gen. Stat. § 163-230.2(c), (e), and (e1) is a severe burden on the fundamental right to vote and Plaintiff LWVNC, their members, and the voters they will assist during the upcoming election. This restriction impairs LWVNC's efforts to help voters cast a ballot and limits the assistance LWVNC and its members can provide to voters wishing to vote by mail, during an election in which a voters are expected to vote by mail—and do so for the first time—in unprecedented numbers.

46

88.     In the midst of this ongoing public health crisis, there is no state interest in favor of enforcing these restrictions that justifies the burden placed on the constitutional right to vote. Any purported state interest in enforcing the restriction on who can assist individuals in requesting absentee ballots is neither narrowly drawn to advance nor justified by this interest, in light of the ongoing public health crisis.

*Vote-by-mail Witness Requirement*

89.     North Carolina's two-witness or notary requirement for mail-in absentee voting pursuant to N.C. Gen. Stat. § 163-231(a) is a severe burden on Plaintiffs' right to vote in light of the COVID-19 pandemic, because it will require voters, particularly voters at high risk of severe complications and death from COVID-19, to break their self-quarantine and violate social distancing directives at risk to their health. For example, Plaintiffs Clark, Edwards, and Priddy, who are each self-quarantined with one other person in their household, will be forced to choose between staying home and avoiding contact with people outside their households or seeking out another person to serve as a second witness despite guidance from the CDC and medical professionals to stay quarantined and limit contact with people outside their households. Plaintiffs Cates and Bentley, who are also self-isolated at home, live alone and do not have any family members nearby. Satisfying the two-witness requirement will require them to put themselves at risk of contracting COVID-19 in order to satisfy the two-witness certification requirement.

90.     In the midst of this ongoing public health crisis, there is no state interest in favor of enforcing the two-witness or notary requirement that justifies the burden placed on Plaintiffs' constitutional right to vote. Any purported state interest in enforcing the two-

47

witness or notary requirement is neither narrowly drawn to advance nor justified by this interest, in light of the ongoing public health crisis.

*Vote-by-mail lack of fail-safe for absentee ballots that are not timely delivered to voters*

91. North Carolina lacks any fail-safe option for mail-in absentee voters, if the state's election administrators, as anticipated, cannot successfully deliver mail-in ballots on time to ten times as many absentee voters as usual. In order to prevent the wholesale and unlawful denial of the right to vote to voters who cannot risk voting in person at a polling site on or before Election Day, Defendants must afford voters who timely request an absentee ballot but who do not receive their requested absentee ballot in time to vote and drop them off or mail them by Election Day—*i.e.* within a certain number of days of the election of their request and/or within a certain number of days of the request—the option to use the Federal Write-In Absentee Ballot ("FWAB") as an alternative of last resort to cast their votes.[67] Plaintiffs Clark, Cates, Edwards, Priddy, and Bentley all intend to vote by mail-in absentee ballot, in order to safeguard their health. If, as expected, North Carolina's state and local election officials and their staff cannot keep pace with the unprecedented rise in absentee ballot requests, some or all of these five Plaintiffs may well not receive their absentee ballots in a timely fashion such that they can be cast and counted. Accordingly, in order to protect their right to vote, just like overseas civilian voters, Plaintiffs Clark, Cates, Edwards, Priddy, and Bentley must be permitted to cast FWABs, as a fail-safe option.

---

[67] *See* https://www.fvap.gov/uploads/FVAP/Forms/fwab2013.pdf.

92.     Particularly in the midst of this ongoing public health crisis, the failure to offer this standardized fail-safe option for mail-in absentee voters, which would completely deny the right to vote to countless domestic civilian absentee voters, cannot be justified by any legitimate or important state interest. This option is already afforded to overseas civilian voters; the exclusion of domestic, civilian voters, at least in the limited context where a voter does not receive a requested absentee ballot in the mail, is unreasonable and discriminatory. *See Burdick*, 504 U.S. at 434 ("But when a state election law provision imposes only reasonable, *nondiscriminatory* restrictions upon the First and Fourteenth Amendment rights of voters, the State's important regulatory interests are generally sufficient to justify' the restrictions.") (emphasis added, internal quotations omitted). Any purported state interest in failing to provide these services is neither narrowly drawn to advance nor justified by this interest, in light of the ongoing public health crisis.

*Vote-by-mail failure to provide other accommodations*

93.     North Carolina's failure to provide mechanisms for requesting absentee ballots by phone, email, or online, its failure to provide contactless drop boxes for absentee ballots that would allow voters to submit their absentee ballots from their vehicles instead of violating social-distancing directives and guidelines, and its failure to provide a statewide-mandated procedure for voters to cure deficient absentee ballot requests are all, individually or in combination, severe restrictions on Plaintiffs' right to vote and will require them to put their own health at risk in order to successfully vote by absentee ballot. *See Clingman v. Beaver*, 544 U.S. 581 607–08 (2005) (O'Connor, J., concurring); *N.C. State Conf. of NAACP v. McCrory*, 831 F.3d 204, 231 (4th Cir. 2016). Plaintiff Cates

49

cannot secure an absentee ballot request form on her own, though she could if online or phone request options were made available. LWVNC will also have to redirect a significant amount of its limited resources toward helping eligible voters to access absentee ballot request forms without a phone, email, or online option to request an absentee ballot.

