EXHIBIT 1

Letter from Karen Brinson Bell, Executive Director, N.C. State Board of Elections, to Governor Roy Cooper et al. (Mar. 26, 2020)

Exhibit to Declaration of Allison J. Riggs in support of Plaintiffs Motion for a Preliminary Injunction

*Mailing Address:*
P.O. Box 27255, Raleigh, NC 27611

(919) 814-0700 or
(866) 522-4723

*Fax:* (919) 715-0135

# NORTH CAROLINA
## STATE BOARD OF ELECTIONS

| | |
|---|---|
| **TO:** | Governor Roy Cooper; Speaker Tim Moore; President Pro Tempore Phil Berger; Joint Legislative Elections Oversight Committee; Joint Legislative Oversight Committee on General Government; and House Select Committee on COVID-19, Continuity of State Operations Working Group |
| **FROM:** | Karen Brinson Bell, Executive Director |
| **RE:** | Recommendations to Address Election-Related Issues Affected by COVID-19 |
| **DATE:** | March 26, 2020 |

The spread of the novel coronavirus (COVID-19) impacts the conduct of elections and daily operations for the State Board of Elections (State Board) and county boards of elections. In response, our agency has taken a number of actions in recent days and weeks to address election-related impacts of the pandemic and inform the public about our efforts. These include:

- An emergency Executive Order issued on March 20, 2020, that, among other things, rescheduled the Republican second primary in Congressional District 11 from May 12, 2020, to June 23, 2020.

- An amended Administrative Rule 08 NCAC 01 .0106, by both emergency and proposed temporary rulemaking, to clarify the Executive Director's statutory authority to exercise emergency powers to conduct an election in a district where the normal schedule for the election is disrupted by a natural disaster, extremely inclement weather, or armed conflict. The amendment clarifies that a catastrophe arising from natural causes includes a disease epidemic or other public health incident that makes it impossible or extremely hazardous for elections officials or voters to reach or otherwise access the voting place or that creates a significant risk of physical harm to persons in the voting place, or that would otherwise convince a reasonable person to avoid traveling to or being in a voting place.

- Numbered Memo 2020-11, released on March 15, 2020, provides guidance on immediate actions that may be taken by authority of the Executive Director and other steps that may be taken by county boards of elections.

- Establishment of a working group of State and county election officials to consider immediate steps that should be taken for the conduct of the federal second primary and also more long-term steps including legislative requests to administer elections in times of disease epidemics, necessary measures if mail balloting were expanded, and efforts that must be taken to ensure the health and well-being of voters and workers during in-person voting.

- A statement released by the NCSBE on March 12, 2020.

While the State Board will continue to administer elections in the wake of COVID-19 within our current legal authority, the State Board respectfully recommends the General Assembly consider making the following statutory changes to address the impacts of the coronavirus pandemic on our elections. We believe that, in order to ensure continuity and avoid voter confusion, the changes should be made permanent, except where indicated otherwise.

- **Expand options for absentee requests.** We recommend allowing a voter to submit an absentee ballot request form by fax and email. Current law restricts the return of the absentee request form to the voter and the voter's near relative or legal guardian, and restricts the methods by which the requests can be returned to in-person or by mail or designated delivery service. We also recommend a limited exception to G.S. § 163-230.2(e)(2) to allow county boards of elections to pre-fill a voter's information on an absentee request form. The voter or near relative would still be required to sign the form, but this change would allow voters who are home due to COVID-19 to request an absentee request form by phone and have a pre-filled form sent to them rather than having to travel to the county board office to receive assistance.

- **Establish online portal for absentee requests.** The State Board expects a large increase in the number of voters who choose to vote absentee by mail this year, and creating an online portal for absentee voting would make it easier for voters to request an absentee ballot from home. The voter or near relative would provide identifying information (including the voter's date of birth and the last four digits of the voter's Social Security or drivers license number), and an electronic signature as defined in G.S. § 66-312 of the Uniform Electronic Transaction Act would be permitted. An allocation of funds to purchase a program or application to support this functionality may be needed.

- **Allow a voter to include a copy of a HAVA document with their absentee request form if the voter is unable to provide their drivers license number or last four digits of their Social Security number.** We recommend allowing a voter who did not include their drivers license number or the last four digits of their Social Security number the option to include a copy of a current utility bill, bank statement, government check, paycheck, or other government document showing the name and address of the voter. Making this change to G.S. § 163-230.2 would make it easier for those who wish to vote absentee by-mail to do so. The State Board has received multiple reports from county boards of elections and from voters that, without this option, some voters are no longer able to request an absentee ballot. This particularly affects senior citizens who may not have a drivers license number and cannot recall or do not have access to their Social Security number. Allowing this option will make it easier for those most at risk of contracting COVID-19 to vote absentee by mail.

- **Establish a fund to pay for postage for returned absentee ballots.** Elections officials across the nation are anticipating a surge in absentee voting in light of

2

restrictions on movement imposed due to the spread of COVID-19. Prepaid postage would increase the likelihood that a voter would return their ballot, would eliminate the need for a voter to leave their home to purchase postage, and would also decrease any incentive for a voter to turn their ballot over to someone else. Prepaid postage for the return of absentee ballots would also further enable residents and patients of facilities such as nursing homes and group homes to return their ballots safely, easily, and with minimal human contact.

- **Reduce or eliminate the witness requirement.** In light of social distancing requirements to prevent the spread of COVID-19, we recommend reducing the witness requirement for the certification on absentee container-return envelopes. Currently, a voter must have their absentee envelope signed by two witnesses or one notary. North Carolina residents are currently being asked to stay at home, and without a timeline for when the disease will be under control, requiring only one witness would reduce the likelihood that a voter would have to go out into the community or invite someone to their home to have their ballot witnessed. Eliminating the witness requirement altogether is another option and would further reduce the risk.

- **Modify procedure for counting of ballots on Election Day.** To allow county boards of elections more time to process the anticipated surge in absentee ballots, we recommend amending the law to provide that ballots received by the Saturday prior to the election must be counted on Election Day, and all other absentee ballots that are timely received will be counted on the day of the canvass. Currently, G.S. § 163-234(2) requires county boards to meet on Election Day to count all absentee ballots received by 5:00 p.m. on the day before the election. Changing the timeframe for when absentee ballots are counted would help ease the burden of an increased volume of absentee ballots, especially in larger counties. This change would not affect the deadline for the county boards to receive absentee ballots, nor would it affect which ballots are counted; rather, it would ameliorate the anticipated increase in absentee ballots received by county boards between the Saturday before the election and 5:00 p.m. on the day before the election. As part of this change, we also recommend extending county canvass to 14 days after the election, rather than 10 days after the election as provided in G.S. § 163-182.5(b), to allow county boards of elections sufficient time to count the large number of ballots that are anticipated being received; State Board canvass would also need to extended accordingly.

- **Temporarily modify restrictions on assistance in care facilities.** Currently, G.S. § 163-226.3(a)(4) makes it a Class I felony for an owner, director, manager, or employee of a hospital, clinic, nursing home, or adult care home to assist a voter in that facility in requesting, voting, or returning the voter's absentee ballot. There are important reasons to discourage facility employees from assisting patients and residents with their absentee requests and with voting their ballots. However, many localities are currently restricting or banning visitors to facilities, and an Executive Order issued by the Governor prevents visitors altogether to reduce the spread of COVID-19. With this in mind, it may not be possible for

3

multipartisan assistance teams (MATs), or others who would traditionally assist facility residents, to provide assistance. Individuals may also be unwilling to serve on MATs due to the increased risk of transmission of COVID-19 at a facility. Many voters in these facilities do require help with requesting, voting, and/or returning their ballots, and with no option available for assistance they may effectively be disenfranchised. We suggest considering options, such as temporarily allowing a facility employee to assist, to ensure these voters are able to continue to exercise their right to vote.

- **Clarify authorization for telephonic meetings.** It would be helpful to clarify that telephonic meetings and meetings held by other remote means are specifically authorized by the open meetings law. State Board counsel construe Article 33C of Chapter 143 to permit telephonic and other remotely held meetings. However, the UNC School of Government has a different interpretation of the law based on its stated familiarity with the law's history.

- **Expand student pollworker program.** We are recommending expanding the student pollworker program to allow students to fill the role of judge or chief judge, to allow juniors or seniors to serve as long as they are at least 16 years old, and to allow service as a pollworker to count as an approved school trip. Chief judges and judges would still be appointed from recommendations provided by the political parties. Currently, G.S. § 163-42.1 requires students be at least 17 years old and only allows them to serve in the role of precinct assistant. It also requires the principal of the student's school to recommend the student; we suggest this section include an exception to that requirement if the school is closed. These changes would increase the county boards of elections' recruitment of students, who tend to be less at risk of COVID-19. The changes will be especially necessary if large numbers of pollworkers are unable to serve. The average age of pollworkers in North Carolina is around 70 and the role requires significant interaction with the public, so we anticipate that pollworkers in at-risk categories may be advised not to serve or may be unable to serve this year.

- **Make Election Day a holiday.** Designating Election Day as a State holiday would expand the potential pool of pollworkers to students, teachers, and younger individuals. It would also encourage state and county employees to work the polls. These groups tend to be in a lower-risk category for COVID-19 and therefore would be an asset given current concerns. An alternative option would be to provide paid leave for state and county employees who serve as pollworkers and providing course credit for student pollworkers.

- **Increase pay for pollworkers.** Precinct officials safeguard the democratic process and help ensure confidence in the system. Increasing pay for pollworkers will help county boards of elections recruit and retain a strong elections workforce this year and for years to come. Current pay for precinct officials is the state minimum wage, $7.25 per hour. G.S. § 163-46. On Election Day, pollworkers must serve for the entire day without leaving the site—a shift of more than 14 hours. The minimum wage requirement was put in place in 1981 (see Session

4

Law 1981-796). Ensuring that pollworkers' unemployment benefits are not affected by their service is another way to increase recruitment efforts.

- **Eliminate requirement that a majority of pollworkers reside in precinct.** Eliminating the requirement in G.S. § 163-41(c) that a majority of pollworkers at a polling place must reside in the precinct would provide county boards of elections with greater flexibility to staff their precincts. It would increase the likelihood a county board of elections would be able to keep a polling place open rather than having to combine it with another polling place to meet the residency requirement.

- **Temporarily suspend purchase and contract requirements for elections-related supplies and other items.** To allow the State Board and county boards to continue operating in a time when many business and government entities have reduced capacity or have closed, temporarily lifting the purchase and contract requirements of Article 3 of Chapter 143 in 2020 would significantly speed up the ability to procure necessary supplies.

- **Match HAVA funds.** In order to receive federal elections security funds that were authorized in late 2019, the State must make a 20% match. This funding will be indispensable in our agency's continued effort to secure North Carolina's elections. This is true even more so as we react and respond to the pandemic, since times of crisis and uncertainty increase the threats of cyber attacks, phishing attempts, and scams. Federal authorities have also indicated these funds may be used for COVID-19 response efforts such as cleaning supplies and protective masks for staff and pollworkers, resources to meet an unanticipated increased demand for mail ballots due to self-isolation and quarantine in response to COVID-19, and temporary staff to process the increased absentee ballot demand. Funds may also be used for costs incurred to communicate law changes, such as changes in absentee-by-mail ballot rules, that could result from the pandemic. Exempting HAVA-funded positions at the State Board from a possible hiring freeze would also be important to ensuring the agency is able to continue to secure the statewide voter registration database and many other duties to protect North Carolina's elections from cyber threats.

