IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

DEMOCRACY NORTH CAROLINA,          )
THE LEAGUE OF WOMEN VOTERS         )
OF NORTH CAROLINA,                 )
DONNA PERMAR, JOHN P. CLARK,       )
MARGARET B. CATES,                 )
LELIA BENTLEY, REGINA WHITNEY      )
EDWARDS, ROBERT K. PRIDDY II,      )
SUSAN SCHAFFER, and                )
WALTER HUTCHINS,                   )
                                   )
          Plaintiffs,              )
                                   )
     v.                            )          1:20CV457
                                   )
THE NORTH CAROLINA STATE           )
BOARD OF ELECTIONS,                )
DAMON CIRCOSTA, in his             )
official capacity as CHAIR         )
OF THE STATE BOARD OF              )
ELECTIONS, STELLA ANDERSON,        )
in her official capacity as        )
SECRETARY OF THE STATE             )
BOARD OF ELECTIONS,                )
KEN RAYMOND, in his official       )
capacity as MEMBER OF THE          )
STATE BOARD OF ELECTIONS,          )
JEFF CARMON III, in his            )
official capacity as MEMBER        )
OF THE STATE BOARD OF              )
ELECTIONS, DAVID C. BLACK,         )
in his official capacity as        )
MEMBER OF THE STATE BOARD          )
OF ELECTIONS, KAREN BRINSON        )
BELL, in her official              )
capacity as EXECUTIVE              )
DIRECTOR OF THE STATE BOARD        )
OF ELECTIONS, THE NORTH            )
CAROLINA DEPARTMENT OF             )

TRANSPORTATION, J. ERIC      )
BOYETTE, in his official     )
capacity as TRANSPORTATION   )
SECRETARY, THE NORTH         )
CAROLINA DEPARTMENT OF       )
HEALTH AND HUMAN SERVICES,   )
and MANDY COHEN, in her      )
official capacity as         )
SECRETARY OF HEALTH AND      )
HUMAN SERVICES,              )
                             )
            Defendants.      )
                             )
     and                     )
                             )
PHILIP E. BERGER, in his     )
official capacity as         )
PRESIDENT PRO TEMPORE OF THE )
NORTH CAROLINA SENATE, and   )
TIMOTHY K. MOORE, in his     )
official capacity as SPEAKER )
OF THE NORTH CAROLINA HOUSE  )
OF REPRESENTATIVES,          )
                             )
     Defendant-Intervenors.  )


<u>**MEMORANDUM OPINION AND ORDER**</u>

**OSTEEN, JR., District Judge**

     This matter is before the court on the Amended Motion for

Preliminary Injunction against several North Carolina voting and

election laws filed by Plaintiffs Democracy North Carolina

("Democracy NC") and The League of Women Voters of North

Carolina ("LWV") (together, "Organizational Plaintiffs"), Donna

Permar, John P. Clark, Margaret B. Cates, Lelia Bentley, Regina

- 2 -

Whitney Edwards, Robert K. Priddy II, Susan Schaffer, and Walter Hutchins (together, "Individual Plaintiffs"). (Pls.' Am. Mot. for Preliminary Injunction ("Pls.' Am. Mot.") (Doc. 31).)

By this order, the court has left the One-Witness Requirement in place, enjoined several rules related to nursing homes that would disenfranchise Plaintiff Hutchins, and enjoined the rejection of absentee ballots unless the voter is provided due process. The remaining requested relief has been denied, often because this court has found Plaintiffs' evidence fails to establish a likelihood of success on the merits. However, a finding by this court that Plaintiffs have failed to establish a likelihood of success on the merits should not be misunderstood by the parties. Plaintiffs have raised genuine issues of concern with respect to the November General Election. Should Legislative and Executive Defendants believe these issues may now be discounted or disregarded for purposes of the impending election, they would be sorely mistaken.

The COVID-19 pandemic has presented, and continues to present, unique and difficult challenges to all of us. The responses by citizens have been divergent. Some citizens are reasonably and genuinely frightened and have, as a result, retreated to their homes. On the other hand, some citizens are reasonably and genuinely frustrated by limitations to their

- 3 -

freedom. Others are reluctant or unwilling to follow
recommendations and requirements such as masks and social
distancing. It does not appear, from the evidence in this case,
that circumstances are likely to change significantly between
now and November 3, 2020. As a result, during this election,
millions of diverse North Carolinians will leave their homes to
assemble and exercise their cherished right to vote in the midst
of the unique circumstances caused by COVID-19.

"States have 'broad powers to determine the conditions
under which the right of suffrage may be exercised.'" Shelby
Cty. v. Holder, 570 U.S. 529, 543 (2013) (quoting Carrington v.
Rash, 380 U.S. 89, 91 (1965)). "Under the Constitution, state
and local governments, not the federal courts, have the primary
responsibility for addressing COVID-19 matters such as
quarantine requirements, testing plans, mask mandates,
phased reopenings, school closures, sports rules, adjustment
of voting and election procedures, state court and correctional
institution practices, and the like." Calvary Chapel Dayton
Valley v. Sisolak, No. 19A1070, ____ U.S. ____, 2020 WL 4251360
at *11 (July 24, 2020) (Kavanaugh, J., dissenting). Accordingly,
the responsibility for conducting a fair, open, and safe
election this November is the primary and substantial

responsibility of the Executive and Legislative branches of the North Carolina government.

This court heard the testimony of Karen Brinson Bell, the Executive Director of the North Carolina State Board of Elections, and finds her testimony to be both credible and thoughtful. The Executive and Legislative branches would do well to carefully consider the actions proposed by Director Bell and those proposed by Plaintiffs. Any failure by the State government to carefully plan, maintain flexibility and alternatives to potential problems, and consider new and unique ways of addressing an election conducted during a global pandemic could easily lead to the same difficulties experienced by Georgia and other states holding elections during this pandemic, resulting in voters unable to exercise their fundamental right to vote. The 2020 General Election is going to be a test of the North Carolina government's thoughtfulness, adaptability, and responsiveness to a rapidly changing environment due to the COVID-19 pandemic. It will require North Carolina citizens, regardless of any personal feelings they might have with respect to masks, social distancing, and other guidelines, to respect and comply with those guidelines for the safety of all voters and in respect to differing voter concerns. It will require the best of the Legislative and Executive

- 5 -

branches, as well as our citizens, to make this General Election safe and open to all eligible North Carolina voters.

Plaintiffs sue Defendants North Carolina State Board of Election ("State BoE"), Damon Circosta, Stella Anderson, Ken Raymond, Jeff Carmon III, David C. Black, Karen Brinson Bell, the North Carolina Department of Transportation ("DOT"), J. Eric Boyette, the North Carolina Department of Health and Human Services ("DHHS"), and Mandy Cohen (together, "Executive Defendants") under 42 U.S.C. § 1983, the First and Fourteenth Amendments, Title II of the Americans with Disabilities Act (the "ADA"), 42 U.S.C. § 12131 et seq., and Section 504 of the Rehabilitation Act (the "RA"), 29 U.S.C. § 794, for preliminary and permanent injunctive relief. (Pls.' Am. Mot. (Doc. 31).) Defendant-Intervenors Philip E. Berger, in his official capacity as the President Pro Tempore of the North Carolina Senate, and Timothy K. Moore, in his official capacity as Speaker of the North Carolina House of Representatives ("together Legislative Defendants"), intervened in this case to oppose Plaintiffs' suit and to represent the interests of the North Carolina General Assembly. (Docs. 16, 26.)

For the reasons set forth herein, the court will grant Plaintiffs' motion for preliminary injunction in part and deny it in part.

- 6 -

# I.    FACTUAL BACKGROUND AND PROCEDURAL HISTORY

## A.    Factual Background

The court held an evidentiary hearing on July 20–21, 2020, and oral argument on July 22, 2020. (Minute Entry 07/20/2020; Minute Entry 07/21/2020; Minute Entry 07/22/2020.) From the evidence submitted, the court makes the following factual findings. The court will address other relevant facts as necessary throughout the Memorandum Opinion and Order. In making these findings, the court has considered the entire record, including the declarations and testimony.[1]

### 1.    The Novel Coronavirus Pandemic

This case arises during the coronavirus ("COVID-19") pandemic.

---

[1] During the course of the evidentiary hearing, Defendants lodged several objections to testimony, which this court took under advisement. (See Evidentiary Hr'g Tr. vol. 1 (Doc. 112) at 19, 39; Evidentiary Hr'g Tr. vol. 2 (Doc. 113) at 10.) The court overrules those objections and finds the evidence admitted. Where necessary, the court will address the weight assigned to that testimony.

As noted throughout this Memorandum Opinion and Order, this court has considered all of the evidence, including testimony, declarations, and pleadings. If a declaration or testimony is not specifically mentioned or discussed herein, the court has considered that evidence and finds for purposes of this Opinion that due to the lack of weight, relevance, or persuasiveness, the evidence does not affect the findings and conclusions contained herein.

- 7 -

North Carolina Governor Roy Cooper declared a State of Emergency due to COVID-19 on March 10, 2020. Executive Order No. 116, https://files.nc.gov/governor/documents/files/EO116-SOE-COVID-19.pdf (last visited July 31, 2020). On May 22, 2020, Governor Cooper signed Executive Order No. 141 which moved North Carolina into Phase 2 of the statewide reopening plan. Executive Order 141, https://files.nc.gov/governor/documents/files/EO141-Phase-2.pdf (last visited July 31, 2020). Governor Cooper issued Executive Order No. 147 on June 24, 2020, which extended the Phase 2 order. Executive Order No. 147, https://files.nc.gov/governor/documents/files/EO147-Phase-2-Extension.pdf (last visited July 31, 2020). Executive Order No. 147 implements new regulations concerning the wearing of face masks for the prevention of transmission of COVID-19. North Carolina is currently in Phase 2 of reopening, extended by Executive Order No. 151 on July 16, 2020. Executive Order No. 151, https://files.nc.gov/governor/documents/files/EO151-Phase-2-Extension.pdf (last visited on July 31, 2020). At this time, under Executive Order No. 151, North Carolina citizens are encouraged to follow social distancing recommendations, including remaining six-feet apart from others, avoiding close contact, wearing face masks, and frequently washing hands or using hand sanitizer. Id.

- 8 -

### 2. __House Bill 1169__

On June 11, 2020, the General Assembly passed House Bill 1169, An Act to Make Various Changes to the Laws Related to Elections and to Appropriate Funds to the State Board of Elections in Response to the Coronavirus Pandemic ("HB 1169"), signed into law on June 12, 2020, by Governor Roy Cooper, which amended several of North Carolina's election laws in response to the COVID-19 pandemic. 2020 N.C. Sess. Laws 2020-17 (H.B. 1169). Relevant to this lawsuit, HB 1169 amended several provisions relating to witness requirements, poll workers, and multipartisan assistance teams ("MATs"), among others. Regarding the witness requirement for absentee ballots, under the prior law, voters needed the signatures of two witnesses, but those witnesses did not need to print their name and address. Under HB 1169, voters now only need the signature of one witness, and that witness must print their name and address as well (the "One-Witness Requirement"). Id. § 1.(a). HB 1169 also relaxed the requirement that all poll workers come from that precinct; now, only one precinct worker must come from that precinct but the remaining precinct workers may come from anywhere in the precinct's county. Id. § 1.(b). HB 1169 further added a provision allowing for multipartisan teams to assist registered voters in "hospitals, clinics, nursing homes, assisted living or

- 9 -

other congregate living situations . . . ." Id. § 2.(b). HB 1169 also expanded voters' ability to request absentee ballots by making it possible for voters to request absentee ballots online. Id. § 7.(a).

### 3. **Parties**

Plaintiffs LWV and Democracy NC are both nonpartisan organizations dedicated to encouraging voting and voter education. (See Second Amended Complaint ("Second Am. Compl." (Doc. 30) ¶¶ 14-15.) Individual Plaintiffs Donna Permar, John P. Clark, Margaret B. Cates, Lelia Bentley, Regina Whitney Edwards, Robert K. Priddy II, and Walter Hutchins are North Carolina citizens who allege they are impacted by the COVID-19 pandemic and who all have health issues which could exacerbate the effects of COVID-19 should they contract it. (Id. ¶¶ 16-22.) Individual Plaintiff Susan Schaffer lives in North Carolina and volunteers in assisting people to register to vote as well as completing absentee ballots. (Id. ¶ 23.)

Defendants include the State BoE, which is the executive agency responsible for administering election laws in North Carolina. (Id. ¶ 24.) Damon Circosta, Stella Anderson, Ken Raymond, Jeff Carmon III, David C. Black, and Karen Brinson Bell are all employees of the State BoE. (Id. ¶¶ 25-30.) Defendant Bell is the Executive Director of the State BoE. (Id. ¶ 30.) The

North Carolina Department of Transportation is the executive agency which implements the online voter registration system in North Carolina, and J. Eric Boyette is the Secretary of the North Carolina Department of Transportation. (Id. ¶¶ 31-32.) Finally, the North Carolina Department of Health and Human Services is the executive agency which administers online public benefits renewals in North Carolina, and Dr. Mandy Cohen is the Secretary of the North Carolina Department of Health and Human Services. (Id. ¶¶ 33-34.)

Defendant-Intervenor Philip E. Berger is the President Pro Tempore of the North Carolina Senate, and Defendant-Intervenor Timothy K. Moore is the Speaker of the North Carolina House of Representatives. (Id. ¶¶ 35-36.)

B. **Procedural History**

Plaintiffs filed their original Complaint on May 22, 2020, (Doc. 1), and their First Amended Complaint on June 5, 2020, (Doc. 8). Also, on June 5, 2020, Plaintiffs filed a Motion for Preliminary Injunction and Request to Expedite briefing and consideration of the motion, (Doc. 9), and a supporting brief, (Pls.' Mem. in Supp. of Mot. for Preliminary Injunction ("Pls.' Br.") (Doc. 10)). Plaintiffs seek an injunction against several North Carolina voting and election laws.

On June 10, 2020, Defendant-Intervenors Philip E. Berger, in his official capacity as the President Pro Tempore of the North Carolina Senate, and Timothy K. Moore, in his official capacity as Speaker of the North Carolina House of Representatives, moved to intervene in this case to oppose Plaintiffs' suit and to represent the interests of the North Carolina General Assembly. (Doc. 16.) The court granted the motion to intervene. (Doc. 26.)

Following the passage of HB 1169, Plaintiffs filed a Second Amended Complaint, (Second Am. Compl. (Doc. 30)), and an Amended Motion for Preliminary Injunction, (Pls.' Am. Mot. (Doc. 31)). Plaintiffs assert that their original preliminary injunction brief, (Doc. 10), supports their amended motion. (Pls.' Am. Mot. (Doc. 31) at 8.)

Legislative Defendants responded, (Leg. Defs.' Resp. in Opp'n to Pls.' Am. Mot. for Preliminary Injunction ("Leg. Defs.' Resp.") (Doc. 51)), as did Executive Defendants, (State Defs.' Resp. to Mot. for Preliminary Injunction ("Exec. Defs.' Resp.") (Doc. 58)). Plaintiffs replied. (Pls.' Reply in Supp. of Am. Mot. for Preliminary Injunction ("Pls.' Reply") (Doc. 74).)

The court held an evidentiary hearing and oral argument from July 20 through July 22, 2020. At the evidentiary hearing, the court heard videotaped testimony from Dr. Megan Murray, an

- 12 -

epidemiologist at Harvard Medical School, (Doc. 107), the former head investigator for the State BoE, Marshall Tutor, (Doc. 108), the former director of the State BoE, Gary Bartlett, (Doc. 109), and Dr. Paul Gronke, (Doc. 110), for Plaintiffs. The court also heard the videotaped testimony of Dr. Theodore J. Plush, (Doc. 111), and live testimony from Defendant Bell, (Doc. 106). Drs. Murray and Plush testified regarding the ways COVID-19 is transmitted, the risks of certain behaviors, and the efficacy of mitigation tactics, such as wearing masks and social distancing. (Docs. 107, 111.) Mr. Tutor opined on the efficacy of the One-Witness Requirement in investigating and preventing voter fraud. (Doc. 108.) Mr. Bartlett testified about voter registration deadlines, the Uniform Hours Requirement, and voting behaviors in North Carolina. (Doc. 109.) Dr. Paul Gronke discussed the Uniform Hours Requirement and voter turnout. (Doc. 110.) Defendant Bell testified to the efforts the State BoE is taking to ensure voters have access to voting despite the COVID-19 pandemic, as well as the logistical implications of Plaintiffs' requested relief. (Doc. 106.)

Plaintiffs seek to enjoin eight of North Carolina's voting laws. First, they seek an injunction against the 25-day voter registration deadline under N.C. Gen. Stat. §§ 163-82.6(d), and 163-82.20(g) and (h). (Pls.' Am. Mot. (Doc. 31) at 4.) Second,

they seek to enjoin N.C. Gen. Stat. § 163-230.2(a), requiring requests for absentee ballots be made by a form created by the State Board of Elections. (Id.) Third, Plaintiffs seek to enjoin N.C. Gen. Stat. § 163-230.2(a)(4), (f), which prescribes the types of acceptable identification voters must submit with their absentee ballot requests forms, "to the extent that it limits the proof of residency documents . . . to only a North Carolina driver's license number, special identification card number, or the last four digits of his or her Social Security number," and instead ask the court to "allow election officials to accept any proof of residency document acceptable under the Help America Vote Act (HAVA)." (Id. at 4–5.) Fourth, Plaintiffs seek to enjoin the restrictions on assisting people in returning absentee ballot requests, in marking and completing absentee ballots, and submitting absentee ballots under N.C. Gen. Stat. §§ 163-226.3(a)(4), 163-226.3(a)(5), 163-226.3(a)(6), 163-230.2(e)(4), 163-231(a), and 163-231(b)(1). (Id. at 5.) Fifth, they seek to enjoin the One-Witness Requirement under N.C. Gen. Stat. § 163-231(a), as amended by HB 1169. (Id.) Sixth, they seek to enjoin N.C. Gen. Stat. § 163-227.6(c), which requires uniform hours in precincts. (Id.) Seventh, Plaintiffs seek to enjoin N.C. Gen. Stat. § 163-42(b), as amended by HB

Case 1:20-cv-00457-WO-JLW   Document 124   Filed 08/04/20   Page 14 of 188

1169, requiring poll workers to come from the county in which they serve. (Id. at 6.)

Plaintiffs also request "that the Court preliminarily enjoin Defendants from violating Plaintiffs' constitutional and federal statutory rights with respect to any election in the state for the November 3, 2020, general election." (Id.)

Finally, Plaintiffs also ask the court to issue an order requiring Defendants perform the following actions: that the BoE Defendants extend the voter registration deadline until 5:00 p.m. on the last Saturday of early voting; that the DOT and DHHS Defendants process voter registrations online and received in their offices up until and including 5:00 p.m. on the last Saturday of early voting for the November 3, 2020 election; that Defendants expand voter registration via online portals available through DHHS services; establish contactless drop boxes for absentee ballots; establish a mechanism for requesting absentee ballots by phone; permit election officials to accept any proof of residency documents acceptable under the HAVA as acceptable forms of identification with absentee ballot requests; establish mechanisms to cure deficient absentee ballot requests and absentee ballots; permit mail-in absentee voters to cast a downloadable Federal Write-In Absentee Ballot if their timely-requested absentee ballot from the BoE does not arrive in

- 15 -

sufficient time to ensure the ballot will be counted; establish a more centralized way in which voters and advocates can monitor precinct consolidation; permit voters who for reason of blindness, disability, or an inability to read or write, require assistance to return an absentee ballot, to obtain assistance from anyone who is not their employer or union representative; and finally, implement a remedial plan to educate voters regarding their options to register to vote and obtain and cast a ballot. (Id. at 6-8.)

## C. Laws at Issue

Plaintiffs challenge several of North Carolina's voting and election laws as applied under the circumstances of the COVID-19 pandemic.

### 1. Voter Registration Deadline Laws

Plaintiffs challenge N.C. Gen. Stat. §§ 163-82.6(d) and -163-82.20(g) and (h). (Pls.' Am. Mot. (Doc. 31) at 4.) Section 163-82.6(d) provides (the "25-day Deadline"):

> (d)  Registration Deadlines for a Primary Election.--
> In order to be valid for a primary or election, the
> [voter registration] form:
>
>> (1)  If submitted by mail, must be postmarked at
>> least 25 days before the primary or
>> election, except that any mailed application
>> on which the postmark is missing or unclear
>> is validly submitted if received in the mail
>> not later than 20 days before the primary or
>> election,

(2) If submitted in person, by facsimile
    transmission, or by transmission of a
    scanned document, must be received by the
    county board of elections by a time
    established by that board, but no earlier
    than 5:00 P.M., on the twenty-fifth day
    before the primary or election,

(3) If submitted through a delegatee who
    violates the duty set forth in subsection
    (a) of this section, must be signed by the
    applicant and given to the delegatee not
    later than 25 days  before the primary or
    election, except as provided in subsection
    (f) of this section.

N.C. Gen. Stat. § 163-82.6(d)(1-3).

The 25-day Deadline has been in force in some form since

1995, 1994 N.C. Sess. Laws 762 (H.B. 1776) § 2, and in its

current substantive form since 2009.[2] 2008 N.C. Sess. Laws 2008-

150 (S.B. 1263) § 5.(d).[3] Further, N.C. Gen. Stat. § 163-

82.20(g), (h) reads:

(g)  Transmittal From Agency to Board of Elections.--
Any voter registration application completed at a

_____

[2] This court has concluded the dates during which these
challenged laws were passed, as many of the challenged laws have
been in force for a lengthy period of time. This context clearly
frames Plaintiffs' challenges, as it is not the law itself but
the circumstances of COVID-19 that create the burden challenged
here. This court addresses this matter further in the
conclusion.

[3] At that time, it was subsection (c), but the language is
nearly identical with the exception of a reference to
"subsection (d)" instead of "subsection (f)" in subsection
(c)(3). (Compare N.C. Gen. Stat. § 163-82.6(d), with 2008 N.C.
Sess. Laws 2008-150 (S.B. 1263) § 5.(d).)

- 17 -

> voter registration agency shall be accepted by that
> agency in lieu of the applicant's mailing the
> application. Any such application so received shall be
> transmitted to the appropriate board of elections not
> later than five business days after acceptance,
> according to rules which shall be promulgated by the
> State Board of Elections.
>
> (h) Twenty-Five-Day Deadline for an Election.--
> Applications to register accepted by a voter
> registration agency shall entitle a registrant to vote
> in any primary, general, or special election unless
> the registrant shall have made application later than
> the twenty-fifth calendar day immediately preceding
> such primary, general, or special election, provided
> that nothing shall prohibit voter registration
> agencies from continuing to accept applications during
> that period.

§ 163-82.20(g), (h). This law has been in force in some form
since 1995, 1994 N.C. Sess. Laws 762 (H.B. 1776) § 2, and in its
current substantive form since 2013. 2013 N.C. Sess. Laws 2013-
381 (H.B. 589) § 12.1.(f).

## 2. Absentee Ballot Requests

Plaintiffs further challenge several restrictions on how a
voter may request an absentee ballot.

First, Plaintiffs challenge N.C. Gen. Stat. § 163-230.2(a),
which requires absentee ballot requests be done on a form
created by the State BoE (the "Form Requirement"). (Pls.' Am.
Mot. (Doc. 31) at 4.) It reads: "(a) Valid Types of Written
Requests.--A completed written request form for absentee ballots
as required by [N.C. Gen. Stat.] § 163-230.1 is valid only if it

- 18 -

is on a form created by the State Board . . . ." N.C. Gen. Stat.
§ 163-230.2(a). Subsection (a) has been in force in some form
since 2013, 2013 N.C. Sess. Laws 2013-381 (H.B. 589) § 4.3, and
in its present substantive form since January 2020, 2019 N.C.
Sess. Laws 2019-239 (S.B. 683) § 1.3(a).

Second, Plaintiffs challenge N.C. Gen. Stat. § 163-
230.2(a)(4), (f), which place limits on the types of documents
that may serve as proof of residency that a voter must submit
with their absentee ballot request form (the "Identification
Requirement"). (Pls.' Am. Mot. (Doc. 31) at 4-5.) Section
163-230.2(a), (f) reads:

> (a) Valid Types of Written Requests. A completed written
> request form for absentee ballots as required by [N.C. Gen.
> Stat.] § 163-230.1 is valid only if it is on a form created
> by the State Board and signed by the voter requesting
> absentee ballots or that voter's near relative or
> verifiable legal guardian. The State Board shall make the
> form available at its offices, online, and in each county
> board of elections office, and that form may be reproduced.
> The request form created by the State Board shall require
> at least the following information:
>
>      . . . .
>
>     (4) One of the following:
>
>        a. The number of the applicant's North
>           Carolina drivers license issued under
>           Article 2 of Chapter 20 of the General
>           Statutes, including a learner's permit
>           or a provisional license.

- 19 -

> > b. The number of the applicant's special
> > identification card for nonoperators
> > issued under [N.C. Gen. Stat.] 20-37.7.
>
> > c. The last four digits of the applicant's
> > social security number.
>
> . . . .
>
> (f) Rules by State Board.--The State Board shall adopt
> rules for the enforcement of this section.

§ 163-230.2(a), (f); <u>see also</u> 2020 N.C. Sess. Laws 2020-17 (H.B.

1169) § 5. Subsections (a)(4), (f) have been in force in some

form since 2013, 2013 N.C. Sess. Laws 2013-381 (H.B. 589) § 4.3,

and in its present substantive form since January 2020. 2019

N.C. Sess. Laws 2019-239 (S.B. 683) § 1.3(a).

Third, Plaintiffs seek to enjoin restrictions placed on who

may assist a voter in filling out and returning an absentee

ballot request and how they may assist a voter in doing so (the

"Request Assistance Ban"). (Pls.' Am. Mot. (Doc. 31) at 5.)

N.C. Gen. Stat. § 163-230.2(e)(2), (4) restricts who can

assist in requesting an absentee ballot and how an absentee

ballot request may be returned:

> (e) Invalid Types of Written Requests.--If a county
> board of elections receives a request for absentee
> ballots that does not comply with this subsection or
> subsection (a) of this section, the board shall not
> issue an application and ballots under [N.C. Gen.
> Stat.] 163-230.1. A request for absentee ballots is
> not valid if any of the following apply:
>
> . . . .

- 20 -

> > (2) The completed written request is completed,
> > partially or in whole, or signed by anyone
> > other than the voter, or the voter's near
> > relative or verifiable legal guardian. A
> > member of a multipartisan team trained and
> > authorized by the county board of elections
> > pursuant to [N.C. Gen. Stat.] 163-226.3 may
> > assist in completion of the request.
>
> > . . . .
>
> > (4) The completed written request is returned to
> > the county board by someone other than a
> > person listed in subsection (c) of this
> > section,[4] the United States Postal Service,
> > or a designated delivery service authorized
> > pursuant to 26 U.S.C. § 7502(f)(2).

Id. § 163-230.2(e)(2), (4). This law has been in effect since

January 1, 2020. 2019 N.C. Sess. Laws 2019-239 (S.B. 683)

§ 1.3(a).

---

[4] Subsection (c) provides:

(c) Return of Request.--The completed request form for
absentee ballots shall be delivered to the county
board of elections only by any of the following:

> (1) The voter.

> (2) The voter's near relative or verifiable legal
> guardian.

> (3) A member of a multipartisan team trained and
> authorized by the county board of elections
> pursuant to [N.C. Gen. Stat.] 163-226.3.

N.C. Gen. Stat. § 163-230.2(c).

- 21 -

H.B. 1169 also provides that a MAT may "assist any voter in the completion of a request form for absentee ballots or in delivering a completed request form for absentee ballots to the county board of elections and may serve as a witness for the casting of absentee ballots." 2020 N.C. Sess. Laws 2020-17 (H.B. 1169) § 1.(c).

### 3.  <u>Absentee Ballots</u>

Plaintiffs seek to enjoin several laws relating to the requesting, completing, and delivering of absentee ballots themselves.

