UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

Civil Action No. 1:20-cv-457

| | |
|---|---|
| DEMOCRACY NORTH CAROLINA, *et al.*, <br><br> Plaintiffs, <br> v. <br><br> THE NORTH CAROLINA STATE BOARD OF ELECTIONS; *et al.*, <br><br> Defendants, <br><br> and <br><br> PHILIP E. BERGER, etc., *et al.*, <br> Intervenors. | **RESPONSE TO PLAINTIFFS' MOTION TO ENFORCE ORDER GRATING IN PART PRELIMINARY INJUNCTION, OR, IN THE ALTERNATIVE, MOTION FOR CLARIFICATION, AND TO EXPEDITE CONSIDERATION** |

To aid the Court in its consideration of the Plaintiffs' motion to enforce the order on injunctive relief, the State Defendants have respectfully dispensed with the traditional format for a response brief as required by the Local Rules and have instead endeavored to answer the Court's questions from its order (Dkt. 149) directly below. The State Defendants stand ready to expeditiously supplement this response with any information the Court may find helpful in its consideration of the motion.

1. The State Defendants take no position on whether Plaintiffs' motion for clarification is timely in light of *Purcell v. Gonzales*, 549 U.S. 1 (2006). Under *Purcell*, "courts must assess the particular circumstances of each case . . . to determine whether an injunction is proper." *Feldman v. Ariz. Sec'y of State's Office*, 843 F.3d 366, 368-69 (9th

Cir. 2016). Those circumstances include, *inter alia*: whether the injunction would "have any effect on voters themselves, on the conduct of election officials, or on the counting of ballots," whether it would disrupt longstanding procedures, whether the plaintiffs delayed in bringing the action, whether the challenged law already survived some measure of review, and the thoroughness of the court's reasoning. *Id.* But "*Purcell* did not set forth a per se prohibition against enjoining voting laws on the eve of an election." *Id.*; *see also Veasey v. Perry*, 135 S.Ct. 9, 10 (2014) (Ginsburg, J., dissenting) ("*Purcell* held only that courts must take careful account of considerations specific to elections cases, not that elections cases are exempt from traditional stay standards."). Because the application of *Purcell* is a fact-intensive inquiry, the State Defendants offer the following facts for the Court's consideration of Plaintiffs' motion.

The State Defendants respect the Court's order of September 30 in which the Court stated that it "does not find [Numbered Memo 2020-19] consistent with this court's order entered on August 4, 2020." Dkt. 145 at 3. The State Defendants appreciate the opportunity to clarify their position here and explain their understanding of how they have acted in compliance with the Court's order on injunctive relief. But, after this opportunity, should the Court continue to believe that Numbered Memo 2020-19 is inconsistent with this Court's order on injunctive relief, the State Defendants would appreciate further guidance on the scope of that injunction.

In its August 4 order on injunctive relief, this Court denied Plaintiffs' motion to enjoin the witness requirement in its entirety. Dkt. 124 at 102. The Court did, however, enjoin the State Defendants from the "disallowance or rejection, or permitting the

2

disallowance or rejection of absentee ballots without due process as to those ballots with a material error that is subject to remediation." *Id.* at 187. This Court further held that the "injunction shall remain in force until such time as Defendants implement a law or rule which provides a voter with notice and an opportunity to be heard before an absentee ballot with a material error subject to remediation is disallowed or rejected." *Id.*

As the Court observed, even before the injunction was issued, the State Board was already in the process of creating a formal cure procedure for mail-in ballots, particularly as the State Board was expecting a ten-fold increase in mail-in voting participation for 2020. *Id.* at 185 ("[T]he State BoE is already working on a curing procedure for mail-in absentee ballots for this election.").

On August 21, 2020, an initial cure procedure was implemented by the State Board, in time for absentee ballots to be mailed beginning on September 4. Declaration of K. Bell, ¶ 6. This initial cure procedure allowed a voter to cure, by affidavit, mistakes involving only the voter signature. Ex. A at 2.

The initial cure procedure also provided a process for a hearing for voters whose ballots contained other deficiencies, like mistakes in providing witness information, that would not be cured by the initial procedure. Bell Dec., ¶ 11. The purpose of a hearing in these circumstances is to allow a voter to contest any determinations that cannot be cured by certification. *Id.* Therefore, the initial cure procedure permitted voters to contest the circumstances under which they were issued a new ballot and challenge whether or not they returned the new ballot. *Id.* Voters were afforded an opportunity to be heard at canvass, when county boards determine that the "votes have been counted and tabulated

3

correctly, culminating in the authentication of the official election results." N.C. Gen. Stat. § 163-182.5(a).

