DEMOCRACY NORTH CAROLINA, THE LEAGUE OF WOMEN VOTERS OF NORTH CAROLINA, DONNA PERMAR, JOHN P. CLARK, MARGARET B. CATES, LELIA BENTLEY, REGINA WHITNEY EDWARDS, ROBERT K. PRIDDY II, WALTER HUTCHINS, AND SUSAN SCHAFFER,

       *Plaintiffs,*

       *vs.*

THE NORTH CAROLINA STATE BOARD OF ELECTIONS; DAMON CIRCOSTA, in his official capacity as CHAIR OF THE STATE BOARD OF ELECTIONS; STELLA ANDERSON, in her official capacity as SECRETARY OF THE STATE BOARD OF ELECTIONS; KEN RAYMOND, in his official capacity as MEMBER OF THE STATE BOARD OF ELECTIONS; JEFF CARMON III, in his official capacity as MEMBER OF THE STATE BOARD OF ELECTIONS; DAVID C. BLACK, in his official capacity as MEMBER OF THE STATE BOARD OF ELECTIONS; KAREN BRINSON BELL, in her official capacity as EXECUTIVE DIRECTOR OF THE STATE BOARD OF ELECTIONS; THE NORTH CAROLINA DEPARTMENT OF TRANSPORTATION; J. ERIC BOYETTE, in his official capacity as TRANSPORTATION SECRETARY; THE NORTH CAROLINA DEPARTMENT OF HEALTH AND HUMAN SERVICES; MANDY COHEN, in her official capacity as SECRETARY OF HEALTH AND HUMAN SERVICES,

       *Defendants,*

PHILIP E. BERGER, in his official capacity as PRESIDENT PRO TEMPORE OF THE NORTH CAROLINA SENATE; TIMOTHY K. MOORE, in his official capacity as SPEAKER OF THE NORTH CAROLINA HOUSE OF REPRESENTATIVES,

Civil Action
No. 20-cv-457

1

*Defendant-Intervenors.*

## PLAINTIFFS' MOTION FOR AFFIRMATIVE RELIEF

### Introduction

The rules under which the 2020 presidential election are conducted were set on August 4, 2020, when this Court entered a preliminary injunction. All voters participating in this election via absentee by mail received and will cast a ballot with an application that states a witness is required, and with this Court's intervention, they did so with reassurances that if they made a mistake on their ballot, they would receive notice and an opportunity to cure that mistake.

To be sure, much administrative work is yet to be done to ensure the election is conducted in a manner consistent with the due process protections guaranteed by this Court, and Plaintiffs have assiduously been working to push the State Board of Elections to put in place safeguards to ensure that voters with unaccepted absentee ballots receive notice and an opportunity to be

2

heard. And while the State Board has made some progress, those negotiations have failed to ensure that not only will every North Carolina absentee voter who casts a deficient absentee ballot be notified about that mistake, but that voter will also have an opportunity to be heard (or cure) that ballot before it is rejected. Thus, this Court's action is now required to ensure North Carolinians' due process rights are more than just an illusory promise.[1]

## Statement of Facts

### I. The Cure Procedures In Numbered Memo 2020-19

On August 4, 2020, this Court issued a preliminary injunction order, which ordered the following relief:

> IT IS ORDERED that Defendants, including the North Carolina State Board of Elections, are PROHIBITED AND ENJOINED from the disallowance or rejection, or permitting the disallowance or rejection, of absentee ballots without due process as to those ballots with a material error that is subject to remediation. This injunction

---

[1] Plaintiffs have styled this action for relief as a Motion for Affirmative Relief, in accordance with this Court's October 2, 2020 Order (ECF 152), but also incorporate herein, without any waiver, the arguments made in Plaintiffs' Motion to Enforce (ECF 147), and documents submitted in support thereof, and renew that motion to the extent the relief sought therein are not read to be included in this Motion.

shall remain in force until such time as Defendants implement a law or rule which provides a voter with notice and an opportunity to be heard before an absentee ballot with a material error subject to remediation is disallowed or rejected.

ECF No. 124, at 187.

