# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

Civil Action No. 1:20-cv-457

| | |
|---|---|
| DEMOCRACY NORTH CAROLINA, *et al.*, ) | |
| ) | |
| Plaintiffs, ) | |
| v. ) | **STATE DEFENDANTS' RESPONSE** |
| ) | **TO LEGISLATIVE INTERVENORS'** |
| THE NORTH CAROLINA STATE ) | **MOTION FOR RELIEF UNDER THE** |
| BOARD OF ELECTIONS; *et al.*, ) | **ALL WRITS ACT** |
| ) | **[DE 155]** |
| Defendants, ) | |
| ) | |
| and ) | |
| ) | |
| PHILIP E. BERGER, etc., *et al.*, ) | |
| Intervenors. ) | |
| ) | |

## INTRODUCTION

Seeking to justify federal court intervention in state law issues, the Legislative Defendants disguise their collateral attack on a state-court proceeding as a request under the All Writs Act. Under the guise of acting "in aid of" this Court's jurisdiction, the Legislative Defendants effectively ask this Court to enjoin a parallel state-court proceeding that has already rejected their same basic arguments and entered judgment against them. The Court should reject that invitation.

The Legislative Defendants claim they are trying to protect this Court's injunction. They are wrong—and their arguments fundamentally mischaracterize the State

Defendants' actions in this case. The State Defendants respectfully take this opportunity to set the record straight.

The State Defendants have in no way flouted this Court's injunction. The injunction prohibits the State Board from rejecting ballots without a cure procedure for ballots that subject to cure. The initial cure procedure that the State Defendants issued complied with these requirements: it did not allow rejection of ballots without a cure procedure for ballots with deficient voter signatures. The State Board soon became aware that this cure procedure did not fully cover all ballots that could be remediated, and appeared to impact communities of color disparately, as compared to other voters. The State Board therefore issued a new cure memo that expanded the category of ballots with remediation procedures.

This cure memo also complied with this Court's injunction: it did not allow rejection of ballots without a cure procedure for ballots with deficient absentee ballot container-envelope information—all information that the State Board through its independent statutory authority and expertise determined were subject to remediation. It is this cure procedure that the Legislative Defendants seek to enjoin.

The Legislative Defendants' motion for an injunction under the All Writs Act is not their first bite at the apple. The first bite was when they vigorously opposed the State Defendants' motion for entry of a consent judgment in state court. Nor is it their second bite. That was their improper collateral federal attack on the state-court proceeding in the Eastern District of North Carolina, which is now the subject of a Fourth Circuit appeal.

2

This motion is their *third* bite at the apple of trying to disrupt the State's ability to maintain an orderly elections process.

The proper—and constitutional—venue for the Legislative Defendants to advance their ideas about how elections should be administered by executive officials is not through disruptive federal court litigation that delays resolution and finality, but through the legislative process. As the North Carolina court ruled on October 2, 2020, the State Board clearly had authority under North Carolina law to carry out the terms of the consent judgment that Legislative Defendants seek to challenge here. Legislative Defendants can attempt to change that law, consistent with the North Carolina Constitution, but in order to do so they must convince their colleagues to pass new legislation, subject to the Governor's veto. It is time for the Legislative Defendants to stop their attempts to bury elections officials with litigation in the middle of an election. At some point, for the sake of North Carolina voters, enough is enough.

## ARGUMENT

### I.    The All Writs Act Is Inapplicable to This Case.

The Legislative Defendants' attempt to make an end-run around the state-court proceedings fails. The All Writs Act provides that federal courts "may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651(a). The Legislative Defendants' maneuver satisfies none of these requirements.

The All Writs Act—an extraordinary remedy—is one that is used to "effectuate and prevent the frustration of orders it has previously issued in its exercise of jurisdiction

3

otherwise obtained." *Pennsylvania Bureau of Corrections v. United States Marshals Servs.*, 474 U.S. 34, 40 (1985). The All Writs Act is not typically adopted to accomplish what the Legislative Defendants attempt here: to force a policy choice that the movant would prefer, as the only way to comply with an injunction.