94.     Additionally, Plaintiffs Clark, Cates, Edwards, Priddy, and Bentley all intend to vote by mail-in absentee ballot, some for the first time, and may well make errors on their absentee ballot request forms or absentee ballots and/or their certificate envelopes. Procedural due process requires a cure procedure for these defects. Furthermore, the lack of any uniform mechanism to cure will require LWVNC and Democracy NC to devote additional resources towards researching these various rules to help ensure the voters they assist have followed all procedures for requesting and filling out absentee ballots precisely, in addition to their general educational efforts.

95.     In the midst of this ongoing public health crisis, there is no state interest in failing to provide these services that justifies the burden placed on Plaintiffs' constitutional right to vote, especially given the numerous other states that do provide these services. Any purported state interest in failing to provide these services is neither narrowly drawn to advance nor justified by this interest, in light of the ongoing public health crisis.

*Poll worker "home precinct" requirement*

96.     North Carolina's requirement that a majority of poll workers reside in the precinct where they serve on Election Day pursuant to N.C. Gen. Stat. § 163-42(b) is a severe burden on Plaintiffs' right to vote, as it will exacerbate a shortage of poll workers,

50

force precinct consolidation and relocation, and create long lines and crowds on Election Day that contravene social distancing directives needed to protect Plaintiffs' health.

97.     This constitutes a severe burden on voters, particularly those who cannot wait in line for hours to vote. SBE Defendants are on notice that precinct consolidation due to lack of poll workers is likely, given the requests for precinct consolidation for the June 23, 2020 second Republican Primary, and their failure to prepare for this same eventuality in the November 3, 2020 general election will severely burden the rights of voters who rely on in-person voting. *See Ury v. Santee*, 303 F. Supp. 119, 124 (N.D. Ill. 1969) (finding that the defendant's failure to provide adequate voting facilities despite their foreknowledge of precinct consolidations deprived voters of their constitutional rights); *see also League of Women Voters of Ohio v. Brunner*, 548 F.3d 463, 478 (6th Cir. 2008) (finding long lines and inadequate voting machines severely burdened Ohio voters' right to vote).

98.     Plaintiff Permar relies on polling sites being open in order to vote in-person given her disability and her need to use an ADA compliant voting machine. She also relies on polling places being located in places that are accessible by public transportation, which she uses to independently travel. Ms. Permar's right to vote and others similarly situated would be severely burdened if precincts are consolidated in such a way as to force her or others similarly situated to travel to a polling place that is not accessible by public transportation or to wait in long lines exposing themselves to COVID-19 when they get to the polling place. Plaintiff LWVNC will also be required to divert resources to recruit poll workers, as well as in its voter education efforts to alert its members and those in their communities about precinct consolidations if the in-precinct requirement for poll workers

51

remains in place and precincts are consolidated as a result. Democracy NC's poll monitors will also have to divert their resources to ensure voters find the correct precinct, instead of providing the help they would otherwise provide voters.

99.     In the midst of this ongoing public health crisis, there is no state interest in enforcing this requirement that justifies the burden placed on Plaintiffs' constitutional right to vote. Any purported state interest in enforcing this requirement is neither narrowly drawn to advance nor justified by this interest, in light of the ongoing public health crisis.

*In-person voting uniform hours*

100.     North Carolina's requirement that early voting sites in every county maintain uniform hours pursuant to N.C. Gen. Stat. § 163-227.6(c) is a severe burden on Plaintiffs' right to vote, as the costs of maintaining uniform hours and limited resources in counties will cause precinct consolidation and long lines and crowds on early voting days that contravene social distancing directives needed to protect Plaintiffs' health. Additionally, given the SBE Defendants' knowledge about the effect that COVID-19 has had on the June 2020 runoff election and could have on the November 2020 general election, they have an obligation to mitigate precinct consolidation as much as possible so as to not severely burden voters' right to vote. *See Ury*, 303 F. Supp. at 124.

101.     Plaintiff Permar works at Duke Hospital as a staff assistant, thus it is important that she is able to vote at a time that is in line with her work schedule. Further, Ms. Permar or other similarly situated disabled individuals should not have to wait in long lines further risking their health or potential COVID-19 infection. Plaintiffs Democracy NC and LWVNC will also be required to divert resources in its voter education efforts to

52

alert their members/advocates and those in their communities about precinct consolidations if the uniform hours requirement remains in place.