- **One-Stop.** Consider whether changes to one-stop requirements, such as site and hour requirements, may be needed in light of the uncertainty regarding containment of the COVID-19 pandemic by the early voting period in October 2020. Currently, if any one-stop site is open all one stop-sites must be open and all sites other than the county board office must be open 8:00 a.m. to 7:30 p.m. County boards of elections need flexibility to determine hours because they are affected differently by, and respond differently to, the COVID-19 pandemic.

While the situation with COVID-19 is changing on a daily and sometimes hourly basis, we believe the above recommendations will help the elections that form the basis of North Carolina's democracy remain strong and resilient in these uncertain times.

We are appreciative of the appointment of the House Select Committee on COVID-19, Continuity of State Operations Working Group, and I stand ready to answer your questions or provide any other information that may be useful in consideration of these recommendations.

Sincerely,

Karen Brinson Bell
Executive Director
State Board of Elections

# EXHIBIT 2

Letter from Karen Brinson Bell, Executive Director, N.C. State Board of Elections, to Governor Roy Cooper et al. (Apr. 22, 2020)

Exhibit to Declaration of Allison J. Riggs in support of Plaintiffs Motion for a Preliminary Injunction



**KAREN BRINSON BELL**
*Executive Director*

*Mailing Address:*
P.O. Box 27255,
Raleigh, NC 27611

*Phone:*
(919) 814-0700 or
(866) 522-4723

*Fax:*
(919) 715-0135

| **TO:** | Governor Roy Cooper; Speaker Tim Moore; President Pro Tempore Phil Berger; Joint Legislative Elections Oversight Committee; Joint Legislative Oversight Committee on General Government; House Select Committee on COVID-19, Continuity of State Operations Working Group; House Democratic Leader Darren Jackson; Senate Democratic Leader Dan Blue |
|---|---|
| **FROM:** | Karen Brinson Bell, Executive Director |
| **RE:** | CARES Act Request and Clarification to Recommendations to Address Election-Related Issues Affected by COVID-19 |
| **DATE:** | April 22, 2020 |

We write to provide you with updated information regarding our legislative requests made on March 26, 2020, including estimated costs and the timeframes for when changes would need to be made. We are also writing to provide additional detail about the Coronavirus Aid, Relief, and Economic Security (CARES) Act requirements that we received last week. On April 6, 2020, we were informed of North Carolina's award of $10,897,295 under the CARES Act, which was appropriated "to prevent, prepare for, and respond to coronavirus, domestically or internationally, for the 2020 Federal election cycle." The State match requirement is 20%, or $2,179,459.

We have completed two trainings to better understand how the match may be met and how the funds may be applied. Some key points are:

- The funds are for <u>additional costs</u>, either new or increased, associated with the national emergency related to coronavirus.
- All funds must be spent or incurred by December 31, 2020 or returned to the federal government.
- Pre-award costs may be included if they were incurred on or after January 20, 2020.
- The State match may be funded over two years and may also be met:
  - By direct funding of the State;
  - By indirect or direct costs incurred by the State Board of Elections, county boards of elections, and/or partners supporting state or county election boards to conduct elections through this pandemic; and/or,
  - Through in-kind contributions. We are working with the National Association of State Election Directors to identify hand sanitizer and other supplies that may be provided free of charge if available.

1

To date, we have identified $58,962 already incurred by the State Board of Elections, county boards of elections, and supporting entities that can be credited towards the State's match. This includes $38,031 in indirect costs incurred by the State Board of Elections; $14,931 in direct costs incurred by the county boards of elections; and $6,000 in in-kind donations.

**We therefore are requesting state funding of $2,120,497 to receive the $10+ million awarded to North Carolina.**

Through these funds we can offset significant new and increased costs to the counties because of a projected 30% to 40% voter absentee-by-mail participation rate (compared to a 4% to 5% rate traditionally), the need to more thoroughly sanitize and improve hygiene methods during one-stop early voting and on Election Day, and to address possible poll worker shortage due to illness or reluctance or inability to serve. The CARES Act funds would directly assist counties through bulk purchases, state purchase and distribution to the counties, or through reimbursement, and could include but are not limited to the cost of:

- One-time-use pens and styluses for each voter, or sanitization of reusable supplies
- Hand sanitizer and masks for voters, poll workers, and election staff
- Social distancing tools and protective devices such as face shields, stanchions and plexiglass shields at check-in stations
- Facility rental fees to assist counties in moving to sites large enough to accommodate social distancing, including former department stores or grocery stores, if available
- Facility cleaning fees before, during, and after the election
- Increased postage costs due to a higher volume of absentee-by-mail requests
- Mail tracking software to help the voter understand where their ballot is in the process and to help the counties prepare for the volume of incoming returned ballots
- Cost of additional absentee-by-mail envelopes and other supplies

Just to conduct the General Election statewide on Election Day, we will operate nearly 2,700 voting sites with approximately 18,000 workers employed for 14 to 16 hours. We are preparing for more than 4.5 million voters to vote in-person or by-mail in this election. To ensure the health and safety of the voters and workers, the costs add up quickly. And while we would like to think that coronavirus will be a distant memory by November, we must prepare to address lingering fears, new social norms, and the possibility that the virus could reoccur seasonally as do influenza and other viruses. As elections officials, we must prepare for the worst-case scenario to ensure that voters are able to cast their ballots. All of this means we need legislative approval for the associated State match to move forward with the CARES Act funding.

Procuring and purchasing these supplies must happen now to ensure delivery by July when counties will begin to assemble their supply kits, train poll workers, and receive orders from print houses. We must also be mindful that all 50 states and territories will be implementing similar procedures for the same Election Day and the supply chain is very stressed to meet the demands.

For these reasons, we also request that the General Assembly move forward with the following recommendations during the special session beginning April 28, 2020. These are immediate needs that apply to the 11th Congressional District Republican Second Primary, the new Columbus County Commissioner District 2 Republican Primary, and the 2020 General Election. Particular to the General Election, because of the high expected turnout for a presidential general election, supplies must be ordered, printing changes must be submitted and scheduled with print houses, and other changes or orders should be completed by June 15, 2020 to meet deadlines associated with that election, which starts with absentee-by-mail voting on September 4, 2020. The recommendations needing immediate consideration for all three elections are:

- **Match CARES Act funds** as outlined above.

- **Match HAVA** funds as outlined in my [March 26, 2020 letter](March 26, 2020 letter).

- **Temporarily suspend purchase and contract requirements for elections-related supplies and other items.** Because of the time limitations and amount of supplies needed to protect voters and pollworkers from COVID-19, the State Board and county boards may have difficulty complying with procurement processes without the temporary suspension. <u>This change would need to happen right away as we are currently attempting to procure many supplies due to the upcoming second primary and the shortages that have occurred with so many states competing for resources.</u>

  - ➢ No additional expected cost

- **Expand options for absentee requests (allow requests by fax and email).** We recommend allowing a voter to submit an absentee ballot request form by fax and email to allow voters to submit their absentee requests without leaving their home or needing to purchase stamps or envelopes. <u>This change needs to be made as soon as possible as voters may already request absentee ballots for the June 23 and November 3 elections.</u>

  - ➢ No additional expected cost

- **Allow a voter to include a copy of a HAVA document with their absentee request form if the voter is unable to provide their driver's license number or last four digits of their Social Security number.** Restoring this option will make it easier for those most at risk of contracting COVID-19 to vote absentee by-mail. <u>This change is needs to be made as soon as possible as voters may already request absentee ballots for the June 23 and November 3 elections.</u>

  - ➢ No additional expected cost

- **Reduce or eliminate the witness requirement for absentee ballots.** Most voters, under current law, would have to invite another adult into the voter's home to complete the voting process since most voters do not live with two other individuals age 18 or older. This increases the risk of transmission or exposure to disease. By reducing the witness requirement to one witness during a disease epidemic, we can effectively conduct

3

absentee-by-mail voting while reducing a voter's risk of disease. Additionally, it should be noted that we continue to support restricting the return of absentee-by-mail ballots to the voter or near relative as enacted by Session Law 2019-239. It is necessary to make the change now in order to update the absentee instructions and return envelope, since these will need to be redesigned by June and printed in early July to ensure the counties can meet the start of absentee-by-mail voting on September 4, 2020.

An alternative option, and one that could be carried out beyond the 2020 General Election, is to consider signature matching software. Software is available to compare the voter's signature on file to the signature provided on the absentee-ballot return envelope. Moving to this verification process would eliminate the need for witnesses.

> ➢ No additional expected cost to reducing witness requirement. Software would have added cost, but we do not yet have information about the expected cost.

- **Temporarily modify restrictions on assistance in care facilities.** Many localities are currently restricting or banning visitors and family members to facilities, and an [Executive Order](#) issued by the Governor prevents visitors altogether to reduce the spread of COVID-19. Additionally, across the state, care facilities have tragically experienced large numbers of coronavirus cases and deaths. We do not know what the conditions will be like when absentee voting occurs from September to November this year. With this in mind, it may not be possible for multipartisan assistance teams (MATs), or others who would traditionally assist facility residents, to provide assistance. Many voters in these facilities do require help with requesting, voting, and/or returning their ballots, and with no option available for assistance, they may effectively be disenfranchised. We suggest considering options, such as temporarily allowing a facility employee to assist, to ensure these voters are able to continue to exercise their right to vote. Similar to states like Indiana, two trained facility employees not of the same political party could be designated to administer voting and could be trained accordingly by the county board prior to serving in this capacity. Election officials could then transport materials to and from the facility with chain of custody procedures documenting the acceptance of materials by the designated facility administrators. It is necessary to make this change as soon as possible to designate and train appropriate individuals to serve in facilities.

> ➢ No additional expected cost

- **Expand student pollworker program** and **eliminate requirement that a majority of pollworkers reside in the precinct.** We recommend this change be made immediately because there are shortages in some polling places in the 11th Congressional District Republican Second Primary and the new Columbus County Commissioner District 2 Republican Primary that may require transferring voters to another precinct.

> ➢ No additional cost expected

4

**We also request the General Assembly move forward with the following recommendations during the special session beginning April 28, 2020. These are immediate needs, but it is not possible to implement them for the 11ᵗʰ Congressional District Republican Second Primary and the new Columbus County Commissioner District 2 Republican Primary. Because of deadlines associated with the 2020 General Election, however, there is an immediate need to prepare for a coronavirus response:**

- **Establish online portal for absentee requests.** This change would need to be made immediately due to the time required to acquire software, modify the State Board of Elections' Statewide Elections Information Management System (SEIMS), and inform the public of the change prior to the start of absentee voting on September 4, 2020.

  - ➢ We have received a quote from a vendor who supports numerous states and jurisdictions throughout the country. Based upon the volume projected for North Carolina, the annual license fee is $398,000 with a pre-election configuration fee of $25,950.

- **Establish a fund to pay for postage for outbound and returned absentee ballots.** We would request any funds be allocated as soon as possible to allow county boards of elections to budget for the election and in light of the budgetary reductions they are already being requested to make at the county level.

  - ➢ The estimate for prepaid postage for the November general election, based upon 65% of registered voters participating in the election and 40% of those participating by mail, would be $3,640,000, at a cost of approximately $2 total per ballot (7 million voters x 65% overall participation=4,550,000 participating voters with 40% participating by mail=1,820,000 by mail ballots). This prepaid cost would include both the outgoing and incoming postage cost. Envelope size and weight may affect this estimate.

- **Modify one-stop site and hour requirements.** We recommend any changes be made as soon as possible to allow time for county boards of elections to locate and procure appropriate sites, a process that has already begun for the November 3 election.