Plaintiffs seek to enjoin § 163-226.3(a)(4)-(6), which makes the following acts unlawful:

> (4) For any owner, manager, director, employee, or other person, other than the voter's near relative or verifiable legal guardian, to (i) make a written request pursuant to [N.C. Gen. Stat.] 163-230.1 or (ii) sign an application or certificate as a witness, on behalf of a registered voter, who is a patient in any hospital, clinic, nursing home or rest home in this State or for any owner, manager, director, employee, or other person other than the voter's near relative or verifiable legal guardian, to mark the voter's absentee ballot or assist such a voter in marking an absentee ballot. This subdivision does not apply to members, employees, or volunteers of the county board of elections, if those members, employees, or volunteers are working as part of a multipartisan team trained and authorized by the county board of elections to assist voters with absentee ballots. Each county board of elections shall train and authorize such teams, pursuant to procedures which shall be adopted by the State Board of Elections. If neither

- 22 -

the voter's near relative nor a verifiable legal
guardian is available to assist the voter, and a
multipartisan team is not available to assist the
voter within seven calendar days of a telephonic
request to the county board of elections, the voter
may obtain such assistance from any person other
than (i) an owner, manager, director, employee of
the hospital, clinic, nursing home, or rest home in
which the voter is a patient or resident; (ii) an
individual who holds any elective office under the
United States, this State, or any political
subdivision of this State; (iii) an individual who
is a candidate for nomination or election to such
office; or (iv) an individual who holds any office
in a State, congressional district, county, or
precinct political party or organization, or who is
a campaign manager or treasurer for any candidate
or political party; provided that a delegate to a
convention shall not be considered a party office.
None of the persons listed in (i) through (iv) of
this subdivision may sign the application or
certificate as a witness for the patient.

(5) For any person to take into that person's
possession for delivery to a voter or for return to
a county board of elections the absentee ballot of
any voter, provided, however, that this prohibition
shall not apply to a voter's near relative or the
voter's verifiable legal guardian.

(6) Except as provided in subsections (1), (2), (3)
and (4) of this section, [N.C. Gen. Stat.]
163-231(a), and [N.C. Gen. Stat.} 163-227.2(e), for
any voter to permit another person to assist the
voter in marking that voter's absentee ballot, to
be in the voter's presence when a voter votes an
absentee ballot, or to observe the voter mark that
voter's absentee ballot.

§ 163-226.3(a)(4-6). This law has been in force since 1979, 1979

N.C. Sess. Laws Ch. 799 (S.B. 519) § 4, https://www.ncleg.

gov/enactedlegislation/sessionlaws/pdf/1979-1980/sl1979-799.pdf

(last visited July 31, 2020), and in its current form since 2013. 2013 N.C. Sess. Laws 2013-381 (H.B. 589) § 4.6.(a).

Plaintiffs also seek to enjoin the One-Witness Requirement under § 163-231(a), as amended by HB 1169, which lists the procedure for voting an absentee ballot, including the requirement that one person witness the voter completing their absentee ballot. Section 163-231(a) reads:

(a)  Procedure for Voting Absentee Ballots.--In the presence of two persons who are at least 18 years of age, and who are not disqualified by [N.C. Gen. Stat.] 163-226.3(a)(4) or [N.C. Gen. Stat.] 163-237(b1), the voter shall do all of the following:

(1) Mark the voter's ballots, or cause them to be marked by that person in the voter's presence according to the voter's instruction.

(2) Fold each ballot separately, or cause each of them to be folded in the voter's presence.

(3) Place the folded ballots in the container-return envelope and securely seal it, or have this done in the voter's presence.

(4) Make the application printed on the container-return envelope according to the provisions of [N.C. Gen. Stat.] 163-229(b) and make the certificate printed on the container-return envelope according to the provisions of [N.C. Gen. Stat.] 163-229(b).

(5) Require those two persons in whose presence the voter marked that voter's ballots to sign the application and certificate as witnesses and to indicate those persons' addresses. Failure to list a ZIP code does not invalidate the application and certificate.

- 24 -

(6) Do one of the following:

    a. Have the application notarized. The notary public may be the person in whose presence the voter marked that voter's ballot.

    b. Have the two persons in whose presence the voter marked that voter's ballots to certify that the voter is the registered voter submitting the marked ballots.

§ 163-231(a)(1-6). Section 231(a) has been in force in some form since 1967, 1967 N.C. Sess. Laws Ch. 775 (H.B. 146), https://www.ncleg.gov/enactedlegislation/sessionlaws/pdf/1967-1968/sl1967-775.pdf (last visited July 31, 2020), and has been in force in its present form since 2018, 2018 N.C. Sess. Laws 2018-146 (H.B. 1029) § 4.8.

HB 1169 amends the requirement that there be two witnesses:

For an election held in 2020, notwithstanding [N.C. Gen. Stat.] 163-229(b) and [N.C. Gen. Stat.] 163-231(a), and provided all other requirements for absentee ballots are met, a voter's returned absentee ballot shall be accepted and processed accordingly by the county board of elections if the voter marked the ballot in the presence of at least one person who is at least 18 years of age and is not disqualified by [N.C. Gen. Stat.] 163-226.3(a)(4) or [N.C. Gen. Stat.] 163-237(c), provided that the person signed the application and certificate as a witness and printed that person's name and address on the container-return envelope. For an election held in 2020, notwithstanding [N.C. Gen. Stat.] 163-229(b), the State Board of Elections may prepare applications for each container-return envelope providing for a space for the identification of one person witnessing the casting of the absentee ballot in accordance with [N.C. Gen. Stat.] 163-231, that person's signature, and that person's printed name and address.

- 25 -

2020 N.C. Sess. Laws 2020-17 (H.B. 1169) § 1.(a).

Plaintiffs further seek to enjoin § 163-231(b)(1), which restricts who may transmit completed absentee ballots to the county boards of election (the "Ballot Delivery Restriction"). It reads:

> (b) Transmitting Executed Absentee Ballots to County Board of Elections.--The sealed container-return envelope in which executed absentee ballots have been placed shall be transmitted to the county board of elections who issued those ballots as follows:
>
>> (1) All ballots issued under the provisions of this Article and Article 21A of this Chapter shall be transmitted by mail or by commercial courier service, at the voter's expense, or delivered in person, or by the voter's near relative or verifiable legal guardian and received by the county board not later than 5:00 p.m. on the day of the statewide primary or general election or county bond election. Ballots issued under the provisions of Article 21A of this Chapter may also be electronically transmitted.

§ 163-231(b)(1). Subsection (b)(1) has been in force since 1967, 1967 N.C. Sess. Laws Ch. 775 (H.B. 146), https://www.ncleg.gov/enactedlegislation/sessionlaws/pdf/1967-1968/sl1967-775.pdf (last visited July 31, 2020), and in its current form since 2013. 2013 N.C. Sess. Laws 2013-381 (H.B. 589) § 4.4.

The court will refer to the Ballot Delivery Restriction and N.C. Gen. Stat. § 163-226.3(4)–(6) (together as the "Ballot Assistance Ban").

- 26 -

## 4.  Precinct Requirements

Finally, Plaintiffs seek to enjoin two laws affecting polling places and poll workers.

First, Plaintiffs seek to enjoin N.C. Gen. Stat. § 163-227.6(c), which requires uniform hours in precincts (the "Uniform Hours Requirement"):

(c)  For all sites approved for one-stop voting under this section, a county board of elections shall provide the following:

>    (1) Each one-stop site across the county shall be open at that same location during the period required by [N.C. Gen. Stat.] 163-227.2(b).

>    (2) If any one-stop site across the county is opened on any day during the period required by [N.C. Gen. Stat.] 163-227.2(b), all one-stop sites shall be open on that day.

>    (3) On each weekday during the period required by [N.C. Gen. Stat.] 163-227.2(b), all one-stop sites shall be open from 8:00 A.M. to 7:30 P.M.

>    (4) If the county board of elections opens one-stop sites on Saturdays other than the last Saturday before the election during the period required by [N.C. Gen. Stat.] 163-227.2(b), then all one-stop sites shall be open for the same number of hours uniformly throughout the county on those Saturdays.

>    (5) If the county board of elections opens one-stop sites on Sundays during the period required by [N.C. Gen. Stat.] 163-227.2(b), then all one-stop sites shall be open for the same number of hours uniformly throughout the county on those Sundays.

- 27 -

> (6) All one-stop sites shall be open on the last
> Saturday before the election, for the hours
> required under [N.C. Gen. Stat.] 163-227.2(b)
> for that last Saturday.

§ 163-227.6(c). The Uniform Hours Requirement was originally

passed in 2018, 2018 N.C. Sess. Laws 2018-112 (S.B. 325) § 2

(amending N.C. Gen. Stat. § 163A-1303), and was passed in its

present form in 2019, 2019 N.C. Sess. Laws 2019-239 (S.B. 683)

§ 2.(b).

Second, Plaintiffs seek to enjoin N.C. Gen. Stat. § 163-

42(b), as amended by H.B. 1169, concerning the residency

requirements for poll workers (the "County Residency

Requirement"):

> For an election held in 2020, notwithstanding [N.C.
> Gen. Stat.] 163-42(b), in making appointments of the
> precinct assistants for each precinct in a county, the
> county board of elections shall ensure that at least
> one precinct assistant is a registered voter of the
> precinct, but may appoint registered voters from other
> precincts of the same county as precinct assistants
> for the remaining positions if there are an
> insufficient number of precinct assistants who reside
> within the precinct to fill all positions for the
> precinct, provided that the registered voter meets all
> qualifications to be a precinct assistant other than
> residence. For an election held in 2020,
> notwithstanding [N.C. Gen. Stat.] 163-41(c), the
> county board of elections shall ensure that at least
> one position of chief judge or judge is a registered
> voter of the precinct, but may appoint a registered
> voter from other precincts of the same county to fill
> the other two positions of chief judge or judge in a
> precinct, provided that the registered voter meets all
> other qualifications to be a chief judge or judge
> other than residence.

- 28 -

2020 N.C. Sess. Laws 2020-17 (H.B. 1169) § 1.(b).[5]

II. **ANALYSIS**

Legislative Defendants challenge Plaintiffs' standing to seek a preliminary injunction regarding their First and Fourteenth Amendment claims as to the right to vote, their unconstitutional conditions doctrine claim, and their Voting

---

[5] N.C. Gen. Stat. § 163-42(b) states:

(b) The chairman of each political party in the county shall have the right to recommend from three to 10 registered voters in each precinct for appointment as precinct assistants in that precinct. If the recommendations are received by it no later than the thirtieth day prior to the primary or election, the board shall make appointments of the precinct assistants for each precinct from the names thus recommended. If the recommendations of the party chairs for precinct assistant in a precinct are insufficient, the county board of elections by unanimous vote of all of its members may name to serve as precinct assistant in that precinct registered voters in that precinct who were not recommended by the party chairs. If, after diligently seeking to fill the positions with registered voters of the precinct, the county board still has an insufficient number of precinct assistants for the precinct, the county board by unanimous vote of all of its members may appoint to the positions registered voters in other precincts in the same county who meet the qualifications other than residence to be precinct officials in the precinct. In making its appointments, the county board shall assure, wherever possible, that no precinct has precinct officials all of whom are registered with the same party. In no instance shall the county board appoint nonresidents of the precinct to a majority of the positions as precinct assistant in a precinct.

Rights Act claim. (Leg. Defs.' Resp. (Doc. 51) at 14, 59, 65.)[6]
Legislative Defendants also challenge the ripeness of
Plaintiffs' Americans with Disabilities Act and Rehabilitation
Act claims, in addition to standing. (Id. at 63.) Defendants
also attack Plaintiffs' motion for preliminary injunction on the
merits.

Because standing and ripeness are dispositive issues, the
court addresses them first, then addresses Plaintiffs' motion on
the merits.

## A. **Standing**

Federal district courts exercise limited jurisdiction.
Exxon Mobil Corp. v. Allapattah Servs., Inc., 545 U.S. 546, 552
(2005). For a case or controversy to be justiciable in federal
court, a plaintiff must allege "such a personal stake in the
outcome of the controversy as to warrant his invocation of
federal court jurisdiction and to justify exercise of the
court's remedial powers on his behalf." White Tail Park, Inc. v.
Stroube, 413 F.3d 451, 458 (4th Cir. 2005) (quoting Planned
Parenthood of S.C. v. Rose, 361 F.3d 786, 789 (4th Cir. 2004)).

---

[6] All citations in this Memorandum Opinion and Order to
documents filed with the court refer to the page numbers located
at the bottom right-hand corner of the documents as they appear
on CM/ECF.

The judicial doctrine of standing is "an integral component of the case or controversy requirement." CGM, LLC v. BellSouth Telecomms., Inc., 664 F.3d 46, 52 (4th Cir. 2011) (quoting Miller v. Brown, 462 F.3d 312, 316 (4th Cir. 2006)).

The party seeking to invoke the federal courts' jurisdiction has the burden of satisfying Article III's standing requirement. Miller, 462 F.3d at 316. To meet that burden, a plaintiff must demonstrate three elements: (1) that the plaintiff has suffered an injury in fact that is "concrete and particularized" and "actual or imminent"; (2) that the injury is fairly traceable to the challenged conduct of the defendant; and (3) that a favorable decision is likely to redress the injury. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560–61 (1992).

In the voting context, "voters who allege facts showing disadvantage to themselves as individuals have standing to sue," Baker v. Carr, 369 U.S. 186, 206 (1962), so long as their claimed injuries are "distinct from a 'generally available grievance about the government,'" Gill v. Whitford, 585 U.S. ____, ____, 138 S. Ct. 1916, 1923 (2018) (quoting Lance v. Coffman, 549 U.S. 437, 439 (2007) (per curiam)).

In multi-plaintiff cases, "[a]t least one plaintiff must have standing to seek each form of relief requested in the complaint." Town of Chester v. Laroe Estates, Inc., 581 U.S.

- 31 -

____, ____, 137 S. Ct. 1645, 1651 (2017). Further, if there is one plaintiff "who has demonstrated standing to assert these rights as his own," the court "need not consider whether the other individual and corporate plaintiffs have standing to maintain the suit." Vill. of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 264 & n.9 (1977).

Regarding organizations, an organization may establish standing by suing on its own behalf "when it seeks redress for an injury suffered by the organization itself." White Tail Park, 413 F.3d at 458. Organizational Plaintiffs only allege prudential standing and organizational standing, not representational standing.[7] (See Pls.' Reply (Doc. 74) at 3–6.)

The Supreme Court in Havens Realty Corp. v. Coleman, 455 U.S. 363, 378–80 (1982), addressed whether an organization suing in its own right had standing under the Fair Housing Act. There, the organization pled that it had been "frustrated by defendants' racial steering practices in its efforts to assist equal access to housing through counseling and other referral services. Plaintiff [] has had to devote significant resources to identify and counteract the defendant's [sic] racially discriminatory steering practices." Id. at 379 (internal

---

[7] The court will address Legislative Defendants' challenge to prudential standing infra Part II.A.8.

quotation marks omitted). The Court held that it was improper to dismiss the organization's claims for lack of standing, because

> [i]f, as broadly alleged, petitioners' steering practices have perceptibly impaired [Plaintiff]'s ability to provide counseling and referral services for low-and moderate-income homeseekers, there can be no question that the organization has suffered injury in fact. Such concrete and demonstrable injury to the organization's activities — with the consequent drain on the organization's resources — constitutes far more than simply a setback to the organization's abstract social interests[.]

Id. Further, "[t]hat the alleged injury results from the organization's noneconomic interest in encouraging [a policy preference] does not effect [sic] the nature of the injury suffered, and accordingly does not deprive the organization of standing." Id. at 379 n.20 (citations omitted).

The Fourth Circuit addressed organizational standing for a diversion of resources in Lane v. Holder, 703 F.3d 668 (4th Cir. 2012). There, a gun rights group, challenging a federal statute restricting interstate transfers of handguns, alleged that it had been injured "because its resources [were] taxed by inquiries into the operation and consequences of interstate handgun transfer provisions." Lane, 703 F.3d at 670, 675. The Fourth Circuit held that the group did not have organizational standing. Id. at 675. The court appeared to distinguish the situation from that in Havens Realty as based upon the law's

- 33 -

impact on the group's mission and work, as opposed to simply the fact that the law necessitated expenditures; the closer a group's mission is to the challenged conduct, or the more impacted the group is by the defendant, the more likely the group is to have organizational standing. Id. at 674-75 (noting that in Havens Realty, the organization's impaired function was a "key component" to its mission).

The court reads Lane as laying out a two-prong test for finding organizational standing, consistent with Havens Realty. An organization has organizational standing (1) "when a defendant's actions impede its efforts to carry out its mission," and (2) forcing the organization to divert its resources in order to address the defendant's actions. Lane, 703 F.3d at 674-75.

Other circuits appear to emphasize diversion of resources in finding organizational standing. See Jacobson v. Fla. Sec'y of State, 957 F.3d 1193, 1205 (11th Cir. 2020) ("[O]ur precedent holds that 'an organization has standing to sue on its own behalf if the defendant's illegal acts impair its ability to engage in its projects by forcing the organization to divert resources to counteract those illegal acts.'" (quoting Fla. State Conference of NAACP v. Browning, 522 F.3d 1153, 1165 (11th Cir. 2008))); Common Cause Ind. v. Lawson, 937 F.3d 944, 952

- 34 -

(7th Cir. 2019) ("Our sister circuits have upheld the standing of voter-advocacy organizations that challenged election laws based on similar drains on their resources. Like us, they have found that the organizations demonstrated the necessary injury in fact in the form of the unwanted demands on their resources."); Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay, 868 F.3d 104, 111 (2d Cir. 2017) ("[W]here an organization diverts its resources away from its current activities, it has suffered an injury that has been repeatedly held to be independently sufficient to confer organizational standing."); Ne. Ohio Coal. for the Homeless v. Husted, 837 F.3d 612, 624 (6th Cir. 2016) ("Because their allegations indicate that the burden would cause them to change significantly their expenditures and operation and a favorable decision would redress that injury, [the Plaintiff] has organizational standing here as well."); Scott v. Schedler, 771 F.3d 831, 837 (5th Cir. 2014) ("[A]n organization has standing to sue on its own behalf where it devotes resources to counteract a defendant's allegedly unlawful practices." (alteration in original) (quoting Ass'n of Cmty. Orgs. for Reform Now v. Fowler, 178 F.3d 350, 360 (5th Cir. 1999))).

Other circuits have emphasized the requirement that a frustration of the organization's goals is required, along with

- 35 -

a diversion of resources. See E. Bay Sanctuary Covenant v. Trump, 932 F.3d 742, 765 (9th Cir. 2018) ("We have thus held that, under Havens Realty, a diversion-of-resources injury is sufficient to establish organizational standing for purposes of Article III, if the organization shows that, independent of the litigation, the challenged policy frustrates the organization's goals and requires the organization to expend resources in representing clients they otherwise would spend in other ways." (internal quotation marks and citations omitted)); Food & Water Watch, Inc. v. Vilsack, 808 F.3d 905, 919–20 (D.C. Cir. 2015) ("An organization's ability to provide services has been perceptibly impaired when the defendant's conduct causes an inhibition of [the organization's] daily operations. . . . Furthermore, an organization does not suffer an injury in fact where it expend[s] resources to educate its members and others unless doing so subjects the organization to operational costs beyond those normally expended." (alterations in original) (internal quotation marks and citations omitted)).

This court applies the standard from Havens Realty. Organizational standing requires impaired ability to provide its intended services, including a drain of resources.

Legislative Defendants contend that none of the Plaintiffs have Article III standing. (Leg. Defs.' Resp. (Doc. 51) at 14.)

The court will address each of Plaintiffs' claims, keeping in mind that if there is one plaintiff "who has demonstrated standing to assert these rights as his own," the court "need not consider whether the other individual and corporate plaintiffs have standing to maintain the suit." Vill. of Arlington Heights, 429 U.S. at 264 & n.9.

### 1. Voter Registration Laws

Legislative Defendants first contend that all of the Individual Plaintiffs are already registered to vote in North Carolina, thus an injunction against the 25-day Deadline poses no threat of injury to any Individual Plaintiff, and further, that the Organizational Plaintiffs fail to identify any members who would independently have standing to challenge this deadline. (Leg. Defs.' Resp. (Doc. 51) at 15.) Legislative Defendants also contend that Organizational Plaintiffs cannot establish their own standing, because their allegations that they will have to divert resources to help voters comply with the current laws are not injuries for standing purposes under Article III. (Id. at 16.)

Regarding Individual Plaintiffs, the court agrees with Legislative Defendants. Individual Plaintiffs are all registered voters in North Carolina. (See Doc. 11-3 ¶ 2; Doc. 11-4 ¶ 3; Doc. 11-5 ¶ 3; Doc. 11-6 ¶ 2; Doc. 11-7 ¶ 2; Doc. 11-8 ¶ 2; Doc.

- 37 -

11-9 ¶ 3; Doc. 11-10 ¶ 3.) None of them has declared that they will have to re-register to vote before the November 2020 election. Individual Plaintiffs therefore are not at risk of injury due to the 25-day Deadline and therefore have no standing to seek an injunction of this law.

Regarding Organizational Plaintiffs, LWV's mission is to encourage "Americans to participate actively in government and the electoral process." (Doc. 11-2 ¶ 3.) It "conducts voter registration and education initiatives throughout North Carolina, including voter registration drives, distribution of voter education materials, and voting-day assistance to help individuals exercise their right to vote." (Id. ¶ 6.) It contends that, due to the COVID-19 pandemic, "many voters will try to register and be unable to due to the 25-day registration deadline, and if this deadline remains in force it will have the effect of frustrating [its] purpose in promoting voter registration." (Id. ¶ 8.) LWV further alleges that, if the 25-day Deadline is enforced, it "will be prevented from pursuing [its] core voter registration mission in helping the expected influx of voters who need to register after the 25-day deadline, especially those who are at-risk and unable to safely utilize same day in-person voter registration." (Doc. 73-2 ¶ 8.)

- 38 -

Because LWV has alleged its mission to register voters will be at least partly frustrated by the 25-day Deadline, and it will have to divert resources to address this frustrated mission, the court finds Organizational Plaintiff LWV has sufficiently alleged an organizational injury for the purposes of standing.

### 2. <u>One-Witness Requirement</u>

Legislative Defendants further contend that, of the Individual Plaintiffs, only two are "potentially capable of challenging the Witness Requirement as amended" - Individual Plaintiff Bentley, who lives alone, and Individual Plaintiff Hutchins, who lives alone but resides in a nursing home. (Leg. Defs.' Resp. (Doc. 51) at 17, 19.) Legislative Defendants argue Bentley has not alleged she will "not need to leave her house in the months preceding the election such that she will necessarily come in contact with at least one person eligible to serve as her witness," nor that "no member of her own family will visit her from out-of-town between now and Election Day who could serve as a witness," nor that she could not ask a neighbor to serve as a witness and comply with Centers for Disease Control ("CDC") recommendations for sanitization and social distancing. (<u>Id.</u> at 17–18.) Regarding Individual Plaintiff Hutchins, Legislative Defendants argue he does not allege why the six-foot

- 39 -

social distancing requirements would not preclude another
resident from serving as a witness. (Id. at 19.) Legislative
Defendants further contend a member of a MAT could serve as his
witness under HB 1169. (Id.) Finally, Legislative Defendants
argue Plaintiff Hutchins's impending injury is speculative,
because the living facility may not be on lockdown by November
2020.[8] (Id.)

The court finds Plaintiffs Hutchins and Bentley have
standing to challenge the One-Witness requirement; other witness
requirements have been treated as a cognizable injury sufficient
to confer standing, and the court is satisfied that requiring
absentee voters to seek out contact with another person, even
adhering to social distancing requirements, still places the
voters at sufficient risk to constitute a cognizable injury for
standing purposes. See, e.g., Ray v. Texas, Civil Action No.
2-06-CV-385 (TJW), 2008 WL 3457021 (E.D. Tex. Aug. 7, 2008)
(addressing a restriction connected to the Texas witness
requirement on the merits); see also People First of Ala. v.
Merrill, Civil Action No. 2:20-cv-00619-AKK, _____ F. Supp. 2d.

_____

[8] The court notes that the evidence presented, as well as
the oral arguments, all seem to assume the facts in November
will be similar to those now present. Predicting the future is
beyond the ability of this court; the court thus evaluates the
facts and evidence as presented currently and does not assume
any substantive change.

- 40 -

_____, 2020 WL 3207824, at *6 (N.D. Ala. June 15, 2020) ("<u>People First I</u>)") ("Simply put, a voter always has standing to challenge a statute that places a requirement on the exercise of his or her right to vote.").

Regarding the Organizational Plaintiffs, Legislative Defendants again argue that diversion of resources is not enough to secure organizational standing and that Organizational Plaintiffs fail to allege that their members would not be able to meet the One-Witness Requirement or identify any such member. (Leg. Defs.' Resp. (Doc. 51) at 19–20.) However, only one plaintiff need establish standing in order for the court to consider the claim on the merits. <u>Bostic v. Schaefer</u>, 760 F.3d 352, 370–71 (4th Cir. 2014). The court therefore need not address whether Organizational Plaintiffs have standing to challenge the One-Witness Requirement, as Plaintiff Bentley's standing is sufficient to make these issues justiciable.

### 3.   **The Form Requirement**

Legislative Defendants further argue the two Individual Plaintiffs — Cates and Hutchins – who challenge the Form Requirement no longer have standing due to the change in the law under HB 1169. (Leg. Defs.' Resp. (Doc. 51) at 20.)

Under HB 1169, voters may "call the State Board of Elections or a county board of elections office and request that

- 41 -

the blank request form be sent to the voter by mail, e-mail, or fax." 2020 N.C. Sess. Laws 2020-17 (H.B. 1169) § 5. Additionally, voters may submit an online request for an absentee ballot by submitting all information required for a valid written request for an absentee ballot, along with an electronic signature. Id. § 7(a).

Individual Plaintiff Cates declared that she would request an absentee ballot online if she were able or would request an absentee ballot request form by phone. (Doc. 11-5 ¶ 8.) Under the current amended laws, Cates faces no barriers to acquiring an absentee ballot, thus she has suffered no redressable injury and does not have standing to challenge the Form Requirement.

Further, Plaintiff Hutchins's wife has since submitted a request for an absentee ballot on his behalf, (Minute Entry 07/09/2020); any claim he may have had regarding the Form Requirement is now moot.

The court finds no Plaintiff has standing to challenge the Form Requirement. The court will nevertheless address this issue on the merits, as an alternative basis for the findings and conclusions.

### 4. Drop Boxes

Legislative Defendants also argue that none of Individual Plaintiffs have "declared a need" for a contactless drop box;

therefore, none of them have standing to request this order. (Leg. Defs.' Resp. (Doc. 51) at 20.) Legislative Defendants further argue Organizational Plaintiffs lack standing to request drop boxes because they fail to identify members who would use drop boxes, therefore, Organizational Plaintiffs lack representational standing, and, as previously stated, a diversion of resources is not enough to establish organizational standing. (Id. at 21.)

The court agrees. While no Individual Plaintiffs indicate that a lack of drop boxes creates an injury, Organizational Plaintiff LWV alleges that it has already had to "dedicate significant resources towards meetings with our local chapters and other community groups in North Carolina to address . . . how to help voters concerned about USPS's ability to deliver their absentee ballots with safely delivering their ballots without drop boxes." (Doc. 73-2 ¶ 6.) However, this diversion of resources has not stemmed from Defendants' frustrating Organizational Plaintiffs' mission. The court finds this is more akin to the situation in Lane, in which the diversion of funds "results not from any actions taken by [Defendants], but rather from the organization[s'] own budgetary choices." Lane, 703 F.3d at 675 (citation omitted). The court finds Plaintiffs do not have standing to challenge the lack of drop boxes. As with other

- 43 -

issues, however, the court will, in the alternative, address this challenge on the merits.

###     5.    Opportunity to Cure Absentee Ballots and Procedural Due Process

Plaintiffs challenge the lack of a statewide curing process under both the First and Fourteenth Amendment Right to Vote, as well as under procedural due process. (Second Am. Compl. (Doc. 30) ¶¶ 104, 136–43.) Plaintiffs' claims reach both the rejection of absentee ballots and absentee ballot requests. (Id.)

Legislative Defendants argue Individual Plaintiffs lack standing with regard to their right-to-vote claim, under which they allege their right to vote is being unduly burdened by a lack of an opportunity to cure an absentee ballot mistake, as well as their procedural due process claim, under which they allege a lack of a curing procedure violates their procedural due process rights. (Leg. Defs.' Resp. (Doc. 51) at 21, 59.) Because the same conduct underlies both the right-to-vote claim and the procedural due process claim, the court considers the standing for these claims together.

Legislative Defendants contend none of the Individual Plaintiffs allege or declare that they will need an opportunity to cure deficiencies in submitting their absentee ballots nor

- 44 -

that they will make a mistake that will require such an opportunity, thus, their injuries are purely speculative. (Id.)

Legislative Defendants argue that Organizational Plaintiffs also lack representational standing due to their failure to identify individual members who would have standing, that diversion of resources is insufficient to establish organizational standing, and they lack prudential standing. (Id. at 21-22, 59.) Legislative Defendants further argue Organizational Plaintiffs cannot invoke procedural due process concerns here. (Id. at 59.)