While this initial cure procedure was in place, the State Board staff assisted county board staffs by providing guidance and answering questions individually about the application of the initial cure process. *Id.*, ¶ 7. Soon after absentee ballots began being mailed out, however, the State Board office began receiving numerous complaints that the use of different color shading and other aspects of the absentee ballot container envelope were overwhelmingly confusing to voters. *Id.* The State Board determined that the cure procedure needed to be modified to allow the voter to cure mistakes involving other aspects of the ballot. *Id.*

The initial cure procedure was in place for one week, until September 11, when county boards were instructed to stop issuing cure affidavits or reissuing ballots due to the concerns about voter confusion and inadequacy of the initial cure procedure. *Id.*

At the same time, the Executive Director of the State Board also became aware of reports from numerous sources informing her that the absentee ballot voting process, in conjunction with the cure procedure, resulted in the ballots of Black voters and other voters of color being rejected at a much greater rate than those of White voters. *Id.*, ¶ 8; *see also* Kaleigh Rogers, *North Carolina Is Already Rejecting Black Voters' Mail-In Ballots More Often Than White Voters*', FiveThirtyEight (Sept. 17, 2020), https://fivethirtyeight.com/features/north-carolina-is-already-rejecting-black-voters-mail-in-ballots-more-often-than-white-voters/ ("As of September 17, Black voters' ballots are being rejected at more than four times the rate of white voters."); North Carolina Early

4

Voting Statistics, https://electproject.github.io/Early-Vote-2020G/NC.html (detailing that, as of September 28, 2020, Black voters had a rejection rate of 4.3% while white voters had a rejection rate of 1.1%; Hispanic and Native American voters' ballots are being rejected at nearly three times the rate of white voters' ballots, and Asian voters' ballots are being rejected at more than twice the rate of white voters). As of September 28, in North Carolina alone, white voters had submitted 182,312 ballots, and 2,005 of those ballots had been rejected, while Black, Hispanic, Asian, and Native American voters combined had submitted 83,102 ballots, and 2,075 had been rejected. North Carolina Early Voting Statistics, https://electproject.github.io/Early-Vote-2020G/NC.html.

To address the inadequacies of the initial cure procedure and the racially disparate impact that the absentee ballot process appeared to have on voters of color, and pursuant to section 163-22.2, the State Board staff, including the Executive Director, began to formulate a new cure procedure. Bell Dec., ¶ 8; *see also* N.C. Gen. Stat. § 163-22.2 (giving the State Board authority to make interim rules and regulations with respect to pending primary or general elections when a statute is held unconstitutional or invalid by a State or federal court or in consideration of a settlement of litigation). In doing so, the State Board staff began seeking ways to address these concerns within the existing legal framework. Bell Dec., ¶ 8.

The State Board staff paid particular attention to the witness requirement, which was the reason an overwhelming number of ballots were being rejected. *Id.*, ¶ 9. The Board staff focused on maintaining the purpose behind the existence of the witness

5

requirement: To prevent the voter from having her ballot stolen and marked without her knowledge. *Id.* In other words, the purpose of the witness requirement was to prevent fraud by ensuring that the voter is the person who marked her ballot. *See also* Certification on absentee ballot container envelope (confirming that the voter marked the ballot or caused it to be marked in the voter's presence).

The State Board staff then began developing a witness cure procedure that would allow a voter herself to confirm that her ballot was not stolen. Bell Dec., ¶ 9. This would allow a voter to reduce her risk to infection from COVID-19 by only requiring her to expose herself *once* (during the initial marking of the ballot), rather than having to risk repeated exposure to correct any deficiencies in the witness certification procedure. *Id.* In addition, it was the opinion of the Executive Director that allowing a voter herself to cure the witness requirement would address the confusion engendered by the color coding of the absentee ballot container envelope as well as the process's racially disparate rejection rates. *Id.*

The new witness cure procedure would require county boards to contact a voter directly to confirm that the voter is the person who marked her ballot. *Id.* In this way, the county board official would act as the voter's witness (though not contemporaneously with the marking of the ballot). The State Board staff believed that this would be a sufficient anti-fraud measure because the county board would communicate with the voter in the manner that the voter designated on her absentee ballot request form. This would ensure that any possibility of fraud resulting from interception of correspondence would be limited. Requiring a voter to confirm, through preapproved personal channels

6

of communication, that she is the person who voted her ballot was an appropriate cure procedure that would avoid the need for the voter to mark an entirely new ballot.