Executive Director Bell first issued Numbered Memo 2020-19 on August 21, 2020, directing North Carolina's county boards of elections as to the processing of absentee ballots. In its original form, Numbered Memo 2020-19 required that counties identify any deficiencies with the absentee ballot envelopes that can be fixed (such as voter or witness information issues), directing counties to notify any voter of any such deficiencies with their ballots, and providing voters an opportunity to "cure" such deficiencies. ECF No. 148-3 ("Numbered Memo 2020-19"). The August 21, 2020 version of Numbered Memo 2020-19 provided a procedure for voters to submit a "Cure Affidavit" to fix any deficiencies in voter information but required voters to submit a new ballot for any deficiencies in witness information. *Id.* at 3. The SBOE issued the cure process set forth in Numbered

4

Memo 2020-19 in part to comply with this Court's preliminary injunction order.

On September 22, 2020, SBOE Executive Director Bell issued a revised version of Numbered Memo 2020-19. ECF No. 143-1, Revised Numbered Memo 2020-19. The revised memo included, among other revisions, two changes to the cure process that plaintiffs in the actions *Moore* and *Wise* (discussed further *infra*) allege violate Art. I, § 4, Art. II, § 1, and the Fourteenth Amendment of the U.S. Constitution: (1) allowing the voter to cure any witness information issues using a new "Cure Certification", and (2) extending the absentee ballot receipt deadline by nine days to November 12, 2020.

## II. The *Moore* and *Wise* Actions Challenging Numbered Memo 2020-19

On August 10, 2020, the North Carolina Alliance for Retired Americans and individual voters brought suit in state court, challenging many of the same election statutes under the North Carolina Constitution. *N.C. Alliance for Retired Americans v. State of North Carolina*, No. 20-CVS-8881 (Wake Cnty. Super. Ct.) ("N.C.

5

Alliance"). Legislative Defendants intervened as defendants. *See id.*, ECF No. 9 at 5. In response to the N.C. Alliance, on September 22, SBOE Defendants revised Numbered Memorandum 2020-19, in addition to issuing two new memoranda—Numbered Memorandum 2020-22 and Numbered Memorandum 2020-23—and filed a joint motion for entry of a consent judgment with the N.C. Alliance plaintiffs, providing:

> For the 2020 elections, ***Executive Defendants shall institute a process to cure deficiencies that may be cured with a certification from the voter in accordance with the procedures set forth in Numbered Memo 2020-19*** (attached as Exhibit B). Curable deficiencies include: no voter signature, misplaced voter signature, no witness or assistant name, no witness or assistant address, no witness or assistant signature, and misplaced witness or assistant signature. If a county board office receives a container-return envelope with such a curable deficiency, it shall contact the voter in writing by mail and, if available, email, within one business day of identifying the deficiency, informing the voter that there is an issue with their absentee ballot and enclosing a cure certification. The written notice shall be sent to the address to which the voter requested their ballot be sent. The cure certification must be received by the county board of elections by no later than 5 p.m. on Thursday, November 12, 2020, the day before county canvass. The cure certification may be submitted to the county

> board office by fax, email, in person, or by
> mail or commercial carrier.

*Moore v. Circosta*, 1:20-cv-00911-WO-JLW, ECF No. 1-2 at 21 (emphasis added). Thus, under the consent judgment, SBOE Defendants revised Memorandum 2020-19 such that defects in a witness certification—which had previously been identified as issues that could not be cured—could now be cured by a voter by submitting an affidavit. *Compare* ECF No. 148-3, Numbered Memo 2020-19 *with* ECF No. 143-1 (Revised "Numbered Memo 2020-19").

Rather than appealing the consent judgment, however, Legislative Defendants filed another action in the Eastern District, alleging that Memoranda 2020-19 (as revised on September 22), 2020-22 and 2020-23 violated the Legislature's power under Article I, Section IV, Clause 1 ("Elections Clause") of the U.S. Constitution to enact election laws, and the individual Plaintiffs' rights under the Equal Protection Clause of the Fourteenth Amendment. *See Moore*, 1:20-cv-00911-WO-JLW, ECF No. 1, ¶¶ 76-96. They also filed a motion for a

temporary restraining order, seeking in relevant part an order "[e]njoining Defendants from enforcing and distributing Numbered Memo 2020-19 or any similar memoranda or policy statement that does not comply with the requirements of the Elections Clause" or "the Equal Protection Clause.' *See* Motion for Temporary Restraining Order, *Moore*, 1:20-cv-00911-WO-JLW, ECF No. 9 at 23-24.