A. **An Injunction Under the All Writs Act Does Not Aid This Court's Jurisdiction.**

1. **The Purpose of the All Writs Act Is to Prohibit a Party From Evading the Federal Court's Jurisdiction.**

The purpose of the All Writs Act is to ensure that a federal court's judgment is not evaded. The Fourth Circuit's discussion in *SAS Institute, Incorporated v. World Programming Limited*, a case that the Legislative Defendants prominently cite, illustrates this purpose. 952 F.3d 513 (4th Cir. 2020).

In *SAS Institute*, judgment was entered against the defendant. But instead of paying the judgment, the company repeatedly engaged in litigation in the U.K. to collaterally attack the U.S. judgment and avoid payment. *Id.* at 521. By the time the Fourth Circuit got involved, the company had only paid a small fraction of the judgment. *Id.* The Fourth Circuit observed that the district court faced a "daunting situation," with its judgment under collateral attack in foreign courts. *Id.* at 524. Under these circumstances, and to protect its judgment and jurisdiction from a defendant that was flouting its authority, the Fourth Circuit held that the district court was "well within its rights to issue an injunction preventing" the U.K. judgments. *Id.* at 525-26; *see also Scardelletti v. Rinckwitz*, 68 F. App'x 472, 477 (4th Cir. 2003) (holding that the All Writs Act aids in jurisdiction when it enjoins parties from "attempting to relitigate decided

4

issues and to prevent collateral attack of its judgments."

The circumstances here could not be more different. The State Defendants are not trying to evade this Court's jurisdiction. Indeed, they have submitted to this Court's jurisdiction willingly, arguing that the collateral challenges launched by the Legislative Defendants in their preferred district be transferred to this Court, *over the Legislative Defendants' opposition. See Moore v. Circosta*, No. 5:20-cv-507-D, Dkt. 15 (State Defendants' motion to transfer the case to this Court); *id.*, Dkt. 21 (Legislative Defendants' opposition).

### 2. The State Board Is Not Attempting to Evade This Court's Jurisdiction.

The State Board's actions refute the claim that they are evading this Court. After this Court entered its injunction on August 4, the State Board set about to implement the cure procedure it had already been contemplating. In considering the cure provision, the State Board was mindful of this Court's injunction, which required two essential things: (1) no rejection of ballots *until* (2) there was a procedure in place that would afford due process for voters whose ballots contained a material error subject to remediation. Dkt. 124 at 187.

On August 22, 2020, the State Board instituted an initial cure process that allowed a voter to cure only those mistakes involving the voter signature, and provided voters whose ballots had been rejected an opportunity to be heard. Declaration of K. Bell, Dkt. 151-3, ¶¶ 6, 11 & Ex. A at 2. This cure procedure, the State Board believed, complied with this Court's injunction because it did not allow rejection of ballots until county

5

boards instituted the procedure to send cure affidavits to voters who had made mistakes on their signature and new ballots to those voters who made any other errors. *Id.*

Soon after absentee ballots started being issued, however, the State Board office began to receive numerous complaints that the absentee ballot container envelope instructions were overwhelmingly confusing to voters, and this was resulting in a sharper-than-expected increase in deficient ballots. *Id.*, ¶ 7.