102.   In the midst of this ongoing public health crisis, there is no state interest in enforcing this uniform hours requirement that justifies the burden placed on Plaintiffs' constitutional right to vote. Any purported state interest in enforcing this requirement is neither narrowly drawn to advance nor justified by this interest, in light of the ongoing public health crisis.

*Precinct-consolidation monitoring*

103.   North Carolina's failure to provide a more accessible, centralized way in which voters and advocates can monitor precinct consolidation is a severe burden on Plaintiffs' right to vote. The lack of centralized access to this information will impede and confuse voters' ability to determine where and how best to vote in-person and will impede the efforts of advocates to oppose harmful precinct consolidations. Plaintiff Permar and other voters rely on being able to know in advance where early voting locations are, or where their election-day polling place is, so as to ensure that they are able to properly schedule a time to vote. Democracy NC is a central hub for voter information, and it would be a huge drain on its resources to not have easy access to proposed precinct consolidations to inform voters. In the midst of this ongoing public health crisis, there is no state interest in failing to provide this service that justifies the burden placed on Plaintiffs' constitutional right to vote. Any purported state interest in failing to provide this service is neither narrowly drawn to advance nor justified by this interest, in light of the ongoing public health crisis.

Case 1:20-cv-00457   Document 1   Filed 05/22/20   Page 53 of 72

*Personal Protective Equipment*

104.    North Carolina's failure to provide PPE to all counties for use during early and Election-Day in-person voting is a severe burden on Plaintiffs' right to vote, as the failure to provide this will exacerbate the shortage of poll workers and increase the risk present to all individuals that vote in person. In conducting its Election Protection hotline and poll monitoring program, Democracy NC volunteers will almost certainly be queried about PPE, who has it, and how to get it if is not provided. In the midst of this ongoing public health crisis, there is no state interest in failing to provide PPE that justifies the burden placed on Plaintiffs' constitutional right to vote. Any purported state interest in failing to provide PPE is neither narrowly drawn to advance nor justified by this interest, in light of the ongoing public health crisis.

105.    Defendants, acting under color of state law, have deprived and will continue to deprive Plaintiffs of their rights under the First and Fourteenth Amendments to the U.S. Constitution by administering and enforcing the above laws and/or by failing to provide the above accommodations and services during the COVID-19 pandemic.

106.    For the foregoing reasons, Defendants have deprived and will continue to deprive Plaintiffs of the right to be free of undue burdens on their right to vote in violation of the First and Fourteenth Amendments to the U.S. Constitution as enforced by 42 U.S.C. § 1983.

Case 1:20-cv-00457   Document 1   Filed 05/22/20   Page 54 of 72

# COUNT TWO

## (SBE Defendants)
## (Unconstitutional Condition on Right to Vote Compelling Forfeiture of Right to Bodily Integrity in Violation of the Fourteenth Amendment to the U.S. Constitution and 42 U.S.C. § 1983)

107.    Plaintiffs reallege and reincorporate by reference all prior paragraphs of this Complaint and the paragraphs in the counts below as though fully set forth herein.

108.    Voting is protected by the First Amendment as a means of political association and political expression. *See Cal. Democratic Party v. Jones*, 530 U.S. 567, 574 (2000); *Norman v. Reed*, 502 U.S. 279, 288–90 (1992); *Anderson v. Celebrezze*, 460 U.S. 780, 787–89, 806 (1983); *Kusper v. Pontikes*, 414 U.S. 51, 56–58 (1973); *Williams v. Rhodes*, 393 U.S. 23, 30–31 (1968).

109.    Under the unconstitutional conditions doctrine, the government may not require an individual to forfeit one constitutional right in order to exercise another. *See Lefkowitz v. Cunningham*, 431 U.S. 801, 807–08 (1977); *Simmons v. United States*, 390 U.S. 377, 394 (1968); *Howard v. Walker*, 406 F.3d 114, 129 (2d Cir. 2005); *Bourgeois v. Peters*, 387 F.3d 1303, 1324 (11th Cir. 2004); *Green v. Brigano*, 123 F.3d 917, 921 (6th Cir. 1997).

110.    "[W]hen a condition on a government benefit burdens a constitutional right, it generally triggers the same scrutiny as a direct penalty would." *McCabe v. Sharrett*, 12 F.3d 1558, 1562 (11th Cir. 1994). Government actions that threaten the right to bodily integrity are subject to strict scrutiny. *See Kallstrom v. City of Columbus*, 136 F.3d 1055, 1064 (6th Cir. 1998). The Supreme Court has invalidated voting requirements or conditions

Case 1:20-cv-00457   Document 1   Filed 05/22/20   Page 55 of 72

that require the forfeiture of another fundamental right. *See Dunn v. Blumstein*, 405 U.S. 330, 346, 353 (1972) (finding that durational residency requirement for voter registration placed unconstitutional condition on fundamental right to interstate travel).