  - ➢ We expect a change would reduce costs for the county boards of elections. Due to the uncertainty of any possible change, it is not currently possible to estimate the savings.


We appreciate the dialogue we have had with many of you through this process and uncharted waters. Our goal is to "prepare for the worst" in hopes that we are overly prepared. Elections administration, as we have discussed, is a planning and logistics operation. The bulk of an election is executed before voting ever begins, which is why we come before you now. If we can secure the funds needed and know any legislative changes that may occur, then we can better prepare and deliver successful elections under normal conditions or in times of crisis.

I stand ready to answer your questions or provide any other information that may be useful in consideration of these funding requests and recommendations.

Sincerely,

Karen Brinson Bell
Executive Director
State Board of Elections

6

# EXHIBIT 3

# Letter from Board of Elections Members in Congressional District 11 to General Assembly Leaders et al. (Apr. 29, 2020)

Exhibit to Declaration of Allison J. Riggs in support of Plaintiffs Motion for a Preliminary Injunction

**CONGRESSIONAL DISTRICT 11 BOARDS OF ELECTIONS**
**c/o Kathy Ray, Madison County Board of Elections**
**Marshall, NC 28753**
**Phone:  828-649-3731**
**Email:  madison.boe@madisoncountync.gov**

April 27, 2020

Dear General Assembly Leaders, Election Committee Members, and Western NC Legislators,

We write as Republican and Democratic members of the county boards of elections in Congressional District 11 with an urgent request.

As we prepare to administer the runoff election (Second Primary) on June 23, we are learning that many of our regular poll workers are reluctant to serve.  A large percent of them are elderly and are genuinely concerned about their health.  In addition, some of our polling places are now being used by other agencies for emergency purposes.  If we must change or combine polling places because of a poll worker shortage or a need for alternative locations, we must place a public notice in the media by May 9th and must mail notices to all affected voters by May 23rd.

Under current law, a majority of poll workers must reside in the precinct where they serve on Election Day.  State Board of Elections Director Karen Brinson Bell has requested a change in state law to allow county boards to recruit and train poll workers from across the county.  This change would significantly help us staff polling places in these challenging times.  Because we must make decisions very soon, we encourage you to include this change in the actions you take when you reconvene next week.

We are committed to administering secure and fair elections, and we would be happy to provide our insights about other changes that may be needed in the future. Our county directors are also valuable resources for conducting safe and secure elections at the county level.  The State Board of Elections has provided a number of suggestions that address important issues at the state level, and many of them are also time sensitive, including matching state funds to release federal dollars for enhanced security and COVID-19 related election expenses.

We appreciate your leadership and look forward to working with you.

Sincerely,

*Board of Elections Members in Congressional District 11 (alphabetical order of signers)*

Pat Ackerman, Cherokee County
Eddie Adams, Cherokee County
Craig Allen, Cherokee County
Jerry Anderson, Clay County
Brian Ball, Madison County
Gary Boone, Yancey County

Sara Champion, Transylvania County
Juanita Colvard, Graham County
Lowell Crisp, Graham County
Gail Criss, Clay County
William Cutler, Henderson County
Pamela Dashiell, Transylvania County
Danny Davis, Haywood County
Gary Dills, Macon County
Billy Ditmore, Graham County
Teresa Eller, Graham County
Lynne Garrison, Macon County
Jeff Gillette, Macon County
Gary Kilpatrick, Cherokee County
Ray Lewis, Madison County
Frances Lockwood, Rutherford County
Pat Margo, Clay County
Charles McCurry, Yancey County
Rusty McLean, Haywood County
Lee McMinn, Transylvania County
Charles Medd, Henderson County
Joey Miller, Yancey County
David Morrow, Transylvania County
Elizabeth Norris, Haywood County
June Ray, Haywood County
Keith Rogers, Graham County
Paul Rohs, Clay County
Dyatt Smathers, Madison County
Linda Smith, Rutherford County
Sandy Solsbee, Cherokee County
Howard Sorrells, Haywood County
Christian Stolz, Henderson County
Kathy Tinsley, Macon County
Julia Tipton, Yancey County
Sandra Tolley, Madison County
John Vanhook, Macon County
Michael Wainwright, Transylvania County
Jerry Wallin, Madison County
Brenda Wilson, Yancey County
Keyla Youngblood-Stillwell, Clay County

# EXHIBIT 4

*Statement on the second meeting of the International Health Regulations (2005) Emergency Committee Regarding the Outbreak of Novel Coronavirus (2019-nCoV)* published by the World Health Organization

Exhibit to Declaration of Allison J. Riggs in support of Plaintiffs Motion for a Preliminary Injunction

**World Health Organization**

©

# Newsroom Detail

# Statement on the second meeting of the International Health Regulations (2005) Emergency Committee regarding the outbreak of novel coronavirus (2019-nCoV)

30 January 2020 | Statement | Geneva, Switzerland

The second meeting of the Emergency Committee convened by the WHO Director-General under the International Health Regulations (IHR) (2005) regarding the outbreak of novel coronavirus 2019 in the People's Republic of China, with exportations to other countries, took place on Thursday, 30 January 2020, from 13:30 to 18:35 Geneva time (CEST). The Committee's role is to give advice to the Director-General, who makes the final decision on the determination of a Public Health Emergency of International Concern (PHEIC). The Committee also provides public health advice or suggests formal Temporary Recommendations as appropriate.

## Proceedings of the meeting

<u>Members and advisors of the Emergency Committee</u> were convened by teleconference

The Director-General welcomed the Committee and thanked them for their support. He turned the meeting over to the Chair, Professor Didier Houssin.

Professor Houssin also welcomed the Committee and gave the floor to the Secretariat.

A representative of the department of compliance, risk management, and ethics briefed the Committee members on their roles and responsibilities.

Committee members were reminded of their duty of confidentiality and their responsibility to disclose personal, financial, or professional connections that might be seen to constitute a conflict of interest. Each member who was present was surveyed and no conflicts of interest were judged to be relevant to the meeting. There were no changes since the previous meeting.

The Chair then reviewed the agenda for the meeting and introduced the presenters.

Representatives of the Ministry of Health of the People's Republic of China reported on the current situation and the public health measures being taken. There are now 7711 confirmed and 12167 suspected cases throughout the country. Of the confirmed cases, 1370 are severe and 170 people have died. 124 people have recovered and been discharged from hospital.

The WHO Secretariat provided an overview of the situation in other countries. There are now 83 cases in 18 countries. Of these, only 7 had no history of travel in China. There has been human-to-human transmission in 3 countries outside China. One of these cases is severe and there have been no deaths.

At its first meeting, the Committee expressed divergent views on whether this event constitutes a PHEIC or not. At that time, the advice was that the event did not constitute a PHEIC, but theCommittee members agreed on the urgency of the situation and suggested that the Committee should continue its meeting on the next day, when it reached the same conclusion.

This second meeting takes place in view of significant increases in numbers of cases and additional countries reporting confirmed cases.

# Conclusions and advice

The Committee welcomed the leadership and political commitment of the very highest levels of Chinese government, their commitment to transparency, and the efforts made to investigate and contain the current outbreak. China quickly identified the virus and shared its sequence, so that

other countries could diagnose it quickly and protect themselves, which has resulted in the rapid development of diagnostic tools.

The very strong measures the country has taken include daily contact with WHO and comprehensive multi-sectoral approaches to prevent further spread. It has also taken public health measures in other cities and provinces; is conducting studies on the severity and transmissibility of the virus, and sharing data and biological material. The country has also agreed to work with other countries who need their support. The measures China has taken are good not only for that country but also for the rest of the world.

The Committee acknowledged the leading role of WHO and its partners.

The Committee also acknowledged that there are still many unknowns, cases have now been reported in five WHO regions in one month, and human-to-human transmission has occurred outside Wuhan and outside China.

The Committee believes that it is still possible to interrupt virus spread, provided that countries put in place strong measures to detect disease early, isolate and treat cases, trace contacts, and promote social distancing measures commensurate with the risk. It is important to note that as the situation continues to evolve, so will the strategic goals and measures to prevent and reduce spread of the infection. The Committee agreed that the outbreak now meets the criteria for a Public Health Emergency of International Concern and proposed the following advice to be issued as Temporary Recommendations.

The Committee emphasized that the declaration of a PHEIC should be seen in the spirit of support and appreciation for China, its people, and the actions China has taken on the frontlines of this outbreak, with transparency, and, it is to be hoped, with success. In line with the need for global solidarity, the Committee felt that a global coordinated effort is needed to enhance preparedness in other regions of the world that may need additional support for that.

# Advice to WHO

The Committee welcomed a forthcoming WHO multidisciplinary technical mission to China, including national and local experts. The mission should review and support efforts to investigate the animal source of the outbreak, the clinical spectrum of the disease and its severity, the extent of human-to-human transmission in the community and in healthcare facilities, and efforts to control the outbreak. This mission will provide information to the international community to aid in understanding the situation and its impact and enable sharing of experience and successful measures.

The Committee wished to re-emphasize the importance of studying the possible source, to rule out hidden transmission and to inform risk management measures

The Committee also emphasized the need for enhanced surveillance in regions outside Hubei, including pathogen genomic sequencing, to understand whether local cycles of transmission are occurring.

WHO should continue to use its networks of technical experts to assess how best this outbreak can be contained globally.

WHO should provide intensified support for preparation and response, especially in vulnerable countries and regions.

Measures to ensure rapid development and access to potential vaccines, diagnostics, antiviral medicines and other therapeutics for low- and middle-income countries should be developed.

WHO should continue to provide all necessary technical and operational support to respond to this outbreak, including with its extensive networks of partners and collaborating institutions, to implement a comprehensive risk communication strategy, and to allow for the advancement of research and scientific developments in relation to this novel coronavirus.

WHO should continue to explore the advisability of creating an intermediate level of alert between the binary possibilities of PHEIC or no PHEIC, in a way that does not require reopening negotiations on the text of the IHR (2005).

WHO should timely review the situation with transparency and update its evidence-based recommendations.

The Committee does not recommend any travel or trade restriction based on the current information available.

**The Director-General declared that the outbreak of 2019-nCoV constitutes a PHEIC and accepted the Committee's advice and issued this advice as Temporary Recommendations under the IHR.**

# To the People's Republic of China

Continue to:

• Implement a comprehensive risk communication strategy to regularly inform the population on the evolution of the outbreak, the prevention and protection measures for the population, and the response measures taken for its containment.

• Enhance public health measures for containment of the current outbreak.

• Ensure the resilience of the health system and protect the health workforce.

• Enhance surveillance and active case finding across China.

• Collaborate with WHO and partners to conduct investigations to understand the epidemiology and the evolution of this outbreak and measures to contain it.

• Share relevant data on human cases.

• Continue to identify the zoonotic source of the outbreak, and particularly the potential for circulation with WHO as soon as it becomes available.

• Conduct exit screening at international airports and ports, with the aim of early detection of symptomatic travelers for further evaluation and treatment, while minimizing interference with international traffic.

# To all countries

It is expected that further international exportation of cases may appear in any country. Thus, all countries should be prepared for containment, including active surveillance, early detection, isolation and case management, contact tracing and prevention of onward spread of 2019-nCoVinfection, and to share full data with WHO. Technical advice is available on the WHO website.

Countries are reminded that they are legally required to share information with WHO under the IHR.

Any detection of 2019-nCoV in an animal (including information about the species, diagnostic tests, and relevant epidemiological information) should be reported to the World Organization for Animal Health (OIE) as an emerging disease.