Organizational Plaintiffs allege the lack of a curing mechanism will "frustrate [their] core mission to encourage voter participation because, without this safety net in place, any efforts we spend encouraging voters to use absentee-by-mail voting could result in voters being inadvertently disenfranchised if they make a mistake." (Doc. 73-1 ¶ 2; see also Doc. 73-2 ¶ 11.) They also allege that, "without being able to assure voters they will have notice and opportunity to fix absentee ballots, we will have to dedicate significantly more resources toward explaining in greater detail the voting process so that they are more likely to submit it correctly, instead of the more general instructions typically provided." (Doc. 73-2 ¶ 11.).

When a plaintiff seeks relief in the form of a forward-looking injunction, as is the case here, they must demonstrate they are "immediately in danger of sustaining some direct injury as the result of the challenged official conduct and the injury or threat of injury [is] both real and immediate, not conjectural or hypothetical." Lebron v. Rumsfeld, 670 F.3d 540, 560 (4th Cir. 2012) (quoting City of Los Angeles v. Lyons, 461 U.S. 95, 102 (1983)).

"The court is 'not at liberty to resolve every grievance over government policy, no matter how significant, for Article III of the Constitution confines the federal courts to adjudicating actual cases and controversies.'" Native Angels Home Health, Inc. v. Burwell, 123 F. Supp. 3d 775, 779 (E.D.N.C. 2015) (quoting Doe v. Obama, 631 F.3d 157, 160 (4th Cir. 2011)).

In Martin v. Kemp, 341 F. Supp. 3d 1326, 1335-36 (N.D. Ga. 2018), the district court addressed Georgia's signature-matching requirement for absentee ballots and found the organizational plaintiffs had organizational standing, having alleged "high absentee ballot rejection rates" in at least one county, and thus, the organizations would need to divert resources towards warning voters about the risk of signature mismatching. Id. at 1335. The court granted organizational standing to organizational plaintiffs for their procedural due process claim

- 46 -

upon making a showing that the organization would have to divert resources to warn voters about signature mismatch risks under Georgia's signature-matching law in light of evidence of high absentee ballot rejection rates in some parts of the state. Id.; see also Common Cause/Georgia v. Billups, 554 F.3d 1340, 1350–51 (11th Cir. 2009) (finding NAACP had organizational standing to bring an Anderson-Burdick right-to-vote challenge to Georgia's voter ID law).

Organizational Plaintiffs put forth evidence that around 15% of absentee mail-in ballots were rejected in the March 2020 North Carolina primary. (Doc. 12-5 ¶ 5.) Executive Defendants argue that "plaintiffs conclude that the lack of a standardized curative process is the reason these ballots were rejected. But they provide no evidence to suggest that this is true." (Exec. Defs.' Resp. (Doc. 58) at 35.) The court, however, finds that the data submitted demonstrates "at least 41% . . . of all rejected mail in ballots were rejected due to non-compliance with form requirements," and thus could presumably have been cured. (See Doc. 73-7 ¶ 7.)

Further, though Defendant Bell testified that Executive Defendants are currently working on an absentee voting guide for the county boards of elections which will include a standardized curing procedure with notice to voters if their absentee

- 47 -

application cannot be approved, (Doc. 58-1 ¶ 17), and that there will be a procedure in place for absentee ballots as well, (Minute Entry 07/22/2020), these procedures are not yet in place.

The court finds Organizational Plaintiffs have standing to challenge a lack of procedure regarding absentee ballots under both a right-to-vote claim and a procedural due process claim. See Martin, 341 F. Supp. 3d at 1333–35. Keeping in mind that only one plaintiff need establish standing in order for the court to consider the claim on the merits, Bostic, 760 F.3d at 370–71, the court need not address Individual Plaintiffs' standing to challenge the lack of curing procedure, and further finds this issue justiciable based upon the standing of Organizational Plaintiffs.

Plaintiffs, however, failed to put forth any evidence as to the prevalence of rejections of absentee ballot request forms. The potential future rejection of an absentee ballot request is therefore entirely speculative and cannot serve as the basis for either a right-to-vote claim or a procedural due process claim, as there is no evidence to suggest the existence of an injury in fact to any Plaintiff. This court finds none of Plaintiffs have standing to challenge the rejection of absentee ballot request forms. This issue will not be further addressed.

- 48 -

### 6. <u>Precinct Requirements</u>

Regarding standing to challenge the County Residency and Uniform Hours Requirements, Legislative Defendants contend only one Individual Plaintiff, Plaintiff Permar, has expressed any desire to vote in person but has only alleged an "entirely speculative" injury of precinct consolidation. (Leg. Defs.' Resp. (Doc. 51) at 22.) Legislative Defendants also argue Organizational Plaintiffs lack standing because they have not identified individual members nor can resource diversion serve as an injury. (<u>Id.</u> at 23.)

Plaintiff Permar, who is completely blind, alleges she must use public transportation in order to go to her polling place. (Doc. 11-3 ¶¶ 3, 7.) Because her husband is also completely blind, she cannot complete an absentee ballot with assistance from another individual without compromising the secrecy of her ballot and therefore must vote in person using an ADA-compliant voting machine. (<u>Id.</u> ¶ 5.) She alleges that "[i]f precincts are consolidated in a manner in which I would not have access to my polling place via public transportation, it would place a severe burden" on her ability to vote in person. (<u>Id.</u> ¶ 7.)

The court agrees with Legislative Defendants that Plaintiff Permar's alleged injuries are purely hypothetical; there is no evidence that Plaintiff Permar's precinct is in imminent danger

- 49 -

of needing to be consolidated or, even if it were consolidated, that her new polling place would not be accessible via public transportation. This is the type of "hypothetical future harm" which the Supreme Court has held cannot be used to establish injury-in-fact for standing purposes. See Clapper v. Amnesty Int'l USA, 568 U.S. 398, 402 (2013). The court finds Plaintiff Permar does not have standing to challenge the County Residency Requirement nor the Uniform Hours Requirement.

LWV alleges that "[i]f the uniform hours requirement remains in place and precincts are consolidated as a result, the LWVNC [the League of Women Voters of North Carolina] will have to divert its limited resources in its voter education efforts to alert its members and those in their communities about the changes." (Doc. 11-2 ¶ 20.) Further, Plaintiffs allege Democracy NC is diverting resources "into never-before-needed recruitment efforts to ensure that opportunities for in-person voting remain open to North Carolina voters," and that "[a]bsent this too-onerous limitation on poll worker eligibility, we would not need to fund or staff this initiative . . . and would be able to focus instead on our core purpose of engaging underrepresented North Carolinians and encouraging their participation." (Doc. 73-1 ¶ 2.)

However, this diversion of resources has not stemmed from Defendants' frustrating Organizational Plaintiffs' mission. The court finds this is more akin to the situation in <u>Lane</u>, in which the diversion of funds "results not from any actions taken by [Defendants], but rather from the organization[s'] own budgetary choices." <u>Lane</u>, 703 F.3d at 675. The court finds this is more of a "generalized grievance," than an organizational injury, and, as such, Organizational Plaintiffs cannot establish standing.

Indeed, the court is concerned about redressability as well. To satisfy redressability, a plaintiff must demonstrate "it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." <u>Sierra Club v. U.S. Dep't of the Interior</u>, 899 F.3d 260, 284 (4th Cir. 2018) (quoting <u>Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.</u>, 528 U.S. 167, 181 (2000)). It is not clear to the court that, if it were to issue an injunction against the County Residency Requirement, that it is "likely, as opposed to merely speculative," the State BoE and Plaintiffs would then be able to procure enough poll workers from across the state to prevent precinct consolidation. This further underscores the court's conclusion that Plaintiffs lack standing to challenge these two laws. Similarly, with respect to the Uniform Hours Requirement, no evidence has been presented to suggest that injunctive relief

- 51 -

would in turn prevent the closing of polling places beyond pure speculation.

The court will nevertheless alternatively address these issues on the merits.

### 7. **Voting Rights Act**

Legislative Defendants also argue Hutchins, as the only Plaintiff who falls under Section 208 of the Voting Rights Act ("VRA"), "has not demonstrated that he is affected by either of the features of North Carolina law" that Plaintiffs challenge. (Leg. Defs.' Resp. (Doc. 51) at 65.)

The court finds Hutchins, as a person covered by Section 208, has standing, given the conflict between Section 208 and the North Carolina laws concerning who may assist Hutchins in requesting, marking and completing, and returning his absentee ballot, thus directly implicating his rights under Section 208. This is a live controversy that is redressable by this court. See OCA-Greater Houston v. Texas, 867 F.3d 604, 610–14 (5th Cir. 2017) (finding plaintiffs had standing to challenge the Texas interpreter assistance law under Section 208); Priorities USA v. Nessel, Case No. 19-13341, _____ F. Supp. 3d. _____, 2020 WL 2615766, at *14 (E.D. Mich. May 22, 2020) (addressing the plaintiffs' claim that Section 208 preempted Michigan's absentee ballot assistance restrictions on the merits). Plaintiff

- 52 -

Hutchins therefore has standing to challenge North Carolina's absentee ballot laws under the VRA.

However, because Plaintiff Hutchins's wife has already requested a ballot for him, (Minute Entry 07/09/2020), he no longer has standing to challenge N.C. Gen. Stat. § 163-230.2(e)(4), which governs written requests for ballots returned to a county board of elections by someone other than the approved list of people. The court therefore finds Plaintiff Hutchins, the only Plaintiff put forth as having suffered an injury under the VRA, can only challenge N.C. Gen. Stat. §§ 163-226.3(a)(4)-(6), 163-231(a), as amended by HB 1169, 163-231(b)(1).

### 8. <u>Prudential Standing</u>

Legislative Defendants contend Organizational Plaintiffs lack prudential standing, or third-party standing, because "organizational plaintiffs' complaint is that state laws and policies violate the rights of unspecified North Carolina voters — third parties who are strangers to this action." (Leg. Defs.' Resp. (Doc. 51) at 23.) They argue Organizational Plaintiffs' relationships with voters is distinguishable from the relationships courts have traditionally found sufficient for third-party standing, such as the relationship between doctors who provide abortions and their patients. (<u>Id.</u> at 24.) Further,

- 53 -

they contend Organizational Plaintiffs have failed to make the affirmative showing that the parties whose rights are directly affected are not the best representatives to bring suit to enforce those rights. (Id.)

"[P]rudential standing encompasses 'the general prohibition of a litigant's raising another person's legal rights, the rule barring adjudication of generalized grievances more appropriately addressed in the representative branches, and the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked.'" Doe v. Va. Dep't of State Police, 713 F.3d 745, 753 (4th Cir. 2013) (quoting Elk Grove Unified Sch. Dist. v. Newdow, 542 U.S. 1, 12 (2004)).

The Supreme Court has "generally permitted plaintiffs to assert third-party rights in cases where the 'enforcement of the challenged restriction against the litigant would result indirectly in the violation of third parties' rights.'" June Med. Servs. L.L.C. v. Russo, ___ U.S. ___, ____, 140 S. Ct. 2103, 2118-19 (2020) (quoting Kowalski v. Tesmer, 543 U.S. 125, 130 (2004)) (collecting cases). The Fourth Circuit summarizes the test for prudential standing as follows: "To overcome the prudential limitation on third-party standing, a plaintiff must demonstrate: (1) an injury-in-fact; (2) a close relationship between herself and the person whose right she seeks to assert;

- 54 -

and (3) a hindrance to the third party's ability to protect his or her own interests." <u>Freilich v. Upper Chesapeake Health, Inc.</u>, 313 F.3d 205, 215 (4th Cir. 2002).

Organizational Plaintiffs rebut Legislative Defendants' argument, contending Organizational Plaintiffs "have developed close relationships with the voters they assist and who are presented with an undue burden, and the urgent nature of the relief needed here presents a hindrance to individual voters to protect their own rights." (Pls.' Reply (Doc. 74) at 6–7.)

Plaintiffs offer the following evidence in support of their argument. Tomas Lopez, the director of Democracy NC, asserts it will be helping "voters problem-solve complying with existing rules: from registering to vote, to successfully requesting and submitting a valid absentee ballot, to finding a place and time to vote safely in-person." (Doc. 11-1 ¶ 18.) Further, Jo Nicholas, the director for LWV, alleges "[d]irectly assisting voters is . . . an essential means of how we build relationships and associate with voters, including our members," and that "[v]oters have already communicated to [LWV] their concerns and their confusion." (Doc. 11-2 ¶¶ 13, 22.) Finally, Nicholas alleges that "[i]n order to effectively undertake our voter education and assistance initiatives, we need the ability <u>now</u> to

- 55 -

give voters the information and reassurance that they will be able to vote safely in November." (Id. ¶ 22.)

As Legislative Defendants note, a district court in Michigan recently dealt with prudential standing in a voting case. See Priorities USA, 2020 WL 2615766, at *9. In that case, the organizational plaintiffs, voting rights organizations, attempted to assert prudential standing with respect to undue burden on voting claims under the Fourteenth Amendment. Id. at *4, *9. The court found "neither a 'close relationship' between the plaintiff organization and the unidentified voters nor a 'hindrance' to the voters' ability to protect their own rights." Id. at *9. The same is true here.

Plaintiffs point to Mayor & City Council of Baltimore v. Azar, Civil Action No. RDB-19-1103, 2019 WL 4415539 (D. Md. Sept. 12, 2019), for support of their claim to prudential standing. The court does not find this case persuasive, however. The court in Azar found the government plaintiffs could assert third-party standing on behalf of patients, "especially . . . poor, young teenage girls who seek confidential care and assistance from the City's school-based health centers." Id. at *5. The court likened the third-parties at issue there to the paradigmatic example of the doctor-patient relationships in abortion cases. Id.

- 56 -

Here, as in <u>Priorities USA</u>, Organizational Plaintiffs simply do not put forth evidence to allow the court to find that they enjoy a "close relationship" with the voters they assist comparable to the paradigmatic close relationships that other courts have traditionally found as an adequate basis for third-party standing. Nor does the court find that Organizational Plaintiffs have demonstrated any hindrance to any third-party's ability to protect his or her own interests. <u>See</u> <u>Freilich</u>, 313 F.3d at 215. The court finds Organizational Plaintiffs may not assert third-party standing on behalf of unnamed voters in North Carolina with regard to Plaintiffs' Fourteenth Amendment right-to-vote claims.

## B. **Ripeness Regarding Plaintiffs' Americans with Disabilities Act and Rehabilitation Act Claims**

Legislative Defendants contend Plaintiffs' allegations that Plaintiffs Clark, Edwards, and Priddy "may well" not receive their absentee ballots in time is "pure speculation," and thus Plaintiffs' ADA/RA claim is not ripe. (Leg. Defs.' Resp. (Doc. 51) at 63.) Legislative Defendants also argue that Plaintiff Hutchins has neither standing nor a ripe claim under the ADA and the RA, because MATs will be available to assist him. (<u>Id.</u>)

"[R]ipeness derives from Article III," and "addresses 'the appropriate timing of judicial intervention.'" <u>Deal v. Mercer</u>

- 57 -

Cty. Bd. of Educ., 911 F.3d 183, 190 (4th Cir. 2018), cert. denied, ____ U.S. ____, 140 S. Ct. 111 (2019) (quoting Cooksey v. Futrell, 721 F.3d 226, 240 (4th Cir. 2013)). In reviewing a ripeness challenge, the court considers "(1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration." Id. at 191 (internal quotation marks omitted) (quoting Cooksey, 721 F.3d at 240).

"A case is fit for judicial decision when the issues are purely legal and when the action in controversy is final and not dependent on future uncertainties." Va. Dep't of State Police, 713 F.3d at 758 (quoting Miller, 462 F.3d at 319). Thus, "[a] claim should be dismissed as unripe if the plaintiff has not yet suffered injury and any future impact 'remains wholly speculative.'" Id. (quoting Gasner v. Bd. of Supervisors, 103 F.3d 351, 361 (4th Cir. 1996)).

Regarding Plaintiffs' allegations that Plaintiffs Clark, Edwards, and Priddy "may well not receive their absentee ballots in a timely fashion," due to the USPS not being able to keep pace with the "unprecedented rise in absentee ballot requests," and therefore "the failure to offer FWABs [Federal Write-In Absentee Ballots] as an accommodation and a fail-safe option would prevent" Plaintiffs from being able to vote in violation of the ADA, (Second Am. Compl. (Doc. 30) ¶ 149), the court

- 58 -

agrees with Legislative Defendants that this claim is "based on hypothetical future harm that is not certainly impending," that is, the inability of the USPS to keep pace with the absentee ballot requests. Clapper, 568 U.S. at 402. Plaintiffs have offered no evidence that the USPS in North Carolina is likely, as opposed to speculatively, to fail in keeping pace with absentee ballot requests; such a proposition "remains wholly speculative," and relies upon "future uncertainties." The court finds Plaintiffs' challenge to the failure to offer FWABs is not ripe.

Turning to Plaintiff Hutchins, the court finds he has standing and a ripe claim under the ADA and the RA.

As previously noted, a plaintiff's injury must be "actual or imminent" in order to establish standing. Leifert v. Strach, 404 F. Supp. 3d 973, 985 (M.D.N.C. 2019); see Clapper, 568 U.S. at 401-02 ("[R]espondents cannot manufacture standing . . . based on hypothetical future harm that is not certainly impending.").

With regard to Plaintiffs' allegations that Plaintiff Hutchins will be unable to vote by absentee ballot under the current North Carolina absentee ballot framework, the court finds Plaintiff Hutchins's ability to receive assistance because he has an uncontested disability while locked down is not based

- 59 -

"upon a hypothetical state of facts" – his nursing home is locked down; thus, he cannot receive in-person assistance from his wife or from a MAT, which he requires due to his disability. (Declaration of Walter Hutchins in Supp. of Pls.' Mot. for Preliminary Injunction ("Hutchins's Decl.") (Doc. 11-9) ¶¶ 5-6.) Given the ever-changing state of the pandemic, the court cannot forecast any better than the parties what the situation will be like in the coming months or if Hutchins's nursing home will still be on lockdown. Operating off of the current facts, and under the assumption Hutchins's nursing home will continue to restrict visitors for the foreseeable future, the court finds Hutchins has a redressable injury and a ripe claim.

However, because Plaintiff Hutchins's wife has already requested a ballot for him, (Minute Entry 07/09/2020), he no longer has standing to challenge N.C. Gen. Stat. § 163-230.2(e)(4), which governs written requests returned to a county board of elections by someone other than the approved list of people. The court therefore finds Plaintiff Hutchins only has standing to challenge N.C. Gen. Stat. §§ 163-226.3(a)(4)–(6), -231(b)(1).

C. **Political Question Doctrine**

Legislative Defendants argue that Plaintiffs' constitutional voting rights claims must be dismissed under the

political question doctrine. (Leg. Defs.' Br. (Doc. 51) at 25.)
The court finds this argument unpersuasive.

Though Legislative Defendants cite to a recently-decided
district court case from the Northern District of Georgia,
<u>Coalition for Good Governance v. Raffensperger</u>, Civil Action No.
1:20-cv-1677-TCB, 2020 WL 2509092 (N.D. Ga. May 14, 2020),
<u>appeal filed</u>, No. 20-12362 (11th June 26, 2020), for this
proposition, the court declines to follow that case. As
persuasively stated by a district court in Alabama, to dismiss
Plaintiffs' claims as nonjusticiable political questions

> would result in the court abdicating from its role to
> address disputes that arise under the Constitution or
> federal statutes. This is precisely what the
> plaintiffs seek in this case — i.e., they ask the
> court to decide whether the challenged provisions run
> afoul of the Constitution, the VRA, or the ADA. The
> court agrees with the Fifth Circuit, which easily
> dismissed the contention that a similar claim was a
> non-justiciable political question by noting that the
> "standards for resolving such claims are familiar and
> manageable, and federal courts routinely entertain
> suits to vindicate voting rights." <u>Texas Democratic
> Party [v. Abbott]</u>, 961 F.3d 389 (5th Cir. 2020). The
> plaintiff's claims are justiciable, and the court can
> thus proceed to consider the merits of the motion for
> a preliminary injunction.

<u>People First I</u>, 2020 WL 3207824, at *12; <u>see also</u> <u>Texas
Democratic Party</u>, 961 F.3d at 398 (declining to follow
<u>Raffensperger</u>). The court finds this reasoning persuasive and

- 61 -

applies it here. The court will "proceed to consider the merits of the motion for a preliminary injunction."

### D.    Preliminary Injunction Standard of Review

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20 (2008). Such an injunction "is an extraordinary remedy intended to protect the status quo and prevent irreparable harm during the pendency of a lawsuit." Di Biase v. SPX Corp., 872 F.3d 224, 230 (4th Cir. 2017). To demonstrate a likelihood of success on the merits, "[a] plaintiff need not establish a certainty of success, but must make a clear showing that he is likely to succeed at trial." Id. Accordingly, the court first must determine whether Plaintiff is likely to succeed on the merits.

### E.    Success on the Merits

The court will first address Plaintiffs' Constitutional claims, then will examine Plaintiffs' ADA and RA claims and will finish by analyzing Plaintiffs' Voting Rights Act claims.

1.   **First and Fourteenth Amendments and the Right to Vote**

Plaintiffs challenge several of North Carolina's election laws as unconstitutional burdens on the right to vote under the First and Fourteenth Amendments.

In light of the "'considerable leeway' in regulating 'election processes generally'" states possess, "the Supreme Court has articulated a "flexible standard" to address 'a [First Amendment] challenge to a state election law.'" Fusaro v. Cogan, 930 F.3d 241, 257–58 (4th Cir. 2019) (quoting Buckley v. Am. Constitutional Law Found., Inc., 525 U.S. 182, 191 (1999); Burdick v. Takushi, 504 U.S. 428, 434 (1992)) (alteration in original).

The court applies the framework articulated in Anderson v. Celebrezze, 460 U.S. 780 (1983), and Burdick, in assessing Plaintiffs' First and Fourteenth Amendment challenges. The Fourth Circuit summarized the Anderson-Burdick framework as follows:

> In short, election laws are usually, but not always, subject to ad hoc balancing. When facing any constitutional challenge to a state's election laws, a court must first determine whether protected rights are severely burdened. If so, strict scrutiny applies. If not, the court must balance the character and magnitude of the burdens imposed against the extent to which the regulations advance the state's interests in ensuring that "order, rather than chaos, is to accompany the democratic processes."

- 63 -

Fusaro, 930 F.3d at 257–58 (quoting McLaughlin v. N.C. Bd. of Elections, 65 F.3d 1215, 1221 (4th Cir. 1995)). "Thus, while 'severe' restrictions 'must be narrowly drawn to advance a state interest of compelling importance,' a reasonable, nondiscriminatory restriction on voting rights is justified by a State's 'important regulatory interests.'" Lee v. Va. State Bd. of Elections, 843 F.3d 592, 606 (4th Cir. 2016) (quoting Burdick, 504 U.S. at 434). The court also notes that the Supreme Court does not "identify any litmus test for measuring the severity of a burden that a state law imposes on a political party, an individual voter, or a discrete class of voters." Crawford v. Marion Cty. Election Bd., 553 U.S. 181, 191 (2008). But, "[h]owever slight that burden may appear, . . . it must be justified by relevant and legitimate state interests 'sufficiently weighty to justify the limitation.'" Id. (quoting Norman v. Reed, 502 U.S. 279, 288–89 (1992)).

### a. Absentee Ballot Laws

Plaintiffs seek to enjoin several of North Carolina's absentee ballot laws: the One-Witness Requirement, the

- 64 -

Identification Requirement, and the Request Assistance Ban. The court will address each in turn.

### i. **One-Witness Requirement**

The court must determine whether Plaintiffs are likely to succeed in their constitutional challenge of 2020 N.C. Sess. Laws 2020-17 (H.B. 1169) § 1.(a), which requires the signature of a witness, along with the printed name and address of the witness on the voter's absentee ballot container-return envelope. Here, Plaintiff Bentley has standing to challenge this law. See supra Part II.A.2.

The court must first determine what level of scrutiny to apply to this regulation; that is, whether the One-Witness Requirement imposes a burden on the right to vote that is severe enough to trigger strict scrutiny or whether the court should apply the Anderson-Burdick balancing test.

Plaintiffs contend the One-Witness Requirement imposes an "insurmountable barrier" for Plaintiff Bentley. Plaintiff Bentley lives alone and is at higher risk for serious disease if she contracts COVID-19. (Doc. 11-6 ¶¶ 1, 3.) Plaintiffs also argue that the One-Witness Requirement does not further the State's interest in preventing and prosecuting voter fraud. Thus, Plaintiffs argue, the One-Witness Requirement imposes a

- 65 -

severe burden on these at-risk Plaintiffs; therefore, strict scrutiny applies. (Pls.' Br. (Doc. 10) at 34, 37.)

Legislative Defendants assert the Anderson-Burdick balancing test applies. (Leg. Defs.' Resp. (Doc. 51) at 38.)

At least two other courts addressing one-witness absentee ballot requirements have applied the Anderson-Burdick balancing test. See Thomas v. Andino, Civil Action Nos. 3:20-cv-01552-JCM, 3:20-cv-01730-JCM, ____ F. Supp. 3d. ____, 2020 WL 2617329, at *19-21 (D.S.C. May 25, 2020); League of Women Voters of Va. v. Va. State Bd. of Elections, Case No. 6:20-CV-00024, ____ F. Supp. 3d. ____, 2020 WL 2158249, at *8-9 (W.D. Va. May 5, 2020). In Andino, a district court in South Carolina declined to reach the issue of whether "to apply a strict scrutiny standard or a lesser level of scrutiny under the Anderson/Burdick balancing test." Andino, 2020 WL 2617329, at *18. Instead, that court assumed, without deciding, that the Anderson-Burdick balancing test applied and found that the burdens "inflicted by the Witness Requirement . . . [were] of sufficient magnitude to warrant the injunction." Id. at *19. Likewise, a district court in Virginia, in determining whether to approve a settlement agreement regarding voting rights, applied the Anderson-Burdick balancing test to Virginia's one-witness requirement. League of Women Voters of Va., 2020 WL 2158249, at *7-8.

The Andino court found that it was not required to decide which test — strict scrutiny or the Anderson-Burdick balancing test — applies at the preliminary injunction stage: "District courts may grant temporary relief without deciding federal constitutional questions prematurely, without forecasting what the exact final decision will be on the ultimate claim, without creating an unseemly conflict between sovereigns and without impairing any state function." Andino, 2020 WL 2617329, at *18.

The court finds this reasoning as to why the court is not required to decide which test persuasive and adopts it here. The court therefore need not decide the constitutional question of whether strict scrutiny or the Anderson-Burdick balancing test applies at this time and will apply the Anderson-Burdick balancing test to the One-Witness Requirement.[9]

Turning to the merits of this claim, Plaintiff Bentley is the only individual Plaintiff affected by the One-Witness

---

[9] Even assuming the court should determine whether a "severe" burden exists, that is, one which arguably effectively disenfranchises a voter as argued, the court would find, at this stage, on the evidence presented and for purposes of this motion only, that Plaintiffs have not shown that the One-Witness Requirement imposes a severe burden on voters. For the reasons explained hereafter, the court finds Plaintiff Bentley has not been, and will not be, deprived of a reasonable opportunity to vote in relative safety by the One-Witness Requirement.

- 67 -

Requirement.[10] She has diagnosed high blood pressure, lives alone, and does not feel comfortable asking her neighbors to witness her absentee ballot, given she does not know how diligent they have been with social distancing. (See Doc. 11-6 ¶¶ 3-4, 7-8.) Plaintiffs argue the One-Witness Requirement places an unconstitutional burden on Plaintiff Bentley that is not justified by the State's interest in applying the One-Witness Requirement. (Pls.' Br. (Doc. 10) at 41.)

On the State's interest side of the test, Defendants contend that the State has an interest in "deterring, detecting, and punishing voter fraud," and that the One-Witness Requirement imposes only a "modest" burden on voting. (Leg. Defs.' Resp.

---

[10] Plaintiff Hutchins also has standing to challenge the One-Witness Requirement. See supra Part II.A.2. Although he alleges that he is unable to vote unless assisted by staff, (Hutchins's Decl. (Doc. 11-9) ¶¶ 5, 11), which is presently prohibited under N.C. Gen. Stat. § 163-226.3(a)(4), Legislative Defendants contend that other residents could witness his ballot while adhering to social distancing regulations, (Leg. Defs.' Resp. (Doc. 51) at 64). Plaintiff Hutchins does not offer any facts to explain why other residents in his nursing home could not serve as a witness. While this court has concerns about the ability of other residents to witness Mr. Hutchins's absentee ballot, at this point, there is no evidence upon which the court can find Mr. Hutchins is unjustifiably burdened by the One-Witness Requirement. The court therefore declines to enjoin the One-Witness Requirement in light of Plaintiff Hutchins's circumstances. Plaintiff Hutchins's disability — blindness — in addition to his living in a locked down nursing home, however, do create other barriers to him voting in the November General Election that will be addressed infra Part II.E.5-6.