This cure procedure does not require—or even allow for—the elimination of the witness requirement entirely. Elimination of the witness requirement would require that a county board accept a ballot even if it does not have a witness signature or witness information. Instead, this cure procedure requires that a ballot without a witness signature or information must *not be accepted*, but must be held pending further action. A voter who makes a mistake in following the witness certification requirement must be contacted by the county board and must take extra affirmative steps to confirm that she is the person who voted her ballot. Once she affirms that she is the one who voted her ballot, she has to then send the certification back directly to the county board of elections. The procedure is not an end-run around the witness signature, but rather a series of additional actions that a voter would have to take to make up for the mistake she made when she initially marked her ballot.

This new cure procedure was presented to the State Board for its approval. On a unanimous, bipartisan vote, the State Board approved this cure procedure to be used for witness information during the November 2020 election cycle.

After this time of extended discussion and collaboration, on September 22, the Executive Director issued a revised Numbered Memo 2020-19. In addition to allowing a voter to cure witness information-related deficiencies, Numbered Memo 2020-19 also requires that county board staff "shall, to the extent possible, regularly review container-return envelopes on each business day, to ensure that voters have every opportunity to

7

correct deficiencies." Ex. B at 2. The Numbered Memo also requires that voters are contacted in writing (by mail and by email, where the voter has provided an email address, or by mail and by phone, where the voter has provided a phone number) within one business day of the county board identifying any deficiencies with the absentee ballot. *Id.* at 3. The State Board also ensured that the cure certification could be returned to any county board office by fax, email, in person, or by mail or commercial carrier. *Id.* at 4.

The cure procedure no longer has a process for a hearing at canvass because a hearing serves the function of allowing a voter to contest determinations for which a cure is not possible. Bell Dec., ¶ 10. Because the cure procedure offers a voter the opportunity to cure any deficiencies with the container envelope, there are no more circumstances under which a voter would have to contest rejections. *Id.*

This cure procedure was in place from September 22 to September 30. The Numbered Memo was rolled out and disseminated on September 22. On September 23, the Executive Director held a meeting at which State Board staff trained county board staff on the procedures and processes in the Numbered Memo, including with a Powerpoint presentation. *Id.*, ¶ 14. The staff then held a Q&A session during which they answered all of the county board staffs' questions. *Id.* On September 28, during the Huddle (a weekly meeting with the county boards of elections), the Executive Director again reminded the county boards that Numbered Memo 2020-19 was in place and further reviewed the processes contained in the Memo. *Id.* Throughout the week, State Board staff made themselves available to answer dozens of questions from the county

8

boards, both in writing and by phone, on a daily basis, to ensure consistent application of the Memo across county boards. *Id.*

On September 25, the Executive Director learned that Heather Ford, the North Carolina Election Day Operations Director for the Donald J. Trump for President campaign, had emailed only Republican members of the county boards of elections and had instructed them not to follow the procedures outlined in Numbered Memo 2020-19. *Id.*, ¶ 15.

In response, and to ensure uniformity and consistency across the State, on Monday, September 28, General Counsel to the State Board, Katelyn Love, emailed all 100 county boards of elections to remind them that Numbered Memo 2020-19 had been in effect since September 22. *Id.*, ¶ 16. County boards were reminded that Numbered Memos were direct instructions from the State Board and that they were required to follow Numbered Memo 2020-19. *Id.*

On September 29, county boards began meeting to vote on accepting and rejecting absentee ballots.

The State Defendants believe that they are complying with this Court's injunction. But to avoid any appearance or suggestion that the State Board is in violation of this Court's order, on October 1, the Executive Director issued a Numbered Memo that instructed counties not to take any action on absentee ballot container-return envelopes with a missing signature until further notice. *Id.*, ¶ 17. As of this time, if a voter returns an absentee ballot with a missing signature, county board staff are not acting on it—the voter is not being notified or being sent a cure certification. *Id.*

9

At the same time, as of this morning, the Wake County Superior Court is hearing argument on a joint motion for entry of a consent judgment in a case in which several state elections laws, including the witness requirement, are being challenged under provisions of the North Carolina Constitution. As part of the resolution of that case, the State Board defendants included Numbered Memo 2020-19 in the proposed consent judgment, as that cure procedure had already been instituted. The parties are awaiting the state court's resolution of the joint motion, including of the implementation of Numbered Memo 2020-19.