Concerned that plaintiffs in *Moore*, some of whom are Legislative Defendants in this case, sought to enjoin Memorandum 2020-19 in its entirety—and with it, the cure process ordered by this Court, the Plaintiffs here (Proposed Intervenor-Defendants in *Moore*), contacted Legislative Defendants' counsel seeking clarification as to the scope of the requested relief. ECF No. 148-14 (Email exchange between Nicole Moss and Hilary Klein). Legislative Defendants' counsel refused to disclaim an intent to enjoin Numbered Memo 2020-19 in its entirety, including those provisions that were issued on August 21, as opposed to only the modifications that had been made pursuant to the North Carolina Alliance litigation and

8

which appeared in the September 22 revisions to Numbered Memorandum 2020-19. *Id*.

Also on September 26, 2020, a simultaneous suit challenging Numbered Memo 2020-19 was filed in the Eastern District of North Carolina by the Republican National Committee, National Republican Senatorial Committee, National Republican Congressional Committee, and North Carolina Republican Party (all of which had moved unsuccessfully to intervene in this action, *see* Order Denying Motion to Intervene, ECF. No. 48), Donald J. Trump for President, Inc., Republican Congressmen Gregory F. Murphy and Daniel Bishop, and several individual voters. The *Wise* action also challenged the SBOE's Memoranda, including Numbered Memo 2020-19, on Constitutional and other grounds. *See generally Wise v. N.C. State Board of Elections*, 1:20-cv-00912-WO-JLW, ECF No. 1. The *Wise* Plaintiffs also moved for a temporary restraining order. *Id.*, ECF No. 3.

On October 2, 2020, Judge Dever of the E.D.N.C. held a hearing regarding the outstanding motions in the *Moore*

and *Wise* actions, including the motion for a temporary restraining order, and on October 3, 2020, Judge Dever granted the two motions for a temporary restraining order and ordered that both the *Wise* and *Moore* cases be transferred to this Court. *See Wise*, 1:20-cv-00912-WO-JLW, ECF Nos. 17 (Order Setting Hearings), 25 (Order); *Moore*, 1:20-cv-00911-WO-JLW, ECF No. 47 (Order).

## Relief Sought

For the reasons articulated in the Argument section below, Plaintiffs request that this Court order the State Board of Elections to issue a directive to the County Boards of Elections that, <u>at a minimum</u>:

1. Permit voters to cure deficiencies whereby the voter did not sign the Voter Certification or signed their container-return envelope on the wrong line, or the voter's witness or assistant did not print his or her address or signed the container-return envelope on the wrong line;

2. Prohibit county boards of elections from rejecting, classifying as deficient, or otherwise requiring

10

further action from a voter who submitted an absentee ballot where the voter's witness or assistant listed a Post Office box address instead of a residential address, or omitted certain address information but can otherwise be determined;

3. Require county boards of elections to regularly review container-return envelopes on each business day and take prompt action the following business day to notify voters of any ballot deficiencies;

4. Require that, where a material error is detected and can be cured, notice and a cure certification be sent to the address to which the voter requested their ballot be sent;

5. Require that, in addition to sending notice and a cure certification to the voter's request address, a cure certification be sent to the voter at any email address on file with the county board of elections;

6. Require that, in addition to sending notice and a cure certification to the voter's requested address,

and where the voter does not have an email address on file with the county board of elections, but does have a phone number on file or a phone number is otherwise available, the county board of elections contact the voter by phone to inform the voter that the county board has mailed the voter a cure certification;

7. Require that, where a material error is detected and cannot be cured, the county board of election promptly spoil that absentee ballot and issue a new ballot to the voter and provide prompt notice about the reason for the spoilation/rejection along with the new ballot;

8. Require that, in addition to issuing a new ballot, notice be sent to the voter at the email address on file with the county board of elections that a new ballot has been issued to the voter;

9. Require that, in addition to issuing a new ballot, and where the voter does not have an email address on file with the county board of elections, but does

12

have a phone number on file or a phone number is
otherwise available, the county board of elections
contact the voter by phone to inform the voter that
a new ballot has been issued to the voter; and

10.    Require that any voter whose ballot is deemed by
the county board of elections to be deficient  such
that it must be rejected under North Carolina law
also be offered the chance for the voter or their
representative to be heard either in person or
remotely by video or teleconference by the board
before the ballot is officially rejected, so that
the voter may contest either the designation of the
ballot as deficient or otherwise defend their ballot.