At the same time, the Executive Director of the State Board also became aware of reports from numerous sources informing her that the absentee ballot voting process, in conjunction with the cure procedure, was resulting in the ballots of Black voters and other voters of color being rejected at a much greater rate than those of White voters. *Id.*, ¶ 8; *see also* Kaleigh Rogers, *North Carolina Is Already Rejecting Black Voters' Mail-In Ballots More Often Than White Voters'*, FiveThirtyEight (Sept. 17, 2020), https://fivethirtyeight.com/features/north-carolina-is-already-rejecting-black-voters-mail-in-ballots-more-often-than-white-voters/ ("As of September 17, Black voters' ballots are being rejected at more than four times the rate of white voters."); North Carolina Early Voting Statistics, https://electproject.github.io/Early-Vote-2020G/NC.html (detailing that, as of September 28, 2020, Black voters had a rejection rate of 4.3% while white voters had a rejection rate of 1.1%; Hispanic and Native American voters' ballots are being rejected at nearly three times the rate of white voters' ballots, and Asian voters' ballots are being rejected at more than twice the rate of white voters). As of September 28, in North Carolina alone, white voters had submitted 182,312 ballots, and 2,005 of those ballots had been rejected, while Black, Hispanic, Asian, and Native American

6

voters combined had submitted 83,102 ballots, and 2,075 had been rejected. North

Carolina Early Voting Statistics, https://electproject.github.io/Early-Vote-

2020G/NC.html.

After these concerning findings and the Board's assessment regarding the

inadequacy of the initial cure process in providing sufficient due process to voters whose

ballots would be rejected, *another* lawsuit was filed—the tenth against the State Board

challenging elections procedures for the November 2020 general election. Ex. A. That

lawsuit alleged that the cure process established in the initial cure memo still failed to

provide sufficient due process with respect to witness defects and disparately affected the

rights of certain protected classes of voters. *Id.*

Given the impact of the absentee ballot envelope instructions and the initial cure

procedure—which did not appear to allow voters a sufficient opportunity to cure ballots

and appeared to create racially disparate impacts on voters of color—the State Board

determined that the cure procedure needed to be further modified. Dkt. 151-3, ¶ 8.

The State Board did not reach that conclusion from the belief that the injunction in

this case *required* such action. The State Board believes that both the initial cure process

and the revised process comply with the injunction. But in the face of evidence of

disparate treatment of voters of color and the threat of new constitutional challenges in

the midst of the election cycle, and pursuant to section 163-22.2, the State Board

determined that it was necessary to formulate a new cure procedure that would treat all

voters fairly. *Id.*; *see also* N.C. Gen. Stat. 163-22.2 (giving the State Board authority to

make interim rules and regulations with respect to pending primary or general elections

7

when a statute is held unconstitutional or invalid by a State or federal court or in consideration of a settlement of litigation). The State Board did so with the understanding that this new cure procedure, like the initial procedure, would still have to abide by this Court's injunction, but it would also allow the State Board to comply with its other legal obligations as well.

The State Board also bore in mind this Court's admonition, when it issued its August 4, 2020 Order, that "Plaintiffs have raised genuine issues of concern with respect to the November General Election. Should Legislative and Executive Defendants believe these issues may now be discounted or disregarded for purposes of the impending election, they would be sorely mistaken." Dkt. 124 at 184. Since that order, the Legislative Defendants and their legislative colleagues have not provided further legislative solutions or direction. The State Board, however, has exercised its statutory authority to implement measured steps to address legitimate concerns.

The State Board staff paid particular attention to the witness requirement, which was the reason an overwhelming number of ballots were being rejected. *Id.*, ¶ 9. The Board staff focused on honoring the central purpose of the witness requirement: To prevent the voter from having her ballot stolen, marked without her knowledge, and returned to be counted. *Id.* In short, the central purpose of the witness requirement is to prevent fraud by ensuring that the eligible, registered voter is the person who actually marked her ballot. *See also* Certification on absentee ballot container envelope (confirming that the voter marked the ballot or caused it to be marked in the voter's presence).