111.   The Fourteenth Amendment guarantees the right to bodily integrity, and this right is violated if government officials are deliberately indifferent to the violation of the plaintiff's bodily integrity. *See Missouri v. McNeely*, 569 U.S. 141, 159 (2013); *Guertin v. Michigan*, 912 F.3d 907, 919 (6th Cir. 2019) (recognizing that "individuals possess a constitutional right to be free from forcible intrusions on their bodies against their will, absent a compelling state interest") (quoting *Planned Parenthood Sw. Ohio Reg. v. DeWine*, 696 F.3d 490, 506 (6th Cir. 2012)).

112.   "Involuntarily subjecting nonconsenting individuals to foreign substances with no known therapeutic value . . . is a classic example of invading the core of the bodily integrity protection." *Guertin*, 912 F.3d at 921–22.

113.   Defendants require Plaintiffs Clark, Cates, Edwards, Priddy, and Bentley to satisfy unnecessary requirements for mail-in absentee voting that cannot be reasonably and safely accomplished without severely threatening their right to bodily integrity. Because in-person voting even more severely threatens to violate Plaintiffs' bodily integrity by subjecting them to the significant risk of contracting COVID-19, Defendants' enforcement of North Carolina's requirements as to mail-in voting force Plaintiffs to forfeit their right to bodily integrity in order to exercise their right to vote. Should Plaintiffs Clark, Cates, Edwards, Priddy, and Bentley exercise their right to vote by mail under these circumstances, Defendants will have knowingly subjected Plaintiffs to a foreign

56

substance—the novel coronavirus that causes COVID-19—without a therapeutic basis or Plaintiffs' consent.

114. Defendants, acting under color of state law, have deprived and will continue to deprive Plaintiffs of their rights under the Fourteenth Amendment to the U.S. Constitution, by requiring them to forfeit their right to bodily integrity in order to exercise their right to vote.

115. For the foregoing reasons, Defendants have deprived and will continue to deprive Plaintiffs of the right to be free of unconstitutional conditions on their rights to vote in violation of the Fourteenth Amendment to the U.S. Constitution as enforced by 42 U.S.C. § 1983.

## COUNT THREE

### (SBE Defendants)
### (Violation of the Organizational Plaintiffs' Rights of Free Speech and Association in violation of the First and Fourteenth Amendments to the Constitution of the United States and 42 U.S.C. § 1983)

116. Plaintiffs reallege and reincorporate by reference all prior paragraphs of this Complaint and the paragraphs in the counts below as though fully set forth herein.

117. The First Amendment to the United States Constitution, as applied to the states through the Fourteen Amendment, prohibits an abridgment of the freedom of speech or associational rights. Any burden, regardless of how slight, "must be justified by relevant and legitimate state interests sufficiently weighty to justify the limitation*." Norman*, 502 U.S. at 288– 89.

Case 1:20-cv-00457   Document 1   Filed 05/22/20   Page 57 of 72

118.     The restrictions on who can assist voters with completing and returning mail-in absentee ballot request forms pursuant to N.C. Gen. Stat. § 163-230.2 effectively prohibits the Organizational Plaintiffs and their members' core political speech and expressive conduct, which includes assisting voters with requesting and submitting absentee ballot requests in an effort to engage potential voters and encourage them to vote. These efforts are particularly important in the midst of the current public health crisis, where for many voting by mail is crucial to protecting their health and the health of their co-habitants and family members, and where the anticipated surge in individuals voting by mail means many will be doing so for the first time and without prior experience. Because of this prohibition, the Organizational Plaintiffs and their members will not be able to effectively engage potentially eligible absentee voters, nor will they be able to effectively facilitate those eligible voters requesting absentee ballots.

119.     N.C. Gen. Stat. § 163-230.2 therefore chills the Organizational Plaintiffs' speech and associational rights and does so without being narrowly-tailored to serve a compelling state interest. The restrictions on who can assist voters with completing and submitting absentee ballot requests are not justified by a state interest, especially in light of the current COVID-19 pandemic, where allowing individuals to follow social-distancing guidelines and self-quarantine is crucial to protecting their health and the health of their co-habitants and family members.

## COUNT FOUR

### (SBE Defendants)
### (Denial of Plaintiffs' Right to Procedural Due Process in violation of the Fourteenth Amendment to the Constitution of the United States and 42 U.S.C. § 1983)

120.    Plaintiffs reallege and reincorporate by reference all prior paragraphs of this Complaint and the paragraphs in the counts below as though fully set forth herein.

121.    The Due Process Clause of the Fourteenth Amendment prohibits the deprivation of "life, liberty, or property, without due process of law." U.S. CONST. amend. XIV § 1. "Where the government seeks to deprive someone of a liberty interest protected by due process, due process demands that certain procedural safeguards be provided." *United States v. Baker*, 45 F.3d 837, 843 (4th Cir. 1995). A liberty interest that is governed by due process can be created by the Constitution or "may arise from an expectation or interest created by state laws or policies." *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005).