Countries should place particular emphasis on reducing human infection, prevention of secondary transmission and international spread, and contributing to the international response though multi-sectoral communication and collaboration and active participation in increasing knowledge on the virus and the disease, as well as advancing research.

The Committee does not recommend any travel or trade restriction based on the current information available.

Countries must inform WHO about travel measures taken, as required by the IHR. Countries are cautioned against actions that promote stigma or discrimination, in line with the principles of Article 3 of the IHR.

The Committee asked the Director-General to provide further advice on these matters and, if necessary, to make new case-by-case recommendations, in view of this rapidly evolving situation.

# To the global community

As this is a new coronavirus, and it has been previously shown that similar coronaviruses required substantial efforts to enable regular information sharing and research, the global community should continue to demonstrate solidarity and cooperation, in compliance with Article 44 of the IHR (2005), in supporting each other on the identification of the source of this new virus, its full potential for human-to-human transmission, preparedness for potential importation of cases, and research for developing necessary treatment.

Provide support to low- and middle-income countries to enable their response to this event, as well as to facilitate access to diagnostics, potential vaccines and therapeutics.

Under Article 43 of the IHR, States Parties implementing additional health measures that significantly interfere with international traffic (refusal of entry or departure of international travellers, baggage, cargo, containers, conveyances, goods, and the like, or their delay, for more than 24 hours) are obliged to send to WHO the public health rationale and justification within 48 hours of their implementation. WHO will review the justification and may request countries to reconsider their measures. WHO is required to share with other States Parties the information about measures and the justification received.

The Emergency Committee will be reconvened within three months or earlier, at the discretion of the Director-General.

The Director-General thanked the Committee for its work.

**Subscribe to our newsletters** →

# EXHIBIT 5

*People who are at higher risk for severe illness,*
published by Ctrs. for Disease Control and
Prevention ("CDC")

Exhibit to Declaration of Allison J. Riggs in support of Plaintiffs Motion for a Preliminary
Injunction



COVID-19 is a new disease and there is limited information regarding risk factors for severe disease. Based on currently available information and clinical expertise, **older adults and people of any age who have serious underlying medical conditions** might be at higher risk for severe illness from COVID-19.

Based on what we know now, those at high-risk for severe illness from COVID-19 are:

- People 65 years and older
- People who live in a nursing home or long-term care facility

People of all ages with underlying medical conditions, particularly if not well controlled, including:

- People with chronic lung disease or moderate to severe asthma
- People who have serious heart conditions
- People who are immunocompromised
  - Many conditions can cause a person to be immunocompromised, including cancer treatment, smoking, bone marrow or organ transplantation, immune deficiencies, poorly controlled HIV or AIDS, and prolonged use of corticosteroids and other immune weakening medications
- People with severe obesity (body mass index [BMI] of 40 or higher)
- People with diabetes
- People with chronic kidney disease undergoing dialysis
- People with liver disease



| Older Adults | People with Asthma |
| At Risk For Severe Illness | People with HIV |
| People with Liver Disease | People Who Are Immunocompromised |

## COVID-19: Are You at Higher Risk for Severe Illness?

### Resources

- ASL Video Series: COVID-19: Are You at Higher Risk for Severe Illness?
- Learn how you can help protect yourself if you are at higher risk of severe illness from COVID-19

Page last reviewed: May 14, 2020

# EXHIBIT 6

# Remarks by President Trump, Vice President Pence, and Members of the Coronavirus Task Force (Mar. 25, 2020)

Exhibit to Declaration of Allison J. Riggs in support of Plaintiffs Motion for a Preliminary Injunction



# Remarks by President Trump, Vice President Pence, and Members of the Coronavirus Task Force in Press Briefing



**HEALTHCARE**

Issued on: **March 25, 2020**

★ ★ ★

James S. Brady Press Briefing Room

5:54 P.M. EDT

THE PRESIDENT: Thank you very much. So, nice to be with you. America continues to gain ground in the war against the virus.

I want to thank the American people for answering the call, following our guidelines, and making the sacrifices required to overcome this terrible threat. More aggressively we commit to social distancing — so important. Social distancing — such an important phrase. And we do it right now. The more lives we can save and the sooner we can eventually get people back to work, back to school, and back to normal.

And there are large sections of our country — probably can go back much sooner than other sections. And we're obviously looking at that also. People are asking, "Is that an alternative?" And I say, "Absolutely, it is an alternative."

I have now approved major disaster declarations for New York, California, Washington, Iowa, Louisiana, Texas, and Florida. That has great significance, as you know, and legal significance.

So, each person in every place — no matter what county, what community, what state — can work with us to ensure that we prevent the spread of this virus to others.  So thank you.

THE VICE PRESIDENT:  Well done.

Doctor?

DR. FAUCI:  Thank you, Mr. Vice President.  I just want to spend a couple of minutes telling you a little bit about some information that I got on our weekly call that we have at least once a week with the W- — with WHO, which is led by Dr. Tedros and Mike Ryan, who's the point man there, to give us some information.  And, in that regard, I want to apologize for my curt response to you when you asked me about the China deal because I shouldn't have done that.  That's not my style.

But what I really wanted to say is that my job is that I'm a scientist, I'm a physician, and I'm a public-health person and I don't like to get involved in that stuff.

So, anyway, getting back to the WHO.  So we learned some really interesting information because, obviously, the other countries, like China and others, have — had been hit prior that we did.

One of the things that was striking to me — and I just throw it out because it's something that we will face.  We're not facing it now, but we will face — our Chinese colleagues are very concerned because they went through the entire cycle of the curve to come down.  And they have very, very few cases.  But what they're starting to see as they're relaxing the constraints on travel, that they're getting imported cases.  And they wanted to warn us that when we get successful, make sure you very carefully examine how you're going to release the constraints on inputs.

So I know we're going to be successful in putting this under control, but I think we're going to have to remember, we don't want to import cases in.  That's the first thing for today.

The second thing that was important is that — it was something that Dr. Birx mentioned.  And that is, when you look at the inflection of the curves, we now have multiple different countries that have gone through various phases of their individual outbreaks and you could learn something from them about where you are in your own outbreak.

For example, when China went up, what happened is they just didn't turn around. They went from going to — I'll just take an arbitrary number — 500 new cases a day. The next day, it was 1,000 cases, then 1,500, and then 2,000. But once the number of new cases each day starts to flatten out, that's when you get to that point where the inflection goes down.

So if you — what — things we want to look for are the things that Dr. Birx had mentioned. That doesn't mean you declare victory when it does that, but you know you're at least on the way to where you want to go. And I think that's really very important.

The third and final thing that I think gets back to the question that many of you in the audience have asked of us, is about: Would this possibly become a seasonal cyclic thing? And I've always indicated to you that I think it very well might.

And the reason I say that is that what we're starting to see now in the Southern Hemisphere — in southern Africa and in the Southern-Hemisphere countries — is that we're having cases that are appearing as they go into their winter season. And if, in fact, they have a substantial outbreak, it will be inevitable that we need to be prepared that we'll get a cycle around the second time.

What does that mean for us and what we're doing? It totally emphasizes the need to do what we're doing in developing a vaccine, testing it quickly, and trying to get it ready so that we'll have a vaccine available for that next cycle. In addition, to do the randomized controlled trials of drugs, so that we will have a menu of drugs that we have shown to be effective and shown to be safe. Because I know we'll be successful in putting this down now, but we really need to be prepared for another cycle. And what we're doing, I believe, will prepare us well.

Thank you.

THE VICE PRESIDENT: Thanks, Doctor. We'll take a few questions. Please.

Q  Mr. Vice President, on ventilators, some really important reporting from the Center of Public Integrity today. They suggested that there's only 16,000 in the National Stockpile. Can you just give us some clarity: How many ventilators do you have the National Stockpile? Who else is making them? And how long will it take for them to make the critical mass? Because based on the Center for Public Integrity, it appears there aren't enough and people are doing to die as a result.

# EXHIBIT 7

*CDC Director Warns Second Wave of Coronavirus Might be 'More Difficult'* (Apr. 21, 2020) published by the Hill

Exhibit to Declaration of Allison J. Riggs in support of Plaintiffs Motion for a Preliminary Injunction



# CDC director warns second wa coronavirus might be 'more dit

BY **ZACK BUDRYK** - 04/21/20 04:51 PM EDT

**16,793** SHARES

SHARE                    TW



00:03 / 00:35

A potential second wave of the novel coronavirus late in the year would likely be more deadly, as it would overlap with flu season, Centers for Disease Control and Prevention (CDC) head Robert Redfield told The Washington Post on Tuesday.

"There's a possibility that the assault of the virus on our nation next winter will actually be even more difficult than the one we just went through," Redfield _told the Post_. "And when I've said this to others, they kind of put their head back, they don't understand what I mean."

Redfield said two coinciding respiratory outbreaks would strain the nation's health care system even further than the current pandemic, which has been marked by shortages of ventilators, test kits and personal protective equipment.

Americans can make such a scenario less likely, he said, by keeping up to date on flu vaccinations, which he said "may allow there to be a hospital bed available for your mother or grandmother that may get coronavirus."

Governors detail frustrations with Trump over COVID-19 supplies

Overnight Health Care: White House shifts focus from coronavirus |...

Redfield said the U.S. was spared a much worse COVID-19 outbreak because the coronavirus hit the nation when the seasonal flu was already on the decline. Had they hit at the same time, "it could have

## Just In...

**Watch live: Rod Rosenstein testifies before Senate on Russia probe**
SENATE — 7S AGO

**Mother of George Floyd's 6-year-old daughter: 'He'll never see her grow up'**
STATE WATCH — 9M 4S AGO

**Watch live: De Blasio holds press conference on NYC protests, pandemic response**
IN THE NEWS — 9M 49S AGO

**Dershowitz: Does President Trump have power to declare martial law?**
OPINION — 11M 39S AGO

**ADP report shows 2.8 million jobs lost in May**
FINANCE — 14M 40S AGO

**Pope condemns racism, says street violence is 'self-defeating'**
INTERNATIONAL — 22M 4S AGO

**Poll: Majority 'sympathetic' to protesters, disapprove of Trump's response**
CAMPAIGN POLLS — 30M 46S AGO

**Stocks continue winning streak amid protests**
FINANCE — 31M 1S AGO

**VIEW ALL**

been really, really, really, really difficult in terms of health capacity," he said.

The 2009 swine flu pandemic followed a similar trajectory, with an initial wave in spring and then a second in fall and winter, when flu season in the U.S. typically takes place.

The CDC head told the Post that federal and state officials should use the months ahead to scale up their testing capacity for after more widespread restrictions are lifted as well as their ability to find anyone with whom a confirmed case has interacted. Officials must also continue to stress the importance of social distancing even after the restrictions end, Redfield said.