(Doc. 51) at 38-39; see also Exec. Defs.' Resp. (Doc. 58) at
28).) They assert voters who live alone can safely satisfy the
One-Witness Requirement by abiding by all social distancing and
sanitization guidelines. (Leg. Defs.' Resp. (Doc. 51) at 38-39.)
Executive Defendants contend Plaintiffs fail to demonstrate
"what proportion of [the 1.1 million] single-member households
would be unable to comply with the witness requirement." (Exec.
Defs.' Resp. (Doc. 58) at 27.)

     The court first notes that both district courts in the
Fourth Circuit which have addressed one-witness requirements in
the COVID-19 context found that the burden on voters during this
pandemic was not outweighed by state concerns about voter fraud.
See Andino, 2020 WL 2617329, at *19-21; League of Women Voters
of Va., 2020 WL 2158249, at *8-9. In Andino, the district court
noted that, while the state had an interest in preventing voter
fraud, "the interest will not suffice absent 'evidence that such
an interest made it necessary to burden voters' rights.'" Id. at
*20 (quoting Fish v. Schwab, 957 F.3d 1105, 1133 (10th Cir.
2020)). The court found that the government submitted no
evidence of voter fraud in South Carolina other than fleeting
mentions combined with the South Carolina Elections Commissions
Director's letter stating that the witness requirement offered
no benefit, evidence that undermined the strength of the state's

- 69 -

interest in preventing voter fraud. Id. at *20. Thus, the court reasoned, the "character and magnitude of the burdens" imposed on the voters "in having to place their health at risk during the COVID-19 pandemic likely outweigh the extent to which the Witness Requirement advances the state's interests of voter fraud and integrity." Id. at *21. The court further found that the state's interest in preventing fraud and preserving election integrity "are still served by other means," such as "requiring absentee ballot applications to include identifying information." Id. at *21 n.22.

Likewise, the district court in Virginia observed that "[d]uring this pandemic, the witness requirement has become 'both too restrictive and not restrictive enough to effectively prevent voter fraud,'" League of Women Voters of Va., 2020 WL 2158249, at *7–8 (quoting N.C. State Conference of NAACP v. McCrory, 831 F.3d 204, 235 (4th Cir. 2016)), meaning that it prohibited too many voters from being able to vote and did not do enough to prevent voter fraud.

The disagreement between Plaintiffs and Defendants is largely dependent on the degree of risk and the resulting danger posed by that risk as imposed by the One-Witness Requirement on voter health. Given the rapidly changing nature of the COVID-19 pandemic, the court finds it necessary to explain at some length

- 70 -

its factual findings as to how COVID-19 is transmitted and the different methods people can use to prevent the spread of this virus. Relatedly, while this court respects and recognizes the holdings of other district courts in this circuit, this court views the State's interest in voter identification and preventing voter fraud differently on the specific facts presented here.

### (A) Burden on Voters from COVID-19 and the One-Witness Requirement

The court will begin by giving an overview of the evidence presented, then will make findings of fact as to the burden on voters from COVID-19.

### Overview of Evidence Presented

The court considered testimony from two expert witnesses on COVID-19 and the risk to voters: Dr. Murray, an epidemiologist at Harvard Medical School, and Dr. Plush, an emergency room doctor in New Jersey. Both testified by videotape shown during the evidentiary hearing. The court also considered their declarations submitted as evidence.[11]

Plaintiffs submit evidence that North Carolinians are at particular risk of serious disease should they contract

_____

[11] In deciding whether a preliminary injunction should issue, this court has considered the testimony as well as the written record, including declarations and other pleadings.

COVID-19. In her declaration, Dr. Murray notes that the CDC has documented that 33% of North Carolinians are obese, 35% have diagnosed high blood pressure, and 13.1% have diagnosed diabetes mellitus, all of which are risk factors for severe disease or death from COVID-19. (Declaration of Meghan Murray in Supp. of Pls.' Mot. for Preliminary Injunction ("Murray Decl.") (Doc. 12-1) ¶¶ 21, 46.) Dr. Murray observes that on one risk assessment index, North Carolina ranked "second among the states" on "being the most vulnerable," due primarily to its "high (poor) score in the area of healthcare system factors." (Id. ¶ 50.) Dr. Murray interpreted this risk assessment as suggesting "that in the event of further spread of Covid-19, North Carolina may experience higher levels of disease, disability and death than other states experiencing the same amount of transmission." (Id.) She further observed another study which suggested that 39% of adults over the age of 18 in North Carolina "are at risk for serious disease [from COVID-19] with older adults making up 54.2% of those at high risk." (Id. ¶ 48.)

Dr. Murray testified that there are three known ways that COVID-19 is spread, through respiratory droplets, fomites on surfaces, and aerosols remaining in the air. (Doc. 107 at 11-13.) With respiratory droplet transmission, "when a person

- 72 -

coughs, sneezes, talks, sings, they project into the environment, the air, respiratory droplets . . . . [T]hose droplets can . . . get to another person because the person . . . produces respiratory . . . droplets that can be taken indirectly by the other person when they breathe in the air . . . in the vicinity" ("Droplet Transmission"). (Id. at 11–12.) Second, these respiratory droplets can also fall onto objects and surfaces, which become "fomites" — "things that are contaminated with the virus that one might be able to touch" ("Touch Transmission"). (Id. at 12.) Third, if the respiratory droplets are small enough, they "desiccate because they dry out in the air" ("Aerosol Transmission"). (Id. at 12.) According to Dr. Murray, when this occurs, the droplets stay in the atmosphere for hours and move around in the air currents in rooms and buildings. (Id.)

Dr. Murray testified that "there's very strong evidence that most transmission takes place indoors," and that ventilation has a "huge impact" on transmission as well. (Id. at 34.) She further testified that most transmissions occur when people are presymptomatic or asymptomatic. (Id. at 38.)

Dr. Murray testified, with regard to Aerosol Transmission, that "there's increasing evidence that aerosols are also indicated in viral transmission," thus, it seems to the court,

- 73 -

Dr. Murray testified that less is known about aerosol transmission. (Id. at 13.) Unlike the research Dr. Murray cited with respect to Droplet Transmission or Touch Transmission, Dr. Murray did not cite any studies definitively identifying cases of Aerosol Transmission. Dr. Murray did note a letter from two authors signed by many epidemiologists and engineers sent to the World Health Organization ("WHO"), "arguing that airborne transmission of Covid has been neglected." (Id. at 16; Doc. 102-4.) It does not appear to the court, however, that Dr. Murray relied on this letter for any scientific conclusions regarding Aerosol Transmission. She also noted there is not much data on how much transmission may occur from Aerosol Transmission or from Droplet Transmission, but that the precautionary principle would dictate that people take Aerosol Transmission seriously and act "as though it's real until someone can prove it's not real."[12] (Doc. 107 at 49.)

_____

[12] The precautionary principle, upon which Dr. Murray and Dr. Plush generally agree, (compare Doc. 107 at 48, with Doc. 111 at 71–72), is an environmental law principle which states that if the seriousness of a potential risk is unknown, it is "incumbent on the group that is in governance to assume that it is risky until proven otherwise." (Doc. 107 at 48.) This court declines to adopt that standard. First, to adopt that standard would, in effect, shift the burden to Defendants to prove the absence of harm rather than properly placing the burden on Plaintiffs to demonstrate a likelihood of success of proving the
(Footnote continued)

Regarding prevention of transmission, Dr. Murray testified
that sanitizing surfaces or hands with alcohol or other
antibacterial or antiviral substances after touching a surface
could reduce the possibility of Touch Transmission, and that
masks and social distancing protocols may reduce Respiratory
Transmission. (Id. at 13–14.) Aerosol Transmission, however,
poses a "more challenging" problem, because aerosolized droplets
"are rapidly disseminated through a room," and "they're small
enough that they are not blocked by the usual barrier methods,"
like most cloth masks. (Id. at 14.)

Regarding the CDC's definition of when someone has been
"exposed," such that the risk of transmission is sufficient to
warrant a 14-day quarantine, defined as 10-15 minutes in "close
contact" with someone who has COVID-19, Dr. Murray testified
that this guidance is guided by the principle that, as more time
is spent with someone, they are exhaling more breaths and thus
the number of viral particles in the air increases, which
increases the risk of transmission. (Id. at 22, 27.) She

---

existence of an unconstitutional burden on the right to vote.
Second, as explained hereafter, this court finds Dr. Plush's
testimony persuasive, that Aerosol Transmission has not been
shown at this time to be an infective risk for COVID-19, and
therefore this court does not find the precautionary principle
suggests or supports a finding of an unconstitutional burden on
the right to vote exists from a risk of Aerosol Transmission.

stressed, however, that the CDC's time-limit does not mean that one cannot be infected in under that length of time. (Id. at 25.)[13]

Regarding the efficacy of different types of face masks, Dr. Murray testified that N95 masks, which are used for healthcare and laboratory workers working with aerosol-based infections, are good for filtering out the very small aerosol molecules. (Id. at 40.) Surgical or medical masks are less effective at filtering out the aerosol particles and "are really designed to prevent the wearer from infecting others." (Id. at 43.) Cloth masks, she testified, are less efficacious at preventing transmission, especially given so few people wear masks correctly. (Id. at 44.)

---

[13] Both Dr. Murray and Dr. Plush minimized reliance upon the CDC's definition of close contact as a viable means of determining a potential transmission. Instead, both witnesses acknowledged the CDC's definition of close contact was based upon limited study and solely for the purpose of investigating the spread of COVID-19, not for insuring safety from transmission. (See Doc. 107 at 24-30; Doc. 111 at 51-52.) Insuring safety is predominately dependent upon social distancing and protective equipment. Both witnesses acknowledged that transmission could occur in less than ten minutes. (Doc. 107 at 25; Doc. 111 at 52.) However, both witnesses also acknowledged that risk of exposure did increase over time, and decreased time of exposure to others involved less risk but certainly not no risk. (Doc. 107 at 25-26; Doc. 111 at 52.)

Regarding mitigation tactics one could use while witnessing another's absentee ballot, Legislative Defendants asked Dr. Murray the following:

> Q: . . . Isn't it true that if two people stand outside 12 feet apart wearing a mask, let's say a surgical mask, not talking, not touching their face, maintaining hand hygiene, and the encounter is 30 seconds, that there is a very low risk -- a very low risk -- of transmission between those two individuals on a sunny day, correct?
>
> A. I think that's reasonable.

(Id. at 93.)

Finally, Dr. Murray did not seem to expect any great change in infection numbers, or any chance of the United States achieving herd immunity, or a vaccine being widely available prior to the November General Election. (Id. at 53, 109.)

Turning to Dr. Plush, Legislative Defendants' expert witness, he is a Board-certified physician. (Doc. 111 at 18.) He is currently treating COVID-19 patients and has treated between seventy-five and one hundred COVID-19 patients since the beginning of the global pandemic. (Id.)

He disagrees with the risks posed by COVID-19, pointing to statistics showing only "5% of the current active infections [in North Carolina] are severe enough to require hospitalization, which is far lower than the 39% considered at higher-risk for serious complications." (Doc. 51-6 ¶ 10.)

- 77 -

Dr. Plush agreed with Dr. Murray concerning Droplet Transmission and Touch Transmission. (Doc. 111 at 19-20.) He testified that he was more skeptical of Aerosol Transmission, stating, "[t]he fact that there is some aerosols or particles in the air, again, don't prove any airborne transmission." (Id. at 59-60.) He expanded on Touch Transmission, noting that COVID-19 "is not able to be contracted just by touching the surface with your hand. It cannot travel through the skin of your hand. It can only be transmitted when you touch a mucous membrane of your face, like your nose or mouth." (Id. at 21.) He emphasized, however, that Touch Transmission is "likely not the main way of transmission," given there "are no specific reports documenting [Touch] [T]ransmission only, and that's because usually people who come in contact with infectious surfaces are often in contact with the infectious person themselves, so it's often difficult to separate fomite transmission from droplet transmission." (Id. at 19-20.) And Dr. Plush agreed with Dr. Murray that a person could be infected in fewer than 15 minutes, despite the CDC's guidance. (Id. at 21, 52.)

Regarding the application of the precautionary principle to the risk of Aerosol Transmission, Dr. Plush testified that, given that many people have been exposed to symptomatic COVID-19 patients and have not become infected, thus, "there is some

evidence to show that there is not airborne transmission of this disease in every single case," the costs of abiding by the precautionary principle "would potentially outweigh any benefits." (Id. at 71–72.)

Dr. Plush further cited to a University of Nebraska study, in which researchers found air samples that were positive for COVID-19 RNA, but there were "no signs of infectivity or viral replication." (Id. at 53.) Dr. Plush interpreted this study to mean "the mere presence of airborne particles in itself does not prove airborne [aerosol] transmission." (Id.)

He also agreed with Dr. Murray as to the relative efficacy of the various types of masks: N95 masks are more beneficial than surgical or cloth masks, given N95 masks, when worn correctly, filter out more particles, including potential aerosolized COVID-19 particles, which surgical and cloth masks are not able to do. (Id. at 25, 86–87.)

Regarding the efficacy of other preventative measures, Dr. Plush testified that being outside would reduce the risk of transmission, given the increased air flow as compared to indoor environments. (Id. at 29.) He also testified that physical distance is a "very important part" of the measures one should take, "staying at least six feet back," (Id. at 30), and that more than six feet, such as three meters, further reduces risks,

(Id. at 30-31). He agreed with Dr. Murray that different chemicals, such as "a 60 percent ethanol solution or a 70 percent isopropyl alcohol solution," on surfaces and on hands, in addition to something like Lysol, with 0.1 percent sodium hypochlorite, on surfaces, would be effective at killing the virus. (Id. at 22-23.)

Regarding voting in general, Dr. Plush testified to the following: "I do not believe that there is significant risk if the . . . guidance from the CDC, including physical distancing, wearing a face mask, diligent hand hygiene, and environmental decontamination is followed . . . ." (Id. at 37.) Dr. Plush also stated that if those guidelines are followed, "then the risk to the individual is very low and can approach zero." (Id.) He still cautioned that voting by mail, even with a witness, would most likely be safer than voting in person. (Id. at 76; see also id. at 40.)

**Findings of Fact**

The court finds the following facts:

First, regarding the risk to North Carolinians, the court does not find Dr. Murray's assertions necessarily at odds with Dr. Plush's assertions. The study to which Dr. Murray cites merely states that 39% are "at risk for serious disease," not that 39% will get an infection severe enough to require

- 80 -

hospitalization. Indeed, Dr. Plush asserts that 69% of all COVID-19 patients who died in North Carolina "had at least one significant underlying medical condition," and "82% of all deaths were in patients over the age of 65." (Doc. 51-6 ¶ 9.)

Second, Dr. Murray and Dr. Plush agree that Droplet Transmission and Touch Transmission are both ways COVID-19[14] can be transmitted. This court adopts that as a fact. Dr. Murray and Dr. Plush also seem to agree that the risk of transmission through Touch Transmission is less than Droplet Transmission. (See Doc. 73-4 ¶ 15 ("However, the CDC notes 'transmission of coronavirus occurs much more commonly through respiratory droplets than through objects and surfaces, like doorknobs, countertops . . . .'"); Doc. 51-6 ¶ 3 ("Indirect infection, through touching of an infected surface then touching one's eyes, nose or mouth, may be possible, but it is not the main way that the virus is spread").) The court finds as a fact that the risk of Touch Transmission is significantly lower than Droplet Transmission.

---

[14] This court recognizes that the experts refer to SARS-CoV-2 as the virus and COVID-19 to refer to the disease caused by the virus. Nevertheless, for ease of reference in this opinion, this court has used the term COVID-19 to refer to both the virus and the disease.

Third, the court credits Dr. Plush's testimony and finds that Plaintiffs' evidence does not establish that Aerosol Transmission is an infective risk which imposes a separate burden on voters. The court makes this finding for the following reasons.

The opinions of Dr. Plush and Dr. Murray diverge with respect to Aerosol Transmission. The risk of Aerosol Transmission is a concern of Dr. Murray's. (<u>See</u> Murray Decl. (Doc. 12-1) ¶¶ 25-28; Doc. 73-4 ¶¶ 3-5.) After citing a number of studies suggesting the possibility of Aerosol Transmission, (<u>id.</u>), Dr. Murray concludes: "the mode respiratory transmission of SARS-CoV2 is incompletely understood, but there is growing evidence that transmission can occur through both large droplets and by smaller particles (aerosols)," (Doc. 73-4 ¶ 5).

Dr. Plush, on the other hand, states that Droplet and Touch Transmission

> are the only two known and undisputed ways for the virus to spread. The notion that there may be airborne transmission of SARS-CoV-2 is controversial and the results are mixed. . . . Importantly, the World Health Organization (WHO) acknowledges that "airborne spread has not been reported for COVID-19 and it is not believed to be a major driver of transmission based on available evidence" after an analysis of 75,465 COVID-19 cases in China, reported no evidence of airborne transmission.

- 82 -

(Doc. 51-6 ¶ 3 (quoting Report of the WHO-China Joint Mission on Coronavirus Disease 2019 (COVID-19), WHO (Feb. 28, 2020), https://bit.ly/3eCvjfp (last visited August 2, 2020)).)[15] Notably to this court, Dr. Murray did not dispute Dr. Plush's citation of the WHO's conclusion. Instead, during her testimony, Dr. Murray identified a letter from two authors to the WHO, (Doc. 121-3), signed by "something like 240" scientists "making the case that really WHO needs to kind of back off their claim that this [aerosol transmission] don't play a major role in Covid transmission." (Doc. 107 at 16–17, 18.) Dr. Murray acknowledged that she would not rely upon the letter, (id. at 50), but she did say the proffered evidence "bolstered their position." (Id.) On cross-examination, Dr. Murray acknowledged that she did not know what percentage of people in the United States have caught the virus as a result of aerosol droplets hanging suspended in the air. (Id. at 81.) Dr. Murray also identified recent guidance from the WHO which states that, "In

_____

[15] To be clear, this court is evaluating the facts to determine whether Plaintiffs have established a likelihood of success on the merits as to an unconstitutional burden on the right to vote. Determining whether Aerosol Transmission is a risk, and therefore a potential burden, is a necessary part of the factual analysis. In order to assess the risk, this court does not apply a standard which requires Plaintiffs to prove Aerosol Transmission is "undisputed." Instead, the court determines whether Plaintiffs have established a burden based upon facts establishing a "likelihood of success on the merits."

these outbreaks, aerosol transmission, particularly in these indoor locations where there are crowded and inadequately ventilated spaces where infected persons spend long periods of time with others, cannot be ruled out. More studies are urgently needed to investigate such instances and assess their significance for transmission of COVID-19." (Pls.' Ex. 4 (Doc. 121-4 at 2.)

Dr. Plush testified that, in his opinion, he does "not believe there is significant risk" from in-person voting "if the . . . guidance from the CDC, including physical distancing, wearing a face mask, diligent hand hygiene, and environmental decontamination is followed, then the risk to the individual is very low and can approach zero."[16] (Doc. 111 at 37.) Dr. Plush, in addressing Airborne Transmission directly, testified:

> A. Well, there . . . there's been no evidence and no proof of actual airborne transmission of SARS-CoV-2.
>
> There has been some studies that have found viral RNA in the air, such as the one study quoted by Dr. Murray from University of Nebraska that did find air samples that were positive for SARS-CoV-2 RNA.
>
> When they looked at it and tried to culture it, there was no signs of infectivity or viral replication.

---

[16] As will be explained in a later section, this court finds that in-person voting can be conducted relatively safely so long as these guidelines, described by Dr. Plush, are followed.

- 84 -

> So the mere presence of airborne particles in itself does not prove airborne transmission.
>
> The airborne transmission that's defined by the CDC is airborne particles that are able to be infective over distance and time.
>
> And as of right now there is no direct evidence of airborne transmission.

(Id. at 53.) Later, Dr. Plush testified "[t]here is no studies proving airborne transmission. That's according to the latest WHO transmission scientific brief that was just published in July of 2020." (Id. at 60.) Dr. Plush acknowledged airborne transmission is "possible," (id.), although, as stated, there is no direct evidence of airborne transmission.[17] Finally, as stated in the most recent WHO advisory Q&A, presented during Dr. Murray's testimony, the information provided states: "In these outbreaks, aerosol transmission . . . cannot be ruled out. More studies are urgently needed to investigate such instances and assess their significance for transmission of COVID-19." (Pls.' Ex. 4 (Doc. 121-4) at 2.) Notably, no evidence was

---

[17] Dr. Plush refers to "airborne transmission" and Dr. Murray referred to that same issue as Aerosol Transmission. In this opinion, this court uses the term Aerosol Transmission to refer to those smaller respiratory droplets (generally less than 5 micrometers) which "desiccate because they dry out in the air," and may remain in the atmosphere and in air currents in rooms and stay in the atmosphere for hours. (Doc. 107 at 12.) The terms "airborne transmission" and "Aerosol Transmission" are synonymous for purposes of this opinion.

- 85 -

presented to suggest the WHO withdrew its earlier findings as described by Dr. Plush.

Thus, if Aerosol Transmission is a risk, both Dr. Plush and Dr. Murray acknowledge that mitigation of that risk is difficult. (Doc. 107 at 14; Doc. 111 at 61 ("Social distancing itself is not effective . . . for an airborne pathogen").)

This court finds the evidence is too speculative at the present time to support a finding that aerosol droplets are capable of being infective over distance and time. In reaching this conclusion, this court credits the testimony of Dr. Plush, which relies, at least in part, upon the WHO guidance, for the following reasons.

Dr. Plush's opinion that the existence of COVID-19 airborne particles is not the same as a risk of infective transmission is significant to this court. As Dr. Plush points out, "one study quoted by Dr. Murray from University of Nebraska that did find air samples that were positive for SARS-CoV-2 RNA" also apparently found that there "were no signs of infectivity or viral replication." (Doc. 111 at 53.) Whether COVID-19 is airborne or whether it remains infective if it is in the air "is a hypothetical and is not proven." (Id. at 104.)

Further, Dr. Murray concludes that "[i]t is also possible that Covid-19 is transmitted as an aerosol," (Doc. 12-1 ¶ 25),

- 86 -

while Dr. Plush, reviewing much of that same literature, concludes "there's been no evidence and no proof of actual airborne transmission of SARS-CoV-2," (Doc. 111 at 53). This court has reviewed literature cited by Dr. Murray and Dr. Plush to the extent possible,[18] and finds Dr. Plush's conclusions, for purposes of this preliminary injunction motion and on this evidence, compelling.

For example, in Dr. Murray's declaration, (Murray Decl. (Doc. 12-1) ¶ 25), when explaining that a study suggesting "aerosol spread of SARS-CoV-2 is indeed possible," (id.), Dr. Murray further explained that:

> [t]hese findings are consistent with case reports of Covid-19 patients who were infected in settings in which they did not have direct contact with others. In one case, 45 people were diagnosed with Covid-19 after attending a choir practice in Washington State in early March although they had no direct physical contact with each other.

(Id.) That allegation is indeed alarming with respect to the possibility of Aerosol Transmission. The article cited by Dr. Murray, Hamner, et al., High SARS-CoV-2 Attack Rate Following

---

[18] To be clear, this court is not a medical doctor nor an epidemiologist. This court has reviewed cited literature in an effort to consider and weigh, for purposes of this opinion, the diverging testimony with respect to Aerosol Transmission. This court's conclusions, as explained hereafter, should not be understood to reject the possibility that Aerosol Transmission, through future research, may be found to play a role in transmission as suggested by Dr. Murray.

Case 1:20-cv-00457-WO-JLW   Document 124   Filed 08/04/20   Page 87 of 188

Exposure at a Choir Practice - Skagit County, Washington, March 2020, Morbidity & Mortality Weekly Report Vol. 69 (May 15, 2020) https://www.cdc.gov/mmwr/volumes/69/wr/pdfs/mm6919e6-H.pdf (last visited August 1, 2020), is enlightening. While true, as Dr. Murray states, "[n]o one reported physical contact between attendees," id. at 607; see Doc. 12-1 ¶ 25, the article also states:

> The 2.5-hour singing practice provided several opportunities for droplet and fomite transmission, including members sitting close to one another, sharing snacks, and stacking chairs at the end of the practice. The act of singing, itself, might have contributed to transmission through emission of aerosols, which is affected by loudness of vocalization.

High SARS-CoV-2 Attack Rate at 606. The Washington State outbreak involved attendees who were in close contact and therefore subject to Droplet and Touch Transmissions. Notably, while the article expresses concern over the possibility of aerosol transmission, the authors do not suggest any mitigation other than following CDC guidelines:

> This outbreak of COVID-19 with a high secondary attack rate indicates that SARS-CoV-2 might be highly transmissible in certain settings, including group singing events. This underscores the importance of physical distancing, including maintaining at least 6 feet between persons, avoiding group gatherings and crowded places, and wearing cloth face coverings in public settings where other social distancing measures are difficult to maintain during this pandemic. . . . Current CDC recommendations, including maintaining

- 88 -

> physical distancing of at least 6 feet and wearing
> cloth face coverings if this is not feasible, washing
> hands often, covering coughs and sneezes, staying home
> when ill, and frequently cleaning and disinfecting
> high-touch surfaces remain critical to reducing
> transmission.

Id. at 609-10. Dr. Murray's opinion that the case report is consistent with the study, while true, is not quite as compelling. Dr. Plush's opinion that Aerosol Transmission is hypothetical and has not been proven is a fair assessment of the evidence presented by that article.

Both Dr. Plush and Dr. Murray recognize the diverging conclusions suggested and drawn from the research and literature. For example, Dr. Murray cited a study from Iran in which "air samples taken from a distance of 2 to 5 m from patient beds were negative for SARS-CoV-2 RNA." (Doc. 73-4 ¶ 4.) Similarly, Dr. Plush cited a study from China which "did find SARS-CoV-2 positive aerosols in 14 out of the 40 rooms tested containing COVID-19 positive intensive care unit patients." (Doc. 51-6 ¶ 3.) The court, however, after reviewing studies cited by both Dr. Murray and Dr. Plush, find Dr. Plush's characterization more compelling and entitled to greater weight for purposes of this Memorandum Opinion.

Finally, the court also finds Dr. Plush's opinions are compelling given his ongoing treatment of COVID-19 patients and

daily exposure to the virus. Dr. Plush is an attending physician
at Inspira Medical Center and an adjunctive professor affiliated
with Cooper University Hospital. (Doc. 51-6 ¶ 1.) His work, and
the facilities with which he is associated, are directly
implicated by a suggestion that Aerosol Transmission might be
associated with the hospital-related spread. His review of the
studies and apparent disagreement with a conclusion that
infective airborne transmission has been shown is notable. That
Dr. Plush has treated between seventy-five and one hundred
patients for coronavirus over the past four or five months is
also significant to the court. (Doc. 111 at 18.) He is in
contact with COVID-19 patients often. (Id.) Dr. Plush is not an
epidemiologist and has not devoted his time to "dynamic modeling
of epidemics . . . ; cohort studies on host and pathogen
specific determinants of disease transmission," and "SARS-CoV-2
and its incidence" like Dr. Murray. (See Murray Decl. (Doc.
12-1) ¶¶ 3, 5.) However, Dr. Plush's professional interest in
modes of transmission of COVID-19 while being exposed to active
cases is clear. Dr. Plush has not only studied the research and
literature; but he has also drawn his opinions and conclusions
while being exposed to individuals with COVID-19 for a period of
several months. These facts compel this court to weigh more

heavily on Dr. Plush's review and study of the literature and research which, at present, appears at best uncertain.

The court acknowledges that Dr. Plush admitted that he had not reviewed the Aerosol Transmission studies cited in the WHO letter, nor had he addressed another study dealing with Aerosol Transmission. (Doc. 111 at 84.) The court nevertheless credits Dr. Plush's testimony that he has reviewed "a large majority of the research," (id.), and finds that his failure to review the studies cited in the WHO letter and the other study about which he was asked does not materially affect the reliability of his testimony regarding Aerosol Transmission. While it is close issue, this court finds Dr. Plush's opinion persuasive.

This court therefore finds as a fact for purposes of this hearing only and on the record before it that the presence of airborne COVID-19 particles is different from infective risk leading to Aerosol Transmission. This court further finds the possibility of infective risk from airborne particles is hypothetical and not proven. This court therefore further finds that no additional burden or risk is placed on a voter as a result of Aerosol Transmission.