Because this Court and the state court are both considering issues related to Numbered Memo 2020-19, the State Board has put the implementation of Numbered Memo 2020-19 on hold while it awaits resolution of both cases. The State Board will, of course, comply with all orders entered by both this Court and the state court.

2. This Court need not enjoin any other actions by the State Board for two reasons.

First, the State Board is in full compliance with this Court's order. This Court directed the State Board to not reject any ballots unless there was a law or rule implementing a process that provides voters with notice and an opportunity to be heard before an absentee ballot with a material defect subject to remediation could be rejected. Dkt. 124 at 187.

Numbered Memo 2020-19 performs the function of a rule. Numbered Memos are the usual process by which the State Board, through its Executive Director, instructs and provides guidance to county boards of elections. Bell Dec., ¶ 18. The use of Numbered

10

Memos is a decades-old procedure. The State Board has the authority to remove a county board member for non-compliance with their duties, which includes following the instructions contained in any Numbered Memo. *See* N.C. Gen. Stat. § 163-22(c). The Executive Director is not aware of a county board member ever having been removed for failure to comply with a numbered memo, as county board members always comply. Bell Dec., ¶ 18. Plaintiffs' insistence that the State Board implement its instructions through certain particular procedures elevates form over substance. For all purposes, the Numbered Memo functions in exactly the same way as a rule and is the usual manner in which county boards of elections are given instruction.

This Court's order on injunction also requires that the State Board provide notice to voters whose container envelopes are deficient. Numbered Memo 2020-19 does so. As explained above, the Memo requires that county board staff regularly review envelopes so that they cannot be piled up and backlogged (Ex. B at 2) and that staff contact voters in writing within one business day to notify them of any defects (*id.* at 3). In addition, the Memo requires that county boards use both mail and more immediate forms of contact (email or phone) to notify voters of deficiencies and requires that county boards allow cure certifications to be returned through a number of channels including fax, email, in person, and mail. *Id.* at 4.

Plaintiffs appear to complain that these procedures are insufficient because at least one county board delayed notification of deficiencies to voters pending a county board meeting. But, as discussed above, the State Board immediately dealt with that issue when it became aware of it. The State Board's General Counsel immediately issued

11

direction to county boards that this sort of delay was not permitted. Plaintiffs put forth no other evidence of delay by county boards and rest their objections on speculation. That speculation should not be given credence here.

Plaintiffs also appear to object to several procedures in the initial cure procedure. But that cure procedure is no longer in effect. Accordingly, Plaintiffs' objections to the initial cure procedure, which is no longer in effect, should be denied as moot.

Plaintiffs also claim that the State Board's implementation of the cure procedure has been inconsistent. But that is untrue. For the one week during which it was in effect, the State Board worked to maintain consistent implementation of the procedure. As explained above, the State Board disseminated Numbered Memo 2020-19 on September 22, trained county board staffs on its implementation the very next day, answered numerous calls and emails from individual county board staff members, reviewed the processes again at the next county board Huddle, and sent direction clarifying the scope of the Numbered Memo after a member of the Donald J. Trump for President campaign directed Republican county board members to disregard the memo. The State Board's actions demonstrate that they consistently provided guidance and immediately clarified when they became aware that their guidance was not being followed.

All of the evidence from this time period supports the conclusion that, during this time, the State Board consistently monitored and enforced the application of the Numbered Memo. The "lack of clarity" Plaintiffs object to because there are no explicit provisions for monitorship or enforcement of the Numbered Memo within the Memo itself is based on speculation.

12

Case 1:20-cv-00457-WO-JLW   Document 151   Filed 10/02/20   Page 12 of 16

Plaintiffs also object to the Numbered Memo because it no longer provides for a hearing process to contest curable deficiencies. But a hearing is unnecessary here because the Numbered Memo allows a voter to cure all container-envelope deficiencies through certification, thereby satisfying due process. Ex. B at 4; *see also Zessar v. Helander*, No. 05-cv-1917, 2020 WL 642646, at *9 (N.D. Ill. Mar. 13, 2006) (holding that a process that allows for an affidavit form to be created and sent to rejected absentee voters, who could then return it in person or by mail or fax, sufficiently counted as a "hearing" under the Due Process Clause).