Plaintiffs also request that this Court retain
jurisdiction to ensure compliance and uniform application
and clarify that the State Board of Elections may take
further action in addition to what is enumerated above
to ensure that the Due Process rights of absentee voters
are guaranteed and to further ensure the orderly

13

operation of elections processes during the 2020 election.

## Argument

**III. Further direction from this Court to State Defendants is necessary to ensure that this Court's August 4 Order protects the due process rights of North Carolina absentee voters.**

Plaintiffs have done their utmost to work constructively with the State Defendants to effectuate full relief from likely due process violations for absentee voters who submit a deficient ballot and to avoid burdening this Court with excess or unripe motions practice. But the State Defendants still fall short of ensuring that the due process guarantee recognized by this Court is made meaningful for all holders of that right. Negotiations with them have failed, and litigation outside Plaintiffs' control, including a recent state court consent decree and two new federal lawsuits now before this Court, have introduced confusion. That is why Plaintiffs acted early last week to seek from this Court resolution of this intractable conflict.

14

To be sure, Plaintiffs have been upfront with their advice to the State Defendants, one of the parties tasked with the responsibility of developing procedures consistent with due process, about what kinds of processes and procedures would most fully effectuate this Court's injunction. From the outset, Plaintiffs have consistently advocated for the State Board of Elections and county election boards to (1) seek every avenue possible to notify voters of a deficient ballot, including e-mail, phone, and mail; (2) set deadlines for initial review of absentee ballots to identify deficiencies, notifying voters, and providing opportunities to cure; (3) provide fulsome opportunities for remote cure options; and (4) deem a broad number of categories of deficient absentee ballots curable. ECF Nos. 148-2 (Letter to State Defendants, Aug. 12, 2020), 148-4 (Letter to State Defendants, Aug. 26, 2020). To be sure, Plaintiffs have recognized that some errors made by voters are not curable – notably, duplicate ballots, absentee ballots in the wrong envelope, multiple absentee

15

ballots in one envelope or omission of the ballot from the envelope, or unsealed envelopes. ECF No. 148-2, at 4. This is consistent with this Court's view that not every deficient absentee ballot is curable. ECF No. 152, at 7-8.

Both versions of Numbered Memo 2020-19 have provided some elements of further compliance with the injunction in place, and yet, both were insufficient. Significantly, while the revised 2020-19 Memorandum provided full relief on the initial notice that must be provided to voters who cast deficient absentee ballots (initial notice was deficient in the original memo), it inexplicably omitted an opportunity for voters to be heard at county board canvasses, which was provided for in the first version of the numbered memo. And neither numbered memo provided any guidance on the steps the State Board will take to ensure compliance with its guidance or the injunction. *See generally* ECF No. 148, Plaintiffs' Memorandum in Support of Motion to Enforce.

16

As this Court noted, Plaintiffs did not offer a formal definition of the term "material error subject to remediation" in its letters and correspondence to the SBOE. ECF No. 152, at 7-8. Indeed, this Court instructed Defendants in this case, not Plaintiffs, to develop a "law or rule" to provide due process guarantees consistent with the preliminary injunction order. ECF No. 124, at 187. The North Carolina General Assembly convened for two days starting on September 2, 2020, and passed no such law, S.J. Res. 873, 2019 Sess. (N.C. 2019) (enacted), leaving that pre-existing delegated authority in the hands of the State Board of Elections and its Director. *Id.*[2] Importantly, North Carolina state law confers upon the Director the authority to provide guidance to the counties, and this guidance does not

---

[2] The convening of the General Assembly after the issuance of the first version of Numbered Memo 2020-19 and failure to override statutorily any of its provisions must certainly be read at bare minimum the concession that the State Board Director had the authority to issue such numbered memo (thus negating any suggestion that the issuance of numbered memos creates Elections Clause conflict) and, more significantly, that the Director has the authority to set the terms of remedial action to comply with the preliminary injunction.

carry the weight of a law or rule. *See* ECF No. 148, at 14. As such, the numbered memo at issue just clarified previously-unsettled law and did not create it.