8

The State Board staff then began developing a witness cure procedure that would fulfill that purpose by allowing a voter herself to confirm that her ballot was not stolen. Dkt. 151-3, ¶ 9. This would allow a voter to reduce her risk to infection from COVID-19 by only requiring her to expose herself *once* (during the initial marking of the ballot), rather than having to risk repeated exposure to correct any deficiencies in the witness certification procedure. *Id.* In addition, it was the assessment of the Executive Director that allowing a voter herself to cure the witness requirement would address potential confusion from the design of the absentee ballot container envelope as well as the process's racially disparate rejection rates. *Id.*

The new witness cure procedure would require county boards to contact a voter directly to confirm that the voter is the person who marked her ballot. *Id.* In this way, the county board official would, in essence, act as the voter's witness (though not contemporaneously with the marking of the ballot). The State Board staff believed that this would be an effective anti-fraud measure because a county board employee would communicate with each voter in the manner that the voter designated on her absentee ballot request form. Requiring a voter to confirm, through preapproved personal channels of communication, that she is in fact the person who voted her ballot is an appropriate cure procedure that avoids the need for the voter to mark an entirely new ballot.

The Legislative Defendants note that the Executive Director, in her testimony before this Court, stated that a missing witness signature would normally, under the procedure at that time, require the county board to spoil the ballot and the voter to mark a

new one.  Dkt. 155 at 13-14.  Of course that is true.  A witness must contemporaneously witness and sign a ballot—a witness would not be able to re-witness a ballot later unless the voter were marking a new one.  Dkt. 151-3, ¶ 4.  But that does not mean that a missing witness signature can never be remediated through other means that fulfill the same purpose as the signature.  It is this remediation procedure that the State Board determined should be put in place.

This cure procedure does not require—or even allow for—the elimination of the witness requirement entirely.  Elimination of the witness requirement would require that a county board simply accept a ballot even if it does not have a witness signature or witness information.  Instead, this cure procedure requires that a ballot without a witness signature or information must *not be accepted*, but must be held pending further action that fulfills the purpose of the witness signature.  Under this process, a voter who makes a mistake in following the witness certification requirement must be contacted by the county board and must take extra affirmative steps to confirm the same thing that the witness signature confirmes—i.e., that the voter whose ballot is being counted is the person who completed that ballot.  Once the voter affirms this, after being contacted by a board employee, she must send the certification back directly to the county board of elections.  The procedure is not an end-run around the witness signature, but rather a series of additional actions that a voter must take to confirm that she is the person who actually marked her ballot, if she made a mistake on the first attempt.

In a unanimous, bipartisan vote, after lengthy discussion, the State Board approved the new cure procedure for witness information during the November 2020 election

10

cycle.  This new procedure, the State Board believed, complied with this Court's injunction because it did not allow rejection of ballots until county boards instituted the procedure to send cure affidavits to voters who had made mistakes on their absentee ballot container envelopes.  The primary difference between the initial cure procedure and the new cure procedure was an expansion of the types of mistakes that the Board deemed subject to remediation.

By being mindful at each step of the requirements of this Court's injunction, the State Defendants have not evaded this Court's jurisdiction.  Rather, they have submitted themselves consistently to it and operated within the boundaries of their understanding of what the injunction requires.  The Legislative Defendants' invocation of the All Writs Act is unnecessary to aid this Court in protecting its jurisdiction.

**B.  An Injunction Under the All Writs Act Is Neither Necessary Nor Appropriate.**

The cure procedure is not a collateral attack on the Court's preliminary injunction order and does not frustrate that order.

First, the State Board's decision to modify the original cure procedure is not a collateral attack on the Court's preliminary injunction order.  Rather, the State Board has at all times had the good-faith belief that the modified process does not violate any aspect of the Court's preliminary injunction order.  Moreover, on October 2, 2020, a North Carolina state court separately ordered the State Board to implement the modified cure procedure on independent state-law grounds.  As shown below, granting additional relief

11

under state law is not a collateral attack on the relief that the Court has ordered under federal law.

The State Board understood the Court's admonishment to not "discount[] or disregard[] for purposes of the impending election" the concerns the plaintiffs raised here as encouragement for the Board to be proactive in responding to problems in administering this fall's general election as they emerged. The new cure process was a good-faith effort to continue to honor this Court's order while also complying with other legal obligations. *See supra*.