122.    At a minimum, "procedural due process requires fair notice of impending state action and an opportunity to be heard." *Snider Int'l Corp. v. Town of Forest Heights*, 739 F.3d 140, 146 (4th Cir. 2014) (citing *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976)).

123.    "Proper notice is 'an elementary and fundamental requirement of due process,' and must be reasonably calculated to convey information concerning a deprivation.'" *Snider Int'l*, 739 F.3d at 146 (quoting *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950)); *see also Presley v. City of Charlottesville*, 464 F.3d 480, 490 (4th Cir. 2006).

124.    As for the opportunity to be heard, "*Mathews* set forth the familiar three-step inquiry for determining the adequacy of the opportunity to be heard: a balancing of the

59

private interest and the public interest, along with 'the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards.'" *Snider Int'l*, 739 F.3d at 146 (quoting *Mathews*, 424 U.S. at 335). "Fundamental to due process is an opportunity to be heard—'an opportunity which must be granted at a meaningful time.'" *Sciolino v. City of Newport News, Va.*, 480 F.3d 642, 653 (4th Cir. 2007) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)).

125. Absent exigent circumstances, due process requires pre-deprivation procedures. *See Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985) ("We have described 'the root requirement' of the Due Process Clause as being 'that an individual be given an opportunity for a hearing before he is deprived of any significant property interest.'" (quoting *Boddie v. Connecticut*, 401 U.S. 371, 379 (1971) (emphasis in original)); *Sciolino*, 480 F.3d at 653 ("An opportunity to clear your name after it has been ruined by dissemination of false, stigmatizing charges is not 'meaningful.'").

126. North Carolina law gives all registered North Carolina voters statutory rights to request and cast a mail-in absentee ballot that will be processed and counted, thereby vesting them with liberty interests. Eligible, registered voters enjoy an "individual and personal" right to vote under North Carolina law. *Gill v. Whitford*, 138 S. Ct. 1916, 1929 (2018) (quoting *Reynolds v. Sims*, 377 U.S. 533, 561 (1964)).

127. However, the SBE Defendants do not afford mail-in absentee voters any notice of or opportunities to cure material defects in their absentee ballot request forms or absentee ballots including their certificate envelopes that will result in rejection, thereby depriving Plaintiffs and other registered North Carolina voters of their liberty interests in

60

requesting and casting a mail-in absentee ballot and exercising their fundamental right to vote.

128.    The risk of erroneous deprivation is high, as these eligible, registered North Carolina voters are entitled by law to request an absentee ballot and to vote an absentee ballot and, therefore, must be provided with an additional procedural safeguard, the opportunity to timely cure any defect that would cause the absentee ballot request form's rejection or the absentee ballot's rejection.

129.    Plaintiffs Clark, Cates, Edwards, Priddy, and Bentley all intend to vote by mail-in absentee ballot, some for the first time, and may well make errors on their absentee ballot request forms or absentee ballots and/or their certificate envelopes. Procedural due process requires a cure procedure for these defects.

130.    Defendants cannot advance any interests that outweigh the risk of erroneous deprivation. The threat of disenfranchising Plaintiffs and their members far outweighs any increased administrative burden in affording voters an opportunity to cure their absentee ballot request form defects or their absentee ballot defects, including any defects on the certificate envelope. Defendants' interest in conducting fair election administration and preserving election integrity would not be compromised in the slightest, and they would satisfy their weighty interest in abiding by federal constitutional requirements.

131.    For the foregoing reasons, SBE Defendants have violated and will continue to violate Plaintiffs Clark, Cates, Edwards, Priddy, and Bentley's federal constitutional rights to procedural due process.

132.    At all relevant times, Defendants have acted under color of state law.

61

133.    Defendants have deprived and will continue to deprive Plaintiffs Clark, Cates, Edwards, Priddy, Bentley and all voters seeking to vote by mail of their right to adequate notice and a meaningful opportunity to be heard in order to cure deficiencies with their absentee ballot request forms and their absentee ballots. This wholly fails to meet these minimum requirements of procedural due process, as guaranteed to Plaintiffs by the Fourteenth Amendment to the U.S. Constitution and 42 U.S.C. § 1983.

## COUNT FIVE

### (SBE Defendants)
### (Failure to Provide Reasonable Accommodations in Violation of Title II of the Americans with Disabilities Act, 42 U.S.C. §§ 12131, *et seq.*)

134.    Plaintiffs reallege and reincorporate by reference all prior paragraphs of this Compliant and the paragraphs in the counts below as though fully set forth herein.

135.    Under Title II of the Americans with Disabilities Act, state and local governments must not impose requirements on participation in public services, programs, or activities, including voting, that screen out individuals with disabilities from fully and equally enjoying those programs and must make reasonable modifications in policies, practices, or procedures, including voting and election procedures, when the modifications are necessary to avoid discrimination on the basis of disability.