**TAGS   THE WASHINGTON POST   ROBERT REDFIELD   CORONAVIRUS   FLU SEASON   PANDEMIC SOCIAL DISTANCING   PERSONAL PROTECTIVE EQUIPMENT**

SHARE          TWEET



**THE HILL 1625 K STREET, NW SUITE 900 WASHINGTON DC 20006 | 202-628-8500 TEL | 202-628-8503 FAX**
**THE CONTENTS OF THIS SITE ARE ®2020 CAPITOL HILL PUBLISHING CORP., A SUBSIDIARY OF NEWS COMMUNICATIONS, INC.**

# EXHIBIT 8

# Governor Roy Cooper's Exec. Order No. 141 (May 20, 2020)

Exhibit to Declaration of Allison J. Riggs in support of Plaintiffs Motion for a Preliminary Injunction



# State of North Carolina

## ROY COOPER
GOVERNOR

**May 20, 2020**

**EXECUTIVE ORDER NO. 141**

**EASING RESTRICTIONS ON TRAVEL, BUSINESS OPERATIONS, AND MASS GATHERINGS:  PHASE 2**

**WHEREAS**, on March 10, 2020, the undersigned issued Executive Order No. 116 which declared a State of Emergency to coordinate the State's response and protective actions to address the Coronavirus Disease 2019 ("COVID-19") public health emergency and provide for the health, safety, and welfare of residents and visitors located in North Carolina; and

**WHEREAS**, on March 11, 2020, the World Health Organization declared COVID-19 a global pandemic; and

**WHEREAS**, on March 13, 2020, the President of the United States issued an emergency declaration for all states, tribes, territories, and the District of Columbia, retroactive to March 1, 2020, and the President declared that the COVID-19 pandemic in the United States constitutes a national emergency; and

**WHEREAS**, on March 25, 2020, the President approved a Major Disaster Declaration, FEMA-4487-DR, for the State of North Carolina; and

**WHEREAS**, in responding to the COVID-19 pandemic, and for the purpose of protecting the health, safety, and welfare of the people of North Carolina, the undersigned has issued Executive Order Nos. 116-122, 124-125, 129-131, 133-136, and 138-140; and

**WHEREAS**, more than twenty thousand people in North Carolina have had laboratory-confirmed cases of COVID-19, and hundreds of people in North Carolina have died from the disease; and

**WHEREAS**, hospital administrators and health care providers have expressed concerns that unless the spread of COVID-19 is limited, existing health care facilities may be insufficient to care for those who become sick; and

**WHEREAS,** the undersigned and the Secretary of Health and Human Services have directed hospitals, physicians' practices, and other health care entities to undertake significant actions as part of North Carolina's emergency response to address the COVID-19 pandemic; and

**WHEREAS**, slowing and controlling community spread of COVID-19 is critical to ensuring that the state's healthcare facilities remain able to accommodate those who require medical assistance; and

WHEREAS, the continued community spread of COVID-19 within North Carolina requires the state to continue some measures to slow the spread of this virus during the pandemic; and

WHEREAS, since the issuance of executive orders to slow the spread of COVID-19, North Carolina has "flattened the curve" and prevented a surge or spike in cases across the state, and North Carolina has also increased its capacity for testing, tracing and the availability of personal protective equipment ("PPE"); and

WHEREAS, despite the overall stability in key metrics, North Carolina's daily case counts of COVID-19 continue to increase slightly in the context of increased testing, demonstrating the state must remain vigilant in its work to slow the spread of the virus; and

WHEREAS, should there be an increase in the percentage of emergency department visits that are due to COVID-19 like illness, an increase in the number of laboratory-confirmed cases, an increase in the positive tests as a percent of total tests, an increase in COVID-19-related hospitalizations that threaten the ability of the health care system to properly respond, or should the State's ability to conduct testing and tracing be compromised, it may be necessary to reinstate certain restrictions eased by this Executive Order so as to protect the health, safety, and welfare of North Carolinians; and

WHEREAS, the risk of contracting and transmitting COVID-19 is higher in settings that are indoors, where air does not circulate freely and where people are less likely to maintain social distancing by staying six (6) feet apart; and

WHEREAS, the risk of contracting and transmitting COVID-19 is higher in settings where people are stationary and in close contact for long periods of time; and

WHEREAS, the risk of contracting and transmitting COVID-19 is higher in gatherings of larger groups of people because these gatherings offer more opportunity for person-to-person contact with someone infected with COVID-19; and

WHEREAS, to lower the risk of contracting and transmitting COVID-19, this Executive Order imposes restrictions on businesses that limit the number of contacts between people, particularly in settings that are indoors, involve people being stationary and in close contact for long periods of time, or are part of mass gatherings; and

WHEREAS, certain types of businesses by their very nature present greater risks of the spread of COVID-19 because of the nature of the activity, the way that people have traditionally acted and interacted with each other in that space, and the duration that patrons stay in the establishment; and

WHEREAS, people in North Carolina are encouraged to use a cloth face covering to reduce the spread of COVID-19, but some populations may experience increased anxiety and fear of bias and being profiled if wearing face coverings in public spaces; and

WHEREAS, if someone is the target of ethnic or racial intimidation as the result of adhering to the mask provision or as a result of the pandemic, they are encouraged to report the matter to law enforcement or another government entity; and

WHEREAS, people in North Carolina must remain flexible to account for the evolving nature and scope of the public health emergency posed by COVID-19, and also return to—in a safe, strategic, and incremental manner—their normal personal and professional activities, to the extent public health circumstances permit; and

WHEREAS, people in North Carolina are encouraged to take on the challenges of living in a community beset by a global pandemic, while also returning to school, work, and social activities in a safe, strategic and incremental manner to help reduce the risk of COVID-19 transmission; and

**WHEREAS,** businesses that are open during the duration of this Executive Order are encouraged to follow the Guidelines for Businesses published by the North Carolina Department of Health and Human Services ("NCDHHS"), available electronically on its website; and

**WHEREAS,** food service and food availability remain an important component of North Carolina's response to the COVID-19 pandemic, such that food service providers, including restaurants and other dine-in facilities are encouraged to open to the extent practicable to safely provide food and nutrition to people in North Carolina; and

**WHEREAS,** it is in the interest of the State of North Carolina to provide as many viable avenues as practicable for North Carolina agricultural products to be consumed in-state in order to avoid unnecessary waste in the production of food; and

**WHEREAS,** the closure of on-premises dining in restaurants has significantly curtailed demand for food sold by restaurants and, therefore, disproportionately harmed workers, farms, and businesses involved in the sale of food through the restaurant supply chain and led to the waste of food produced by such workers, farms, and businesses; and

**WHEREAS,** because restaurants and grocery stores are served by different supply chains that cannot always be rapidly adjusted, the closure of on-premises dining in restaurants has shifted food demand to grocery stores, taxing the supply chain for grocery stores and leading to higher grocery prices for consumers; and

**WHEREAS,** reopening restaurants for on-premises dining in a safe, strategic manner should ameliorate the adverse economic effects on workers, farms, and businesses involved in the sale of food through the restaurant supply chain, prevent the waste of food, and reduce stress on the supply chain for grocery stores, thereby lowering grocery prices for consumers; and

**WHEREAS,** despite the unprecedented nature of the COVID-19 pandemic, people in North Carolina should have the opportunity to enjoy performing arts and competitive sporting events broadcast into their homes; and

**WHEREAS,** as long as progress continues to be met on the COVID-19 metrics, and as long as health care systems continue to be projected to have sufficient capacity for patient care, commerce that does not raise unreasonable risks of COVID-19 spread may be reopened; and

**WHEREAS,** with public health requirements in place and face coverings more readily available, personal care, grooming, and tattoo businesses may be reopened in a safe, strategic manner without raising unreasonable risk of COVID-19 spread; and

**WHEREAS,** Executive Order No. 116 invoked the Emergency Management Act, and authorizes the undersigned to exercise the powers and duties set forth therein to direct and aid in the response to, recovery from, and mitigation against emergencies; and

**WHEREAS,** pursuant to N.C. Gen. Stat. § 166A-19.10(b)(2), the undersigned may make, amend, or rescind necessary orders, rules, and regulations within the limits of the authority conferred upon the Governor in the Emergency Management Act; and

**WHEREAS,** N.C. Gen. Stat. § 166A-19.10(b)(3) authorizes and empowers the undersigned to delegate Gubernatorial vested authority under the Emergency Management Act and to provide for the sub-delegation of that authority; and

**WHEREAS,** N.C. Gen. Stat. § 166A-19.10(b)(4) gives the undersigned the authority to "cooperate and coordinate" with the President of the United States; and

**WHEREAS,** pursuant to N.C. Gen. Stat. § 166A-19.12(3)(e), the Division of Emergency Management must coordinate with the State Health Director to revise the North Carolina Emergency Operations Plan as conditions change, including making revisions to set "the appropriate conditions for quarantine and isolation in order to prevent the further transmission of disease," and following this coordination, the Emergency Management Director and the State

Health Director have recommended that the Governor develop and order the plan and actions identified in this Executive Order; and

WHEREAS, pursuant to N.C. Gen. Stat. § 166A-19.23 in conjunction with N.C. Gen. Stat. §§ 75-37 and 75-38, the undersigned may issue a declaration that shall trigger the prohibitions against excessive pricing during states of disaster, states of emergency or abnormal market disruptions; and

WHEREAS, pursuant to N.C. Gen. Stat. § 166A-19.30(a)(1), the undersigned may utilize all available state resources as reasonably necessary to cope with an emergency, including the transfer and direction of personnel or functions of state agencies or units thereof for the purpose of performing or facilitating emergency services; and

WHEREAS, pursuant to N.C. Gen. Stat. § 166A-19.30(a)(2), the undersigned may take such action and give such directions to state and local law enforcement officers and agencies as may be reasonable and necessary for the purpose of securing compliance with the provisions of the Emergency Management Act and with the orders, rules, and regulations made thereunder; and

WHEREAS, pursuant to N.C. Gen. Stat. § 166A-19.30(c)(i), the undersigned has determined that local control of the emergency is insufficient to assure adequate protection for lives and property of North Carolinians because not all local authorities have enacted such appropriate ordinances or issued such appropriate declarations restricting the operation of businesses and limiting person-to-person contact, thus needed control cannot be imposed locally; and

WHEREAS, pursuant to N.C. Gen. Stat. § 166A-19.30(c)(ii), the undersigned has determined that local control of the emergency is insufficient to assure adequate protection for lives and property of North Carolinians because some but not all local authorities have taken implementing steps under such ordinances or declarations, if enacted or declared, in order to effectuate control over the emergency that has arisen; and

WHEREAS, pursuant to N.C. Gen. Stat. § 166A-19.30(c)(iii), the undersigned has determined that local control of the emergency is insufficient to assure adequate protection for lives and property of North Carolinians because the area in which the emergency exists spreads across local jurisdictional boundaries and the legal control measures of the jurisdictions are conflicting or uncoordinated to the extent that efforts to protect life and property are, or unquestionably will be, severely hampered; and

WHEREAS, pursuant to N.C. Gen. Stat. § 166A-19.30(c)(iv), the undersigned has determined that local control of the emergency is insufficient to assure adequate protection of lives and property of North Carolinians because the scale of the emergency is so great that it exceeds the capability of local authorities to cope with it; and

WHEREAS, N.C. Gen. Stat. § 166A-19.30(c) in conjunction with N.C. Gen. Stat. § 166A-19.31(b)(1) authorizes the undersigned to prohibit and restrict the movement of people in public places; and

WHEREAS, N.C. Gen. Stat. § 166A-19.30(c) in conjunction with N.C. Gen. Stat. § 166A-19.31(b)(2) authorizes the undersigned to prohibit and restrict the operation of offices, business establishments, and other places to and from which people may travel or at which they may congregate; and

WHEREAS, N.C. Gen. Stat. § 166A-19.30(c) in conjunction with N.C. Gen. Stat. § 166A-19.31(b)(5) authorizes the undersigned to prohibit and restrict other activities or conditions, the control of which may be reasonably necessary to maintain order and protect lives or property during a state of emergency; and

WHEREAS, pursuant to N.C. Gen. Stat. § 166A-19.30(c)(1), when the undersigned imposes the prohibitions and restrictions enumerated in N.C. Gen. Stat. § 166A-19.31(b), the

undersigned may amend or rescind the prohibitions and restrictions imposed by local authorities; and

WHEREAS, pursuant to N.C. Gen. Stat. § 166A-19.30(a)(2), during a Gubernatorially declared State of Emergency, the undersigned has the power to "give such directions to State and local law enforcement officers and agencies as may be reasonable and necessary for the purpose of securing compliance with the provisions of this Article."