This court's finding that Aerosol Transmission has not been shown on this evidence to be a source of infective transmission should not be misconstrued. These findings do not in any way

- 91 -

suggest CDC guidelines suggesting properly operating ventilation systems, open windows and doors, and other reasonable precautions can be ignored. This court finds many reasons those guidelines should be followed; taking steps to mitigate the risk of Droplet Transmission and perhaps also the presence of any aerosols are reasonable safety precautions regardless of this court's finding.

This court's finding should also not be misconstrued to suggest Aerosol Transmission will not be proven through additional, future research as an independent source of infective transmission. As Dr. Plush reports:

> The notion that there may be airborne transmission of SARS-CoV-2 is controversial and the results are mixed. In a Hong Kong hospital, a COVID-19 positive patient placed in an open ward came in close contact with 10 other patients and 7 staff members, none of which were protected with n95 respirators. After 28 days of surveillance, all the close contacts remained asymptomatic and there were no positive cases identified. Similarly, air samples taken from 6 separate COVID-19 positive patients, singly isolated in a negative pressure room, were negative for SARS-CoV-2 RNA. Conversely, a study from China did find SARS-CoV-2 positive aerosols in 14 out of the 40 rooms tested containing COVID-19 positive intensive care unit patients.

(Doc. 51-6 ¶ 3.) More recently, the WHO acknowledged:

> There have been reported outbreaks of COVID-19 in some closed settings, such as restaurants, nightclubs, places of worship or places of work where people may be shouting, talking, or singing. In these outbreaks, aerosol transmission, particularly in these indoor

> locations where there are crowded and inadequately
> ventilated spaces where infected persons spend long
> periods of time with others, cannot be ruled out. More
> studies are urgently needed to investigate such
> instances and assess their significance for
> transmission of COVID-19.

(Pls.' Ex. 4 (Doc. 121-4) at 2.) There is reasonable concern over the possibility of Aerosol Transmission from credible sources, including Dr. Murray. Those sources, including the WHO letter, are sufficient, as the WHO points out, to support further investigation and research. But at this time, on the record before this court, the court does not find Aerosol Transmission presents an infective risk which burdens an individual's right to vote.

After review of the testimony and evidence as to Droplet, Touch, and Aerosol Transmissions, this court makes the following additional findings of fact. This court credits the testimony of both Dr. Murray and Dr. Plush in terms of known risks of transmission and finds that currently, the risk of contracting COVID-19 from either procuring a witness or witnessing another's absentee ballot when done in accordance with the CDC-recommended precautions, including maintaining a distance of 6 feet or more for social distancing, does not pose a serious risk to voters. Voters can have another person witness their absentee ballot

without violating social distancing procedures or "exposing" themselves to someone with COVID-19.

This court has examined the sample ballot, (see Doc. 115-1), and is familiar with the process of witnessing another individual's signature to a document. The court finds, as a result of its examination of the sample ballot, that a voter should be likely able to fill out and sign the two-page ballot in a relatively short period of time, including the witnessing process, in fewer than ten minutes. The court further finds that a voter can vote absentee by mail without serious risk by adhering to social distancing measures and following all CDC guidelines. The court further recognizes and finds that some risk of Touch Transmission could arise in the process of moving the ballot from voter to witness and back, but that this risk can be mitigated, if not completely eliminated, by surface cleaning and handwashing in accordance with CDC guidelines; this risk is thus also minimal. The court therefore does not find the

One-Witness Requirement unduly burdensome on even high-risk voters.[19]

Although this section of the Memorandum Opinion and Order specifically addresses the One-Witness Requirement to absentee voting, the same evidence relates to the safety of voting in general. Therefore, relatedly, based upon the evidence presented with respect to in-person voting, this court finds that there is no significant risk to in-person voting "if the . . . guidance from the CDC, including physical distancing, wearing a face mask, diligent hand hygiene, and environmental decontamination is followed . . . ." (Doc. 111 at 37.) If those guidelines are

---

[19] Obviously, if two or more people should gather and none of those individuals have COVID-19 in any form, then the risk of spread of COVID-19 does not exist. However, because the spread of COVID-19 occurs substantially with presymptomatic and asymptomatic carriers, and the prevalence of presymptomatic and asymptomatic individuals in the state is not known, then guidance, reason, safety, and common sense require all individuals, including this court, to assume that if two or more individuals gather in some form, one of those individuals may be an unknowing, potential carrier of COVID-19, requiring all parties to act accordingly. In assessing the testimony and finding the facts, this court has considered as a fact that, during this pandemic, evidence, reason, and common sense mandate that individual interactions be considered in light of the existence of presymptomatic and asymptomatic carriers.

followed, "then the risk to the individual is very low and can approach zero."[20] (Id.)

The court now turns to examining the weight of the State's interests in keeping the One-Witness Requirement.

### **(B)    The State's Interests**

The court considered all the evidence submitted, particularly the testimony of Marshall Tutor, the former lead investigator for the State BoE, and of Defendant Bell, in determining the weight of the State's interest in retaining the One-Witness Requirement, as well as the declaration from Ken Block, a data analyst.

Marshall Tutor testified that a witness requirement will not deter someone intent on committing voter fraud. (See Doc.

---

[20] Both Dr. Murray and Dr. Plush expressed reservations as to the efficacy of masks. (Doc. 107 at 42–43; Doc. 111 at 86–87.) Defendant Bell, during her testimony, advised the court that the State BoE takes the position that masks cannot be required of an individual as a condition to exercise the right to vote, but that social distancing could be required in order to maintain order at polling stations. (Evidentiary Hr'g Tr. vol. 2 (Doc. 113) at 74–77.) This court makes no finding as to that particular position of the State BoE. However, if wearing masks is not mandated, the State BoE should consider carefully the testimony of its own expert witness, Dr. Plush, and consider mandating social distancing of greater than six feet, i.e., three meters (9 feet or more), for polling places.

12-4 ¶ 8.) He also testified that the State BoE has never opened an investigation based upon a potentially fraudulent witness signature, nor that he was ever able to detect a forged witness signature based solely on the absentee ballot envelope itself. (Doc. 108 at 17.)

Mr. Tutor also discussed the 2016 and 2018 general election absentee ballot collection fraud case in North Carolina involving Leslie McCrea Dowless (the "Dowless Scheme").[21] (Id. at 9.) Dowless's intention in perpetrating this scheme was to get as many Republican votes in before election day as possible. (Id.) Dowless would hire people to go and pick up absentee ballots from voters in the district; he knew who had been mailed absentee ballots by finding out from his contacts in the Bladen County Board of Elections staff. (Id. at 11.) His people would talk voters into filling out their ballots in support of the candidates Dowless supported and at least would collect the voters' ballots. (Id. at 11–12.) Some of these ballots were then thrown away. (Id. at 12.) Dowless's teams would also sometimes sign the witness boxes after they had picked up the ballots, sometimes with fake names. (Id. at 14.) However, Mr. Tutor

---

[21] Mr. Tutor testified that "[t]he 2016 and 2018 cases, facts, and people merged," (Doc. 108 at 10), and the court will therefore treat these cases under the umbrella of the Dowless Scheme.

- 97 -

testified, the State BoE only became aware of the Dowless Scheme because voters who had been approached by Dowless's teams reached out to the county BoE; generally, the State BoE usually, "if not basically all of the time," becomes aware of potential absentee ballot fraud from a voter contacting their local county BoE. (Id. at 10, 16, 40.)

Mr. Tutor explained that this type of scheme would be nearly impossible now, because the State BoE has made the information pertaining to who has requested an absentee ballot confidential until election day. (Id. at 12.)

Turning to Defendant Bell, she originally suggested reducing the two-witness requirement down to one witness or eliminating the witness requirement altogether in her March 26, 2020 letter to the General Assembly. (Doc. 12-7 at 4.) At that point, however, Defendant Bell had asserted, as part of that letter, that the State could procure signature-matching technology, which would serve the purpose of ensuring the person submitting the ballot was actually the person whose name was on the ballot. At this time, however, Defendant Bell testified that, due to demand from other states, North Carolina would not be able to procure such technology in time for the election, thus leaving the State BoE without a way to verify absentee

- 98 -

ballots if the One-Witness Requirement is eliminated. (Evidentiary Hr'g Tr. vol. 2 (Doc. 113) at 44.)

Legislative Defendants also submit a declaration from Ken Block, a data analyst, in which he found 1,265 instances of duplicative voting from the 2016 General Election; that is, a person voting in both North Carolina and another state. (Doc. 51-2 ¶ 11.) Legislative Defendants contend this is further evidence of voter fraud requiring deterrence and prevention. (Leg. Defs.' Resp. (Doc. 51) at 37.)

The court first notes that preventing voter fraud and preserving election integrity are important state interests. See Timmons v. Twin Cities Area New Party, 520 U.S. 351, 364 (1997) ("States certainly have an interest in protecting the integrity, fairness, and efficiency of their ballots and election processes as means for electing public officials.").

The court finds the One-Witness Requirement plays a key role in preventing voter fraud and maintaining the integrity of elections, much like an in-person voter is required to state their name and address upon presenting themselves at an in-person polling place; the act of identification, as witnessed by the poll worker, acts as the same deterrent from committing fraud. The court thus does not assign much weight to Mr. Tutor's

- 99 -

testimony that anyone intent on committing absentee ballot fraud will do so regardless of the law.

Prevention of voter fraud requires consideration of that interest in a broader sense than simply measuring deterrence. As the facts of the Dowless Scheme demonstrate, not only was the fraud investigated but the election results were also set aside and a new election was held for North Carolina's 9th Congressional District. (See Doc. 102-10 at 2.) Even Mr. Tutor, who did not believe any witness-signature law would prevent absentee ballot fraud, did acknowledge the witness requirement was at least of "marginal" assistance in the subsequent investigation. (See Doc. 108 at 22–23.) This court is not persuaded by, and thus assigns no weight to, Mr. Tutor's characterization of the assistance as "marginal."

The court would reach the same conclusion here even if the analysis were limited to the State's interest in voter identification and deterring voter fraud. Indeed, this court finds that the State's interest in deterring voter fraud extends not only to deterring fraud at the outset but also in establishing certain minimal standards to allow for detection, investigation, and ultimately rejection of fraudulent ballots, and, if warranted, the holding of a new election to cure

- 100 -

election results tainted by fraud, all of which occurred in response to the Dowless Scheme. (See Doc. 102-10 at 2.)

The court finally finds Defendants' stated interest in preventing voter fraud is stronger than the government's in Andino for one substantial reason: North Carolina experienced a serious case of voter fraud involving absentee ballots in the 2016 General Election with the Dowless Scheme. (See Doc. 102-10 at 2.) Defendants' interest in preventing voter fraud is therefore not illusory or speculative. (See Leg. Defs.' Resp. (Doc. 51) at 37.) This history of voter fraud weighs far heavier in the Anderson-Burdick balancing test. The Supreme Court has observed that the courts do not "require elaborate, empirical verification of the weightiness of the State's asserted justifications." Timmons, 520 U.S. at 364. Indeed, the Supreme Court has upheld what is likely a more burdensome regulation, requiring photo identification issued by the government in order to vote in person, even in the face of a record devoid of any evidence of voter fraud occurring in Indiana in its history. Crawford, 553 U.S. at 194–96.

The State's interest in preventing, identifying, and investigating voter fraud weighs heavily against the burden on voters.

### (C) One-Witness Requirement Conclusion

The court thus must weigh the burden on Plaintiff Bentley in procuring a witness for her absentee ballot against the State's interest in preventing and detecting voter fraud.

The court finds that even high-risk voters can comply with the One-Witness Requirement in a relatively low-risk way, as long as they plan ahead and abide by all relevant precautionary measures, like social distancing, using hand sanitizer, and wearing a mask; in other words, the burden on voters is modest at most.

Turning to the State's interest, the court first notes that, while the evidence does not demonstrate that the witness requirement is integral to initially detecting voter fraud, the deterrent effect of the One-Witness Requirement, in addition to North Carolina's recent history of voter fraud involving absentee ballots, are sufficiently weighty to justify the modest burden on voters.

Plaintiffs have not demonstrated a likelihood of success on the merits of their constitutional challenge to the One-Witness Requirement under the Anderson-Burdick balancing test.

### ii.  The Identification Requirement

Plaintiffs seek an injunction of N.C. Gen. Stat. § 163-230.2(a)(4), the Identification Requirement, which

- 102 -

requires a voter requesting an absentee ballot provide one of
the following: (1) the voter's driver's license number, (2) the
voter's special identification card number, or (3) the last four
digits of the voter's social security number, and request the
court order election officials to "accept any proof of residency
document acceptable under the Help America Vote Act (HAVA) as
acceptable forms of identification with absentee ballot
requests." (Pls.' Am. Mot. (Doc. 31) at 4-5, 7.)

This court will assume, without deciding, that the
Anderson-Burdick balancing test, not strict scrutiny, applies.
See Andino, 2020 WL 2617329, at *18-19; see also Democratic
Nat'l Comm. v. Bostelmann, No. 20-cv-24-wmc, _____ F. Supp. 3d.
_____, 2020 WL 1320819, at *6-7 (W.D. Wis. Mar. 20, 2020)
("Bostelmann I"), (applying the Anderson-Burdick balancing test
in evaluating a challenge to an identification requirement for
requesting an absentee ballot). The court thus must determine
the extent of the burden imposed by the proof of residency
restrictions, the State's interest in justifying these
restrictions, and whether the State's interest justifies the
burden. See Burdick, 504 U.S. at 434.

Executive Defendants contend that Plaintiffs fail to
demonstrate why requiring absentee voters submit one of the
forms of accepted identification would be burdensome or why the

- 103 -

COVID-19 pandemic would "heighten" any such burden. (Exec. Defs.' Resp. (Doc. 58) at 21.) They further acknowledge that Plaintiffs' request is "sound policy" but point to Bostelmann I as evidence that courts "have denied motions for preliminary injunctions where plaintiffs have argued that requiring proof of residency and proof of voter identification for absentee ballot applications in light of the COVID-19 pandemic are unconstitutional burdens on the right to vote." (Id. at 21–22.)

The court agrees with Executive Defendants. The district court in Bostelmann I declined to enjoin a similar identification requirement for absentee ballot requests. See Bostelmann I, 2020 WL 1320819, at *6–7; cf. Luft v. Evers, 963 F.3d 665, 676 (7th Cir. 2020) (affirming the district court's finding that Wisconsin's law requiring documentary proof of residence to register to vote was constitutional because "[p]roof of residence helps assign voters to their proper districts and is valid for that reason alone"); Frank v. Walker, 768 F.3d 744, 751 (7th Cir. 2014) (upholding Wisconsin's voter ID law under Crawford); Democratic Nat'l Comm. v. Bostelmann, Nos. 20-cv-249-wmc, 20-cv-278-wmc, 20-cv-284-wmc, _____ F. Supp. 3d _____, 2020 WL 1638374, at *20–21 (W.D. Wis. Apr. 2, 2020) ("Bostelmann II") (same).

The court finds that "the State's interest with respect to [an identification] requirement has been recognized by the United States Supreme Court . . . ." Bostelmann I, 2020 WL 1320819, at *7.

Plaintiffs' attempt to distinguish Bostelmann by arguing "the plaintiffs in that case requested striking down the requirement entirely, not allowing alternative methods of proof." (Pls.' Reply (Doc. 74) at 23.) The court finds this argument unpersuasive. The burden on Plaintiffs is modest; none of the Individual Plaintiffs have indicated they will not be able to comply with this regulation nor have Organizational Plaintiffs indicated they will be harmed by this regulation. Given this modest burden, and given a similar restriction was recently upheld in Bostelmann, the court finds Plaintiffs are unlikely to prevail on the merits on their Identification Requirement claim.

### iii. Restrictions on Who May Assist in Completing and Submitting Absentee Ballot Requests

Plaintiffs next seek an injunction against N.C. Gen. Stat. § 163-230.2, as amended by H.B. 1169, which limits who may request an absentee ballot on behalf of a voter, assist a voter in making such a request, and deliver such a request on behalf of a voter. (Pls.' Am. Mot. (Doc. 31) at 4-5.)

- 105 -

The court first notes Plaintiffs' challenge to the Form Requirement, insofar as they request an online option and the ability to seek a request form over the phone, is moot; no Individual Plaintiffs as voters have standing to challenge this law, because they all possess the ability to request an absentee ballot request form under the current laws. <u>See</u> Part II.A.3.

Second, regarding the Request Assistance Ban, the court notes that none of the Individual Plaintiffs as voters have standing to challenge these laws, because no Individual Plaintiffs alleged they will be burdened by these laws.[22] With respect to Organizational Plaintiffs, the claimed injuries to these Plaintiffs are not burdens on the right to vote, but

---

[22] Defendants did not challenge standing with respect to the Request Assistance Ban as to any of the Individual Plaintiffs. (<u>See</u> Leg. Defs.' Br. (Doc. 51) at 14–23.) To the extent Organizational Plaintiffs challenge the Request Assistance Ban on behalf of third-party voters, the court found Organizational Plaintiffs do not have prudential standing to do so. <u>Supra</u> Part II.A.8.

instead are burdens on their ability to associate with voters.[23]

Indeed, Plaintiffs, as part of their Right-to-Vote section of their brief, argue that the Request Assistance Ban "impedes LWVNC's educational mission and message of participation in voting, its ability to build relationships and associate with voters, and most importantly, its mission of promoting voter participation and civic engagement." (Pls.' Br. (Doc. 10) at 33 (emphasis added).) These are quintessentially freedom of speech and association injuries. The court will accordingly consider Plaintiffs' challenges to the Request Assistance Ban, as part of the court's analysis of their First Amendment Freedom of Association claim, infra Part II.E.3.

---

[23] While Plaintiffs argue that the Request Assistance Ban "prevents voters from receiving needed assistance to navigate the ballot request process," (Pls.' Br. (Doc. 10) 32-33), the court finds this argument would serve as an end run around prudential standing. To argue that harm will come to voters because of the harm to Organizational Plaintiffs is to argue that the Request Assistance Ban unconstitutionally burdens voters, who are third-parties; this is the essence of third-party standing. The court found Organizational Plaintiffs do not have prudential standing, see Part II.A.8, therefore this argument cannot serve as the basis for analyzing Organizational Plaintiffs' challenge to the Request Assistance Ban under a fundamental right to vote framework. Further, while Organizational Plaintiffs allege these laws frustrate their mission of helping citizens vote, Organizational Plaintiffs have not pled a diversion of resources such that they could establish organizational standing either. (See Second Am. Compl. (Doc. 30) ¶ 96.) Instead, Organizational Plaintiffs' challenge must be construed as a First Amendment associational claim.

- 107 -

### b.  <u>Voter Registration Deadlines</u>

Plaintiffs challenge the 25-day Deadline on registering to vote by mail, through state agencies, or online through the Department of Motor Vehicles ("DMV") website under N.C. Gen. Stat. §§ 163-82.6(d) and 163-82.20(g), (h). (Pls.' Am. Mot. (Doc. 31) at 4.) Only Organizational Plaintiffs have standing to challenge this law. <u>See</u> Part II.A.1.

The parties disagree over whether the 25-day Deadline "severely burden[s]" the right to vote, and thus, the level of scrutiny the court must apply. (<u>Compare</u> Pls.' Br. (Doc. 10) at 27, <u>with</u> Leg. Defs.' Resp. (Doc. 51) at 28.) As the court has already noted, it "need not reach that decision," and will assume, without deciding, that the <u>Anderson-Burdick</u> balancing test, not strict scrutiny, applies.[24] <u>See</u> <u>Andino</u>, 2020 WL 2617329, at *18-19; <u>see also</u> <u>Bostelmann I</u>, 2020 WL 1320819, at *4-5 (applying the <u>Anderson-Burdick</u> test to a voter registration deadline).

Outside the COVID-19 pandemic, courts routinely uphold voter registration deadlines as constitutional burdens on the

---

[24] As described previously, it does not appear that this deadline disenfranchises or threatens to disenfranchise any voter, nor does it appear to unfairly affect any constitutionally-protected group. On the evidence presented, and for purposes of this motion only, the court would not find this to be a severe burden.

right to vote. See Burns v. Fortson, 410 U.S. 686, 686–87 (1973) (per curiam) (upholding Georgia's 50-day registration deadline, though it "approache[d] the outer constitutional limits in this area"); Rosario v. Rockefeller, 410 U.S. 752, 761–62 (1973) (upholding a law requiring voters to register with a political party at least thirty days prior to the previous general election in order to participate in the state's subsequent closed primary election); Diaz v. Cobb, 541 F. Supp. 2d 1319, 1340 (S.D. Fla. 2008) (upholding a 29-day voter registration deadline); see also Pisano v. Strach, 743 F.3d 927, 937 (4th Cir. 2014) (upholding May 17 petition-filing deadline for the formation of new political parties for the November general election).

Plaintiffs contend the 25-day Deadline will serve as a barrier to voters seeking to register closer to the election due to limitations on in-person registration efforts and voters' fear of registering at in-person early voting due to COVID-19. (Pls.' Br. (Doc. 10) at 28.) In particular, Plaintiffs argue COVID-19 limits voter registration opportunities, given many voter registration organizations, including Organizational Plaintiffs, have reduced or cancelled their in-person voter registration initiatives, and many DMV and state agencies have closed or limited in-person access. (Id. at 27.) Thus, they

- 109 -

argue, many voters will attempt to register to vote closer to the election, and the 25-day Deadline unduly burdens voters who would not feel comfortable taking advantage of same-day registration at in-person early voting sites, and burdens Organizational Plaintiffs in getting as many voters registered as possible. (Id. at 28.)

Executive Defendants contend the 25-day Deadline is only a "modest" burden, outweighed by the State's interest in maintaining the deadlines; that is, the interest in ensuring voters receive their verification mailings before Election Day, reducing voter confusion, and allowing the State and county boards of election to process registration forms. (Exec. Defs.' Resp. (Doc. 58) at 14–15.)

Legislative Defendants likewise view this restriction as justified, pointing to the State's interest in "ensuring orderly, fair, and efficient procedures for the election of public officials." (Leg. Defs.' Resp. (Doc. 51) at 28–29 (quoting Pisano, 743 F.3d at 936).)

Plaintiffs point to "dramatic" drops in voter registration rates compared to 2016. They submit evidence of a 162% increase in registration in January 2020 compared to registrations in January 2016, but "February, March, and April 2020 had changes of -10%, -14%, and -50% compared to the same months of 2016

- 110 -

respectively." (Doc. 12-5 ¶ 4.) Plaintiffs also offer data suggesting nearly 350,000 potential voters may be ineligible to use the DMV online voter registration portal and therefore would likely have to register to vote either in person or through the mail. (Doc. 73-7 ¶ 8.)

Legislative Defendants submit the declaration of Angela Hawkins, a member of the Wake County Board of Elections, to rebut the significance of these figures. (Doc. 51-5.) She contends it is not surprising registrations went down in April, considering more people registered in January, presumably to vote in the 2020 primary elections, and considering the stay-at-home orders that were in place. (Id. ¶ 4.) She maintains that, despite these numbers, voters have plenty of time to register to vote prior to the November 2020 election. (Id.)

Legislative Defendants also submit the declaration of Linda Devore, the Secretary of the Cumberland County Board of Elections. (Declaration of Linda Devore in Opp'n to Pls.' Mot. for Preliminary Injunction ("Devore Decl.") (Doc. 51-4) ¶ 1.) She contends that extending the 25-day Deadline through the close of One-Stop early voting would pose considerable problems in facilitating the election. (Id. ¶ 6.) She asserts that such a change would "require updating nearly 300 storage drives for laptops used on Election Day" in Cumberland County alone and

- 111 -

would "require local and State Boards of Elections to process, update, and download updated voter registration files for each of more than 2500 precincts in the State within 72 hours of Election Day." (Id.)

At least one district court has enjoined an online voter registration deadline, but not a mail-in deadline, due to the COVID-19 pandemic. See Bostelmann I, 2020 WL 1320819, at *6. That court, working on a timeline of approximately two weeks,[25] found that extending the online registration deadline would "vindicate the rights of as many voters as practical." Id. The court further acknowledged the concerns from the defendants that there would be voter confusion and that there would be issues in amending the printing of municipal poll books, but found that the municipalities would be able to publish additional registrations in supplemental books, and further, that any voter confusion would not result in prejudice to voters; if anything, "at least some will be afforded a mechanism to vote safely," even if some mistakenly believe their opportunity to register had passed. Id. at *5-6. The court declined to extend the mail-in registration date, finding it could act to

---

[25] The court was determining whether to enjoin the enforcement of a March 18, 2020 registration deadline for an April 7, 2020 election, and the court issued its opinion on March 20, 2020. Id.

disenfranchise voters if their registration was not received in time, giving them "a false sense of confidence that they will be able to vote by absentee ballot." Id. at *6.

Though the Wisconsin district court was also dealing with a voter registration deadline impacted by the COVID-19 pandemic, the court finds the two situations distinguishable. There, the voter registration deadline was March 18, three weeks before Wisconsin's April 7, 2020 election. Id. at *2. The COVID-19 pandemic was just beginning to impact Wisconsin, with the Wisconsin governor ordering a statewide ban on group gatherings and the closing of places such as libraries, schools, and malls on March 17. Id. The Wisconsin district court found that, given the government's urging of people to avoid public spaces, many voters would abide by these precautions and forgo registering to vote in public when they had initially planned to do so. Id. at *4. The voters in Wisconsin had been caught off guard by the COVID-19 pandemic. This is not the case here.

While the COVID-19 pandemic is ongoing, and the situation ever-changing, the court nevertheless cannot say that the voters of North Carolina are similarly disadvantaged by being caught off guard by a sudden pandemic; North Carolina voters still have over two months to register to vote before the 25-day Deadline, as opposed to the Wisconsin voters who saw the registration

- 113 -

deadline pass nearly simultaneously with their state's new COVID-19 restrictions.

In balancing the burden on Plaintiffs and the State's interests, the court finds the State's interests justify any burden on Plaintiffs imposed by the 25-day Deadline.

While the court is concerned by Plaintiffs' data tending to show that approximately 350,000 North Carolina citizens do not have a DMV account and therefore cannot register to vote online, (see Doc. 73-7 ¶ 8), there is nothing to prevent these voters from timely registering by mail at some point over the next two months. In comparison, the State has an interest in verifying all voter registrations and ensuring that all county boards of elections poll books are up to date so as not to erroneously prevent a registered voter from voting due to a clerical error.[26] (See Exec. Defs.' Resp. (Doc. 58) at 15; Devore Decl. (Doc. 51-4) ¶ 6.)

The court therefore finds that the burden to Plaintiffs is modest at best and is justified by the State's interest in "ensuring orderly, fair, and efficient procedures for the

---

[26] Even if the court were to consider the stricken testimony from Bartlett's reply declaration concerning the 25-day Deadline, (Doc. 73-6), the court would find the weight of Defendant Bell's testimony and the declaration of Ms. Devore, (Doc. 51-4), compel the same conclusion.

election of public officials." Pisano, 743 F.3d at 937. The court finds Plaintiffs have failed to show a likelihood of success on the merits regarding their challenge to the 25-day Deadline.

### c. The County Residency Requirement

Plaintiffs seek to enjoin the newly-amended residency requirements for poll workers. (Pls.' Am. Mot. (Doc. 31) at 6.)

As to this issue, the court found supra Part II.A.6, that Plaintiffs do not have standing to challenge this law. The court noted that only three Plaintiffs - Plaintiff Permar and Organizational Plaintiffs - could have had standing, but the court found Plaintiff Permar's injuries purely hypothetical at this point, and thus, she does not have standing. The court further found that Organizational Plaintiffs' alleged injuries arise from budgetary choices and thus do not constitute recognizable organizational injuries.