Moreover, there are a number of logistical and administrative reasons why a hearing, outside of the canvass meeting, would be difficult to administer. Because canvass is statutorily mandated to take place at 11 a.m. on the tenth day after the election—the first day all county board members will be present after the last day for votes to be returned before the deadline—the hearing date would need to be fixed for that day as well. Bell Dec., ¶ 11. And there would be no ability to offer remote participation because the voter must be present to inspect the container envelope being challenged. *Id.* In addition, remote hearings would be impossible to administer securely because, without the voter present, county boards would have no way of determining whether the person remotely attending is the voter and is authorized to make representations to the county board at the hearing. *Id.*

In sum, this Court's order prohibits rejection of ballots until a cure procedure that offers notice and an opportunity to cure is in place. Numbered Memo 2020-19 complies with that direction. Therefore, no further restraint or injunction is required here.

13

Second, consideration of whether Numbered Memo 2020-19 comports with the witness requirement under state law is beyond the scope of this Court's jurisdiction. Where a challenge to a state official's action is made on the basis of state law, sovereign immunity bars a federal court from granting relief. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 124-25 (1984) ("[T]he federal courts lack[ ] jurisdiction to enjoin . . . state officials on the basis of . . . state law."). "[S]overeign immunity . . . bars a court's grant of any type of relief . . . based upon a State official's violation of State law." *Bragg v. W. Va. Coal Ass'n*, 248 F.3d 275, 293 (4th Cir. 2001); *see also Pennhurst*, 465 U.S. at 106, 124-25. Indeed, "it is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law." *Pennhurst*, 465 U.S. 89, 106.

An objection to the State Board's Numbered Memo on the basis that it violates the witness requirement would be barred by this rule. This Court does not have jurisdiction to restrain the use of the Numbered Memo on the ground that the State Board's actions exceeded the authority it enjoys under state law. Any injunction or restraining order this Court enters against the State Board therefore "contravenes the Eleventh Amendment." *Pennhurst*, 456 U.S. at 117; *see also id.* at 106 ("A federal court's grant of relief against state officials on the basis of state law . . . conflicts directly with the principles of federalism that underlie the Eleventh Amendment.").

Accordingly, because the State Board is complying with this Court's injunction and this Court does not have jurisdiction to find that the State Board's actions exceed its authority under state law, no further injunction or restraint is required here.

14

3. A curable defect is any defect that a voter can correct without having to spoil their ballot and complete a new one or voting in person. It is the State Board's view that the following are curable defects: problems with the witness/assistant signature, problems with the witness/assistant's name and contact information, and problems with the voter signature. Ex. B at 2. As explained above, the witness signature is a curable defect because there are other ways for a voter to confirm that she is the one who voted the ballot—the purpose of the witness signature provision for absentee ballots. The initial cure procedure only addressed some of these defects, namely problems with the voter signature. In addition, and as discussed above, data showed that the initial cure memorandum appeared to result in unintended consequences of disproportionately rejecting the ballots of voters of color. Therefore, the initial cure memorandum was insufficient to cure all defects and may, unwittingly, have contributed to the deprivation of the right to vote for specific protected groups within North Carolina's voting population. Accordingly, the initial cure memorandum was an insufficient cure procedure to comply with this Court's injunction as well as the State Board's other legal obligations.

4. The State Defendants believe that Numbered Memo 2020-19 does not improperly eliminate the witness requirement. All voters still need to abide by the witness requirement, as they do the voter signature requirement. If a voter makes an error with regard to the witness requirement, the voter is able to cure her ballot only by taking extra steps that she would not have had to take if she had met the witness requirement. The same process is true of the voter signature requirement—where a voter

makes a mistake with the voter signature requirement, the voter is able to cure her ballot only by taking extra steps that she would not have had to take had she met the voter signature requirement. For the voter to complete these extra steps, the county board of elections must reach out to the voter, separately and directly, using the contact information the voter provided in her absentee ballot request form, and provide a cure form directed specifically to that voter. The voter must then attest that she is the one who marked her ballot by returning a separate certification, fulfilling the purpose of the witness requirement. Therefore, Numbered Memo 2020-19 does not improperly eliminate the witness requirement.

But even if it had, this Court does not have jurisdiction to issue a restraining order against the State Defendants for having eliminated the witness requirement in a manner inconsistent with state law because sovereign immunity forbids it. *See supra* Answer to Question 2.

This the 2nd day of October, 2020.

JOSHUA H. STEIN
Attorney General

/s/ Alexander McC. Peters
Alexander McC. Peters
N.C. State Bar No. 13654
Chief Deputy Attorney General
Email: apeters@ncdoj.gov

N.C. Dept. of Justice
Post Office Box 629
Raleigh, NC 27602
Telephone: (919) 716-6900
Facsimile: (919) 716-6763

16

Case 1:20-cv-00457-WO-JLW   Document 151   Filed 10/02/20   Page 16 of 16