It is important that this Court recognize that the data necessary for Plaintiffs in this case to monitor compliance with this Court's preliminary injunction and for this Court to assess the claims raised in the *Moore* and *Wise* actions, exists behind a veil and is not disclosed in a transparent manner. The State Board's coding practices for absentee ballots are problematic and prevent a timely, accurate assessment of the State Defendants' compliance and consistency. Significantly, one of the categories of absentee ballots that are not accepted and queued for rejection is "WITNESS INFO INCOMPLETE." This category is, of course, central to the dispute here.[3] But that code or label lacks differentiation and fails to disaggregate into the more specific defects beyond a missing witness signature,

---

[3] Central, but not exclusive: Plaintiffs seek to ensure that the notice guaranteed by this Court's order is fully respected, which does not implicate the categories of absentee ballots which are subject to remediation.

including: (1) when the witness signature is in the wrong place, (2) when the witness' zip code is missing from the information provided, (3) when the county board may mistakenly interpret a P.O. Box address as unacceptable, and (4) potentially more. There is simply no evidence in the record as to how many of the ballots coded as "WITNESS INFO INCOMPLETE" are ones where the voter failed to obtain a witness at all. This Court should not enjoin a legal administrative action—so deemed by a state court judge—taken by the Director of the State Board of Elections, based on speculation. It is entirely possible that no voter has yet completely failed to obtain a witness for his or her absentee ballot, and many ballots may be categorized as "WITNESS INFO COMPLETE" where the voter did indeed have a witness. Because there is no record to the contrary before this Court, the Court should not treat the whole category as incurable.

That the Plaintiffs seek more clarification and guidance from the State Defendants, and the full weight of the injunctive relief ordered by this Court, does not

19

mean the thus-far inadequate relief is illegal or inappropriate. It needs to be supplemented, not enjoined, because it provides the floor, not the ceiling, to Plaintiffs' due process rights. To the extent the Court finds any independent violations of federal constitutional guarantees as to specific provisions in Numbered Memo 2020-19, then this Court must enjoin those specific provisions *and go no further*.

The proper remedy for the alleged constitutional violations in *Moore* and *Wise*, which have been transferred to this Court, is to enjoin the parts of Numbered Memo 2020-19 that they allege are unconstitutional, not the whole, for the same reason a court never enjoins an entire statute or an entire regulation, when enjoining a specific provision will suffice to cure the alleged legal violation. Well-settled precedent dictates that injunctive relief may reach no farther than is necessary to redress a legal violation: "It is well established that 'injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief

20

to the plaintiffs.'" *Kentuckians for Commonwealth, Inc. v. Rivenburgh*, 317 F.3d 425, 436 (4th Cir. 2003) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)); *Roe v. U.S. Dep't of Def.*, 947 F.3d 207, 231 (4th Cir. 2020), *as amended* (Jan. 14, 2020) (same in regards to preliminary injunctions). The Fourth Circuit has further explained that "[a]n injunction should be carefully addressed to the circumstances of the case." *Va. Soc'y for Human Life v. FEC*, 263 F.3d 379, 393 (4th Cir. 2001) (citing *Hayes v. N. State Law Enf't Officers Ass'n*, 10 F.3d 207, 217 (4th Cir. 1993) ("Although injunctive relief should be designed to grant the full relief needed to remedy the injury to the prevailing party, it should not go beyond the extent of the established violation") (emphasis added)).

Under these binding precedents, the only appropriate remedy for these alleged constitutional violations is to enjoin specific provisions or add specific provisions and requirements to Numbered 2020-19 to bring it into conformity with all federal legal requirements and

21

judicial orders. But there is no legal claim or basis in this action to enjoin Numbered Memo 2020-19 on its face.

To the extent Legislative Defendants believe any administrative action or guidance of the State Defendants violates state law, the proper venue for that claim is state court, as this Court of course has no jurisdiction to resolve such disputes.

## IV. *Purcell* is inapplicable in this context and neither grounds for denying Plaintiffs the relief sought nor for invalidating Numbered Memo 2020-19.

While Plaintiffs submitted a Motion to Enforce just a few hours after this Court's order requesting briefing, *see* ECF No. 148, at 2-3, the Motion was in the works long before this Court's order and was filed on that date for two reasons: (1) the *Purcell* principle is not implicated, or at least not yet significantly, by continuing developments on post-election absentee ballot counting, see below at subsection 1; and (2) litigants should avoid motions practice on unripe issues, particularly where negotiation might resolve the dispute. *Abbott Laboratories v. Gardner*, 387 U.S. 136, 148-49 (1967). It

22

is Plaintiffs' understanding from review of the absentee data file that not a single absentee ballot has been rejected yet – some have yet to be accepted or marked for cure, but because there have been no absentee ballot rejections, the matter was unripe for a motion to enforce.