While the Court's injunction did not require the State Board to establish the revised cure procedure, the fact that the revised procedure includes provisions not specifically required by the injunction does not mean that the procedure is a "collateral attack" on the Court's order. The Court's order holds that federal due process demands a cure process, so that voters could remedy problems with their absentee ballots. *Id.* at 150-60. But the Court did not specify what that process must include, and did not hold that the State Board could not take *other steps* under state law to ensure that all North Carolinians could vote, beyond the bare minimum that due process demands under federal law. Nor could the Court have limited the Board from taking additional measures, as states are free to provide "greater protection" to their citizens "under [their own] state constitution[s and statutes] than is afforded under" the U.S. Constitution. *Michigan v. Long*, 463 U.S. 1032, 1038 (1983).

Notably, the federal-law claims that the plaintiffs in this case filed in federal court are not the only claims that have been filed against the State Board concerning this fall's

12

election. Among other lawsuits, the N.C. Alliance for Retired Americans also sued the State Board in state court, alleging, *inter alia*, that the witness requirement for absentee ballots violated the North Carolina Constitution. *See N.C. Alliance for Retired Americans*, No. 20 CVS 8881 (N.C. Super. Ct.).

Last week, a North Carolina superior court held that the plaintiffs in the *NC Alliance* case were "likely to succeed on the merits of their [state] constitutional claims" concerning the witness requirement. *See* Order, ¶ 17. Given the litigation risk that the State Board faced under the North Carolina Constitution, the superior court approved a consent judgment that the State Board negotiated with the *NC Alliance* plaintiffs because, among other reasons, the settlement is "fair, adequate, and reasonable," and because the State Board had "a strong incentive to settle this case to ensure certainty on the procedures that will apply during the current election cycle." *Id.* ¶¶ 18, 21.

The superior court also held that the State Board has statutory authority to enter into the consent judgment, for multiple reasons. *See id.* ¶¶ 22-24. First, the State Board had authority to enter into the consent judgment under section 163-22.2 of the North Carolina General Statutes, which authorizes the State Board, "upon recommendation of the Attorney General, to enter into agreement with the courts in lieu of protracted litigation until such time as the General Assembly convenes." Second, the superior court also held that the State Board had authority to grant the relief in the consent judgment under section 163-27.1, which allows the State Board's Executive Director to "exercise

13

emergency powers to conduct an election in a district where the normal schedule for the election is disrupted by" a "natural disaster."[1]

Thus, the superior court ordered the State Board to implement the amended cure process to resolve the *NC Alliance* plaintiffs' claims under the North Carolina Constitution. *See* Consent Judgment at 15, ¶ C. In no way does this independent state-law relief for North Carolina voters constitute a collateral attack on the Court's preliminary injunction, which protected the due process rights of voters under federal law. If it did, then any relief ordered by state courts under state law that exceeded the scope of federal constitutional rights would be a collateral attack on orders entered by federal courts that protect overlapping rights. But the Supreme Court has already clearly held that the U.S. Constitution creates a floor, not a ceiling, on rights: States may provide "greater protection" to their citizens under state law "than is afforded under" federal law. *Long*, 463 U.S. at 1038. That is all that has occurred here. No injunction is necessary appropriate to unwind the State Board's actions.

Nor is an injunction appropriate in these circumstances. Generally, courts do not grant relief under the All Writs Act where a party has a separate remedy. "The All Writs Act is a residual source of authority to issue writs that are not otherwise covered by statute." *Calderon v. Thompson*, 523 U.S. 538, 554 (1998). "Where a statute specifically

---

[1]     In their memorandum of law, the Legislative Defendants again make the baseless assertion that the Elections Clause of the U.S. Constitution divests state executive officials and state courts of any authority to regulate election procedures. Rather than restate its arguments on the Elections Clause here, the State Board respectfully refers the Court to its responses to the motions of the Legislative Defendants' for a temporary restraining order and a preliminary injunction.