136.    Individuals who suffer a significant medical vulnerability that places them at extremely high risk of serious bodily injury or death should they leave the confines of their homes—including Plaintiffs Clark, Edwards, and Priddy, whose health conditions put them at significant risk of severe illness or death should they contract COVID-19—have a disability within the meaning of the ADA.

62

137.    The CDC has deemed that individuals who suffer from the impairments that Plaintiffs Clark, Edwards, and Priddy possess are "at higher risk for severe illness from COVID-19." Because of these high risks, Plaintiffs Clark, Edwards and Priddy are substantially affected and unable to enjoy at least one major activity: their fundamental right to vote.

138.    Plaintiff Clark, who is 79 years old, suffers from severe COPD, which has rendered him highly susceptible to complications from COVID-19, a disease that often causes severe respiratory distress. Plaintiff Edwards possesses type 1 Diabetes, a physical impairment that has detrimental effects on her health and put her at risk of severe illness from COVID-19. Plaintiff Priddy's pre-existing conditions are physical impairments that puts him at risk of severe illness from COVID-19. These physical impairments substantially affect the major life activities of Plaintiffs Clark, Edwards, and Priddy because they cannot safely exercise their fundamental right to vote without risking their lives. Plaintiffs Clark, Edwards and Priddy should be provided meaningful access to the ballot, either through a more accessible mail-in voting process or safer in-person voting precautions.

139.    Plaintiffs Clark, Edwards, and Priddy are unable to safely obtain two witness signatures without ignoring the CDC's guidelines and putting themselves at risk of contracting COVID-19 and suffering serious health consequences, including death. Plaintiffs Clark, Edwards, and Priddy would be unable to safely vote by absentee ballot unless SBE Defendants eliminate the two-witness signature requirement.

Case 1:20-cv-00457   Document 1   Filed 05/22/20   Page 63 of 72

140.     Defendants' failure and refusal to ensure that plaintiffs with disabilities are given the ability to vote without risks of serious illness or death constitute a failure to make a reasonable accommodation for those, such as Plaintiffs Clark, Edwards and Priddy, whose health limits their ability to have contact with others in this time of public health emergency created by COVID-19, in violation of the ADA.

141.     The failure to accommodate these voters constitutes a condition on access to the ballot box that has the effect of screening out such individuals from participating in the November 3, 2020 general election, in violation of Title II of the Americans with Disabilities Act.

## COUNT SIX

### (SBE Defendants)
### (Failure to Provide Reasonable Accommodations in Violation of Section 504 of the Rehabilitation Act, 29 U.S.C. § 794)

142.     Plaintiffs reallege and reincorporate by reference all prior paragraphs of this Complaint and the paragraphs in the counts below as though fully set forth herein.

143.     Under Section 504 of the Rehabilitation Act, federally funded programs, including state and local programs related to elections and voting, must not discriminate against individuals with disabilities and must make reasonable accommodations to allow individuals with disabilities to access the federal funded program, activity, or service.

144.     The State of North Carolina receives federal funding to conduct its elections. Thus, Defendants are obligated to comply with the Rehabilitation Act.

145.     Individuals who suffer a significant medical vulnerability that places them at extremely high risk of serious bodily injury or death should they leave the confines of their

64

homes—including Plaintiffs Clark, Edwards, and Priddy whose health conditions put them at significant risk of severe illness or death should they contract COVID-19—have a disability within the meaning of the Rehabilitation Act.

146.    The CDC has deemed that individuals who suffer from the impairments that Plaintiffs Clark, Edwards, and Priddy possess are "at higher risk for severe illness from COVID-19." Because of these high risks, Plaintiffs Clark, Edwards and Priddy are substantially affected and unable enjoy at least one major activity: their fundamental right to vote.

147.    Plaintiff Clark, who is 79 years old, suffers from severe COPD, which has rendered him highly susceptible to complications from COVID-19, a disease that often causes severe respiratory distress. Plaintiff Edwards possesses type 1 diabetes, a physical impairment that has detrimental effects on her health and put her at risk of severe illness from COVID-19. Plaintiff Priddy's pre-existing conditions are physical impairments that put him at risk of severe illness from COVID-19. These physical impairments substantially affect the major life activities of Plaintiffs Clark, Edwards, and Priddy because they cannot safely exercise their fundamental right to vote. Plaintiffs Clark, Edwards, and Priddy should be provided meaningful access to the poll, either through a more accessible mail-in voting process or safer in-person voting precautions.

148.    Plaintiffs Clark, Edwards, and Priddy are unable to obtain two witness signatures without ignoring the CDC's guidelines and putting themselves at risk of contracting COVID-19 and suffering serious health consequences, including death.

Case 1:20-cv-00457    Document 1    Filed 05/22/20    Page 65 of 72

Plaintiffs Clark, Edwards, and Priddy would be unable to safely vote by absentee ballot unless Defendants eliminate the two-witness signature requirement.