NOW, THEREFORE, by the authority vested in me as Governor by the Constitution and the laws of the State of North Carolina, **IT IS ORDERED**:

**Section 1.  Definitions**.  In this Executive Order:

1. "Bars" means establishments that are not eating establishments or restaurants as defined in N.C. Gen. Stat. §§ 18B-1000(2) and 18B-1000(6), that have a permit to sell alcoholic beverages for onsite consumption under N.C. Gen. Stat. § 18B-1001, and that are principally engaged in the business of selling alcoholic beverages for onsite consumption.

2. "Core Signage, Screening, and Sanitation Requirements" are the following actions which establishments open to the public under the terms of this Executive Order must follow, namely:

   a. Post the Emergency Maximum Occupancy in a noticeable place.

   b. Post signage reminding attendees, customers, and workers about social distancing (staying at least six (6) feet away from others) and requesting that people who have been symptomatic with fever and/or cough not enter.

   c. Conduct daily symptom screening of workers, using a standard interview questionnaire of symptoms, before workers enter the workplace.

   d. Immediately isolate and remove sick workers.

   e. Perform frequent and routine environmental cleaning and disinfection of high-touch areas with an EPA-approved disinfectant for SARS-CoV-2 (the virus that causes COVID-19).

   NCDHHS has prepared sample signs and a sample screening checklist questionnaire, available at https://covid19.ncdhhs.gov/guidance, that may be used to meet some of the requirements above.  Businesses or operations do not need to use the NCDHHS sample signs and questionnaires to meet the requirements of this Executive Order.

3. "Emergency Maximum Occupancy" is defined in Section 6.

4. "Face Covering" means a covering of the nose and mouth by wearing a covering or mask for the purpose of ensuring the physical health or safety of the wearer or others as defined in Session Law 2020-3 s. 4.3(a).  In the context of the COVID-19 emergency, the Face Covering works to protect other people more than the wearer.

5. "Personal Care, Grooming, and Tattoo Businesses" means businesses that (a) do not provide health care services; and (b) either (i) have workers directly touch customers or (ii) have a piece of equipment (other than a touchscreen) repeatedly come into contact directly with customers' skin.  This includes, but is not limited to, barber shops, beauty salons (including but not limited to waxing and hair removal centers), hair salons, nail salons, manicure or pedicure providers, tattoo parlors, tanning salons, and massage therapists.

6. "Recommendations to Promote Social Distancing and Reduce Transmission" are defined in Section 3(B) below.

7. "Restaurants" means permitted food establishments, under N.C. Gen. Stat. § 130A-248, and other establishments that both prepare and serve food. This includes, but is not limited to, restaurants, cafeterias, food halls, dining halls, food courts, and food kiosks. This includes not only free-standing locations but also locations within other businesses or facilities, including, but not limited to airports, shopping centers, educational institutions, or private or members-only clubs where food and beverages are permitted to be consumed on premises.

8. "Retail Business" means any business in which customers enter a space to purchase goods or services, including but not limited to grocery stores, convenience stores, large-format retail stores, pharmacies, banks, and ABC stores. This also includes, but is not limited to, (i) retail establishments operated by the state, its political subdivisions, or agencies thereof, and (ii) state agencies under the jurisdiction of the undersigned which have a public-facing component offering a service, such as the Division of Motor Vehicles, the Department of Revenue, and shops in Department of Natural and Cultural Resources facilities.

## Section 2. High-Risk Individuals Encouraged to Stay at Home.

People who are at high risk of severe illness from COVID-19 are very strongly encouraged to stay home and travel only for absolutely essential purposes. The Centers for Disease Control and Prevention ("CDC") defines high-risk individuals as people 65 years or older **and people of any age who have serious underlying medical conditions**, including people who are immunocompromised or who have chronic lung disease, moderate-to-severe asthma, serious heart conditions, severe obesity, diabetes, chronic kidney disease undergoing dialysis, or liver disease.

## Section 3. Activities Outside the Home.

For the reasons and pursuant to the authority set forth above, the undersigned orders as follows:

A. **Stay at Home Order Lifted.** The Stay at Home Order in Executive Order No. 138 is lifted. Individuals are strongly encouraged to telework to the greatest extent permissible by their employer.

B. **Follow the Recommendations to Promote Social Distancing and Reduce Transmission.** When people are outside their homes, they are strongly encouraged to take the following Recommendations to Promote Social Distancing and Reduce Transmission:

1. Maintain at least six (6) feet social distancing from other individuals, with the exception of family or household members.

2. Wear a cloth Face Covering when leaving home and wear it inside all public settings such as grocery stores, pharmacies, or other retail or public-serving businesses. A Face Covering should also be worn outdoors when you cannot maintain at least six (6) feet distancing from other people with the exception of family or household members. These coverings function to protect other people more than the wearer.

3. Carry hand sanitizer with you when leaving home, and use it frequently.

4. Wash hands using soap and water for at least twenty (20) seconds as frequently as possible.

5. Regularly clean high-touch surfaces such as steering wheels, wallets, and phones.

6. Stay at home if sick.

## Section 4. Exemptions from This Executive Order.

Worship, religious, and spiritual gatherings, funeral ceremonies, wedding ceremonies, and other activities constituting the exercise of First Amendment rights are exempt from all the

requirements of this Executive Order and Executive Order Nos. 121 and 138, notwithstanding any other provision of this Executive Order or of Executive Order Nos. 121 and 138.

The undersigned strongly urges that entities and individuals engaging in these exempted activities follow the Recommendations to Promote Social Distancing and Reduce Transmission, avoid exceeding Emergency Maximum Occupancy in the places where they meet, and avoid holding Mass Gatherings.

## Section 5.  Structure of This Executive Order.

The restrictions in this Executive Order are tailored for particular situations where COVID-19 can spread.  As a result, the restrictions in this Executive Order fall into three categories:

- Section 6 establishes restrictions for certain listed kinds of businesses and operations.  The restrictions in this Section ensure that there is not overcrowding and spread people out in each space to reduce the risk from COVID-19.

- Section 7 establishes a Mass Gathering limit.  This limit controls the risk of COVID-19 spread in events or convenings that are not covered by the specific restrictions in Section 6.

- Section 8 keeps closed certain kinds of businesses and operations because those types of businesses, by their very nature, present greater risks of the spread of COVID-19.  These greater risks are due to factors such as people traditionally interacting in that space in a way that would spread COVID-19, shared equipment that is repeatedly touched by customers or attendees, or a business model that involves customers or attendees remaining in a confined indoor space over a sustained period.

## Section 6.  Restrictions on Certain Businesses and Operations.

For the reasons and pursuant to the authority set forth above, the undersigned orders as follows:

A. **Prohibition.** To control the spread of COVID-19 and protect lives during the State of Emergency, this Section lists restrictions on the operations of business establishments and other places to or from which people may travel or at which they may congregate.  Businesses or operations within the scope of this Section are prohibited from operating unless they follow the restrictions stated in this Section.

B. **Retail Businesses.**

  1. **Requirements for Retail Businesses.**  While this Executive Order is in effect, all open Retail Businesses must do all of the following.

      a. Limit customers inside the store to Emergency Maximum Occupancy. Under this Executive Order, the Emergency Maximum Occupancy for a Retail Business is the lowest number produced by applying the following two tests:

          i. Limit the number of customers in the store to fifty percent (50%) of stated fire capacity (or, for spaces without a stated fire capacity, no more than twelve (12) customers for every one thousand (1000) square feet of the location's total square footage, including the parts of the location that are not accessible to customers or guests).

          ii. Limit the number of people in the store so that everyone can stay six (6) feet apart.

      b. Mark six (6) feet of spacing in lines at point of sale and in other high-traffic areas for customers, such as at deli counters and near high-demand products.

      c. Follow the Core Signage, Screening, and Sanitation Requirements as defined in this Executive Order.

C. **Restaurants**.

1. **Restaurants May Open for On-Premises Service.** During the effective period of this Executive Order, restaurants may allow on-premises consumption of food and beverages. Restaurants must meet the sanitation requirements of this Section even if they are open only for take-out or delivery service.

2. **Requirements**. While this Executive Order is in effect, all open restaurants must do all of the following:

   a. Limit customers in indoor and outdoor seating areas to Emergency Maximum Occupancy. Under this Executive Order, the Emergency Maximum Occupancy for a restaurant is the lowest number produced by applying the following three tests:

      i. Limit the number of customers in the restaurant to fifty percent (50%) of stated fire capacity (or, for spaces without a stated fire capacity, no more than twelve (12) customers for every one thousand (1000) square feet of the location's total square footage, including the parts of the location that are not accessible to customers or guests).

      ii. Limit the number of people in the space so that groups can stay six (6) feet apart.

      iii. Arrange the restaurant so that customers sitting at a table are not within six (6) feet of any customers sitting at another table. Moreover, each group of customers sitting at a counter should be separated from other groups by six (6) feet.

   b. Limit customers at tables so that no more than ten (10) people shall be seated together at the same table. However, more than ten (10) people may sit together at the same table if they are members of the same household.

   c. Workers in Restaurants are strongly encouraged to wear Face Coverings when they are within six (6) feet of another person. Notwithstanding this general rule, people whose religious beliefs prevent them from wearing a Face Covering, people who cannot wear a Face Covering due to a medical or behavioral health condition, and people who are under twelve (12) years of age are excepted from the requirement to wear a Face Covering. Children under two (2) years of age shall not wear a Face Covering so that their breathing may not be inhibited.

   d. Follow the Core Signage, Screening, and Sanitation Requirements as defined in this Executive Order, along with the following additional requirements:

      i. Increase disinfection during peak times or high customer density times, and disinfect all shared objects (e.g., dining tables, booths, counters, payment terminals, tables, countertops/bars, receipt trays, condiment holders, and reusable menus) between each use.

      ii. Promote frequent use of hand-washing and hand sanitizer for wait staff and food service staff throughout the shift and upon reporting to work. Hand washing must at least meet the requirements specified in the North Carolina Food Code Manual.

   e. Mark six (6) feet of spacing in lines at high-traffic areas for customers, such as a cash register or place where customers wait to be seated at their table.

3. **Clarifications**. People sitting at a table need not be members of the same household and do not need to stay six (6) feet apart. Moreover, this Executive Order does not require servers and wait staff to stay six (6) feet away from customers.

4. **Miscellaneous.** A restaurant that operates consistent with the terms of this Subsection of this Executive Order shall continue to be considered an "Essential Business" for the purpose of N.C. Sess. L. 2020-03, Sec. 4.14(a) to the extent that COVID-19-related claims are made against the restaurant.

D. **Personal Care, Grooming, and Tattoo Businesses**.

1. **Personal Care, Grooming, and Tattoo Businesses May Open.** During the effective period of this Executive Order, Personal Care, Grooming, and Tattoo Businesses may operate, but must be in compliance with this Section.