The court also noted that Plaintiffs must demonstrate for purposes of standing that "it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." Sierra Club, 899 F.3d at 284. Plaintiffs' proposed remedy, enjoining the County Residency Requirement, may have some logical force from the possibility of perhaps recruiting larger numbers of poll workers from more populous counties to

- 115 -

serve across the state. Whether that would in fact remediate the

issue, however, is speculative at best.[27]

---

[27] Plaintiffs, in making these arguments as to a remedy,
have relied upon the declaration Jake Quinn and parts of the
Gronke Reply Declaration. (See Pls.' Reply (Doc. 74) at 29.)
However, that evidence has been struck. (See Doc. 116 at 47.)
Even if the court were to consider that evidence, any remedy is
still speculative at best. Quinn's declaration only recognizes
that there were difficulties finding people willing to work at
the polls and that there may be difficulties in the future, (see
Doc. 73-9 ¶¶ 18-21), but fails to offer a solution. (See id.)
Even if the court were to consider the portions of Dr. Gronke's
declaration which were struck, those assertions do not offer any
assurance that enjoining the County Residency Requirement would
address any potential problems. Dr. Gronke opines that, unless
North Carolina removes "the requirement that poll workers are
registered in the county where they are working, North Carolina
will experience poll worker shortages." (Doc. 73-5 ¶ 12.) But
neither Plaintiffs nor Dr. Gronke offer compelling evidence to
support that claim; although Defendant Bell testified that the
State BoE has only hired 1,100 of roughly 25,000 workers needed,
(Evidentiary Hr'g Tr. vol. 2 (Doc. 113) at 111), no evidence was
presented as to whether the county board of elections has
experienced any difficulties in hiring poll workers for the
November General Election. Dr. Gronke also opines that relaxing
the County Residency Requirement can allow "sister counties to
recruit poll workers among college students . . . . [Y]ounger
citizens are not at an increased risk of contracting the corona
virus." (Doc. 73-5 ¶ 13.) As an initial matter, this court is
not aware of any evidence that college students are at a
different risk of contracting COVID-19, only that their age
could make them less likely to suffer serious illness should
they contract the virus. Nevertheless, Dr. Gronke's opinion
fails to offer any evidence that college students, whether
studying remotely or on campus, will be interested in working as
poll workers with the attendant responsibilities, nor why
college students in this particular year would be more likely to
sign up than other individuals, nor why those college students
are likely going to be willing to work in counties other than
their home counties. Dr. Gronke's opinion is thoughtful but

(Footnote continued)

The court will nevertheless address this issue on the merits, as an alternative basis for its conclusions.

The parties disagree over whether this law "severely burdens" the right to vote, and thus, the level of scrutiny the court must apply. (Compare Pls.' Br. (Doc. 10) at 50, with Leg. Defs.' Resp. (Doc. 51) at 47; Exec. Defs.' Resp. (Doc. 58) at 12, 31–32.) Plaintiffs do not argue that the previous requirement, requiring all poll workers live in the precinct in which they work, was burdensome to the voters on its own. Nor do Plaintiffs contend that the modification to that law by HB 1169, the County Residency Requirement, is unduly burdensome on its face.

In asserting the County Residency Requirement unconstitutionally burdens voters, Plaintiffs first argue that the presence of COVID-19 and the related complications created

---

falls short of demonstrating a likelihood the issue would be redressed by a favorable decision of this court. Dr. Gronke's original opinion, that the precinct residency requirement should be changed, (Doc. 12-2 ¶ 23), was in fact implemented by HB 1169 to expand to a county residency requirement. These changes demonstrate the difficulty of accurately predicting the future under the best of circumstances. Even were the court to consider the excluded Quinn declaration and the excluded portions of the Gronke reply declaration, the court would still find Plaintiffs failed to establish that the requested relief would in fact remediate the issue, because the requested relief is merely speculative as to whether it would be redressed by a favorable decision.

by COVID-19 will limit the pool of individuals willing to work as poll workers in this environment. (Pls.' Reply (Doc. 74) at 27.) Second, Plaintiffs contend a collateral consequence of COVID-19 limiting the number of willing individuals combined with the County Residency Requirement is that there will be a shortage of poll workers and, as a result, the County Residency Requirement will "lead to precinct consolidation and less one-stop voting sites, burdening in-person voters such as Plaintiff Permar." (Id. at 27–28.)

This court finds that Plaintiffs have not made a clear showing that the County Residency Requirement will result in a severe burden on the right to vote. The Supreme Court has not identified "any litmus test for measuring the severity of a burden that a state law imposes on . . . an individual voter, or a discrete class of voters." Crawford, 553 U.S. at 191. For example, in Florida Democratic Party v. Scott, 215 F. Supp. 3d 1250 (N.D. Fla. 2016), the district court considered an injunction against the voter registration deadline after Hurricane Matthew forced many people to evacuate or lockdown, thus missing the deadline. Id. at 1254. The district court found the refusal to extend the deadline a severe burden on the right to vote, stating, "because Florida's statutory framework would categorically deny the right to vote to [thousands of]

- 118 -

individuals, it is a severe burden that is subject to strict scrutiny." Id. at 1257 (citing Burdick, 504 U.S. at 434).

Similarly, in Lecky v. Virginia State Board of Elections, a district court in Virginia recognized that "the last minute consolidation of precincts resulting in hours long wait times and mass disenfranchisement . . . amount[s] to the kind of 'broad-gauged unfairness' that renders an election patently and fundamentally unfair." 285 F. Supp. 3d 908, 915-16 (E.D. Va. 2018). The evidence submitted in support of Plaintiffs' concerns about precinct consolidation due to poll worker shortages, however, is insufficient to demonstrate the closing of polling places will occur in such large numbers so as to disenfranchise voters and create a severe burden. The court will thus assume that the Anderson-Burdick balancing test applies, instead of strict scrutiny. See Andino, 2020 WL 2617329, at *18–19.

Executive Defendants argue that the State has "taken additional steps to ensure that polling places will remain open and unaffected by the COVID-19 pandemic." (Exec. Defs.' Resp. (Doc. 58) at 32.) Defendant Bell announced her "commitment to maintaining election-day precincts as they are and avoiding precinct mergers whenever possible for general elections." (Bell Decl. (Doc. 58-1) ¶ 12.) Thus, Executive Defendants argue, "if a polling place needs to be shut down because of a COVID-19

- 119 -

outbreak, the impact of this closure will be reduced by the widespread availability of other open polling locations." (Exec. Defs.' Resp. (Doc. 58) at 32; see also Bell Decl. (Doc. 58-1) ¶ 12.) Executive Defendants also argue Plaintiffs' challenge is moot. (Exec. Defs.' Resp. (Doc. 58) at 32.)

Legislative Defendants argue first that Plaintiffs asked for a county residency rule in an exhibit from before the passage of H.B. 1169, and second, that Plaintiffs have offered only conclusory allegations that this rule will result in precinct consolidation, thus, "Plaintiffs cannot show that the law burdens their rights to vote at all." (Leg. Defs.' Br. (Doc. 51) at 46–47.)

The court finds Executive Defendants' mootness argument without merit; it is entirely possible, and indeed, in light of the consolidations that occurred for the Republican primary in June 2020; it is possible that consolidations will occur again during early one-stop voting and on election day due to a lack of poll workers. The issue is not so speculative as to be moot.

As the court already noted, supra Part II.A.6, Plaintiffs have not shown a likelihood of success regarding the redressability of this challenge. Even assuming redressability from an injunction, however, the court cannot find from the

evidence presented that the burden on voters is an unjustifiable one.

At the evidentiary hearing, Defendant Bell testified that she believed "we have the means to staff our one-stop early voting sites," but that she is "concerned about election day in particular." (See Evidentiary Hr'g Tr., vol. 2 (Doc. 113) at 109.) However, she also testified that she is not confident the State and county boards of elections will be able to procure the requisite number of poll workers to keep all polling places open as planned. (See id. at 109–10.) She further testified that she was aware that precinct consolidation in the June 9, 2020 Georgia Primary was due, in part, to a "mass exodus of poll workers fearing coronavirus exposure," despite Georgia also having a county residency requirement for poll workers. (Id. at 107–08.)

Plaintiffs offer several pieces of evidence concerning the June 23, 2020 primary election in support of their motion to enjoin this provision. They submit a letter from the Yancey County Board of Elections to Defendant Bell requesting a transfer of voters due, in part, to "the pandemic of COVID 19 and a large number of our poll workers being the high risk age, we do not have enough people to cover all of our normal 11 precincts." (Doc. 12-9 at 2.) Plaintiffs also submit several

- 121 -

other letters from other county boards of elections requesting the temporary transfer of voters or precinct consolidation due at least in part to a shortage of poll workers. (Id. at 6–7, 10, 16–19.) In Macon County, the Macon County Board of Elections had to combine fifteen precincts into three. (Id. at 15.)

The court finds Plaintiffs have identified a burden resulting from the County Residency Requirement which Legislative Defendants only attempt to justify by stating "the State's interest in election administration and integrity supports the requirement that poll workers reside in-county." (Leg. Defs.' Resp. (Doc. 51) at 46.)

At this time, however, the court cannot help but find that the existence of a burden, and the weight of that burden, is too speculative to support injunctive relief. The court finds that it is entirely possible that there will be polling place consolidations due in part to poll worker shortages, but the court cannot say Plaintiffs' evidence demonstrates a likelihood of success on the merits. Defendant Bell testified that the State BoE statewide initiative to hire poll workers is ongoing, but at this time, has resulted in the hiring of approximately 1,100 poll workers out of the roughly 20,000 to 25,000 poll workers necessary. (Evidentiary Hr'g Tr., vol. 2 (Doc. 113) at 111.) While this testimony is cause for concern, no evidence was

presented as to the success, or lack thereof, by county boards of elections in hiring poll workers. Based on the evidence presented, this court simply cannot find that a shortage of poll workers will arise or, if it should, that it will rise to a level which in turn places an unjustified burden on voters through any substantial number of polling site closures.

The court is of course encouraged that Defendant Bell has announced her commitment to maintaining election-day precincts as they are and to avoiding precinct mergers. A commitment is not the same as a guarantee, however, nor is it a solution. Keeping in mind that "[s]tates have broad powers to determine the conditions under which the right of suffrage may be exercised," Shelby County v. Holder, 570 U.S. 529, 543 (2013) (internal quotation marks omitted), and "[u]nder the Constitution, state and local governments, not the federal courts, have the primary responsibility for addressing COVID-19 matters such as . . . adjustment of voting and election procedures . . . and the like," Calvary Chapel, 2020 WL 4251360 at *11. Legislative and Executive Defendants would do well to work with Defendant Bell to address any uncertainty in recruiting poll workers, if it exists, immediately.

The court finds Plaintiffs have not shown a likelihood of success on the merits as to this claim.

- 123 -

### d.  <u>Uniform Hours Requirement</u>

Plaintiffs challenge the Uniform Hours Requirement, N.C. Gen. Stat. § 163-227.6(c), on the basis that it, along with the County Residency Requirement, will cause further consolidation and elimination of precincts for the November General Election, resulting in confusion, increased travel times, long lines, and crowds that will put voters at greater risk of contracting COVID-19, thus creating an undue burden on the right to vote in violation of the First and Fourteenth Amendments. (Pls.' Br. (Doc. 10) at 50-51; Second Am. Compl. (Doc. 30) ¶¶ 110-12.) Further, Organizational Plaintiffs will have to divert resources towards recruiting poll workers, alerting members about precinct closures, and advocating for more early voting days. (Pls.' Br. (Doc. 10) at 51.)

The parties disagree over whether this law "severely burdens" the right to vote. (<u>Compare</u> Pls.' Br. (Doc. 10) at 50, <u>with</u> Leg. Defs.' Resp. (Doc. 51) at 47-50; Exec. Defs.' Resp. (Doc. 58) at 12, 30-31).) As the court has already noted, it "need not reach that decision," and will assume, without deciding, that the <u>Anderson-Burdick</u> balancing test applies, as

opposed to strict scrutiny.[28] See Andino, 2020 WL 2617329, at
*18-19.

Plaintiffs point to the closure of 64 different precincts
from the most recent Republican primary in June in North
Carolina as evidence that this threat is real. (Pls.' Br. (Doc.
10) at 49.)

Executive Defendants argue any consolidation will be
communicated to affected voters "at least 30 days before the
election," in accordance with N.C. Gen. Stat. § 163-128(a).
(Exec. Defs.' Resp. (Doc. 58) at 37-38.) Executive Defendants
further "acknowledge that the uniform hours requirement may
reduce the flexibility of county boards of elections to respond
to exigences that may occur in light of the COVID-19 pandemic."
(Id. at 30.) They contend Plaintiffs fail to demonstrate why the
COVID-19 pandemic would change the burden of this requirement,
because Plaintiffs "have not provided information sufficient to
understand the nature of the burdens to voters resulting from
the confluence of the COVID-19 pandemic and uniform one-stop
hours." (Id. at 31.)

---

[28] It does not appear that this requirement directly
disenfranchises or threatens to disenfranchise any voter, nor
does it appear to unfairly affect any constitutionally-protected
group. On the evidence presented, and for the purposes of this
motion only, the court does not find this to be a severe burden.

Legislative Defendants also argue that Plaintiffs' failure to demonstrate any consolidation due to the Uniform Hours Requirement will result in confusion or long lines or that the Uniform Hours Requirement has led to "increased travel time" for any registered voter. (Leg. Defs.' Resp. (Doc. 51) at 48.) Indeed, Legislative Defendants argue the "Uniform Hours Requirement is designed to <u>expand</u> access to one-stop early voting," but that even if it does not achieve that goal and instead ends up burdening the right to vote, the State's interests in "avoiding voter confusion by promoting uniformity and promoting administrative convenience by making it easier for counties to publicize early voting hours" justifies any such burden. (<u>Id.</u> at 49-50.) Further, Legislative Defendants offer the declaration of Linda Devore, the Secretary of the Cumberland County Board of Elections, who asserted that the Uniform Hours Requirement "ensure[s] that all voters in a county have the same opportunity to vote," because it "eliminates (or at least substantially reduces) partisan decision-making on where and when to allow early voting." (Devore Decl. (Doc. 51-4) ¶ 8.)

Plaintiffs point to Defendant Bell's March 2020 letter to the Executive Branch and the General Assembly, in which she requests the government consider changing the Uniform Hours Requirement, because "[c]ounty boards of elections need

- 126 -

flexibility to determine hours because they are affected differently by, and respond differently to, the COVID-19 pandemic." (Doc. 12-7 at 6.) She repeated this request in her April 2020 letter. (Id. at 13.)

In conducting the Anderson-Burdick balancing test, the court first notes that Defendants articulate strong interests on behalf of the State in maintaining the Uniform Hours Requirement — expanding access to one-stop voting, avoiding voter confusion, promoting administrative convenience, preventing discriminatory poll hours — all of which are reasonable.

Concerning the burden on Plaintiffs, the court finds the evidence does not demonstrate that the Uniform Hours Requirement will lead to the closing of polling places. While the court acknowledges Mr. Lopez's experience with election law, the court did not find that he was qualified as an expert to opine on the costs of the Uniform Hours Requirement, given he failed to "provide any basis upon which to conclude his opinion is based on personal knowledge or that he is otherwise competent to offer this opinion." (Doc. 116 at 33.) Thus, the court assigns little weight to his opinions regarding the Uniform Hours Requirement.

The court finds the increased number of days during which early one-stop voting is available in addition to uniform hours do not create a burden on voting. Because the Uniform Hours

Requirement does not create a burden on voting, the State's interest justifies the Uniform Hours Requirement.

The court finds Plaintiffs have not demonstrated a likelihood of success in their challenge of the Uniform Hours Requirement.

### e.    Lack of Curing Mechanism

Because the court finds Plaintiffs have shown a likelihood of success on their procedural due process claim, see Part II.A.5, the court will not address their challenge to a lack of curing mechanism under the Anderson-Burdick framework.

### f.    Affirmative Requests

In addition to Plaintiffs' requests for the court to enjoin Defendants from administering and enforcing several specific North Carolina voting and election laws, Plaintiffs further request the court to order Defendants engage in a myriad of actions not directly related to the requested injunctive relief based on specific North Carolina laws, under the argument that not doing these actions will create an unconstitutional burden on the right to vote under the First and Fourteenth Amendments:

a. Expanding voter registration via online portals available through DHHS services;

b. Establishing contactless drop boxes for absentee ballots;

- 128 -

c. Establishing a mechanism for requesting absentee ballots by phone;

d. Permitting election officials to accept any proof of residency document acceptable under the Help America Vote Act (HAVA) as acceptable forms of identification with absentee ballot requests;

e. Establishing mechanisms to cure deficient absentee ballot requests and absentee ballots;

f. Permitting mail-in absentee voters to cast a downloadable Federal Write-in Absentee Ballot("FWAB"), if their timely-requested absentee ballot does not arrive in sufficient time to ensure the ballot will be counted;

g. Establishing a more accessible, centralized way in which voters and advocates can monitor precinct consolidation.

(Pls.' Am. Mot. (Doc. 31) at 6-7; Second Am. Compl. (Doc. 30) ¶¶ 92-93, 97, 101-03, 113.)

While the court does not comment upon the efficacy or wisdom of each request, it is not the court's role to rewrite North Carolina's election law.

[T]he federal Constitution provides States — not federal judges — the ability to choose among many permissible options when designing elections. And because that's where the decision-making authority is, federal courts don't lightly tamper with election regulations. These concerns are magnified here where the new election procedures proffered by Plaintiffs threaten to take the state into unchartered waters.

Thompson v. Dewine, 959 F.3d 804, 812 (6th Cir. 2020).

Plaintiffs' proposed injunctive relief concerning contactless drop boxes, permitting mail-in absentee voters to

- 129 -

use a FWAB as a back-up, expanding online portals for voter registration, and establishing another way for voters to monitor precinct consolidation are all procedures that "threaten to take the state into unchartered waters." To order these actions on the eve of this election would supplant the legislative process with the court's own policymaking; these decisions should be left to the legislature. Plaintiffs have also failed to show a likelihood that these measures can be implemented. The court finds that Plaintiffs fail to demonstrate a likelihood of success on these issues.

### g. First and Fourteenth Amendments and the Right to Vote Conclusion

The court finds Plaintiffs have failed to establish a likelihood of success on the merits as to each of their First and Fourteenth Amendment Right to Vote claims asserted for the reasons stated. The court has also considered whether the challenged laws, collectively, present an unconstitutional burden under the circumstances created by the COVID-19 pandemic and finds they do not. The court finds, alternatively, that even if the court did share Plaintiffs' concern, it is not for this court to undertake a wholesale revision of North Carolina's election laws. Many of these laws have been in place for extended periods of time. As the Supreme Court in Purcell v.

- 130 -

_Gonzalez_, 549 U.S. 1 (2006), warned, "[c]ourt orders affecting elections, especially conflicting orders, can themselves result in voter confusion and consequent incentive to remain away from the polls. As an election draws closer, that risk will increase." _Id._ at 4–5.

### 2.    Unconstitutional Conditions Argument

Plaintiffs put forth the argument that, given the COVID-19 pandemic, forcing voters to vote under the current election law regime will force voters to choose between their "constitutionally-protected right to bodily integrity" and exercising their constitutionally-protected right to vote, in violation of the unconstitutional conditions doctrine. (Pls. Br. (Doc. 10) at 56–58.) In particular, Plaintiffs argue the One-Witness Requirement forces Individual Plaintiff Bentley to risk her right to bodily integrity in order to vote absentee. (_Id._ at 62.) And voting in person is also "not a viable alternative" for an at-risk voter like Bentley. (_Id._)

Under the unconstitutional conditions doctrine, "the government may not deny a benefit to a person because he exercises a constitutional right." _Koontz v. St. Johns River Water Mgmt. Dist._, 570 U.S. 595, 604 (2013) (quoting _Regan v. Taxation with Representation of Wash._, 461 U.S. 540, 545 (1983)). The Supreme Court has summarized the principle behind

- 131 -

the doctrine as one which "vindicates the Constitution's enumerated rights by preventing the government from coercing people into giving them up." Koontz, 570 U.S. at 604. In other words, "the government may not require a person to give up a constitutional right . . . in exchange for a discretionary benefit conferred by the government." Dolan v. City of Tigard, 512 U.S. 374, 385 (1994). The Supreme Court has found that the following constitute "unconstitutional conditions":

> [The Supreme Court] held that a public college would violate a professor's freedom of speech if it declined to renew his contract because he was an outspoken critic of the college's administration. [Perry v. Sindermann, 408 U.S. 593 (1972).] And in Memorial Hospital v. Maricopa County, 415 U.S. 250, 94 S. Ct. 1076, 39 L.Ed.2d 306 (1974), [the Supreme Court] concluded that a county impermissibly burdened the right to travel by extending healthcare benefits only to those indigent sick who had been residents of the county for at least one year.

Koontz, 570 U.S. at 604.

Plaintiffs claim that the State may not require voters to give up their constitutional right to bodily integrity in exchange for being able to vote.

Legislative Defendants argue Plaintiffs' argument is unavailing "because the State has not conditioned the provision of any government benefit on Plaintiffs agreeing to forgo exercise of their constitutional rights." (Leg. Defs.' Resp. (Doc. 51) at 50.) The court will assume, without deciding, that

- 132 -

the State conditions the provision of a government benefit, here, voting, on voters procuring a witness for their absentee ballot.

In determining whether the State has impermissibly conditioned Plaintiffs' rights to vote on forgoing their right to bodily integrity, the court applies the typical standards of review attendant associated with the rights at issue: here, the fundamental right to bodily integrity. See, e.g., Trinity Lutheran Church of Columbia, Inc. v. Comer, 582 U.S. ____, ____, 137 S. Ct. 2012, 2022 (2017) (if the government disqualifies benefit recipients based on their religious character, "such a policy imposes a penalty on the free exercise of religion that triggers the most exacting scrutiny" (emphasis added)); Hobbie v. Unemployment Appeals Comm. of Florida, 480 U.S. 136, 141–42 (1987); McCabe v. Sharrett, 12 F.3d 1558, 1562 (11th Cir. 1994). The court finds an overview of right to bodily integrity is helpful.

The fundamental right to bodily integrity is recognized under the Fourteenth Amendment. See Ingraham v. Wright, 430 U.S. 651, 673–74 (1977); Guertin v. State, 912 F.3d 907, 918 (6th Cir. 2019) ("[B]odily integrity [is] an indispensable right recognized at common law as the 'right to be free from . . . unjustified intrusions on personal security' and 'encompass[ing]

- 133 -

freedom from bodily restraint and punishment.'" (quoting
Ingraham, 430 U.S. at 673–74)); Doe v. Rosa, 795 F.3d 429,
436-37 (4th Cir. 2015) ("Under established precedent, these
constitutional rights include a Fourteenth Amendment substantive
due process right against state actor conduct that deprives an
individual of bodily integrity."); Meeker v. Edmundson, 415 F.3d
317, 321 n.2, 323 (4th Cir. 2005) (recognizing the right to
bodily security protected by substantive due process). As a
fundamental right, the right to bodily integrity is subject to
strict scrutiny. See Bostic, 760 F.3d at 377 ("Strict scrutiny
applies only when laws significantly interfere with a
fundamental right."); see also Guertin v. State, 912 F.3d at
919–20 (summarizing the history of the fundamental right to
bodily integrity and noting "individuals possess a
constitutional right to be free from forcible intrusions on
their bodies against their will, absent a compelling state
interest" (quoting Planned Parenthood Sw. v. Ohio Region v.
Dewine, 696 F.3d 490, 506 (6th Cir. 2012))).

     The court next must determine whether Plaintiffs' right to
bodily integrity is actually at risk here. If the court finds
that potentially being exposed to COVID-19 is a violation of
bodily integrity, then Plaintiffs will have demonstrated that

the State is forcing them to forgo their right to bodily integrity in order to vote.

The court is mindful that the Due Process Clause of the Fourteenth Amendment "does not apply to ordinary governmental neglect, bad policy or inaction, but rather 'only the most egregious official conduct can be said to be arbitrary in the constitutional sense.'" J.S. ex rel. Simpson v. Thorsen, 766 F. Supp. 2d 695, 704 (E.D. Va. 2011) (quoting Waybright v. Frederick Cty., Md., 528 F.3d 199, 204 (4th Cir. 2008)). Thus, "the Supreme Court has, for half a century now, marked out executive conduct wrong enough to register on a due process scale as conduct that 'shocks the conscience,' and nothing less." Waybright, 528 F.3d at 205 (quoting Cty. of Sacramento v. Lewis, 523 U.S. 833, 846 (1998)); see also Cty. of Sacramento, 523 U.S. at 846 (noting the Supreme Court had previously "found the forced pumping of a suspect's stomach enough to offend due process as conduct 'that shocks the conscience' and violates the 'decencies of civilized conduct'").

Plaintiffs point to Guertin v. State, 912 F.3d 907 (6th Cir. 2019), for a comparison for their bodily integrity claim. Guertin dealt with the Flint Water Crisis, in which Flint public officials switched the city's water supply from Detroit's water system to the Flint River, processed by an outdated water

- 135 -

treatment plant, without adding chemicals to counter "the river water's known corrosivity." Id. at 915. This resulted in dangerous levels of lead in the blood of the children in Flint, along with a host of other health problems. Id. The Sixth Circuit observed that "[t]he crisis was predictable, and preventable." Id. The court found that "[i]nvoluntarily subjecting nonconsenting individuals to foreign substances with no known therapeutic value — often under false pretenses and with deceptive practices hiding the nature of the interference — is a classic example of invading the core of the bodily integrity protection," and held that the government had committed an "egregious violation of the right to bodily integrity." Id. at 920–21, 935.

Legislative Defendants would have the court construe Plaintiffs' claim as one for a substantive due process violation concerning the fundamental right to bodily integrity, as opposed to an unconstitutional conditions claim, wherein Plaintiffs would be forgoing one right in order to exercise another. (Leg. Defs.' Resp. (Doc. 51) at 52.) The court disagrees. Taking as true Plaintiffs' claim, the State would, through the One-Witness Requirement, force Plaintiff Bentley to give up her right to not be exposed to COVID-19 in order to receive the benefit of voting by absentee ballot.

Legislative Defendants would also have the court follow
DeShaney v. Winnebago County Department of Social Services, 489
U.S. 189 (1989), and its progeny in the Fourth Circuit,
concerning the State's role in the fundamental right of bodily
integrity. (Leg. Defs.' Resp. (Doc. 51) at 52.) Under DeShaney,
the Supreme Court held that the Fourteenth Amendment Due Process
Clause does not "generally confer [an] affirmative right to
governmental aid, even where such aid may be necessary to secure
life, liberty, or property interests of which the government
itself may not deprive the individual." Id. at 196; see also
Stevenson ex rel. Stevenson v. Martin Cty. Bd. of Educ., 3 F.
App'x 25, 31 (4th Cir. 2001) ("Failing to provide protection
from danger does not implicate the state in the harm caused by
third parties."). For liability to attach, there must be
"affirmative misconduct by the state." Pinder v. Johnson, 54
F.3d 1169, 1175 (4th Cir. 1995). Thus, Legislative Defendants
argue, because COVID-19 is a natural phenomenon not caused by
the State, Plaintiffs cannot establish a due process violation
because the Constitution does not "require the State to protect
Plaintiffs from a pandemic when voting." (Leg. Defs.' Resp.
(Doc. 51) at 52–53.) Legislative Defendants alternatively argue
Plaintiffs' injuries fall outside the scope of the Supreme

- 137 -

Court's conception of the fundamental right of "bodily integrity." (Id. at 54.)

The court disagrees with Legislative Defendants' framing of the State's role here; the State is plainly affirmatively requiring action for those wishing to vote absentee — have someone witness their ballot. Unlike in DeShaney, in which the government failed to intervene in a father beating his child, here, the State requires that, in order to vote, a voter must potentially expose themselves to contracting COVID-19. The Fourth Circuit's analysis in Meeker is persuasive here: dealing with facts involving a coach encouraging other teammates to beat up the plaintiff, the court distinguished DeShaney, stating, "if [the plaintiff] can prove, as he alleges, that [the defendant] 'instituted, permitted, endorsed, encouraged, [and] facilitated' the beatings, [the defendant] cannot escape liability simply because he did not administer the beatings with his own hands." Meeker, 415 F.3d at 322. So too here: the State cannot escape liability simply because it does not administer COVID-19 to voters with its own hands; as long as it "permitted" and "facilitated" the contraction of COVID-19 with its requirements, it can be held liable if the court were to find that such facilitation "shocks the conscience."

However, given the court's findings as to the risk of contracting COVID-19, as discussed supra Part II.E.1.a.i, the court cannot say that Plaintiffs have demonstrated a likelihood of success on the merits that requiring a voter to procure a witness for an absentee ballot when all of the precautionary measures are taken "shocks the conscience" such that the One-Witness Requirement constitutes a violation of bodily integrity. The court notes that the State is not requiring anyone to interact with anyone suspected to have COVID-19.

Further, regarding voting in person, Dr. Plush, whose testimony this court credits due to his history of treating patients with COVID-19, testified that he does "not believe that there is significant risk [from in-person voting] if the -- guidance from the CDC, including physical distancing, wearing a face mask, diligent hand hygiene, and environmental decontamination is followed, then the risk to the individual is very low and can approach zero." (Doc. 111 at 37.) Dr. Plush compared voting to going to the grocery store. (Id. at 38.) Regarding high-risk voters, Dr. Plush nevertheless testified that it would be preferable for those voters to take advantage of absentee voting. (Id.)

In light of this evidence, the court finds that the possibility of contracting COVID-19 is not sufficient to

- 139 -

establish a violation of bodily integrity. Plaintiffs have failed to demonstrate a likelihood of success on the merits on their unconstitutional conditions claim.