1. *Purcell* is not applicable here because there is no election law change implicated, and the status quo remains, legally speaking, as it was when voting started on September 4.

As the numbered memos are inadequate because they do not constitute "rules or laws," ECF No. 148, at 14, no change to these memos can trigger the operation of *Purcell*. There are countless decisions that factor into the administration of an election, particularly during a pandemic, and not all of them trigger the considerations raised in *Purcell*.

Guidance from the First Circuit is particularly instructive. In *Rossello-Gonzalez v. Calderon-Serra*, 398 F.3d 1, 2004 WL 3143501 (1st Cir. Dec. 15, 2004), *as corrected* (Jan. 28, 2005), the First Circuit reviewed an injunction entered prohibiting the adjudication

23

(counting) of ballots where voters marked the ballot for multiple candidates in a race on the ballot, instead of just one candidate.

Concurring in the judgment, Judge Howard noted that, "citing *Partido Nuevo Progresista v. Barreto Perez*, 639 F.2d 825, 827-28 (1st Cir. 1980), we have emphasized that the 'change of rules' claim fails because. . . . [O]n the pleadings and the record, only one conclusion is possible: the Commission's ruling involved only the *clarification* of previously unsettled law. In my view, this is not a 'change in the rules' sufficient to implicate federal interests." *Rossello-Gonzalez*, 2004 WL 3143501, at *20 (Howard, J., concurring); *Bonas v. Town of N. Smithfield, 265 F.3d 69,* 74 (1st Cir. 2001) *(quoting Griffin v. Burns*, 570 F.2d 1065, 1076 (1st Cir. 1978)) (where the First Circuit authorized federal court intervention in elections where the disputed election administration decision involved the disenfranchisement of a discrete group of voters, as opposed to a situation where the disputed election administration

24

decision actually enfranchised voters). Furthermore, in
*Barreto Perez,* 639 F.2d at 828, challengers of the
election practice at issue claimed that "votes were
'diluted' by the votes of others, not that they
themselves were prevented from voting."

Moreover, administrative action to ensure uniformity
in county boards' action taken over the course of an
election, to conform with an injunctive order entered
three months before the election, should be encouraged,
not barred or discouraged, under *Purcell*. *Purcell* stands
for the proposition that courts must weigh the risk of
voter confusion and "consequent incentive to remain away
from the polls," *Purcell v. Gonzalez*, 549 U.S. 1, 4-5
(2006), when assessing whether to change a voting
regulation close to an election. It is *not* a per se
prohibition on late-breaking injunctions. And here, the
injunction was put in place in early August. Voters were
told two months ago, one month before voting began, that
they would be given an opportunity to correct mistakes
with their absentee ballots, and the State Board should

25

continue to issue guidance to ensure county-level
compliance with the numbered memos. Over three hundred
thousand voters have cast absentee ballots to date, and
tens of thousands have been received in the nearly two
weeks in which the state board's additional guidance on
cure procedures was in effect. *See Griffin v. Burns*, 570
F.2d 1065 (1st Cir. 1978) (injunction of election process
would unconstitutionally deprive citizens who voted
according to the procedures that were in place at the
time of their right to vote).

2. *Purcell* counsels against a federal court order here
limiting the preliminary injunctive relief granted
months before the election began.

In fact, regardless of the Court's view of the
constitutional questions raised by Legislative
Defendants (Plaintiffs in the *Moore* action) and others,
the only way in which *Purcell* is even remotely applicable
in the instant situation is in a way which counsels
*against* this federal court now entering a new injunction
just days before Election Day. In *Purcell*, the Supreme
Court noted that, "Court orders affecting elections,

26

*especially conflicting orders* . . . can themselves result in voter confusion and consequent incentive to remain away from the polls," and thus warned district courts to be wary of issuing such injunctions. 549 U.S. at 4-5 (emphasis added). Here, this Court ordered relief to ensure that the state's election machinery respected absentee voters' due process rights and did so over two months ago. An order now enjoining one of the ways in which the State Defendants have responded to that order is certainly such a "conflicting order[]." *Id.*

**V.** **The constitutional questions raised before this Court do not render Numbered Memo 2020-19 illegal and should not be used as a basis to enjoin it.**

In the briefing before this Court and in the two cases previously before Judge Dever in the Eastern District of North Carolina and now before this Court, *see generally, Wise* 1:20-cv-00912-WO-JLW; *Moore,* 1:20-cv-00911-WO-JLW, none of the constitutional claims state any legally cognizable claims by parties with standing to raise them, and should be dismissed. Likewise, without

27

grounds to stand on their own, those claims also cannot be used to justify injunctive relief from this Court.