14

addresses the particular issue at hand, it is that authority, and not the All Writs Act, that is controlling." *Id.* The proper vehicle for the Legislative Defendants' requested relief is not the All Writs Act here. Rather, it is the challenge they continue to mount in state court, where the cure procedure was entered as part of judgment. In addition, the Legislative Defendants have also mounted a baseless collateral challenge in federal court, separate from the relief they seek in state court. While that challenge is improper, it is still ongoing and is certainly yet another avenue for the Legislative Defendants' requested relief. The Court should not entertain this extraordinary writ here, where other avenues for relief exist and would be more appropriate.

### C. An Injunction Under the All Writs Act Is Not Agreeable to the Principles and Usages of Law.

The State Defendants are in no way attempt to frustrate this Court's jurisdiction. Rather, the Legislative Defendants are attempting to use this Court to frustrate the implementation of a judgment of a state court.

One cardinal principle of the All Writs Act is that it does not independently confer jurisdiction and cannot be used to avoid compliance with the requirements of other statutes. *Syngenta Crop Protection, Inc. v. Henson*, 537 U.S. 28, 32-33 (2002).

"A court's authority under the All Writs Act is nowhere more limited than when it is asked to enjoin a proceeding in state court." *United States v. Purdue Frederick Co.*, 963 F. Supp. 2d 561, 567 (W.D.Va. 2013). A court may not "grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments." 28 U.S.C.

15

§ 2283. "Prevention of frequent federal court intervention is important to make the dual system work effectively." *Chick Kam Choo v. Exxon Corp.*, 486 U.S. 140, 146 (1988). The Fourth Circuit "take[s] seriously the mandate in the Anti-Injunction Act and recognize[s] that for over two hundred years, the Act has helped to define our nation's system of federalism." *Employers Resource Mgmt. Co. v. Shannon*, 65 F.3d 1126, 1130 (1995). But this inappropriate intervention is precisely what the Legislative Defendants are asking this Court to do here.

When the State Board moved for entry of the consent judgment in state court, the Legislative Defendants did not seek relief from this Court. Had they thought Numbered Memo 2020-19 violated this Court's order, surely, they would have filed their objection with this Court immediately. But they did not. Instead, they filed a collateral challenge to the joint motion for entry of a consent order in the Eastern District of North Carolina, explicitly asking that court to issue a TRO *before the state court had a chance to rule*. Ex. B at 3. Indeed, the Legislative Defendants' resisted transferring their case to this Court, until after a hearing. *See supra*.

Now, however, the Legislative Defendants are attempting to use this case—in addition to their separate collateral challenge—to enjoin the cure procedure already entered by the state court after it considered and rejected the Legislative Defendants' arguments. In essence, they are asking this Court to sit in judgment of an action that a state court has taken. This is a textbook violation of the Anti-Injunction Act and is not "agreeable to the principles and usages" of the law.

None of the exceptions to the Anti-Injunction Act apply. The three exceptions

16

"are construed narrowly, . . . and are not [to] be enlarged by loose statutory construction."
*Employers Resource Mgmt. Co.*, 65 F.3d at 1130.  But, as discussed *supra*, the injunction
they request is not necessary to aid this Court of jurisdiction.

Nor does the "relitigation exception" apply.  The relitigation exception was
designed to permit a federal court to prevent state litigation of an issue that was
previously presented to and decided by a federal court.  *In re Am. Honda Motor Co.*, 315
F.3d 417, 440 (4th Cir. 2003).  But the State Board does not seek to have the state court
relitigate issues presented here.  Indeed, the inclusion of the new cure procedure in the
state-court consent judgment was based on *state constitutional law*—issues never raised
in this Court.  Rather, what is true is that Legislative Defendants are the ones seeking to
relitigate issues that were decided in state court in the federal collateral challenges and
here.  The Anti-Injunction Act's relitigation exception certainly does not apply.