149. Defendants' failure to ensure that plaintiffs with disabilities are given the ability to vote without risks of serious illness or death constitutes a failure to make a reasonable accommodation for those, such as Plaintiffs Clark, Edwards, and Priddy ,whose physical impairments limit their ability to have contact with others in this time of public health emergency created by COVID-19, in violation of the Rehabilitation Act.

150. The failure to accommodate these voters constitutes a condition on access to the ballot box that has the effect of screening out such individuals from participating in the November 3, 2020 general election, in violation of Section 504 of the Rehabilitation Act.

## COUNT SEVEN

### (SBE Defendants)
### (Disparate Impact Claims in Violation of Title II of the Americans with Disabilities Act, 42 U.S.C. §§ 12131, *et seq*.)

151. Plaintiffs reallege and reincorporate by reference all prior paragraphs of this Complaint and the paragraphs in the counts below as though fully set forth herein.

152. Under Title II of the Americans with Disabilities Act, States cannot promulgate standards, criteria, or methods of administration that have the effect of discriminating against individuals based on their disabilities.

153. The Defendants are all public entities covered by Title II of the ADA.

154. The CDC has declared that individuals with co-morbidities such as Plaintiffs Clark, Edwards, and Priddy are significantly more likely to risk serious illness or death if

66

they contract COVID-19. Defendants' enforcement of current voting regulations will unnecessarily expose Plaintiffs Clark, Edwards, and Priddy to an unjustifiable risk of severe illness from COVID-19 in order to vote. This will result in unjustifiable disparate impact upon Plaintiffs Clark, Edwards and Priddy if they attempt to vote because they will be more harshly affected by COVID-19, in violation of the ADA.

155.    Defendants will be unable to show that the current voting regulations are justified by legitimate state interests.

156.    The disparate impact that will result from enforcing these conditions has the effect of prohibiting individuals with disabilities from participating in the November 3, 2020 general election, in violation of Title II of the ADA.

**COUNT EIGHT**

**(SBE Defendants)**
**(Disparate Impact Claims in Violation of Section 504 of the**
**Rehabilitation Act, 29 U.S.C. § 794)**

157.    Plaintiffs reallege and reincorporate by reference all prior paragraphs of this Complaint and the paragraphs in the counts below as though fully set forth herein.

158.    Section 504 of the Rehabilitation Act prohibits federally funded programs, including state and local programs related to elections and voting, from enacting facially neutral policies that have a discriminatory impact on persons within a protected class.

159.    The State of North Carolina receives federal funding to conduct its elections. Thus, Defendants are obligated to comply with the Rehabilitation Act.

160.    The CDC has declared that individuals with co-morbidities such as Plaintiffs Clark, Edwards, and Priddy are significantly more likely to risk serious illness or death if

they contract COVID-19. Defendants' enforcement of current voting requirements will unnecessarily expose Plaintiffs Clark, Edwards, and Priddy to an unjustifiable risk of severe illness from COVID-19 in order to vote. This will result in disparate impact upon Plaintiffs Clark, Edwards, and Priddy if they attempt to vote because they will be more harshly affected by COVID-19, in violation of the Rehabilitation Act.

161.    Defendants will be unable to show that the current voting regulations are justified by legitimate state interests.

162.    The disparate impact that will result from enforcing these conditions has the effect of prohibiting individuals with disabilities from participating in the November 3, 2020 general election, in violation of Section 504 of the Rehabilitation Act.

## PRAYER FOR RELIEF

Plaintiffs respectfully request that this Court:

(a)        Assume jurisdiction over this matter;

(b)        Declare that Defendants' administration and enforcement of N.C. Gen. Stat. Gen. Stat. §§ 163-82.6(d) and 163-82.20(g), (h) (imposing 25-day voter registration deadlines); N.C. Gen. Stat. § 163-230.2(c), (e), and (e1) (imposing restrictions on absentee ballot request assistance); N.C. Gen. Stat. § 163-231(a) (imposing the double-witness certification requirement); N.C. Gen. Stat. § 163-227.6(c) (requiring uniform hours in precincts); and N.C. Gen. Stat. § 163-42(b) (requiring a majority of poll workers to come from the precinct in which they serve), and the Defendants' failure to expand voter registration via online portals available through DHHS services, failure to establish contactless drop boxes for absentee ballots, and to establish mechanisms for requesting

68

absentee ballots by phone, email, and online, failure to establish mechanisms to cure deficient absentee ballot requests and absentee ballots, failure to allow for submission of FWAB ballots, failure to provide PPE to county boards of election for use during in-person voting, and failure to establish a more accessible, centralized way in which voters and advocates can monitor precinct consolidation (and thus advocate against harmful precinct consolidations), in the context of the pandemic and for the November 3, 2020 general election, taken individually or in combination, violate the First and Fourteenth Amendments to the U.S. Constitution, as enforced through 42 U.S.C. § 1983;