2. **Requirements**. While this Executive Order is in effect, all open Personal Care, Grooming, and Tattoo Businesses must do all of the following:

   a. Limit customers inside the store to Emergency Maximum Occupancy. Under this Executive Order, the Emergency Maximum Occupancy for a Personal Care, Grooming, and Tattoo Business is the lowest number produced by applying the following two tests:

      i. Limit the number of customers in the store to fifty percent (50%) of stated fire capacity (or, for spaces without a stated fire capacity, no more than twelve (12) customers for every one thousand (1000) square feet of the location's total square footage, including the parts of the location that are not accessible to customers or guests).

      ii. Limit the number of people in the store so that patrons can stay six (6) feet apart.

   b. Arrange seating so that groups of customers are separated from one another by six (6) feet.

   c. Workers in Personal Care, Grooming, and Tattoo Businesses shall wear Face Coverings when they are within six (6) feet of another person. Notwithstanding this general requirement, people whose religious beliefs prevent them from wearing a Face Covering, people who cannot wear a Face Covering due to a medical or behavioral condition, and people who are under twelve (12) years of age are excepted from the requirement to wear a Face Covering. Children under two (2) years of age shall not wear a Face Covering so that their breathing may not be inhibited.

   d. Follow the Core Signage, Screening, and Sanitation Requirements as defined in this Executive Order, except for the requirement to have signage remind people about staying six (6) feet apart.

   e. Ensure that all equipment that comes into direct personal contact with customers and all furniture in service areas (such as chairs, capes, and the shampooing area in a barber shop or salon) is completely cleaned and disinfected between each customer.

   f. Mark six (6) feet of spacing in lines at point of sale and in other high-traffic areas for customers, such as at cash registers and waiting areas.

3. **Recommendation**. Patrons in Personal Care, Grooming, and Tattoo Businesses are strongly encouraged to wear Face Coverings when they are within six (6) feet of another person, unless they cannot wear Face Coverings due to religious beliefs, age, or a medical or behavioral health condition.

E. **Pools**.

    1. **Indoor and Outdoor Pools May Open.** During the effective period of this Executive Order, indoor or outdoor pool facilities (whether stand-alone or part of other facilities) may operate, but must be in compliance with this Subsection.

    2. **Requirements**. While this Executive Order is in effect, all open pool facilities must do all of the following:

        a. Limit the user capacity in the pool to no more than 50% of maximum occupancy as determined by fire code (or, when fire code number is not known, thirty-three (33) people per one thousand (1000) square feet in deck areas, wading pools and splash pads), and a maximum occupancy in the water of ten (10) people per one thousand (1000) square feet. This user capacity is the Emergency Maximum Occupancy for the pool facility.

        b. Follow the Core Signage, Screening, and Sanitation Requirements as defined in this Executive Order.

    3. This Subsection applies only to shared pools in commercial settings or at residential complexes. It does not apply to family pools at people's homes.

F. **Child Care Facilities**.

    1. **Child Care Facilities May Open and May Serve All Children**. Child care facilities may open or reopen, and they may serve all children in North Carolina. All references to "covered children" in Executive Order Nos. 130 and 138 shall refer to all children.

    2. **Requirements**. Child care facilities that are open or reopened consistent with the Executive Order must abide by the following requirements:

        a. Follow all applicable NCDHHS guidelines.

        b. Follow the Core Signage, Screening, and Sanitation Requirements as defined in this Executive Order.

        c. Conduct a daily health screening on all individuals who are entering the building.

        d. Immediately isolate sick workers and children from the rest of the facility and send them home.

        e. Have a plan to work with local health departments to identify close contacts of confirmed cases in the child care setting.

        f. Before reopening, child care facilities shall submit to NCDHHS the Emergency Child Care Provider Application. NCDHHS must approve the Emergency Child Care Provider Application before the child care facility can reopen.

    3. **Relationship to Previous Executive Orders**. Subdivisions 1 and 2(a) of this Subsection completely replace Subsections (C) and (D) of Section 2 of Executive Order No. 130. Otherwise, Section 2 of Executive Order No. 130 and Section 3 of Executive Order No. 139 shall remain in effect through 5:00 pm on June 26, 2020. The effective date provisions of those Executive Orders are amended accordingly.

G. **Day Camps and Overnight Camps**.

    1. **Requirements for Day Camps**.

        a. Follow all applicable NCDHHS guidelines.

b. Follow the Core Signage, Screening, and Sanitation Requirements as defined in this Executive Order.

c. Conduct a daily health screening on all individuals who are entering the building.

d. Immediately isolate sick workers and children from the rest of the facility and send them home.

e. Public schools operating day camps and programs may open for the purpose of the day camp or program, but must otherwise remain closed to the general public.

f. Have a plan to work with local health departments to identify close contacts of confirmed cases in the camp setting.

2. **Requirements for Overnight Camps.**

a. Follow all applicable NCDHHS guidelines.

b. Conduct daily symptom screening of workers.

c. Immediately isolate sick campers and staff away from others.

d. If a camper or staff member has been diagnosed with COVID-19 or is presumed positive by a medical professional due to symptoms, the camper or staff member should be isolated away from other campers and staff until they meet the CDC criteria for release from isolation:

   i. No fever for at least 72 hours since recovery (without the use of fever-reducing medicine); and
   ii. Other symptoms have improved (e.g., coughing, shortness of breath); and
   iii. At least ten (10) days have passed since first symptoms.

e. Have a plan to work with local health departments to identify close contacts of confirmed cases in a camp setting

f. Perform ongoing and routine environmental cleaning and disinfection of high-touch areas (e.g., doors, doorknobs, rails) with an EPA approved disinfectant for SARS-CoV-2 (the virus that causes COVID-19), increasing disinfection during peak times or high camper density times.

3. Programs and camps for adults are not covered by this Section.

## Section 7. Mass Gatherings.

For the reasons and pursuant to the authority set forth above, the undersigned orders as follows:

A. **Prohibition on Mass Gatherings.**

1. **Prohibition**. Mass Gatherings are prohibited. "Mass Gathering" means an event or convening that brings together more than ten (10) people indoors or more than twenty-five (25) people outdoors at the same time in a single confined indoor or outdoor space, such as an auditorium, stadium, arena, or meeting hall. This includes parades, fairs, and festivals. In publicly accessible indoor facilities, the Mass Gathering limit applies per room of the facility. A household where more than ten (10) people reside is not a Mass Gathering.

The outdoor Mass Gathering limit of twenty-five (25) people applies to groups of people that may gather together in a park, and on a beach or trail.

2. **Exceptions from Prohibition on Mass Gatherings.** Notwithstanding Subsection (A)(1) above:

   a. The prohibition on Mass Gatherings does not apply to any of the restricted businesses and operations identified in Section 6 of this Executive Order, because in those situations, transmission of COVID-19 will be controlled through the measures specifically tailored for each situation that are listed in those Sections. The prohibition on Mass Gatherings also does not apply to educational institutions or government operations.

   b. The prohibition on Mass Gatherings does not include gatherings for health and safety, to look for and obtain goods and services, for work, or for receiving governmental services. A Mass Gathering does not include normal operations at airports, bus and train stations or stops, medical facilities, libraries, shopping malls, and shopping centers. However, in those settings, people must follow the Recommendations to Promote Social Distancing and Reduce Transmission as much as possible, and they should circulate within the space so that there is no sustained contact between people.

B. **Parks, Trails, and Beaches**.

   1. Each group of people within a park, trail, or beach must be limited so that the group, counted on its own, does not exceed the Mass Gathering limit.

   2. All operators of open public or private parks must meet the following requirements:

      a. Post signage reminding attendees, customers, and workers about social distancing (staying at least six (6) feet away from others) and requesting that people who have been symptomatic with fever and/or cough not enter.

      b. Conduct daily symptom screening of workers, using a standard interview questionnaire of symptoms, before workers enter the workplace.

      c. Immediately isolate and remove sick workers.

      d. Perform frequent and routine environmental cleaning and disinfection of high-touch areas with an EPA-approved disinfectant for SARS-CoV-2 (the virus that causes COVID-19).

   3. **Public Playgrounds Remain Closed**. Because public playground equipment may increase spread of COVID-19, public playgrounds will remain closed during the effective phase of this Executive Order, including public playground equipment located in parks.

C. **Drive-ins**. Events are not prohibited Mass Gatherings if the participants all stay within their cars, such as at a drive-in movie theater.

D. **Households**. A household where more than ten (10) people reside is not a Mass Gathering.

**Section 8. Orders of Closure.**

For the reasons and pursuant to the authority set forth above, the undersigned orders as follows:

A. **Entertainment and Fitness Facilities**.

   1. In addition to the restrictions on Mass Gatherings identified in Section 7 of this Executive Order, the following entertainment and fitness facilities that operate within a confined indoor or outdoor space and do not offer a retail or dining component are ordered to close. Any retail or dining component within the following entertainment and fitness facilities may operate solely for retail or dining, but those components must comply with the restrictions set out in Section 6 of this Executive Order.

2. Entertainment and fitness facilities restricted by this Subsection include, but are not limited to, the following types of business:

- Bingo Parlors, including bingo sites operated by charitable organizations
- Bowling Alleys
- Indoor Exercise Facilities (e.g., yoga studios, dance studios, martial arts facilities, indoor trampoline and rock climbing facilities)
- Gyms
- Indoor Fitness Facilities, including but not limited to indoor basketball courts, volleyball courts, racquetball courts, squash courts, and tennis courts
- Health Clubs and Fitness Centers
- Movie Theaters
- Skating Rinks
- Gaming and business establishments which allow gaming activities (e.g., video poker, gaming, sweepstakes, video games, arcade games, pinball machines or other computer, electronic or mechanical devices played for amusement)
- Venues for Receptions or Parties
- Museums
- Amusement Parks
- Bars
- Night Clubs, Dance Halls, or Music Halls where patrons are not seated.

B. **Limitations of this Executive Order**. This Executive Order solely directs that bars are not to serve alcoholic beverages for onsite consumption, and this Executive Order does not direct the closure of retail beverage venues that provide for the sale of beer, wine, and liquor for off-site consumption only. It also does not require the closure of production operations at breweries, wineries, or distilleries.

C. **Training of Professional and Collegiate Athletes**. Professional athletes and athletes performing on an agreement with an educational institution to receive a scholarship or other benefit may train within indoor fitness facilities that otherwise would be closed under Subsection A above, provided they do not exceed the Mass Gathering limit.

D. **ABC Commission**. If the Alcoholic Beverage Control Commission (the "ABC Commission") identifies other state laws, regulations, and policies that may affect bars, restaurants, and other dining establishments identified in this Executive Order, it is directed to inform the Office of the Governor in writing. Upon written authorization from the Office of the Governor, the ABC Commission may interpret flexibly, modify, or waive those state laws, regulations and policies, as appropriate, and to the maximum extent permitted under applicable state and federal law, to effectuate the purposes of this Executive Order.

**Section 9. Entertainment and Sporting Events in Large Venues.**

A. **Intent**. The intent of this Section is to permit venues to hold sporting or entertainment events, for the recording of and broadcast to the public, if the venue is of sufficient size to allow people to flow in and out of the venue in a way that would avoid creating a risk of spreading COVID-19.

B. **Exception**. Therefore, as an exception to the closure of entertainment and fitness facilities in Section 8 above, an entertainment or sporting venue with at least two entrances and exits and a stated fire capacity of at least five hundred (500) may hold a performance by entertainers, performers, or athletes. The venue must control the flow of people through lobbies and other common spaces to allow social distancing and avoid the spread of COVID-19.

C. **Treatment under Mass Gathering Limit**. In this situation, and only in this situation: (1) entertainers, performers, and athletes, along with coaches, training, support, and broadcast staff, shall not count toward the Mass Gathering limit and (2) employees and other workers at facilities where entertainment and sporting events occur also shall not count toward the Mass Gathering limit.