### 3. Freedom of Association Claim

Plaintiffs further argue the Request Assistance Ban "stymie the Organizational Plaintiffs and their members' core political speech and expressive conduct to engage potential voters and encourage them to vote by assisting voters with requesting and submitting absentee ballot requests." (Pls.' Br. (Doc. 10) at 64; see also Second Am. Compl. (Doc. 30) ¶¶ 126-29.) Plaintiffs' free association claim thus relates only to the completing and submitting of absentee ballot request forms, not absentee ballots themselves. The relevant North Carolina law Plaintiffs seek to enjoin is N.C. Gen. Stat. § 163-230.2, which provides that only a voter, a voter's near relative or legal guardian, or a MAT may submit an absentee ballot request on a voter's behalf. (Pls.' Br. (Doc. 10) at 67; see also Second Am. Compl. (Doc. 30) ¶¶ 126-29.)

Plaintiffs contend there is ambiguity "in what constitutes 'completing' a request form," which "will inevitably 'chill' Plaintiffs' expressive conduct." (Pls.' Reply (Doc. 74) at 36.) They further argue that the assistance of voters is itself "an

- 140 -

expression of Plaintiffs' view that the act of voting and helping others to vote promotes democracy." (Id.)

In response, Legislative Defendants contend the Request Assistance Ban does not violate Plaintiffs' free speech and free association rights, because it "does not touch on protected speech or association at all." (Leg. Defs.' Resp. (Doc. 51) at 56.) Legislative Defendants argue Plaintiffs are free to "say anything they want to any registered voter regarding absentee ballot requests. Indeed, they can stand over the shoulder of a voter and explain step-by-step how to correctly fill out the absentee ballot request." (Id. at 57.)

The parties also disagree over whether Plaintiffs' proposed actions are expressive conduct which implicates the First Amendment.

Although the "First Amendment literally forbids the abridgment only of 'speech,'" the Supreme Court "ha[s] long recognized that its protection does not end at the spoken or written word." Texas v. Johnson, 491 U.S. 397, 404 (1989). "[C]onduct may be 'sufficiently imbued with elements of communication to fall within the scope of the First . . . Amendment[].'" Id. (quoting Spence v. Washington, 418 U.S. 405, 409 (1974)). As the Supreme Court has noted, however, "we cannot accept the view that an apparently limitless variety of conduct

- 141 -

can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea." Spence, 418 U.S. at 409 (internal alterations and quotation marks omitted).

To determine whether conduct is sufficiently communicative to implicate the First Amendment, the court must determine (1) "whether [a]n intent to convey a particularized message was present," and (2) "whether the likelihood was great that the message would be understood by those who viewed it." Johnson, 491 U.S. at 404 (alterations in original) (internal quotation marks omitted). Such conduct has included the wearing of black armbands to protest the Vietnam war, Tinker v. Des Moines Indep. Cmty. Sch. Dist., 393 U.S. 503 (1969), and donating money to political campaigns, Buckley v. Valeo, 424 U.S. 1 (1976). As Plaintiffs' point out, other courts have held that a person or organization's "public endeavors to assist people with voter registration are intended to convey a message that voting is important, that the Plaintiffs believe in civic participation, and that the Plaintiffs are willing to expend the resources to broaden the electorate to include allegedly under-served communities," and thus is expressive conduct which implicates the First Amendment. Am. Ass'n of People with Disabilities v. Herrera, 690 F. Supp. 2d 1183, 1215–16 (D.N.M. 2010), reconsidered on separate grounds, No. CIV 08-0702 JB/WDS, 2010

- 142 -

WL 3834049 (D.N.M. July 28, 2010); see also Voting for Am., Inc. v. Steen, 732 F.3d 382, 389 (5th Cir. 2013) ("The state does not deny that some voter registration activities involve speech — 'urging' citizens to register; 'distributing' voter registration forms; 'helping' voters to fill out their forms . . . ." (emphasis added)); Tenn. State Conference of N.A.A.C.P. v. Hargett, 420 F. Supp. 3d 683, 704 (M.D. Tenn. 2019) (finding voter registration assistance regulations must be "substantially related to important governmental interests" to survive "exacting scrutiny" under Meyer v. Grant, 486 U.S. 414 (1988) and Buckley v. American Constitutional Law Foundation, Inc., 525 U.S. 182 (1999)). Indeed, the district court in Herrera found the "First Amendment protects not only the Plaintiffs' right to engage in incidental speech with prospective voters, but also their right to do so while engaging in the act of registration." Herrera, 690 F. Supp. 2d at 1217. Importantly, however, the Herrera court found that, despite implicating the First Amendment, the third-party registration law at issue was subject to the Anderson-Burdick balancing test, rather than strict scrutiny. Id. at 1213–18.

Further, a district court in Michigan recently dealt with a similar set of prohibitions on assisting voters in requesting, completing, and returning absentee ballots. Priorities USA, 2020

- 143 -

WL 2615766, at *7-8. The laws at issue there prohibited third parties from "offering to assist voters with absentee ballot applications, [and] restrict[ed] possession of absentee ballot applications . . . ." Id. at *5. The court distinguished the challenged activities from "cases involving the mere administrative process or the mechanics of the electoral process," and found "little difference between discussions of whether to register to vote and discussions of whether to vote absentee." Id. at *11. The court rejected the argument that the plaintiffs' conduct was not expressive and held that the plaintiffs wanting to educate voters about their options to use and request absentee ballot applications, offer to return absentee ballot applications, and return absentee ballot applications "necessarily involve[d] political communication and association," thus strict scrutiny applied. Id. at *8, *13.

Defendants, however, are also correct in noting several courts have found the collecting of ballots does not qualify as expressive conduct protected by the First Amendment. See Knox v. Brnovich, 907 F.3d 1167, 1181 (9th Cir. 2018) (finding the collection of absentee ballots is not expressive conduct); Feldman v. Az. Sec'y of State's Office, 843 F.3d 366, 392 (9th Cir. 2016) (holding that collecting ballots is not expressive conduct "[e]ven if ballot collectors intend to communicate that

- 144 -

voting is important"); Voting for Am., 732 F.3d at 391

(collecting cases and finding the collection and delivering of

voter-registration applications are not expressive conduct); but

see League of Women Voters of Fla. v. Cobb, 447 F. Supp. 2d

1314, 1333–34 (S.D. Fl. 2006) (finding "the collection and

submission of voter registration drives is intertwined with

speech and association" and is thus expressive conduct protected

by the First Amendment).

        The court sees assisting voters in registering to vote as

analogous to assisting voters in filling out a request form for

an absentee ballot, and further finds the reasoning of the

Priorities USA court persuasive. The court therefore finds that

assisting voters in filling out a request form for an absentee

ballot is "expressive conduct" which implicates the First

Amendment. Regarding the delivering of the absentee ballot

requests, however, the court will follow the Fifth and Ninth

Circuits in finding that the collecting and delivering of

absentee ballot request forms is not expressive conduct and

therefore does not implicate the First Amendment. The court will

next examine each of these restrictions under the respective

levels of scrutiny.

**Assistance in Filling Out a Ballot Request Form**

Although the court finds assisting voters in filling out ballot request forms is subject to the First Amendment, the Anderson-Burdick balancing test, instead of strict scrutiny, likely applies.[29] See Thompson v. Dewine, 959 F.3d 804, 811 (6th Cir. 2020) (applying the Anderson-Burdick balancing test to Ohio's requirements for collecting signatures for ballot initiatives, which burdened the plaintiffs' First Amendment rights).

Legislative Defendants contend the State's interests in combating election fraud are weighty, (Leg. Defs.' Resp. (Doc. 51) at 59); it points to the Dowless Scheme as evidence that "absentee ballots are particularly susceptible to fraud," (id. at 37). Legislative Defendants also submit evidence that "at

---

[29] The district court in Tennessee State Conference of N.A.A.C.P., in the context of voter registration restrictions, observed that it is not explicitly clear that strict scrutiny applies to laws governing that activity, and compared voter registration expressive conduct to petition-drive activities, regulations of which the Supreme Court has subjected to strict scrutiny. 420 F. Supp. 3d at 701-04. The court recognized the difficulty in situating regulations of First Amendment activity in the context of voting and noting that it is "[l]eft with this sometimes bewildering array of standards to choose from," but applied the "exacting scrutiny" standard set forth in Buckley and Meyer v. Grant, 486 U.S. 414 (1988). Id. at 701. Nevertheless, the court finds the reasoning set forth in Herrera regarding what standard to apply persuasive and adopts it here. See Herrera, 690 F. Supp. 2d at 1213-15.

least 1,265 voters" voted in both North Carolina and another state in the 2016 general election. (Id. at 37; Doc. 51-2 ¶ 11.)

Plaintiffs' interests are in exercising their core political speech. (Pls.' Br. (Doc. 10) at 66.) However, as Legislative Defendants note, Plaintiffs are not barred from talking with voters about absentee voting, or even talking them through the process of filling out a request form. "Indeed, [Plaintiffs] can stand over the shoulder of a voter and explain step-by-step how to correctly fill out the absentee ballot request." (Leg. Defs.' Resp. (Doc. 51) at 57.) Thus, it appears to the court, that Plaintiffs experience almost no burdening or restriction of their political speech, as long as they do not mark the voter's request form themselves.

The court finds that the burdens on Plaintiffs' First Amendment speech and association rights are justified by the State's interest in preventing fraud; Plaintiffs have failed to demonstrate a likelihood of success on the merits with respect

to the prohibition on assisting a voter in filling out an
absentee ballot request form.[30]

### b. Delivering Absentee Ballot Requests

Because delivering absentee ballot requests is not
expressive conduct, it is subject only to rational basis review.
See Johnson v. Robison, 415 U.S. 361, 375 n.14 (1974) ("[S]ince
we hold . . . that the Act does not violate appellee's right of
free exercise of religion, we have no occasion to apply to the
challenged classification a standard of scrutiny stricter than
the traditional rational-basis test."); Voting for Am., 732 F.3d
at 392 ("Because the Non-Resident and County provisions regulate
conduct only and do not implicate the First Amendment, rational
basis scrutiny is appropriate.").

Rational basis review requires that legislative action,
"[a]t a minimum, . . . be rationally related to a legitimate

_____

[30] The court finds that even if this restriction were
subject to strict scrutiny, it would still survive. To survive
strict scrutiny, the restriction must "be narrowly drawn to
advance a state interest of compelling importance." Marcellus v.
Va. State Bd. of Elections, 849 F.3d 169, 175 (4th Cir. 2017)
(citation omitted). Here, Plaintiffs are allowed to "explain
step-by-step" how to correctly fill out an absentee ballot
request; the only expressive conduct that is prohibited is the
physical filling out of the request form. This prohibition
serves the "compelling" state interest of preventing fraudulent
absentee ballot requests. The court finds this law is therefore
"narrowly drawn to advance a state interest of compelling
importance."

- 148 -

governmental purpose." <u>Clark v. Jeter</u>, 486 U.S. 456, 461 (1988).
There is a "strong presumption of validity" when examining a
statute under rational basis review, and the burden is on the
party challenging the validity of the legislative action to
establish that the statute is unconstitutional. <u>FCC v. Beach
Commc'ns, Inc.</u>, 508 U.S. 307, 314–15 (1993). The party defending
the constitutionality of the action need not introduce evidence
or prove the actual motivation behind passage but need only
demonstrate that there is some legitimate justification that
could have motivated the action. <u>Id.</u> at 315.

Here, Legislative Defendants contend the limitations on who
may deliver absentee ballot requests "is a rational means of
promoting the government's legitimate interest in combating
election fraud." (Leg. Defs.' Resp. (Doc. 51) at 59.) The court
finds that this restriction is related to a legitimate
governmental purpose and will likely be upheld.

The court finds Plaintiffs have not demonstrated a
likelihood of success on the merits regarding their challenge to
the Request Assistance Ban, N.C. Gen. Stat. § 163-230.2, under a
First Amendment freedom of association theory.

- 149 -

### 4. <u>Procedural Due Process</u>

The court finds Plaintiffs have demonstrated a likelihood of success as to their procedural due process claim with regard to absentee ballots.

Plaintiffs argue the State's election laws do not afford mail-in absentee voters any notice of, or opportunities to cure, material defects in either their absentee ballot request forms or the absentee ballots themselves, resulting in the deprivation of Plaintiffs' right to vote by mail. (Pls.' Br. (Doc. 10) at 70.) As the court noted <u>supra</u> Part II.A.5, Plaintiffs only have standing to challenge a lack of process regarding absentee ballots, not absentee ballot requests. The court will therefore only address absentee ballots in its analysis.

To state a § 1983 claim for a procedural due process deprivation, a plaintiff must demonstrate: "(1) a cognizable liberty or property interest; (2) the deprivation of that interest by some form of state action; and (3) that the procedures employed were constitutionally inadequate." <u>Accident, Injury & Rehab., PC v. Azar</u>, 943 F.3d 195, 203 (4th Cir. 2019) (quoting <u>Iota Xi Chapter of Sigma Chi Fraternity v. Patterson</u>, 566 F.3d 138, 145 (4th Cir. 2009)). "To assess the constitutional adequacy of an opportunity to be heard, courts consider (1) the private interest affected by the official

- 150 -

action; (2) the risk of an erroneous deprivation of that interest given the procedures used, as well as the probable value, if any, of additional or substitute procedural safeguards; and (3) the government's interest," id., "including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail," Mathews v. Eldridge, 424 U.S. 319, 335 (1976).

The court notes that most cases involving procedural due process challenges involving absentee ballots arise from signature matching procedures which result in erroneous rejections of ballots. See, e.g., Self Advocacy Sols. N.D. v. Jaeger, Case No. 3:20-cv-00071, _____ F. Supp. 3d _____, 2020 WL 2951012, at *8 (D.N.D. June 3, 2020); Martin, 341 F. Supp. 3d at 1329; Saucedo v. Gardner, 335 F. Supp. 3d 202, 217 (D.N.H. Aug. 14, 2018); Zessar v. Helander, No. 05 C 1917, 2006 WL 642646, at *2. (N.D. Ill. Mar. 13, 2006). Nevertheless, the same concerns articulated in Self-Advocacy Solutions N.D. are present here: "sufficient predeprivation process is the constitutional imperative. On this front, North Dakota's signature-matching requirement is wholly deficient. Voters are simply never notified or afforded any opportunity to respond if election officials reject their ballots for a signature discrepancy." 2020 WL 2951012, at *9.

- 151 -

The court construes Plaintiffs' challenge as a facial challenge, given they have not identified a voter to whom the North Carolina statutes have been unconstitutionally applied. See Martin, 341 F. Supp. 3d at 1337. "A facial challenge is really just a claim that the law or policy at issue is unconstitutional in all its applications." Bucklew v. Precythe, 587 U.S. ___, 139 S. Ct. 1112, 1127 (2019). In addressing a facial challenge, "[t]he proper focus of the constitutional inquiry is the group for whom the law is a restriction, not the group for whom the law is irrelevant." City of L.A. v. Patel, 576 U.S. 409, 418 (2015) (quoting Planned Parenthood of Southeastern Pa. v. Casey, 505 U.S. 833, 894 (1992)). The court will therefore direct its focus on voters who make a material error on their ballot that is capable of being remedied, such as witness contact information, or a signature mismatch.

Legislative Defendants argue first, that the right-to-vote absentee is not a protected interest, and second, even if it is a protected interest, the burden of adopting the added safeguard in the form of a curing procedure on the State is too heavy and thus the State may reject such a procedure. (Leg. Defs.' Resp. (Doc. 51) at 60-61.) Legislative Defendants also argue that some county boards of elections already have curing procedures in place, which they argue Plaintiffs do not address. (Id. at 62.)

- 152 -

Executive Defendants argue Plaintiffs fail to demonstrate that the lack of a standardized cure process places an undue burden on voters. (Exec. Defs.' Resp. (Doc. 58) at 35.)

The court will examine whether Plaintiffs have demonstrated a cognizable interest, the deprivation of that interest, and that the procedures employed were constitutionally inadequate.

### a. Cognizable Liberty Interest

The court begins by determining whether the right to vote by absentee ballot is a constitutionally protected liberty interest.

The right to vote is a constitutionally protected liberty interest. See Burdick, 504 U.S. at 433 ("[V]oting is of the most fundamental significance under our constitutional structure."); Self Advocacy Sols. N.D, 2020 WL 2951012, at *8. While there is no federal constitutional right to vote by absentee ballot, see McDonald v. Bd. of Election Comm'rs of Chi., 394 U.S. 802, 807-08 (1969), "[c]ourts around the country have recognized that '[w]hile it is true that absentee voting is a privilege and a convenience to voters, this does not grant the state the latitude to deprive citizens of due process with respect to the exercise of this privilege.'" Martin, 341 F. Supp. 3d at 1338 (quoting Raetzel v. Parks/Bellemont Absentee Election Bd., 762 F. Supp. 1354, 1358 (D. Ariz. 1990)). "[O]nce the state creates

- 153 -

an absentee voting regime, they 'must administer it in accordance with the Constitution.'" Id. (quoting Zessar, 2006 WL 642646, at *6); see Self Advocacy Sols. N.D., 2020 WL 2951012, at *8; Saucedo, 335 F. Supp. 3d at 217 (acknowledging that the privilege of absentee voting is afforded due process protections); see also Ga. Muslim Voter Project v. Kemp, 918 F.3d 1262, 1270-73 (11th Cir. 2019) (denying request for stay of injunction) (Pryor, J., concurring). These cases dealt with erroneous rejections based on the voters' signatures not matching. Martin, 341 F. Supp. 3d at 1331 (quoting Raetzel, 762 F. Supp. at 1358; see also Self Advocacy Sols. N.D., 2020 WL 2951012, at *2; Saucedo, 335 F. Supp. 3d at 205-06.

As Plaintiffs correctly observe, North Carolina law vests registered North Carolina voters with the right to vote by mail-in absentee ballot. N.C. Gen. Stat. § 163-226(a). Thus, North Carolina, having "authorized the use of absentee ballots," must afford appropriate due process protections to the use of the absentee ballots. Legislative Defendants' first argument is therefore without merit; Plaintiffs have demonstrated a protected liberty interest in the counting of their votes when submitted through absentee voting.

### b. Deprivation of Constitutionally-Protected Liberty Interest

Having determined Plaintiffs allege a constitutionally-protected liberty interest, the court now must determine whether "the challenged statutes facially effect a deprivation of the right to vote without due process." Self Advocacy Sols. N.D., 2020 WL 2951012, at *9.

For instance, in Raetzel, the district court in Arizona addressed a challenge to Arizona's procedure for disqualifying absentee ballots if the Absentee Election Board challenged an absentee ballot on the basis that the voter was not a "qualified elector of the voting precinct," or if the voter's accompanying affidavit was "insufficient." 762 F. Supp. at 1357. The voter was given no direct notice if their ballot was challenged and disqualified, only the county chairman of each political party were given notice. Id. The court found that "due process is not provided when the election procedures do not give some form of post-deprivation notice to the affected individual so that any defect in eligibility can be cured and the individual is not continually and repeatedly denied so fundamental a right." Id. at 1358.

Similarly, in Zessar, the district court in Illinois found that the Illinois statutory procedure constitutionally

deficient. 2006 WL 642646, at *2. Under the Illinois procedure,
election judges would open absentee ballots on election day and
determine whether the ballot should be counted. Id. Reasons for
rejecting a ballot included mismatched signatures, failing to
fill out the certification envelope completely, and incorrect
information on the certificate, among others. Id. If the
election judges agreed to reject a ballot, they would fill out a
"Notice of Challenge" card the night of the election, which
would then be mailed to the voter. Id. at *2-3. If a ballot is
rejected, the voter has "no opportunity to oppose the rejection
or to demonstrate that it was erroneous. Her vote simply does
not count in the election." Id. at *6. The district court found
that, under this procedure, absentee "voters risk the
deprivation of their vote, a liberty interest, based on factual
issues relating to their ballot." Id.

Thus, when the ballot is rejected for a reason that is
curable, such as incomplete witness information, or a signature
mismatch, and the voter is not given notice or an opportunity to
be heard on this deficiency, the court finds this "facially
effect[s] a deprivation of the right to vote." Self Advocacy
Sols., N.D., 2020 WL 2951012, at *9.

- 156 -

### c.    Whether Procedures in Place are Constitutionally Adequate

Turning to the adequacy of the procedures in place in North Carolina, the court is compelled to find that the complete lack of statewide curing procedure is constitutionally inadequate.

The "deprivation of a protected interest warrants some sort of notice and opportunity to be heard." Rockville Cars, LLC v. City of Rockville, 891 F.3d 141, 145–46 (4th Cir. 2018); see Fuentes v. Shevin, 407 U.S. 67, 80 (1972) ("Parties whose rights are to be affected are entitled to be heard; and in order that they may enjoy that right they must first be notified."). In determining whether the procedures are adequate, the court will balance the private interest, the risk of erroneous deprivation, and the government's interest. Mathews, 424 U.S. at 335.

First, the private interest of a voter being able to vote absentee is weighty, see Self Advocacy Sols. N.D., 2020 WL 2951012, at *9; Martin, 341 F. Supp. 3d at 1338, particularly in the circumstances present with this pandemic.

Second, turning to the risk of erroneous rejection of a ballot, the court finds there is a risk of erroneous rejection. There are currently no procedures in place statewide that would either notify a voter that their absentee ballot has a material

error nor allow such a voter to be heard in challenging such a rejection. (See Evidentiary Hr'g Tr., vol. 2 (Doc. 113) at 122.)

In examining the data submitted by Plaintiffs as to why absentee ballots were rejected in the March 3, 2020 North Carolina primary, (Doc. 73-7 at 10), the court finds that the reasons for rejecting ballots, such as "signature different," and "witness info incomplete," pose a risk of erroneous rejection, even though the comparative numbers are relatively low. "While the Court recognizes that the risk of an erroneous deprivation is by no means enormous, permitting an absentee voter to resolve an alleged signature discrepancy nevertheless has the very tangible benefit of avoiding disenfranchisement. Accordingly, the probative value of additional procedures is high in the present case." Martin, 341 F. Supp. 3d at 1339 (internal citation omitted).

Finally, the court considers the State's interest and the fiscal and administrative burdens on the State in providing pre-rejection process to voters applying for absentee ballots and voting absentee.

Legislative Defendants argue that the burden of adopting the added safeguard in the form of a curing procedure on the State is too heavy and thus the State may reject such a

- 158 -

procedure.[31] Given Defendant Bell testified that the State BoE is working on implementing a curing procedure, (Evidentiary Hr'g Tr., vol. 2 (Doc. 113) at 54), and that several counties have processes in place already, (id. 121–22), the court finds this argument without merit.[32]

The court finds the burden on the State at this point is minimal.

### d.   Due Process Conclusion

Under the Mathews factors, Plaintiffs have demonstrated a likelihood of success that the current process available to absentee voters is constitutionally inadequate; Plaintiffs have therefore demonstrated a likelihood of success on their procedural due process claim. The court finds an injunction should issue prohibiting the State BoE from disallowing or rejecting absentee ballots without due process as to those

---

[31] The court also finds Legislative Defendants' reliance on Kendall v. Balcerzak, 650 F.3d 515 (4th Cir. 2011) inapposite. That case dealt with the invalidation of signatures on a petition, not absentee ballots. Id. at 529. Further, the government entity there gave the petition's sponsor notice and an opportunity to be heard. Id. Given the differences between the present facts and that case, the court does not find Kendall persuasive.

[32] It concerns the court that up until this point, there was no uniform curing process issued by the State BoE; North Carolinians should not be subject to disparate due process protections based on the county in which they reside.

ballots with a material error that is subject to remediation, such as a signature mismatch or deficient witness contact information.

### 5. **Americans with Disabilities Act and Rehabilitation Act**

The court next determines whether Plaintiffs have shown a likelihood of success on their ADA and Rehabilitation Act claims. Only Plaintiff Hutchins has standing to bring an ADA/RA claim. See supra Part II.B. Plaintiff Hutchins is ninety-one years old and is blind. (Hutchins's Decl. (Doc. 11-9) ¶¶ 1-2.) He presently resides in a locked-down nursing facility where residents are required to social distance. (Id. ¶¶ 6-7.) Under current laws and circumstances, Plaintiff Hutchins is not able to vote, as will be explained hereafter.

Plaintiff Hutchins brings both disparate impact and failure to provide reasonable accommodations claims under Title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act. (Second Am. Compl. (Doc. 30) ¶¶ 144-78.) He seeks an injunction against the One-Witness Requirement under

N.C. Gen. Stat. § 163-231(a),[33] and the prohibition on assistance from nursing home workers, owners, and managers under N.C. Gen. Stat. §§ 163-226.3(a)(4)–(6), 163-230.2(e)(4), and 163-231(b)(1). (Pls.' Br. (Doc. 10) at 76–77; Pls.' Am. Mot. (Doc. 31) at 5.) As the court found, supra Part II.B, that while Plaintiff Hutchins has standing to bring an ADA/RA challenge, he does not have standing to challenge N.C. Gen. Stat. § 163-230.2(e)(4), regarding assistance in requesting an absentee ballot. The court will therefore not consider § 163-230.2(e)(4) in its analysis.

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

Section 504 of the RA also provides that "[n]o otherwise qualified individual with a disability in the United States,

---

[33] While Plaintiffs' memorandum in support of their motion for preliminary injunction discusses the two-witness requirement, (see Pls.' Br. (Doc. 10) at 77), Plaintiffs adopted the memorandum as part of their amended motion for preliminary injunction against the One-Witness Requirement, (Pls.' Am. Mot. (Doc. 31) at 5, 8.) The court will therefore construe Plaintiffs' arguments against the two-witness requirement as against the One-Witness Requirement.

Case 1:20-cv-00457-WO-JLW   Document 124   Filed 08/04/20   Page 161 of 188

. . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ." 29 U.S.C. § 794(a). The court is mindful that the ADA has a "broad scope of protection." ADA Amendments Act of 2008, Pub. L. No. 110-325, § 2(b)(1), 122 Stat. 3553 (2008).

To prevail on Title II and Section 504 claims,[34] "plaintiffs must show: (1) they have a disability; (2) they are otherwise qualified to receive the benefits of a public service, program, or activity; and (3) they were denied the benefits of such service, program, or activity, or otherwise discriminated against, on the basis of their disability." Nat'l Fed'n of the Blind v. Lamone, 813 F.3d 494, 502-03 (4th Cir. 2016). A plaintiff need not be wholly-barred from receiving the benefits of the service, program or activity; it is enough that service, program, or activity is not "readily accessible." 28 C.F.R. § 35.150(a).

---

[34] As Plaintiffs note, the Fourth Circuit considers Title II and Section 504 claims together. Nat'l Fed'n of the Blind v. Lamone, 813 F.3d 494, 502 n.4 (4th Cir. 2016) (noting Section 504 and Title II claims "can be combined for analytical purposes" (quoting Seremeth v. Bd. of Cty. Comm'rs Frederick Cty., 673 F.3d 333, 336 n.1 (4th Cir. 2012))).

The Fourth Circuit has interpreted Title II as imposing "an affirmative obligation to make 'reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services' to enable disabled persons to receive services or participate in programs or activities.'" Constantine v. Rectors & Visitors of George Mason Univ., 411 F.3d 474, 488 (4th Cir. 2005) (quoting 42 U.S.C. § 12131(2)).

Plaintiffs bring disparate impact and failure to provide reasonable accommodations claims. Specifically, Plaintiffs allege Plaintiff Hutchins will be disparately impacted by the One-Witness Requirement, due to being quarantined in his nursing home. (Second Am. Compl. (Doc. 30) ¶¶ 166, 168, 174, 176.) Plaintiffs also allege Plaintiff Hutchins has not been provided with reasonable accommodations given he is prohibited from asking staff or nurses at his nursing home to help him mark, complete, and submit his absentee ballot, and neither his wife nor a MAT may assist him, due to his nursing home being on lockdown. (Id. ¶¶ 150–51, 160–61.)

The State BoE receives Federal financial assistance in carrying out elections. (See, e.g., Second Am. Compl. (Doc. 30) ¶ 173.) The State BoE is therefore subject to Section 504 of the RA, which Defendants do not contest.

- 163 -

Having determined that only Plaintiff Hutchins has standing to challenge North Carolina's absentee voting laws under the ADA/RA, see supra Part II.B, the court will move ahead in determining whether Plaintiffs have established a likelihood of success on the merits as to the ADA/RA claims for Plaintiff Hutchins. See Lamone, 813 F.3d at 505 (determining Maryland's absentee voting program was the appropriate subject of the court's ADA analysis because the plaintiffs challenged Maryland's absentee ballot accommodations).