In particular, the plaintiffs in *Moore* and *Wise* describe a theory of Equal Protection that is unsupported by the law and is fundamentally inconsistent with any change to a voting law, practice or procedure that opens the ballot box to more voters. That is, under the challengers' theory, any time more voters have their votes counted, challengers suffer an injury to the weight of their vote. Federal courts do not recognize this as a cognizable form of vote dilution.

This is not a vote dilution case like in the malapportionment case upon which they rely. In *Reynolds v. Sims*, the Supreme Court distinguished vote dilution from voter disenfranchisement, noting "the right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." 377 U.S. 533, 555 (1964). In the malapportioned districting plan challenged in *Reynolds*, all voters had

28

an equal vote, but district lines were drawn in such a way as to grossly skew the relative *weight* of the votes. Indeed, the Supreme Court has recently recommitted to a definition of "vote dilution" that does not support a claim as made here. *See, e.g., Abbot v. Perez*, 138 S. Ct. 2305, 2314 (2018) (defining "vote dilution" as "'invidiously … minimizing or cancel[ing] out the voting potential of racial or ethnic minorities'") (quoting *City of Mobile v. Bolden*, 446 U.S. 55, 66-67 (1980) (plurality opinion)); *see also, Paher v. Cegavske*, --- F. Supp. 3d ---, 2020 WL 2089813, at *5 n.7 (D. Nev. Apr. 30, 2020) ("Even if the Court had concluded . . . there was a violation of Nevada law in the implementation of the all-mail provisions . . . , the Court finds that Plaintiffs have not established a nexus between such alleged violations and the alleged injury of vote dilution."); *Am. Civil Rights Union v. Martinez-Rivera*, 166 F. Supp. 3d 779, 789 (W.D. Tex. 2015) (finding "the risk of vote dilution" to be "speculative and, as such, more akin to

29

a generalized grievance about the government than an injury in fact.").

Here, the cure process this Court ordered to vindicate North Carolina voters' due process rights prevents disenfranchisement and manifestly does not weight any votes differently from any other . Even if the cure procedure were clarified or modified in one direction or another, this relief still would not dilute any voter vis-à-vis any other voter. Some voters might need to cast new ballots upon spoliation of the first ballot, while others' ballots might be cured and counted, but in no circumstances would any votes be unequally weighted.

Moreover, the Equal Protection theory posited by the challengers of Numbered Memo 2020-19 would be a slippery slope. Federal courts general avoid invitations to "adjudicate every state election dispute, and the elaborate state election contest procedures, designed to assure speedy and orderly disposition of the multitudinous questions that may arise in the electoral

30

process…," *Gamza v. Aguirre*, 619 F.2d 449, 453 (5th Cir. 1980); *see also Hutchinson v. Miller*, 797 F.2d 1279, 1283 (4th Cir. 1986) ("[c]ircuit courts have uniformly declined to endorse action under § 1983 with respect to garden variety election irregularities.") (quoting *Griffin v. Burns*, 570 F.2d 1065, 1076 (1st Cir. 1978)); *Acosta v. Democratic City Comm.*, 288 F. Supp. 3d 597, 643 (E.D. Pa. 2018) ("'[G]arden variety election irregularities' are not actionable under § 1983."). More perversely, the "vote dilution" theory articulated by challengers—absent any evidence that the new votes are improper under the law—would actually act to create constitutional "harms" in every place and in every situation where additional votes were counted or citizens enfranchised. That would be an untenable application of a constitutional provision that has been applied consistently, outside *Bush v. Gore*, where it was limited to the facts, to count ballots from eligible voters, not discount them.

31

The administrative policy that is being challenged here "does not burden anyone's right to vote. Instead, it makes it easier for some voters to cast their ballots," which does not implicate the Equal Protection concerns that animate the voting rights cases brought by voters whose franchise is burdened. *Short v. Brown*, 893 F.3d 671, 677 (9th Cir. 2018).