Finally, there are no equitable considerations that would counsel this Court to
disregard the principles of comity, federalism, and equity.  "Before exercising its
equitable power to enjoin the state proceeding, the District Court must find the plaintiff
threatened with great and immediate irreparable injury that cannot be eliminated by his
defense to the state proceeding." *Younger v. Harris*, 401 U.S. 37, 46 (1971).  The
Legislative Defendants have shown that they can, indeed, raise these same considerations
and oppose the cure procedure in state court.

Indeed, *they have already done so*. After aggressive litigation in the trial court, the
Legislative Defendants have now appealed the superior court's entry of the consent
judgment in the *NC Alliance* case to the North Carolina Court of Appeals and sought a

17

stay of that judgment from that court. No equitable considerations exist sufficient to allow the Legislative Defendants to circumvent the Anti-Injunction Act. Their request under the All Writs Act should therefore be denied.

## II. The Legislative Defendants Should Not Be Permitted to Use *Purcell* as a Sword and a Shield.

When the State Board implemented the new cure procedure in September, it left in place all of the relief that the original version of the cure procedure had made available to voters and implemented a limited expansion of the procedures. Any disruption of that cure process has not been caused by the State Board, but rather by the Legislative Defendants and the other plaintiffs in the federal collateral challenges, who moved to enjoin that cure procedure. If the TRO entered in the collateral challenge is lifted or stayed, then any disruption of the cure process will cease immediately. As the State Board has explained elsewhere, the claims raised in the federal collateral challenges are meritless, and therefore provide no basis for enjoining the State Board from implementing the new cure procedure, which only supplements the relief that the Court has already granted voters under federal law with additional relief under state law.

Indeed, if this Court were to issue a second injunction as Legislative Defendants request, that result would be especially problematic. In their memorandum of law, the Legislative Defendants explain at length that in *Purcell* and other cases, "the Supreme Court 'has repeatedly emphasized that lower federal courts should ordinarily not alter the election rules on the eve of an election.'" Dkt. 155 7 (quoting *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205, 1207 (2020) (per curiam)).

18

But that kind of intrusion by lower federal courts into state election processes is precisely what the federal TROs threaten, and what the Legislative Defendants ask the Court to do again by entering further injunctive relief in this case. The Legislative Defendants have now asked multiple federal courts to stop state officials from dealing with potential disruptions to this fall's elections—including an extraordinary pandemic that has affected the life of every North Carolinian, across the entire state, and related mail delays that the Postal Service has specifically warned North Carolina of the need to address— in the manner provided for by North Carolina law.

If the Legislative Defendants believe that the State Board and the state superior court exceeded their authority in entering into and approving the consent judgment in the *NC Alliance* case, their remedy is to appeal the state court's judgment, just as they have done. Given the federalism principles reflected in *Purcell*, this Court is not the proper forum for litigation over the propriety of measures taken under state law.

## <u>CONCLUSION</u>

For the foregoing reasons, the Legislative Defendants' motion for relief under the All Writs Act should be denied.

This the 6th day of October, 2020.

JOSHUA H. STEIN
Attorney General

/s/ Alexander McC. Peters
Alexander McC. Peters
N.C. State Bar No. 13654
Chief Deputy Attorney General

19

Email: apeters@ncdoj.gov

N.C. Dept. of Justice
Post Office Box 629
Raleigh, NC 27602
Telephone: (919) 716-6900
Facsimile: (919) 716-6763

20

## CERTIFICATE OF WORD COUNT

Pursuant to Local Rule 7.3(d)(1) and the Order entered by the Court on October 2, 2020 (DE 152), the undersigned counsel hereby certifies that the foregoing Memorandum, including body, headings, and footnotes, contains 5,021 words as measured by Microsoft Word.

This the 6th day of October, 2020.

/s/ Alexander McC. Peters
Alexander McC. Peters
Chief Deputy Attorney General