(c) Declare that Defendants' administration and enforcement of N.C. Gen. Stat. § 163-230.2(c), (e), and (e1) (imposing restrictions on absentee ballot request assistance), N.C. Gen. Stat. § 163-231(a) (imposing the double-witness certification requirement), and failure to expand voter registration via online portals available through DHHS services, establish contactless drop boxes for absentee ballots, establish mechanisms for requesting absentee ballots by phone, email, and online, in the context of the pandemic and for the November 3, 2020 general election, taken individually or in combination, violate the unconstitutional condition doctrine and thereby Plaintiffs' First and Fourteenth Amendment right to bodily integrity, as enforced through 42 U.S.C. § 1983;

(d) Preliminarily and permanently enjoin Defendants from administering and enforcing in the 2020 general election and for the persistence of the COVID-19 pandemic:

      i. Gen. Stat. §§ 163-82.6(d) and 163-82.20(g), (h), imposing 25-day voter registration deadlines;

69

  ii.  N.C. Gen. Stat. § 163-230.2(c), (e), and (e1), imposing restrictions on absentee ballot request assistance;

  iii.  N.C. Gen. Stat. § 163-231(a), imposing the double-witness certification requirement;

  iv.  N.C. Gen. Stat. § 163-227.6(c), requiring uniform hours in precincts; and

  v.  N.C. Gen. Stat. § 163-42(b), requiring a majority of poll workers to come from the precinct in which they serve.

(e)  Preliminarily and permanently enjoin Defendants from violating Plaintiffs' constitutional and federal statutory rights with respect to any election in the state during the COVID-19 pandemic.

(f)  Order the SBE Defendants to extend the voter registration deadline in N.C. Gen. Stat. §§ 163-82.6(d) and 163-82.20(g), (h), until 5:00pm on the last Saturday of early voting and the DOT and DHHS Defendants to process voter registrations online and received in their offices up until and including 5:00pm on the last Saturday of early voting.

(g)  Order Defendants to implement measures to ensure eligible North Carolinians are able to vote absentee by mail, with respect to any election in the state during the COVID-19 pandemic, including:

  i.  Expanding voter registration via online portals available through DHHS services;

  ii.  Establishing contactless drop boxes for absentee ballots;

  iii.  Establishing mechanisms for requesting absentee ballots by phone, email, and online;

iv.    Establishing mechanisms to cure deficient absentee ballot requests and absentee ballots;

v.    Establishing a mechanism for accepting FWAB ballots; and

vi.    Establishing a more accessible, centralized way in which voters and advocates can monitor precinct consolidation.

(h)    Order the SBE Defendants to permit mail-in absentee voters to cast a downloadable Federal Write-in Absentee Ballot ("FWAB"), if and only if their timely-requested absentee ballot has not arrived in time for the voter to timely cast that ballot so that it will be counted;

(i)    Order Defendants to implement a remedial plan to educate voters regarding their options to register to vote, and obtain and cast a ballot.

(j)    Retain jurisdiction to monitor Defendants' compliance with this Court's judgment;

(k)    Grant Plaintiffs their reasonable costs and attorneys' fees incurred in bringing this action pursuant to 42 U.S.C. § 1988, 28 U.S.C. § 1920, and as otherwise permitted by law; and

(l)    Grant such other relief as this Court deems just and proper.

*(Rest of page intentionally left blank)*

71

Dated: May 22, 2020.

Respectfully submitted,

/s/ Jon Sherman
Jon Sherman*
D.C. Bar No. 998271
Michelle Kanter Cohen*
D.C. Bar No. 989164
Cecilia Aguilera*
D.C. Bar No. 1617884
FAIR ELECTIONS CENTER
1825 K St. NW, Ste. 450
Washington, D.C. 20006
Telephone: (202) 331-0114
Email: jsherman@fairelectionscenter.org
mkantercohen@fairelectionscenter.org
caguilera@fairelectionscenter.org


*Pro hac vice application forthcoming

/s/ Allison Riggs
Allison J. Riggs (State Bar #40028)
Jeffrey Loperfido (State Bar #52939)
Southern Coalition for Social Justice
1415 West Highway 54, Suite 101
Durham, NC 27707
Telephone: 919-323-3380
Facsimile: 919-323-3942
Email: Allison@southerncoalition.org
       jeff@southerncoalition.org

/s/ George P. Varghese
George P. Varghese*
WILMER CUTLER PICKERING HALE AND
DORR LLP
60 State Street
Boston, MA 02109
Telephone: (617) 526-6000
Fascimile: (617) 526-5000
Email:  george.varghese@wilmerhale.com

Joseph J. Yu*
WILMER CUTLER PICKERING HALE AND
DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Telephone: (212) 230-8800
Fascimile: (212) 230-8888
Email:  joseph.yu@wilmerhale.com