D. **Restrictions on Spectators**. Spectators or other attendees at any sporting or entertainment events allowed under this Section must be no more than the Mass Gathering limit of ten (10) people indoors or more than twenty-five (25) people outdoors. Moreover, any entertainers or athletes must stay six (6) feet away from spectators.

E. **Requirements for Large Venue Operators**. Any venue operator subject to this Section allowing an event permitted by this Section shall:

1. Follow the Core Signage, Screening, and Sanitation Requirements as defined in this Executive Order.

2. Increase disinfection during peak times or high customer density times, and disinfect all shared objects (e.g., payment terminals, tables, countertops/bars, receipt trays, condiment holders) between use.

3. Immediately isolate and remove sick workers.

4. Any food service at sporting or entertainment events must comply with the restrictions set out in Section 6 of this Executive Order. Bars at sporting or entertainment events must remain closed.

## Section 10. Provisions from Previous Executive Orders.

A. The provisions on schools contained in Section 4(E) of Executive Order No. 138 and signed on May 05, 2020 by the undersigned are incorporated by reference into this Executive Order and adopted as if reprinted here in full.

B. The Long Term Care provisions contained in Section 7 of Executive Order No. 138 and signed on May 05, 2020 by the undersigned are incorporated by reference into this Executive Order and adopted as if reprinted here in full.

C. The Local Order provisions contained in Section 8 of Executive Order No. 138 and signed on May 05, 2020 by the undersigned are incorporated by reference into this Executive Order and adopted as if reprinted here in full. The references to maximum occupancy standards for Retail Businesses in Section 8 of Executive Order No. 138 shall instead refer to the equivalent provisions in this Executive Order.

D. Otherwise, all previous travel restrictions, orders to stay at home, and prohibitions of mass gatherings in Executive Orders Nos. 121 and 138 are no longer in effect and are replaced by this Executive Order.

## Section 11. Extension of Price Gouging Period.

For the reasons and pursuant to the authority set forth above, the undersigned orders as follows:

Pursuant to N.C. Gen. Stat. § 166A-19.23, the undersigned extends the prohibition against excessive pricing, as provided in N.C. Gen. Stat. §§ 75-37 and 75-38, from the issuance of Executive Order No. 116 through 5:00 pm on June 26, 2020.

The undersigned further hereby encourages the North Carolina Attorney General to use all resources available to monitor reports of abusive trade practices towards consumers and make readily available opportunities to report to the public any price gouging and unfair or deceptive trade practices under Chapter 75 of the North Carolina General Statutes.

## Section 12. No Private Right of Action.

This Executive Order is not intended to create, and does not create, any individual right, privilege, or benefit, whether substantive or procedural, enforceable at law or in equity by any party against the State of North Carolina, its agencies, departments, political subdivisions, or other entities, or any officers, employees, or agents thereof, or any emergency management worker (as defined in N.C. Gen. Stat. § 166A-19.60) or any other person.

## Section 13.  Savings Clause.

If any provision of this Executive Order or its application to any person or circumstances is held invalid by any court of competent jurisdiction, this invalidity does not affect any other provision or application of this Executive Order, which can be given effect without the invalid provision or application.  To achieve this purpose, the provisions of this Executive Order are declared to be severable.

## Section 14.  Distribution.

I hereby order that this Executive Order be: (1) distributed to the news media and other organizations calculated to bring its contents to the attention of the general public; (2) promptly filed with the Secretary of the North Carolina Department of Public Safety, the Secretary of State, and the superior court clerks in the counties to which it applies, unless the circumstances of the State of Emergency would prevent or impede such filing; and (3) distributed to others as necessary to ensure proper implementation of this Executive Order.

## Section 15.  Enforcement.

A.  Pursuant to N.C. Gen. Stat. § 166A-19.30(a)(2), the provisions of this Executive Order shall be enforced by state and local law enforcement officers.

B.  A violation of this Executive Order may be subject to prosecution pursuant to N.C. Gen. Stat. § 166A-19.30(d), and is punishable as a Class 2 misdemeanor in accordance with N.C. Gen. Stat. § 14-288.20A.

C.  Nothing in this Executive Order shall be construed to preempt or overrule a court order regarding an individual's conduct (e.g., a Domestic Violence Protection Order or similar orders limiting an individual's access to a particular place).

## Section 16.  Effective Date.

This Executive Order is effective at 5:00 pm on May 22, 2020.  This Executive Order shall remain in effect through 5:00 pm on June 26, 2020 unless repealed, replaced, or rescinded by another applicable Executive Order.  An Executive Order rescinding the Declaration of the State of Emergency will automatically rescind this Executive Order.

**IN WITNESS WHEREOF,** I have hereunto signed my name and affixed the Great Seal of the State of North Carolina at the Capitol in the City of Raleigh, this 20th day of May in the year of our Lord two thousand and twenty.

_____
Roy Cooper
Governor

**ATTEST:**

_____
Elaine F. Marshall
Secretary of State

# EXHIBIT 9

*NCDMW Announces Driver License Office Changes during COVID-19 Outbreak* (last updated June 2, 2020), published by the Department of Transportation

Exhibit to Declaration of Allison J. Riggs in support of Plaintiffs Motion for a Preliminary Injunction

# NCDMV Announces Driver License Office Changes during COVID-19 Outbreak

**RALEIGH –** Due to concern for the health and safety of its customers and staff during the coronavirus outbreak, the N.C. Division of Motor Vehicles will consolidate in-person services to offices large enough to maintain social distancing as defined by the Centers for Disease Control and Prevention (CDC), effective Wednesday, until further notice.

The DMV will close about 60 offices that have the fewest examiner stations or have office setups that make it difficult to provide customers with the recommended space recommended by the CDC. Customers who have appointments at those offices are being contacted and will be given new appointments once those offices re-open. Affected employees will be re-assigned to help staff at about 50 offices that are scheduled to remain open, or to assist at our customer service call centers.

**JUNE 2 UPDATE**: This PDF lists which offices remain open and which have now closed.

The open offices will be transitioned to handle appointment-only visits and will limit the number of customers allowed inside at the same time, depending on the office size. They will also no longer conduct road tests except for commercial driver's license and medical reassessments. All customers for the driver license offices will be asked to complete a wellness questionnaire provided by the state health officials to mitigate the potential spread of the virus in our driver license offices.

You can check on the status of your local office on the DMV website.

Customers who have appointments at the open offices can keep those appointments, except for driving tests, and will be given priority if they reschedule their appointments after offices re-open.

Appointments can be made by calling the DMV customer center at (919) 715-7000. People who can use the offices in Cary, West Raleigh, Clayton and Goldsboro can make online appointments. Other offices are being added to the online appointment system as quickly as possible.

"The safety of our customers and staff is our top priority," said DMV Commissioner Torre Jessup. "So we are putting in place a number of measures to better protect everyone from the spread of the virus. As always, we encourage everyone to conduct their business online if possible. We are all in this together and everyone has an important role to play in the safety and well-being of the public."

The DMV services that can be handled online include license and registration renewals, and ordering a duplicate license and registration card. Customers are encouraged to visit www.ncdot.gov/dmv to review a complete list of what services are available. There are fake DMV websites on the internet so please make sure that you are using a website that includes ".gov."

Other steps being taken include:

• Suspending the use of mobile offices;
• Suspending road tests except for commercial driver's license and in-office medical re-evaluations;
• Postponing DMV Hearings for 30 days, with exceptions for insurance liability and safety responsibility hearings, which are conducted by phone; and
• Salvage and special vehicle inspections conducted by appointment only.

All these steps being taken do not apply to DMV License Plate Agencies, as all but one of those is operated either by a contractor or local government. The status of those offices is available on the DMV website.

For information on how to conduct your critical DMV business or if you have additional questions, please visit www.ncdot.gov/dmv. First or official information regarding COVID-19, please visit ncdhhs.gov and governor.nc.gov.

***NCDOT***

*Last updated 8:31 a.m. on Jun. 2, 2020*

## Published Date:

3/17/2020

## Share this page:

 Facebook    Twitter

Case 1:20-cv-00457-WO-JLW   Document 12-7   Filed 06/05/20   Page 53 of 56

# EXHIBIT 10

Letter from Disability Rights North Carolina to members of the Davidson County Board of Elections and the General Counsel for the North Carolina State Board of Elections (Feb. 28, 2020)

Exhibit to Declaration of Allison J. Riggs in support of Plaintiffs Motion for a Preliminary Injunction


**Disability Rights North Carolina**

Sent Via E-Mail Only
February 28, 2020

Ruth Huneycutt, Director
Randall K. Lanier, Chairman
Dawn L. Mitchell, Secretary
Jon W. Myers, Member
Rita C. Haire, Member
Lewie Phillips, Member
Davidson County Board of Elections

Katelyn Love, General Counsel
North Carolina State Board of Elections

Dear Director Huneycutt, General Counsel Love, and others:

Disability Rights NC previously corresponded with you on February 25, 2020 about a voter residing in a skilled nursing facility in Davidson County who sought help from a Multipartisan Assistance Team ("MAT") exercising her right to vote. Davidson County has not assembled a MAT and has given no indication one will be formed in time to assist the voter in requesting and casting her absentee ballot in the primary election taking place on March 3rd. *See* N.C. Gen. Stat. § 163-226.3(4); 8 N.C.A.C. 16.0101 (each county board of elections required to establish a MAT to assist individuals with disabilities residing in residential facilities to vote via absentee ballot). While we appreciate the reminder that a voter may request and cast an absentee ballot without the assistance of a MAT, it misses the point. The MATs exist to provide voters with disabilities critical access to the ballot when they do not have readily available guardians or near relatives.

Davidson County can still act to ensure voters with disabilities who do not have a readily available near relative, guardian, or MAT to vote in the primary. The time period for a voter who is sick or has a physical disability to request an absentee ballot in-person remains open and does not expire until 5:00 p.m. on Monday, March 2nd. *See* N.C. Gen. Stat. § 163-230.1(b). *Cf.* N.C. Gen. Stat. § 163-230.1(a) (the time period for voters not covered by subsection (b) to request an absentee

*North Carolina's Protection and Advocacy System*

3724 National Drive
Suite 100
Raleigh, NC 27612

919-856-2195
877-235-4210
919-856-2244 fax
TTY users, dial 711

**www.disabilityrightsnc.org**

ballot expires at 5:00 p.m. on the Tuesday before the election (February 25, 2020)). In instances where a near relative, guardian, or MAT is not available to assist individuals with disabilities request and vote their absentee ballot, the county board of elections must allow any person other than

> (i) an owner, manager, director, employee of the hospital, clinic, nursing home, or rest home in which the voter is a patient or resident;
> (ii) an individual who holds any elective office under the United States, this State, or any political subdivision of this State;
> (iii) an individual who is a candidate for nomination or election to such office; or
> (iv) an individual who holds any office in a State, congressional district, county, or precinct political party or organization, or who is a campaign manager or treasurer for any candidate or political party…

to assist voters in requesting, casting, and witnessing their ballot. *See* N.C. Gen. Stat. § 163-226.3(4).

It appears employees and volunteers of non-partisan non-profit organizations who are otherwise not a prohibited person (as outlined above), are among those allowed to request and witness an absentee ballot on behalf of voters with disabilities without readily available near relatives, guardians, or MATs. **Please advise immediately if you will permit representatives of Disability Rights NC or other non-partisan organizations to assist voters with disabilities residing in facilities in Davidson County with voting via absentee ballot.**

Sincerely,

Holly Stiles
Litigation Counsel

Kenya Myers
Voting Rights Advocate