Defendants do not contest Plaintiff Hutchins has a disability, nor do they contest Plaintiff Hutchins is "otherwise qualified to receive the benefits of a public service, program or activity," namely, absentee voting. Executive Defendants only challenge the third element — that Plaintiff Hutchins was "denied the benefits of such service, program, or activity" on the basis of his disability. (Exec. Defs.' Resp. (Doc. 58) at 26.) Executive Defendants argue the restrictions do not deny voters assistance altogether, but that they "merely limit the number of people who are permitted to come into contact with absentee ballot requests to reduce the chance of voter fraud." (Id.) Plaintiffs, in Executive Defendants' view, therefore fail to demonstrate that Plaintiff Hutchins has been "denied the franchise." (Id.)

- 164 -

Legislative Defendants argue Plaintiff Hutchins can be helped or assisted by another nursing home resident, thus "[t]here is no scenario in which Hutchins will be disenfranchised by the prohibition on nursing home staff assisting him." (Leg. Defs.' Resp. (Doc. 51) at 64.) Legislative Defendants also argue the ADA and the RA only entitle Plaintiff Hutchins to "meaningful access" to the opportunity to cast an absentee ballot, which, they contend, he has under the current absentee ballot framework. (Id.)

The court first notes Executive Defendants misstate the law; the standard is not whether Plaintiff Hutchins has been "denied the franchise," but whether the franchise is "readily accessible" to Plaintiff Hutchins. In other words, the court must determine whether he has been denied "meaningful access" to absentee voting. See Lamone, 813 F.3d at 507. To the extent Executive Defendants' argument is predicated on Plaintiff Hutchins needing to have been "altogether" denied the right to vote, that argument is not persuasive.

The court turns to whether the current laws deny Plaintiff Hutchins "meaningful access" to absentee voting.

Under the current laws, Plaintiff Hutchins is not able to have any "owner, manager, director, [or] employee" of his nursing home, assist him by witnessing his absentee ballot,

- 165 -

marking or assisting in marking his absentee ballot, or helping

return his absentee ballot, even if he is not able to obtain

assistance from a near relative, legal guardian, or MAT. N.C.

Gen. Stat. § 163-226.3(a)(4)-(5). While he may receive

assistance from another resident, he may only do so after

demonstrating he is not able to obtain assistance from a near

relative, legal guardian, or MAT if it is not available to

assist him within seven days of his request. Id. § 163-

226.3(a)(4).

Regarding marking and completing his ballot, Plaintiff

Hutchins's declaration belies that he could receive assistance

from another resident, a near relative, or a MAT. Due to his

disability, Plaintiff Hutchins needs hands-on assistance in

voting: he states that, in the 2018 election, his wife "recited

the candidates and when I informed her of my choice, she would

position my hand so that I could mark my ballot." (Hutchins's

Decl. (Doc. 11-9) ¶ 5.) But the nursing home in which he resides

is on lockdown and no visitors, including family members, are

allowed in, it does not appear he has a legal guardian in the

nursing home, and the residents are told to maintain at least

six feet of distance from each other; thus, there is no person

available to assist Mr. Hutchins under § 163-226.3(a)(4). (Id.

¶¶ 5-7.)

- 166 -

Because the law explicitly prohibits Hutchins from seeking assistance from any employees of his nursing home, he has only his fellow residents for help, but given their mutual vulnerabilities,[35] and the strict social distancing measures in place, it does not seem to the court that this constitutes "meaningful access" to voting under § 163-226.3(a)(4).

The court finds that but for his blindness, Plaintiff Hutchins would be able to fill out an absentee ballot on his own. Though the statute preventing the employees of the nursing home in which he resides from helping him is not based on his disability, that statute has the effect of depriving Plaintiff Hutchins of "meaningful access" to absentee voting due to his disability. He asserts in his unrebutted declaration that he "would like The Davis Community staff members to be permitted to assist me in voting and returning my absentee ballot, and . . . to serve as my witnesses. Otherwise, my blindness will prevent me from completing and returning my absentee ballot and voting in the upcoming November election." (Hutchins's Decl. (Doc. 11-

---

[35] This facility is described as a nursing home, a term defined in N.C. Gen. Stat. § 131E-101. A nursing home is defined as "a facility . . . for the express or implied purpose of providing nursing or convalescent care for three or more persons . . . ." Id. § 131E-101(6). "A 'nursing home' provides care for persons who have remedial ailments or other ailments, for which medical and nursing care are indicated." Id.

9) ¶¶ 11-12.) If the staff cannot help Plaintiff Hutchins, he will be completely disenfranchised.

Legislative Defendants' argument that other residents could help him fill out an absentee ballot is unpersuasive. Plaintiff Hutchins asserts that the "residents at Davis community [where Plaintiff Hutchins resides] are told to maintain at least 6 feet of distance from each other."[36] (Id. ¶ 7.) Given Plaintiff Hutchins needs hands-on assistance in filling out his ballot, the court cannot conceive of how a resident is supposed to abide by the social distancing requirements and provide Plaintiff Hutchins the hands-on assistance he needs in voting. Further, Plaintiff Hutchins states that he "would like The Davis Community staff members to be permitted to assist me in voting and returning my absentee ballot, and only if necessary, to serve as my witnesses." (Id. ¶ 11.) Indeed, when Dr. Plush was asked if someone placing their hand on Mr. Hutchins in order to assist him in marking his ballot would present a risk, Dr. Plush stated that even with many precautions taken, such as wearing gloves, a face shield, and a gown, such hands-on assistance would present an elevated risk. (Doc. 111 at 39-40.)

---

[36] The court directs Legislative Defendants' attention to the definition of nursing home. N.C. Gen. Stat. § 131E-101(6).

- 168 -

Regarding the One-Witness Requirement, as the court noted, supra n.9, that Plaintiffs have failed to put forth evidence tending to prove Plaintiff Hutchins will be unduly burdened by the One-Witness Requirement such that an injunction should issue.

Further, while the court is still concerned with respect to the ability of Plaintiff Hutchins in being able to procure another resident to witness his ballot, the court cannot say that any difficulty he may have in procuring a witness is due to his disability, but instead is because he resides in a locked-down nursing home. Plaintiffs have not demonstrated that but for his disability, Plaintiff Hutchins would be able to procure a witness. Put simply, it appears it is the lockdown status, not the disability, that creates an issue for witnessing. The court will not enjoin § 163-226.3(a)(4) insofar as it prohibits nursing home staff from serving as a witness for an absentee ballot under the ADA/RA.

Likewise, the court cannot say that § 163-231(b)(1), which restricts who may return an absentee ballot to a county board of elections, deprives Plaintiff Hutchins of "meaningful access" to voting because of his disability. Plaintiffs submitted no evidence tending to show Plaintiff Hutchins cannot mail his absentee ballot to the county board of elections because he is

blind. The court declines to enjoin § 163-231(b)(1) under the ADA/RA.

Finally, the court, recognizing that the purpose of § 163-226.3(a)(4) is to prevent undue influence on vulnerable people, is satisfied that there are other statutes providing for criminal penalties for those who unlawfully influence or interfere with elections in a variety of ways. See N.C. Gen. Stat. §§ 163-237, 163-274, 163-275.

The court finds that the evidence shows Plaintiff Hutchins will be disenfranchised under these circumstances; Plaintiffs have demonstrated a likelihood of success for their ADA/RA claim regarding N.C. Gen. Stat. §§ 163-226.3(a)(4)-(6), insofar as these laws deprive him from receiving assistance from staff in filling out an absentee ballot.

### 6.   Section 208 of the Voting Rights Act

Plaintiffs finally seek an injunction against the absentee ballot regulations concerning who may assist a voter in both requesting a ballot as well as completing and returning a ballot. (Pls.' Am. Mot. (Doc. 31) at 5, 7-8.) Plaintiff Hutchins is the only Plaintiff with standing to bring a claim under Section 208 of the Voting Rights Act, alleging N.C. Gen. Stat. §§ 163-226.3(a)(4)-(6), 163-230.2(e)(4), 163-231(b)(1) violate Section 208 by impermissibly restricting who may assist voters

- 170 -

to whom Section 208 applies. (Second Am. Compl. (Doc. 30) ¶ 184.) As the court found, <u>supra</u> Part II.A.7, Plaintiff Hutchins does not have standing to challenge N.C. Gen. Stat. § 163-230.2(e)(4). The court's analysis will therefore only apply to the remaining laws at issue as they apply to absentee ballots, not absentee ballot requests.

Under Section 208 of the Voting Rights Act, "[a]ny voter who requires assistance to vote by reason of blindness, disability, or inability to read or write [("208-voters")] may be given assistance by a person of the voter's choice, other than the voter's employer or agent of that employer or officer or agent of the voter's union." 52 U.S.C. § 10508.

> The terms "vote" or "voting" shall include all action necessary to make a vote effective in any primary, special, or general election, including, but not limited to, registration, listing pursuant to this chapter, or other action required by law prerequisite to voting, casting a ballot, and having such ballot counted properly and included in the appropriate totals of votes cast with respect to candidates for public or party office and propositions for which votes are received in an election.

<u>Id.</u> § 10310(c)(1).

The court is also mindful that the legislative history for what would become Section 208 reads, "State provisions would be preempted only to the extent that they unduly burden the right recognized in this section, with that determination being a

- 171 -

practical one dependent upon facts." S. Rep. No. 97-417, at *63 (1982), as reprinted in 1982 U.S.C.C.A.N. 177, 241.

Plaintiffs contend Defendants are violating Section 208 by preventing 208-voters from selecting their assistor of choice who is not their employer or union representative to assist them in marking, completing, or submitting their absentee ballot. (Pls.' Br. (Doc. 10) at 79-80.) In particular, Plaintiffs argue Plaintiff Hutchins, as a voter in need of assistance in marking and completing his absentee ballot, and delivering it, is entitled to an assistor of his choice other than his employer or union representative. (Id. at 80.)

Executive Defendants do not address this issue. Legislative Defendants argue Plaintiff Hutchins could have his wife fill out an absentee ballot request form on his behalf as a "near relative" under N.C. Gen. Stat. § 163-226.3(c). (Leg. Defs.' Resp. (Doc. 51) at 65-66.) Because the court is not addressing the requesting of absentee ballots, this argument is inapposite.

Legislative Defendants further argue "Section 208 allows blind, disabled, and illiterate voters to be 'given assistance by a person' — not any person — of [their] choice.'" (Id. at 66.) Legislative Defendants frame Section 208 as requiring states only make "some method of voting with assistance available to voters who are covered by the provision; North

- 172 -

Carolina law is consistent with Section 208 so long as there is at least one means by which Hutchins can cast his ballot with help from a person of his choice." (Id. at 67–68.) While Legislative Defendants are correct that Plaintiff Hutchins's wife may fill out a request form for him — and indeed, she has already done so — she cannot cast his absentee ballot for him.

The Fifth Circuit dealt with a similarly narrowed law in Texas, which dictated that a voter's chosen interpreter be registered to vote in the voter's county of residence. OCA-Greater Houston, 867 F.3d at 609. There, the outcome turned on the definition of "to vote" under Section 208. Texas contended that the term referred only to the literal marking of the ballot, so the "assistance by a person of the voter's choice" did not apply to the "supplemental interpreter right, which extends beyond the ballot box," and therefore was "beyond Section 208's coverage." Id. at 614. The Fifth Circuit disagreed, finding the definition of "vote" under § 10310(c)(1) resolved the dispute, because "'[t]o vote,' therefore, plainly contemplates more than the mechanical act of filling out the ballot sheet. It includes steps in the voting process before entering the ballot box, 'registration,' and it includes steps in the voting process after leaving the ballot box, 'having such ballot counted properly.'" Id. at 614–15. The Fifth Circuit held

- 173 -

that Texas's limitation on voter choice "impermissibly narrows the right guaranteed by Section 208 of the VRA." Id. at 615.

The court finds, as an initial matter, voting using an absentee ballot constitutes "voting" under the VRA, which defines "vote" or "voting" as including "all action necessary to make a vote effective in any primary, special, or general election, including, but not limited to, registration, listing pursuant to this chapter, or other action required by law prerequisite to voting, casting a ballot, and having such ballot counted properly . . . ." 52 U.S.C. § 10310(c)(1). The court further finds that "voting" includes the delivery of an absentee ballot to a county board of elections as an action "necessary to make a vote effective" — an absentee ballot must be delivered in order to be counted.

Regarding the marking and completing of absentee ballots, the court finds North Carolina essentially does not allow Plaintiff Hutchins to choose the person who will assist him. N.C. Gen. Stat. § 163-226.3(a)(4), also impermissibly restricts who may assist 208-voters who are patients "in any hospital, clinic, nursing home or rest home," especially considering the current circumstances, in which Plaintiff Hutchins resides in a locked-down nursing home. Section 163-226.3(a)(4) prohibits anyone but a voter's near relative, legal guardian, or a member

- 174 -

of a MAT, to "mark the voter's absentee ballot or assist such a voter in marking an absentee ballot." Section 163-226.3(a)(4) thus suffers from a fatal constriction: it provides that if neither a near relative nor a legal guardian nor a MAT is available to assist the voter within seven days of a request to the county board of elections, a voter may receive assistance from another constricted list of people, not including

> an owner, manager, director, employee of the hospital, clinic, nursing home, or rest home in which the voter is a patient or resident; (ii) an individual who holds any elective office under the United States, this State, or any political subdivision of this State; (iii) an individual who is a candidate for nomination or election to such office; or (iv) an individual who holds any office in a State, congressional district, county, or precinct political party or organization, or who is a campaign manager or treasurer for any candidate or political party; provided that a delegate to a convention shall not be considered a party office.

N.C. Gen. Stat. § 163-226.3(a)(4). Thus, 208-voters must rely on either a near relative, a legal guardian, or a MAT if they are available before they may choose any other person to assist them.

The court finds these regulations impermissibly narrow Section 208's dictate that a voter may be assisted "by a person of the voter's choice, other than the voter's employer or agent of that employer or officer or agent of the voter's union." 52 U.S.C. § 10508. In the present circumstances, many nursing homes

are locked down and will likely continue to have restricted access for the foreseeable future; 208-voters in these type of adult care facilities may only come into contact with "an owner, manager, director, [or] employee" of their residence and therefore may not have any options for assistance. More significantly, it does not appear to this court that a 208-voter — one who is blind, like Plaintiff Hutchins, can be prohibited by state law from choosing the individual to assist them in voting. With those facts in mind, the court is satisfied that North Carolina's laws violate Section 208.

Plaintiffs also challenge § 163-231(b)(1) and § 163-226.3(a)(5), both which concern the transmission of an absentee ballot for delivery to a county board of elections. Section 163-231(b)(1) dictates that ballots can only be transmitted to the county board of elections by mail or commercial courier service, by the voter, or the voter's near relative, and § 163-226.3(a)(5) prohibits anyone but a voter's near relative or legal guardian from "tak[ing] into that person's possession for delivery to a voter or for return to a county board of elections the absentee ballot of any voter." The court finds that these restrictions suffer from the same fatal constriction as § 163-226.3(a)(4); both delivery restrictions impermissibly dictate who may assist a 208-voter in delivering

- 176 -

their absentee ballot by only allowing a delineated list of people to deliver an absentee ballot to the county board of elections. "The unambiguous language of the VRA resolves" this dispute. OCA-Greater Houston, 867 F.3d at 614.

The court also finds Legislative Defendants' reliance on Ray v. Texas, Civil Action No. 2-06-CV-385 (TJW), 2008 WL 3457021 (E.D. Tex. Aug. 7, 2008), inapposite. The court there noted that the language of Section 208 "allows the voter to choose a person who will assist the voter, but it does not grant the voter the right to make that choice without limitation . . . provided the challenged regulation does not unduly burden the right to vote." Id. at *7. The court in Ray dealt with a Texas law limiting the number of times a person may witness another voter's absentee ballot. Id. That court held the law did not contravene Section 208 as a reasonable restriction by the state. Id. Here, as demonstrated, the State has chosen the person who will assist the voter – their legal guardian or near relative. This limitation is distinguishable from that in Ray. In Ray, only a few people were off-limits to voters, leaving nearly everyone else available to witness an absentee ballot, whereas here, everyone but a few people are off limits. The court therefore finds Ray unpersuasive.

- 177 -

The court finds Plaintiffs have demonstrated a likelihood of success on the merits as to their VRA claim. The court will enjoin the following provisions: N.C. Gen. Stat. § 163-226.3(a)(4)-(6), and § 163-231(b)(1), to the extent they prohibit Plaintiff Hutchins, who "requires assistance to vote by reason of [his] blindness, disability, or inability to read or write" from receiving "assistance by a person of [Plaintiff Hutchins's] choice, other than [his] employer or agent of that employer or officer or agent of the voter's union," 52 U.S.C. § 10508, in marking, completing, and returning his absentee ballots.

### 7.  **Success on the Merits Conclusion**

The court finds Plaintiffs have successfully shown a likelihood of success on the merits as to the following claims: Violation of Section 208 of the VRA, Title II of the ADA, Section 504 of the RA, and procedural due process.

### F.  **Irreparable Harm**

In addition to a likelihood of success on the merits, a plaintiff must also make a "clear showing that it is likely to be irreparably harmed absent preliminary relief" in order to obtain a preliminary injunction. UBS Fin. Servs., Inc. v. Carilion Clinic, 880 F. Supp. 2d 724, 733 (E.D. Va. 2012) (quoting Real Truth About Obama, Inc. v. Fed. Election Comm'n,

575 F.3d 342, 347 (2009) (4th Cir. 2009)). Further, an injury is typically deemed irreparable if monetary damages are inadequate or difficult to ascertain. See Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co., 22 F.3d 546, 551 (4th Cir. 1994), abrogated on other grounds by Winter, 555 U.S. at 22. "Courts routinely deem restrictions on fundamental voting rights irreparable injury." League of Women Voters of N.C., 769 F.3d at 247. "[O]nce the election occurs, there can be no do-over and no redress. The injury to these voters is real and completely irreparable if nothing is done to enjoin th[ese] law[s]." Id. And "[o]rganizations with core voter-advocacy missions, like Plaintiffs in this case, are irreparably harmed when 'the defendant's actions perceptibly impair[] the organization's programs, making it more difficult to carry out its mission.'" N.C. State Conference of NAACP v. Cooper, 430 F. Supp. 3d 15, 51 (M.D.N.C. 2019) (alteration in original) (internal quotation marks omitted) (quoting Action NC v. Strach, 216 F. Supp. 3d 597, 642 (M.D.N.C. 2016)). And a "voting-rights organization is also irreparably harmed when the right to vote is wrongfully denied or abridged — whether belonging to its membership or the electorate at large." Id.

The court therefore finds Plaintiffs have demonstrated a likelihood of irreparable injury regarding their ADA/RA, VRA, and procedural due process claims.

G.    **Balance of Equities**

The third factor in determining whether preliminary relief is appropriate is whether the plaintiff demonstrates "that the balance of equities tips in his favor." Winter, 555 U.S. at 20.

The court notes Defendants have taken steps towards remedying the issues posed by the COVID-19 pandemic by passing and signing into law H.B. 1169. Regarding a curing procedure, this tips in favor of an injunction of limited duration; it appears Executive Defendants are on their way towards implementing a curing procedure, thus an injunction against the rejection of any absentee ballots until such time as Defendants implement a plan or procedure to address material defects will suffice. Further, enjoining the laws restricting assistance for those in facilities, this tips in Plaintiff Hutchins's favor. See N.C. State Conference of NAACP, 430 F. Supp. 3d at 53.

H.    **Public Interest**

Finally, the court must determine whether public policy weighs in favor of granting preliminary relief.

> By definition, "[t]he public interest . . .
> favors permitting as many qualified voters to vote as
> possible." [Obama for Am. v.] Husted, 697 F.3d [423,]

- 180 -

437 [(6th Cir. 2012)]. <u>See also</u> <u>Purcell v. Gonzalez</u>,
549 U.S. 1, 4, 127 S. Ct. 5 (2006) (The public has a
"strong interest in exercising the fundamental
political right to vote." (citations omitted)). And
"upholding constitutional rights serves the public
interest." <u>Newsom v. Albemarle Cty. Sch. Bd.</u>, 354 F.3d
249, 261 (4th Cir. 2003).

<u>League of Women Voters of N.C.</u>, 769 F.3d at 247–48. Further, as

another judge in this district observed, "electoral integrity is

enhanced, not diminished, when all eligible voters are allowed

to exercise their right to vote free from interference and

burden unnecessarily imposed by others. The public interest is

also served by 'upholding constitutional rights.'" <u>N.C. State</u>

<u>Conference of NAACP</u>, 430 F. Supp. 3d at 53 (quoting <u>League of</u>

<u>Women Voters of N.C.</u>, 769 F.3d at 248).

Though "stability and consistency are also virtues" when it

comes to elections, <u>id.</u>, the infringement of the fundamental

right to vote poses a far greater risk. The court finds the

public interest "weighs heavily" in Plaintiffs' favor as to the

issues for which relief will be granted here. <u>League of Women</u>

<u>Voters of N.C.</u>, 769 F.3d at 248.

**I.   Scope of Relief**

The court makes the following findings with regard to the

scope of this injunction.

### 1. **Procedural Due Process**

The court finds that the State BoE should be enjoined from the disallowance or rejection, or permitting the disallowance or rejection, of any absentee ballots without due process as to those ballots with a material error that is subject to remediation until such time as the Legislative and Executive Defendants, including the State BoE, implement a law or rule which provides a voter with notice and an opportunity to be heard before a delivered absentee ballot is disallowed or rejected. This injunctive relief shall terminate upon the passage or implementation of such a law or rule.

### 2. **Plaintiff Hutchins**

Regarding Plaintiff Hutchins, the court finds that an injunction should issue as to N.C. Gen. Stat. §§ 163-226.3(a)(4)-(6), -231(b)(1) to remediate Plaintiff Hutchins's disenfranchisement under the ADA, the RA, and improperly limits his request for assistance under the VRA. This injunction shall remain in force and effect through completion of the November 3, 2020 General Election, including canvassing and certification of election results, or until the Legislative or Executive Defendants address these issues as explained.

- 182 -

### a.  The ADA/RA

First, under the ADA and the RA, Defendants shall be
enjoined from enforcing N.C. Gen. Stat. §§ 163-226.3(a)(4), to
the extent it prohibits Plaintiff Hutchins, a disabled
individual, from receiving assistance in marking and completing
his absentee ballot from an employee or staff member of the
nursing home in which he resides. This injunction shall remain
in effect through the November 3, 2020 General Election or until
The Davis Community allows outside visitors such that a MAT or
his wife could visit and assist him in marking and completing
his absentee ballot. The terms "employees" and "staff," as used
herein, do not include an owner, manager, or director of the
nursing home. The terms of this injunction would permit staff or
employees of Plaintiff Hutchins's nursing home to mark or assist
his ballot. The court notes and recognizes that should this
injunction remain in effect through the election, Legislative
Defendants and Executive Defendants remain free to implement
reasonable requirements to effect the terms of this injunction.

### b.  The VRA

Second, §§ 163-226.3(a)(4)-(a)(6),[37] -231(b)(1) are enjoined
under the VRA as applied to Plaintiff Hutchins until such time

---

[37] N.C. Gen. Stat. § 163-226.3(a)(6) is enjoined to the
extent it violates this injunction.

as Defendants, including the State BoE, implement a law or rule that permits the disabled individual, Plaintiff Hutchins, to select his own person to assist him in marking, completing, and submitting his absentee ballot in accordance with Section 208 of the VRA.

### 3. Remaining Issues

The court turns to Legislative Defendants' remaining concerns. Legislative Defendants urge the court to heed the Supreme Court's warning that "lower federal courts should ordinarily not alter the election rules on the eve of an election," Republican Nat'l Comm. v. Democratic Nat'l Comm., 589 U.S. ____, ____, 140 S. Ct. 1205, 1207 (2020) (per curiam), and should thus abstain from enjoining the challenged laws, (Leg. Defs.' Resp. (Doc. 51) at 69-70).

The court is satisfied that its injunctive relief does not run afoul of Republican National Committee and Purcell. The Supreme Court in Purcell, in holding that an injunction against voter identification procedures entered "just weeks before an election" was done in error, cautioned that "[c]ourt orders affecting elections . . . can themselves result in voter confusion and consequent incentive to remain away from the polls. As an election draws closer, that risk will increase." 549 U.S. at 4-5.

- 184 -

The injunction prohibiting rejection of absentee ballots simply requires due process before a mailed-in absentee ballot is rejected. The State BoE has the statutory duty to "advise [the county boards of elections] as to the proper methods of conducting primaries and elections." N.C. Gen. Stat. § 163-22(c). The State BoE also has the final responsibility "to tabulate the primary and election returns [and] to declare the results." Id. § 163-22(h). Given that the State BoE is already working on a curing procedure for mail-in absentee ballots for this election, this court does not find an injunction preventing the rejection of absentee ballots without a curing procedure will "alter the election rules"; the court is merely ensuring all absentee voters will receive due process, regardless of when their absentee ballot is delivered. Further, Executive Defendants argued that September 4, 2020, is the "deadline to administer absentee-by-mail." (Evidentiary Hr'g Tr., vol. 2 (Doc. 113) at 35.) This injunction comes at a time when Executive Defendants themselves are still finalizing the absentee voting procedure, thus this injunction should not have the effect of causing voter confusion and "consequent incentive to remain away from the polls." Purcell, 549 U.S. at 4–5.

Further, the court further finds, with respect to Plaintiff Hutchins, that this court's injunction does not constitute a

- 185 -

last-minute alteration of election law likely to create voter confusion; indeed, the absentee voting rules have yet to be finalized, as absentee voting has not yet started. The court finds that <u>Purcell</u> does not counsel a different result.

Finally, Legislative Defendants also argue Plaintiffs' requested relief is overbroad. (Leg. Defs.' Resp. (Doc. 51) at 72.) The court, however, is satisfied that the relief provided by the scope of this Memorandum Opinion and Order is appropriately limited by <u>Purcell</u> and the limits of this court's power under the Constitution and the laws of the United States.

## III. <u>CONCLUSION</u>

For the foregoing reasons, the court finds that Plaintiffs' motion for preliminary injunction should be granted in part and denied in part. The court enjoins the statutes limiting assistance by employees of the applicable facilities and the applicable criminal provisions until such time as a plan exists that would reasonably allow a disabled individual affected by these statutes to vote. It also enjoins the State BoE from allowing county boards of elections to reject a delivered absentee ballot without notice and an opportunity to be heard until the State BoE puts such a uniform procedure in place.

**IT IS THEREFORE ORDERED** that Plaintiffs' Motion for Preliminary Injunction, (Doc. 9), is **DENIED AS MOOT** and that

Plaintiffs' Amended Motion for Preliminary Injunction, (Doc. 31), is **GRANTED IN PART AND DENIED IN PART.** The Motion is **GRANTED** as to N.C. Gen. Stat. §§ 163-226.3(a)(4)-(6), 163-231(b)(1), and as to Plaintiffs' procedural due process claim. The Motion is **DENIED** as to the remainder of Plaintiffs' requested relief.

 **IT IS ORDERED** that Defendants, including the North Carolina State Board of Elections, are **PROHIBITED AND ENJOINED** from the disallowance or rejection, or permitting the disallowance or rejection, of absentee ballots without due process as to those ballots with a material error that is subject to remediation. This injunction shall remain in force until such time as Defendants implement a law or rule which provides a voter with notice and an opportunity to be heard before an absentee ballot with a material error subject to remediation is disallowed or rejected.

 **IT IS ORDERED** that Defendants, their agents, employees, and state or local law enforcement are **PROHIBITED AND ENJOINED** from enforcing, and enforcement of, N.C. Gen. Stat. § 163-226.3(a)(4) to the extent those provisions of that statute prohibit Plaintiff Hutchins from receiving assistance in marking and completing his absentee ballot from an employee or staff member, as those terms are defined herein, of the nursing home in which

- 187 -

he resides. This injunction shall remain in effect through the November 3, 2020 General Election or until The Davis Community allows outside visitors such that a MAT or his wife could visit and assist him in marking and completing his absentee ballot.

**IT IS ORDERED** that Defendants, their agents, employees, and state or local law enforcement are **PROHIBITED AND ENJOINED** from enforcing, and enforcement of, N.C. Gen. Stat. § 163-226.3(a)(4)–(6) and N.C. Gen. Stat. § 163-231(b)(1) as to Plaintiff Hutchins until such time as Defendants, including the North Carolina State Board of Elections, implement a law or rule that permits the disabled individual, Plaintiff Hutchins, to select his own person to assist him in marking, completing, and submitting his absentee ballot in accordance with Section 208 of the VRA.

This the 4th day of August, 2020.

William L. Osteen, Jr.
United States District Judge