*Bush v. Gore* does not change the constitutional Equal Protection analysis here. The very constitutional flaw identified by the *Bush* Court—a manual recount of ballots without any "[substantive] standards to ensure its equal application," 531 U.S. 98, 106 (2000)—is precisely the kind of injury avoided by the numbered memos at issue, and courts after *Bush* have so held. *See, e.g., Lemons v. Bradbury*, 538 F.3d 1098, 1106 (9th Cir. 2008) (holding that "[e]ven were *Bush* applicable to more than the one election to which the Court appears to have limited it," formal guidance from the Secretary of State to county election boards "would be sufficiently uniform and specific to ensure equal treatment of voters."); *In re*

32

*Contest of Gen. Election Held on Nov. 4, 2008 for Purpose of Electing a U.S. Senator from Minn.*, 767 N.W.2d 453, 466 (Minn. 2009), (rejecting an Equal Protection challenge to counties' admittedly divergent procedures for counting ballots because "there were clear statutory standards for acceptance or rejection of absentee ballots," and the Secretary of State's office provided "common training" to all county election officials).

Likewise, *Bush* did not alter the governing constitutional standard that, except in the case of *Anderson-Burdick* claims, requires Plaintiffs to plead and prove an intent by state actors to discriminate against them before finding an Equal Protection violation. *Washington v. Davis*, 426 U.S. 299 (1976). This is well-established in federal courts, see *Lyman v. Baker*, 954 F.3d 351, 369-70 (1st Cir. 2020); *Lecky v. Va. State Bd. of Elections*, 285 F. Supp. 3d 908 (E.D. Va. 2018) (Ellis, J.).

## Conclusion

Plaintiffs respectfully request that this Court order the State Board of Elections to take the actions described above to ensure North Carolina voters' constitutional right to due process. Similarly, Plaintiffs urge adoption of a broad interpretation of ballots subject to remediation.

Dated: October 5, 2020.

Respectfully submitted,

/s/ Jon Sherman
Jon Sherman
D.C. Bar No. 998271
Michelle Kanter Cohen
D.C. Bar No. 989164
Cecilia Aguilera
D.C. Bar No. 1617884
FAIR ELECTIONS CENTER
1825 K St. NW, Ste. 450
Washington, D.C. 20006
Telephone: (202) 331-0114
Email:
jsherman@fairelectionscenter.org
mkantercohen@fairelectionscenter.org
caguilera@fairelectionscenter.org

/s/ Allison J. Riggs
Allison J. Riggs (State Bar #40028)
Jeffrey Loperfido (State Bar #52939)
Hilary Klein (State Bar #53711)
Southern Coalition for Social Justice
1415 West Highway 54, Suite 101
Durham, NC 27707
Telephone: 919-323-3380
Facsimile: 919-323-3942
Email:
Allison@southerncoalition.org
jeff@southerncoalition.org

/s/ George P. Varghese
George P. Varghese (Pa. Bar No. 94329)
Joseph J. Yu (NY Bar No. 4765392)
Stephanie Lin (MA Bar No. 690909)
Rebecca Lee (DC Bar No. 229651)
Richard A. Ingram (DC Bar

34

No. 1657532)
WILMER CUTLER PICKERING HALE AND
DORR LLP
60 State Street
Boston, MA 02109
Telephone: (617) 526-6000
Facsimile: (617) 526-5000
Email:
george.varghese@wilmerhale
    .com
joseph.yu@wilmerhale.com
stephanie.lin@wilmerhale.c
    om
rebecca.lee@wilmerhale.com
rick.ingram@wilmerhale.com

## WORD CERTIFICATION

Pursuant to Local Rule 7.3(d)(1), the undersigned certifies that the word count for Plaintiffs' Motion for Affirmative Relief is 5512 words. The word count excludes the case caption, signature lines, cover page, and required certificates of counsel. In making this certification, the undersigned has relied upon the word count of Microsoft Word, which was used to prepare the brief.

*/s/ George P. Varghese*

George P. Varghese

## CERTIFICATE OF SERVICE

The undersigned counsel hereby certifies that, on October 5, 2020, Plaintiffs' Motion for Affirmative Relief was served on all counsel of record by electronic filing via the CM/ECF system.

*/s/ George P. Varghese*

George Varghese